**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bard Peripheral Vascular, Inc.; David Goldfarb, M.D., <br><br>    Plaintiffs, <br><br>vs. <br><br>W.L. Gore & Associates, Inc., <br><br>    Defendant. <br>_____ <br>W.L. Gore & Associates, Inc., <br><br>    Counterclaimant, <br><br>vs. <br><br>Bard Peripheral Vascular, Inc., David Goldfarb, M.D., and C.R. Bard, Inc., <br><br>    Counterdefendants. <br>_____ | No. CV 03-0597–PHX-MHM <br><br>**ORDER** |

Currently before the Court are the parties' objections and comments (Doc.315-16, 329-34) to the Special Master's Report and Recommendations on Claim Construction ("Report"). (Doc. 314). The Court heard oral argument on the issues on May 12, 2006. The Court has reviewed the parties' filed objections and comments, the transcript of the claims construction hearing before the Special Master, and all relevant documents that have been submitted, including the additional case law cited at the hearing.

Defendant W.L. Gore & Associates, Inc. ("Gore") has filed objections to three specific portions of the Special Master's Report and Recommendation. Plaintiffs ("Bard") have filed comments to the Special Master's Report and Recommendation but have not submitted any objection for review by this Court.

In its first objection, Gore has cited paragraph 55 of the Report wherein the Special Master recommends that "all claims mentioning 'ingrowth' in the body or the whereby clause require that the ePTFE structure, at a minimum, allows fibroblasts and red blood cells to enter the pores of the node and fibril microstructures of the ePTFE component of the graft." It is further stated in this paragraph that "the Special Master recommends that for those claims that recite that the ePTFE structure 'permits tissue 'ingrowth,' i.e., claims 20-24 and 27, the structure must allow organized host tissue to grow into the pores of the node and fibril microstructure." Gore contends that this proposed construction is partially erroneous because it does not add that all such ingrowth must be "transmural", i.e., through the wall. Gore argues in support of this contention that the Special Master failed to apply clear and consistent teaching of the patent specification describing ingrowth as "transmural" and that Dr. Goldfarb asserted "transmural" ingrowth to overcome a rejection by the patent examiner.

As to the first prong of its argument, Gore refers to a recitation in the specification at Col. 3, lines 40-55 which states as follows:

> ... the invention constitutes a prosthetic vascular device formed from a small bore tube of polytetrafluoroethylene which has been heated, expanded and sintered so as to have a microscopic superstructure of uniformly distributed nodes interconnected by fibrils and characterized by: (a) an average internodular distance which is (i) large enough to allow transmural migration of typical red cells and fibroblast, ...

Gore claims that this language indicating that the invention "constitutes" a prosthetic vascular device that "allow[s] transmural migration of typical red cells and fibroblast" refers to required "transmural ingrowth" since that is the description of what the invention "constitutes."

The Court concludes that the Special Master's recommended findings are not erroneous on this issue. The specification does not require complete transmural ingrowth as

- 2 -

1 indicated by the words "to allow" which is permissive rather than restrictive. The Special
2 Master indicated that the specification actually discloses that the objective is that the
3 invention provides a structure that "will allow" transmural cellular ingrowth and assure the
4 establishment of a viable neointima. (Report, para. 46). As noted by the Special Master, Gore
5 made this argument even though claims 1-6, 8-11 and 17-19 mention ingrowth in the
6 "whereby" clause; claims 20-24 and 27 recite "which permits tissue ingrowth"; and claims
7 14-16 and 25-26 do not mention ingrowth at all. (Report, para. 39). The Special Master
8 further based his recommended finding on the recitation in claim 20 that the structure
9 "prevent transmural blood flow" indicating that the applicant knew how to use the term
10 "transmural" when he wanted to but did not use it when describing ingrowth in the claims.
11 (Report, para. 44). As discussed by the Special Master, providing objectives in a
12 specification does not create claim limitations, citing Phillips v. AWH Corp., 415 F.3d 1303,
13 1327 (Fed.Cir. 2005). (Report, para. 45).

14 In support of its objection, Gore relies on Nystrom v. Trex Co., Inc., 424 F.3d 1136
15 (Fed. Cir. 2005), as holding that the true test is what the patentee actually described in his
16 specification as his invention. In Nystrom, in the Summary of Invention, the patent described
17 the invention as a "decking board ... which also yields a superior product when cut from a
18 log, ..." Id., 424 F.3d at 1139. The Federal Circuit affirmed the district court's claim
19 construction that the word "board" in independent claim 1 meant a "piece of elongated
20 construction material made from wood cut from a log." Id., at 1142-46. After noting that
21 the claims at issue did not include any language describing the "board" as cut from a log or
22 necessarily being made of wood, the court examined the term "board" in the context of the
23 written description and prosecution history of the patent and concluded that the term "board"
24 must be limited to wood cut from a log. Id., at 1143. It was determined that the patentee had
25 consistently used the term "board" to refer to wood cut from a log. Id., at 1145. In the other
26 cases Gore has cited, Kinik Co. v. Int'l Trade Comm'n, 362 F.3d 1359 (Fed. Cir. 2004), and
27 Lizardtech, Inc. v. Earth Resource Mapping, Inc., 424 F.3d 1336 (Fed. Cir. 2005), the
28 patentee's repeated references in the specification limited the construction of the claims.

1    As discussed above, however, the description at issue in the case at bar does not require complete transmural ingrowth as indicated by the words "to allow" which is permissive rather than restrictive. The Court agrees with the Special Master that the applicant did not use the term "ingrowth" in a manner consistent with only one meaning. The Court also agrees with the Special Master that the reference to transmural ingrowth and neointima formation as objectives in the specification does not create a claim limitation. See Col. 3, lines 27-30 ("...it is a major objective of the present invention to provide a homogeneously porous vascular prosthesis characterized by small nodes interconnected by extremely fine fibrils to form an open superstructure which will allow uniform, controlled transmural cellular ingrowth and thereby assure the establishment and maintenance of a thin, viable neointima ...").

As for the second part of Gore's objection, Gore cites <u>Seachange Intern., Inc. v. C-COR, Inc.</u>, 413 F.3d 1361 (Fed.Cir. 2005), which involved a method and apparatus for redundantly storing video data in "distributed computer systems." Claim 1 of the patent was said to require "interconnecting each one of said processor systems in a point-to-point two way channel interconnection with each other one of said processor systems." <u>Id.</u>, at 1369. Claim 37 was identical to claim 1 except that claim 37 required only that the interconnection be through a "network for data communications." <u>Id</u>. The applicant argued during the prosecution to overcome and to distinguish references that the prior art did not suggest connecting each processor via point-to-point, two-way channel interconnections. The Federal Circuit agreed with C-COR that the "[a]]pplicant's arguments made during the prosecution narrowed the scope of the 'network for data communications' limitation in claim 37(40) to cover only a point-to-point network." <u>Id.</u>, at 1372. The Federal Circuit set forth the applicable principles as follows:

> Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language. [<u>Rheoux, Inc. v. Entact, Inc.</u>, 276 F.3d 1319, 1325(Fed.Cir. 2002)] ("Explicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations"); <u>Ekchian v. Home Depot, Inc.</u>, 104 F.3d

- 4 -

>1299, 1304 (Fed.Cir. 1997)("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."). A disclaimer must be clear and unambiguous.

Id., 413 F.3d at 1372-73.

In this case, the Special Master has recommended that the applicant distinguished the prior art on the basis that it had no ingrowth at all, not on the degree of the ingrowth. (Report, para. 53). The Special Master found no unambiguous statement that the ingrowth in the patented invention must be complete and transmural, even though that is an objective of the invention. (id.). The Special Master based his recommended conclusion on a thorough review of the record and applicable case law. The Court agrees with the Special Master's recommendation and does not find this recommended conclusion erroneous in light of Gore's argument or the case law cited in support. Gore's objections regarding the Special Master's recommended construction of the phrase "which permits transmural ingrowth" are overruled.

Next, Gore contends that the Special Master erred in failing to construe claims 20-27 as requiring a uniform distribution of nodes. Gore states that it does not challenge the Special Master's recommended construction that all claims that recite a "substantially uniform distribution of nodes" as needing to satisfy that element but that claims 20-27 should have been included in that recommended construction even though the requirement is not expressly stated in those claims. Gore argues that the Special Master's rationale for excluding claims 20-27 as requiring a uniform distribution of nodes, that is, that these claims were added some time after Dr. Goldfarb's reliance on the requirement to overcome the prior art, does not withstand scrutiny. Gore refers the Court to paragraph 54 of the Report and Recommendation in which the Special Master discussed the case law relevant to the applicability of earlier arguments to later-added claims as generally requiring the presence of the same limitation or term addressed in or relevant to the prior arguments. The Special Master further noted in paragraph 54 that in limited cases the totality of the prosecution history may require such restriction even when the relevant term or limitation has been excluded from the language of a later claim, citing Alloc, Inc. v. Int'l Trade Comm'n, 342

- 5 -

F.3d 1361, 1372 (Fed.Cir. 2003). Gore relies on <u>Alloc</u> in support of its present objection. The Special Master recommended in paragraph 54 that the prosecution history of the present case, unlike that in <u>Alloc</u>, does not contain arguments accompanying the later claims indicating that the "ingrowth" requirement remained a basis of patentability.

With respect to his discussion regarding the construction of the terms "substantially uniform distribution of nodes" at section E of the Report, the Special Master observed that the phrase appears in claims 1-6, 8-11, and 14-19 but that Gore had asserted that the limitation should apply to all of the asserted claims. (Report, para. 63). At paragraph 67 of the Report, the Special Master rejected Gore's argument, stating his recommendation as follows:

> However, the Special Master does not agree with Gore that the specification or the prosecution history lend some special meaning to the phrase. Though both contain statements as to the importance of uniform distribution of nodes, none provides the sort of unambiguous disclaimer or definition required to depart from the words of the claim themselves. Thus, the Special Master's construction of the phrase applies only to those particular claims in which it appears, i.e., claims 1-6, 8-11, and 14-19.

(Doc. 314, para. 67).

Gore's present objection relies on language recited from the specification at Col. 3, lines 40-44, to the effect that the "invention constitutes a prosthetic vascular device formed ... so as to have a microscopic superstructure of uniformly distributed nodes interconnected by fibrils ..." As the Special Master has recommended, the specification and prosecution history "[b]oth contain statements as to the importance of uniform distribution of nodes, none provides the sort of unambiguous disclaimer or definition required to depart from the words of the claim themselves." (Report, para. 67). Claims 20-27 do not recite the phrase "uniform distribution of nodes" at all much less as a requirement. While claims must be interpreted in light of the specification, the Court must avoid impermissibly importing limitations from the specification. <u>Alloc</u>, 342 F.3d at 1370 (cited references omitted). <u>See</u>, <u>Callicrate v. Wadsworth Mfg., Inc.</u>, 427 F.3d 1361, 1368 (Fed.Cir. 2005)(it is improper to import

1    limitations from the specification into the claims, and thereby restrict the claims to coverage
2    of a limited embodiment).  Gore's objection is overruled.

3    As to Gore's third objection, Gore states that the parties and the Special Master have
4    agreed that an identical construction should be given to each of the introductory terms in each
5    of the claims, that is, "prosthetic vascular structure," "prosthetic vascular graft", and
6    "artificial vascular prosthesis".  (Doc.315, at p. 11).  The Special Master has recommended
7    that these terms be defined as "a structure used to replace, repair, augment, or bypass blood
8    vessels." (Report, para. 26).  Gore contends that the proposed construction is improper to the
9    extent that it includes "augment" or "repair."  Gore contends that the operative word is
10   "prosthesis" or its adjective form "prosthetic" as referring to "an artificial device to replace
11   a missing part of the body."  In support of this definition, Gore refers to the definition set
12   forth in *Webster's Third New International Dictionary* (1972 ed.), noting that medical
13   dictionaries published in 1981, 1985 and 1993 were in accord.  Gore challenges Bard's
14   reference in its opening <u>Markman</u> brief that the meaning of the term "prosthesis" has been
15   expanded in or about 2003 to include "an artificial device to replace or *augment* a missing
16   or impaired part of the body." (emphasis supplied).  (Doc. 315, at p. 12).

17   As part of its objection, Gore contends that the Special Master was incorrect when he
18   stated at paragraph 13 of his Report that "Gore does not dispute that these terms' generally
19   understood meaning in the art would extend to structures used to repair or augment blood
20   vessels ..."  Gore contends that it has expressly denied that "augment" was part of a 1974
21   definition of prosthesis and that it has never asserted any argument about "repair" in the
22   proceedings.  (Doc. 315, at p. 12).

23   At paragraph 14 of the Report, the Special Master noted that Gore had disagreed that
24   it had conceded that any relevant dictionary definition of prosthesis, prosthetic structure or
25   graft includes devices used to repair or augment blood vessels.  The Special Master went on
26   to note in paragraph 14 that at the claims construction hearing, Gore had specifically
27   acknowledged that there are such things as "patch grafts" or "patch prostheses" but had
28   argued that the claims could not cover such structures because "there is no disclosure of a flat

- 7 -

1  patch ... [and] [t]he only description is tubular", citing the hearing transcript. The Special
2  Master further observed that Gore had stressed that the claims cover structures used to
3  "replace and bypass but not repair" "because of the specification", again citing the hearing
4  transcript.

5  As part of this present objection, Gore further argues that there is nothing in the
6  intrinsic record, or the 1974 extrinsic record, which supports the Special Master's
7  recommended conclusion that his construction "reflects the understanding of the meaning of
8  these phrases to one skilled in the art based on the patent and the rest of the intrinsic record",
9  as set forth at paragraph 25 of the Report. Gore therefore contends that there is no support
10 in the intrinsic record, or in the 1974 extrinsic record, for "prosthesis" to be construed to
11 include devices which "repair" or "augment."

12 In paragraph 14, the Special Master recommended that, despite whether Gore's
13 statements at the hearing can be considered concessions, "intrinsic evidence from the patent's
14 prosecution history contains references that indicate that one skilled in the art of the
15 invention at the time of the application would understand the terms 'graft' and 'prosthesis' to
16 include devices used to patch, and thus repair or augment, a blood vessel." The Special
17 Master in support of the recommended finding cited four scientific articles which were prior
18 art references listed on the first few pages of the patent. These articles indicated that patches
19 or patch grafts were known in the prior art by 1974.

20 The Special Master analyzed the issue based on a thorough discussion set forth in
21 several paragraphs of his Report. (Report, paras. 16-25). The Special Master considered
22 whether the words should be accorded their ordinary meaning in the art or whether this
23 meaning should be narrowed by the disclosure of the patent specification. (Report, para. 16).
24 As part of his proposed findings, the Special Master, after citing relevant case law,
25 recommended that the embodiments are exemplary and not restrictive. (Report, para. 21).
26 The Special Master also found in part that "there was no disclaimer of non-tubular or non-
27 sutured embodiments, or of embodiments used to repair or augment a blood vessel." (Report,
28 para. 23). The Special Master specifically noted that "[t]he patent also expressly states that

1  the claimed prosthesis 'may assume many embodiments and configurations other than those
2  specifically set forth and described' in the specification, providing examples," referring to
3  Col. 9, lines 20-28.  (Report, para. 21).  The Special Master supported his recommended
4  conclusion with a thorough analysis of the issue and case law.  The Special Master has
5  recommended that the phrases be construed as "a structure used to replace, repair, augment
6  or bypass blood vessels" (Report, para. 26), stating that he has "articulated the construction
7  using language that he believes more simply reflects the understanding of the meaning of
8  these phrases to one skilled in the art based on the patent and the rest of the intrinsic record."
9  (Report, para. 25).

10        The Court has considered Gore's objection based on a recitation in the specification
11 that "a principle objective of the invention" is to "provide a prosthetic vascular structure
12 capable of replacing or bypassing natural blood vessels...", citing Col. 1, lines 25-27, as well
13 as Gore's objection based on the absence of any pre-1974 dictionary definition that included
14 "repair" or "augment."  The Court also has considered Gore's objection regarding the Special
15 Master's consideration of pre-1974 scientific articles as indicating that the devices could be
16 used "to patch" and "thus repair or augment" a blood vessel.  The Special Master set forth
17 his legal conclusions in part at paragraph 17, including that "[c]laims may cover such after-
18 arising technology, which logically can never be described in the patent specification.
19 (citation omitted)."  See also the Report at paras. 18, 21-22 & 25.  The Special Master gave
20 the terms their ordinary meanings to persons of skill in the art at the time of the invention
21 based on the patent and the rest of the intrinsic record.  This recommended construction is
22 consistent with Phillips, 415 F.3d at 1313 ("the ordinary and customary meaning of a claim
23 term is the meaning that the term would have to a person of ordinary skill in the art in
24 question at the time of the invention, i.e., as of the effective filing date of the patent
25 application.").  The Court is in agreement with the recommendation of the Special Master.
26 Gore's objection is overruled.

27       Bard has asked that the Court adopt the constructions in the Special Master's Report
28 and Recommendation, subject to and reserving its rights on appeal as to the one objection it

- 9 -

1  made to the Special Master's preliminary report.  Bard objected to the Special Master's
2  construction of the term "substantially uniform distribution of nodes" which appears in
3  claims 1-6, 8-11, and 14-19.  (Doc. 316, at page 5 n. 3). Bard has not raised this objection to
4  this Court and therefore it has not been considered.

5  **Accordingly**,

6  **IT IS ORDERED** that Gore's objections to the Special Master's Report and
7  Recommendation (Doc. 315) are overruled.

8  **IT IS FURTHER ORDERED** adopting the Report and Recommendation of the
9  Special Master (Doc. 314) in its entirety as the Order of this Court.

10  DATED this 16th day of September, 2006.

Mary H. Murguia
United States District Judge