**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bard Peripheral Vascular, Inc.; David Goldfarb, M.D., <br><br>　　　　　Plaintiffs, <br><br>vs. <br><br>W.L. Gore & Associates, Inc., <br><br>　　　　　Defendant. <br>_____ <br>W.L. Gore & Associates, Inc., <br><br>　　　　　Counterclaimant, <br><br>vs. <br><br>Bard Peripheral Vascular, Inc., David Goldfarb, M.D., and C.R. Bard, Inc., <br><br>　　　　　Counterdefendants. <br>_____ | No. CIV 03-0597–PHX-MHM <br><br>**ORDER** |

Defendant W.L. Gore & Associates, Inc. ("Gore"), has filed a renewed motion to pierce the privilege/work product claims relating to the work of Dr. J.G.R. Volder. (Doc. 324). Plaintiffs (collectively referred to as "Bard") have filed a response opposing the motion (Doc. 325) and Gore has filed a reply. (Doc. 326). The parties have provided supplemental briefing by way of Bard's sur-reply (Doc. 327) and Gore's response to Bard's sur-reply. (Doc. 328). The Court has considered all briefing filed by the parties. The Court heard oral argument on Gore's renewed motion on May 12, 2006 and now enters this Order.

By way of background, Gore as part of its counterclaim has asserted that the Goldfarb patent is unenforceable as a result of alleged inequitable conduct during the patent application process. Gore alleges that this inequitable conduct includes knowingly and deliberately failing to name the proper inventors in at least some claims of the Goldfarb patent application. In an Order dated March 25, 2004 (Doc. 91), the Court granted in part Gore's motion to compel discovery regarding the inventorship issue within the time frame of a September 9, 1974 meeting allegedly held to discuss the identity of the inventor through October 24, 1974, the date of the patent application.

In an Order filed September 30, 2005 (Doc. 311), the Court considered Gore's motion to expand the scope of the waiver and pierce the privilege/work product immunity on the issue of inventorship. As discussed in that Order, Gore had developed the ePTFE tubes and was engaged in research with surgeons across the country to develop the tubes for use as vascular grafts. The surgeons Gore supplied with ePTFE tube samples included Dr. J.G.R. Volder of the University of Utah and Plaintiff Dr. Goldfarb of the Arizona Heart Institute ("AHI"), among others. According to Gore, Dr. Volder's work involving the ePTFE tubes began in 1972 and in November 1973 Volder published an article that described his work. In mid-1974, several present or former Gore and AHI employees formed a new company to manufacture and sell ePTFE vascular grafts in competition with Gore. These persons included Drs. Goldfarb and Volder, among others, and this new company was initially known as Impra, now known as Bard Peripheral Vascular, a Plaintiff in the present action. (Doc. 311, at pp. 14-15).

Gore contends that Dr. Volder achieved successful results with other ePTFE tubing before Dr. Goldfarb and that Volder's work was recorded in a laboratory notebook. A copy of Dr. Volder's notebook was entrusted to Impra's then attorney, Samuel Sutton, but the copy of the notebook was allegedly "destroyed" or "discarded" by Mr. Sutton between 1989 and 1995 in conjunction with Mr. Sutton's winding down of his legal practice. Gore contends that at a meeting in September 1974, Dr. Goldfarb allegedly was "elected" inventor and that

1 Plaintiffs suppressed Dr. Volder's notebook from the U.S. Patent and Trademark Office
2 ("PTO").

3 Previously before the Court was Gore's motion to expand the scope of the waiver from
4 the original time frame of the September 9, 1974 meeting to the October 24, 1974 patent
5 application to further include May 1974 through issuance of the patent in August 2002. Gore
6 sought an Order compelling Bard to produce all documents relating to Dr. Volder withheld
7 on the basis of attorney-client privilege or attorney work product. The Court determined in
8 the September 30, 2005 Order that on the basis of the record then before it, Gore had failed
9 to make a sufficient showing to invoke the crime-fraud exception. Gore also had not made
10 a sufficient demonstration by an adverse party of substantial need for the materials and
11 undue hardship in obtaining the substantial equivalent of the materials by other means. The
12 Court found it significant that Dr. Volder had not taken any steps to withdraw his 1974
13 statement that Dr. Goldfarb was responsible for the invention or to withdraw or recant his
14 1976 affidavit to that effect filed with the PTO. Dr. Volder also had not made a formal claim
15 of inventorship in legal proceedings. In addition, Gore had not provided sufficient
16 information as to the nature or extent of Dr. Volder's "serious health crisis" that allegedly had
17 occurred during the year preceding September 2005. The Court therefore denied without
18 prejudice Gore's motion for production of the withheld documents relating to Dr. Volder.
19 The Court did find that Gore had shown a sufficient basis for a limited expansion of the
20 waiver to include the time frame of June 1974 to September 9, 1974 based on the deposition
21 testimony of Messrs. Mendenhall and Sutton regarding a meeting and investigation on the
22 issue of inventorship that occurred in or about June 1974.

23 Gore has now filed a renewed motion seeking an Order to compel Plaintiffs and their
24 attorneys to produce all documents referring to Dr. Volder which have previously been
25 withheld on grounds of work product and/or attorney-client privilege. Gore re-asserts that
26 Dr. Goldfarb was chosen the inventor because he was the "safest" choice, that is, he was
27 considered the one with the least chance of an ownership claim by a previous employer. In
28

1  contrast, Harold Green, who became President of Impra, was ruled out due to his ties with
2  Gore. Dr. Volder at the time had an employment contract with the University of Utah.

3  Gore argues that Dr. Volder's notebook contained fairly accurate and complete records
4  of his conception, reduction to practice and diligence relating to artificial blood vessels and
5  that Mr. Sutton has confirmed that the notebook contained detailed and fully witnessed
6  entries which evidence Volder's work on expanded ePTFE structures dating back to the early
7  1970's. Dr. Lenox Baker, then chairman of Impra, testified in 1979 that he had seen and
8  "thumbed through" a book of experimental data that has been alleged to be Dr. Volder's
9  logbook. Gore also cites statements made on behalf of Impra in 1980 litigation and by
10 Impra's counsel in 1978 regarding Dr. Volder's alleged "better" right and claim to the
11 inventorship. Gore cites a statement by Mr. Sutton in a 1980 letter that it was his
12 understanding that the content of Dr. Volder's notebook was instrumental in precipitating
13 Impra's decision to stop paying royalties on Dr. Goldfarb's alleged invention and to
14 reassigning the patent application back to Goldfarb. Gore also points to hearsay testimony
15 from the deposition of Dr. John Johnson in 1978, when Johnson was a director of Impra, that
16 Dr. Volder had expressed the opinion that Volder was the true inventor of the graft. The
17 Court discussed in some detail in its previous Order of September 30, 2005 statements,
18 affidavits and deposition testimony of others associated with Impra, Bard and Gore over the
19 course of many years regarding the claim or repudiation of Dr. Volder as the true inventor.

20 As mentioned above, the copy of the notebook entrusted to Mr. Sutton has been
21 "destroyed" or "discarded." In addition, it appears that Dr. Volder, who presently lives in the
22 Netherlands, has provided to Gore's counsel "all documents that [Volder] had in his
23 possession relating to e-PTFE vascular graft work in the United States in the 1970's." (Doc.
24 311, at p. 17). The alleged notebook was not among these documents. Gore has attached to
25 its present renewed motion as Appendix A an excerpt from Plaintiffs' privilege logs that
26 shows some thirty documents that have been withheld and which are the subject of Gore's
27 renewed motion. Gore also notes that commencing in October 1996, one of Plaintiffs'
28

attorneys (Mr. Polese) had written to Dr. Volder and asked for access to the notebook from Mr. Sutton.

Gore contends in support of its renewed motion that it made attempts to procure Dr. Volder's testimony but was unsuccessful. Gore contends that Dr. Volder became seriously ill following a series of alleged threatening communications from one of Plaintiffs' lawyers. Gore has submitted a medical certificate from Dr. Volder's physician stating that as of October 2005, Dr. Volder is not able to assist in this action due to illness. Gore also contends that Mr. Sutton destroyed the best evidence of Dr. Volder's early work and that Plaintiffs should not be permitted to benefit from that destruction.

In their response opposing Gore's renewed motion, Plaintiffs contend that the medical certificate Gore has submitted is a conclusory, one-sentence "medical statement" which is unsupported. Plaintiffs further argue that Dr. Volder was available during the fact discovery period but Gore did nothing to obtain his testimony. Plaintiffs point out that Gore hired Dutch counsel to speak with Dr. Volder, Gore's general counsel interviewed Dr. Volder several times, Gore received historical documents from Dr. Volder, and that Gore has paid Dr. Volder $10,000.00 to act as a "consultant." According to Plaintiffs, Gore has claimed that its conversations with Dr. Volder are privileged and not discoverable. Plaintiffs have challenged Gore as waiting until Dr. Volder allegedly became "unavailable" as justification for its attempt to gain access to Plaintiffs' attorney work product. Plaintiffs also contend that Gore had the opportunity to obtain from Dr. Volder a prior signed statement or affidavit attesting to his claim as true inventor but failed to do so. Plaintiffs argue that Gore knew about the "destruction" of the copy of Dr. Volder's notebook long ago but did nothing about it, including asking Dr. Volder for the original. Plaintiffs point out that Gore claimed that Peter Cooper was the inventor during the twenty-year interference before the PTO.

Plaintiffs state that some twenty of the withheld documents have not been produced based on a claim of attorney-client communications and some seven of the documents have been withheld based on "opinion work product." Plaintiffs claim that these latter seven documents may be produced only upon a far stronger showing than the substantial need and

- 5 -

1  undue hardship standard relied upon by Gore. Plaintiffs contend that only Item 30, referred
2  to as "Handwritten attorney notes re: telephone conference with Gerald North re: Dr. Jay
3  Volder and Interference No. 101,100" authored by attorney Lawrence M. Green, is
4  potentially discoverable based on Gore's renewed motion. Plaintiffs state that they have
5  provided Items 6 and 8, which are communications between Bard/Goldfarb's counsel and
6  Impra representatives during the time between 1977 and 1996 when Impra was adverse to
7  the Goldfarb patent. (Doc. 325, n. 1).

8        The parties have advanced additional and supplemental arguments in their reply and
9  post-reply submissions. Gore claims it asked Dr. Volder for the notebook but was told he
10 did not have it. Gore contends that Plaintiffs have not provided sufficient foundation for
11 their claim of attorney-client privilege or work product doctrine regarding the withheld
12 documents. Gore also argues that Plaintiffs' contention that Bard cannot be bound by
13 admissions by Impra's officers and attorneys that Dr. Volder's inventorship rights are superior
14 to Dr. Goldfarb's is unfounded because the Impra of 1978-80 is the same corporation known
15 today as Bard Peripheral Vascular. Gore further contends that it had designated Dr. Volder
16 as a possible trial witness as early as August 6, 2003 but has been thwarted by his inability
17 to testify due to illness. Gore also points to Dr. Volder's alleged statements to two Impra
18 executives in 1977-78 that he, not Dr. Goldfarb, was the inventor.

19       The Court has considered the numerous facts and arguments advanced by the parties
20 on the issue. The fact discovery in this case was completed on October 30, 2004 [parties
21 took a deposition on November 11, 2004]. Plaintiffs have submitted correspondence
22 indicating that one of their lawyers (Mr. Polese) was communicating with Dr. Volder and
23 Mrs. Volder between April and August 2004 in an attempt to interview Dr. Volder about the
24 present litigation. Gore's counsel or representative also was communicating with Dr. Volder
25 about this same time. According to the correspondence, Dr. Volder, who had been a
26 shareholder of Impra, indicated that he wished to remain neutral regarding the litigation. It
27 therefore appears that Dr. Volder had not agreed to be a witness for either party. It further
28 appears that Gore made no attempt to depose Dr. Volder or obtain his sworn statement before

- 6 -

1  the close of fact discovery.  The Court reiterates that there is no indication that Dr. Volder
2  has ever claimed to be the inventor based on his own sworn statement or deposition
3  testimony.  As the record now stands, Dr. Volder submitted a letter in September 1974 and
4  a sworn affidavit to the PTO in 1976 supporting Dr. Goldfarb's application to obtain the '135
5  patent.

6        The parties are in dispute over the past relationship between Impra and Bard.  As
7  discussed above, Impra was formed about the time of the patent application in September
8  1974. From approximately mid-1977 to mid-1996, Impra was adverse to the patent
9  application and was involved in a lawsuit against Dr. Goldfarb concerning rights to the
10 application. From 1980 on, C.R. Bard was the exclusive licensee of the '135 patent. In 1996,
11 C.R. Bard acquired Impra. Plaintiffs contend that Impra is the predecessor-in-interest of C.R.
12 Bard and that statements of a predecessor-in-interest are inadmissible and cannot be
13 considered admissions under the hearsay rule.  Fed.R.Evid. 801(d)(2).  Gore, on the other
14 hand, contends that Impra remained intact following acquisition of its stock by C.R. Bard
15 based on the terms of the acquisition agreement.  The entity C.R. Bard is not a plaintiff in this
16 lawsuit and therefore admissions made by Impra's officers and attorneys are admissible
17 against it.  The Court finds it unnecessary to resolve this factual dispute bearing on the
18 relationship between C.R. Bard and Impra in order to resolve the issues before it.

19       Under Fed.R.Civ.P. 26(b)(3), documents and tangible things prepared by a party or
20 his representative in anticipation of litigation, may not be ordered produced unless the party
21 seeking them demonstrates "substantial need [for] the materials in the preparation of the
22 party's case and that the party is unable without undue hardship to obtain the substantial
23 equivalent of the materials by other means." As the Court has previously observed, the
24 attorney-client privilege applies to confidential communications between attorney and client
25 for the purpose of securing legal advice concerning preparation of prosecution of a patent
26 application. Advanced Cardiovascular Systems, Inc. v. C.R. Bard, Inc., 144 F.R.D. 373 (N.D.
27 Cal. 1992).  "Because the attorney-client privilege is in derogation of the search for truth, it
28 is 'narrowly and strictly construed.'"  Verizon California Inc. v. Ronald A. Katz Tech.

1  Licensing, L.P., 266 F. Supp. 2d 1144, 1147 (C.D. Cal. 2003). The work product doctrine,
2  codified in Fed.R.Civ.P. 26(b)(3), "protects 'from discovery documents and tangible things
3  prepared by a party or his representative in anticipation of litigation,' ... Such documents may
4  only be ordered produced upon an adverse party's demonstration of 'substantial need [for] the
5  materials' and 'undue hardship [in obtaining] the substantial equivalent of the materials by
6  other means.'" In re Grand Jury Subpoena [Mark Torf/Torf Environmental Management], 357
7  F.3d 900, 906 (9th Cir. 2004).

8        The following facts lead this Court to deny Gore's present renewed motion. On
9  September 10, 1974, Dr. Volder signed a letter expressing his belief that the '135 patent
10 application "should be filed in the name of Dr. Goldfarb" not his own. (Doc. 325, Exh. 5 at
11 page 3). In an affidavit dated July 27, 1976 and which was submitted to the U.S. Patent and
12 Trademark Office supporting Dr. Goldfarb's application to obtain the '135 patent, Dr. Volder
13 stated that he was "of the unqualified opinion that the prosthetic vascular structure conceived
14 and developed by [Goldfarb], while seemingly apparent when viewed with the aid of
15 hindsight, was by no means obvious to those actively conducting research on [e]PTFE
16 vascular structures during 1972 and 1973." (Doc. 325, Exh. 6 at ¶¶ 5, 10-11). Dr. Volder
17 has had his own patent counsel but has never made a formal claim of ownership regarding
18 the '135 patent with the PTO.

19       Dr. Volder was available to provide a sworn statement during the fact discovery
20 period in this case. It appears that counsel for both parties to this lawsuit were
21 communicating with Dr. Volder between April and August 2004. As an attachment to their
22 sur-reply, Plaintiffs have submitted a letter from Dr. Volder to Plaintiffs' attorney James
23 Polese which states in pertinent part as follows:

> Sorry I missed your call, but my wife has informed me about the message. ... As a matter of fact I am aware that Gore is fighting the Goldfarb patent. Last year I have been contacted with W.L. Gore & Ass., according this matter and had a meeting with its lawyers in the Netherlands, discussing my work in the early 70's. Although I prefer not to be involved in this matter for personal reasons, they kept on calling me with result that I am receiving representatives of Gore next week in the Netherlands to discuss my work in the early 70's again. They are also very

- 8 -

> interested in my archive. They asked me to be an expert witness as well. So I'm very sorry that things are in progress right now, I don't think I can be of any help for you.

(Doc. 327, Exh. B). This letter contains a fax transmission date of July 4, 2004. (id). Gore therefore had been communicating with Dr. Volder during 2003 and thus had ample opportunity to obtain his sworn statement on the issue of any previous inventorship discussions. Moreover, as discussed above, Gore retained Dutch counsel to meet with Dr. Volder, Gore's general counsel and Dutch lawyer met with Dr. Volder, and Gore's general counsel spoke with Dr. Volder. Gore has received documents from Dr. Volder and has paid Dr. Volder $10,000.00 as a "consultant." (Doc. 325, at page 2).

There has been some discussion by Gore in its reply that it planned to bring Dr. Volder to trial as a witness. (Doc. 326, page 9). In their sur-reply, Plaintiffs state that Plaintiffs' counsel asked Gore to explain this assertion and Plaintiffs have attached a letter dated February 6, 2006 from Gore's counsel to Plaintiffs' counsel Mr. Polese that states as follows: "Until your personal interference, Dr. Volder was cooperating with Gore counsel and we believed that he would be willing to attend the trial to make clear his key role in the development of ePTFE vascular graft." (Doc. 327, Exh. 13). Gore, however, never obtained a sworn statement from Dr. Volder during the time it was communicating with him. In another faxed communication from Dr. Volder to Plaintiffs' counsel Mr. Polese dated August 4, 2004, Dr. Volder stated: "I would like to point out again that my standpoint in this case is neutral."

It seems logical that Gore would have sought to prove its claim that Dr. Volder was the true inventor through evidence provided by Dr. Volder. It further seems that it would have been necessary for Dr. Volder to repudiate or at least explain his prior statements affirming Dr. Goldfarb's inventor status. However, Dr. Volder has indicated that he desired to remain neutral. Dr. Volder allegedly is now unavailable due to health reasons. However, Dr. Volder was available during fact discovery and during that time was cooperating with Gore but Gore failed to obtain his testimony or affidavit disputing his prior statements, including his own sworn statement, affirming Dr. Goldfarb's inventor status. Under these

- 9 -

1 circumstances, it does not seem that Gore should now be permitted to obtain from Plaintiffs
2 documents which Plaintiffs claim are privileged or protected under the work product doctrine
3 in order to prove the claim. Gore's belated attempt does not satisfy the Court that Gore has
4 shown a "substantial need [for] the materials" in the preparation of its case and that Gore was
5 "unable without undue hardship to obtain the substantial equivalent of the materials by other
6 means." Gore's renewed motion to pierce privilege/work product claims relating to the work
7 of Dr. Volder is denied.

8 In its reply, Gore raised for the first time its argument that Plaintiffs had not justified
9 or substantiated their designation based on either attorney-client privilege or work product
10 as to certain identified documents on Plaintiffs' privilege log. (Doc. 326, at pages 3-5, 7-8).
11 It does not appear that Plaintiffs responded to this argument in their sur-reply briefing. (Doc.
12 327). At the oral argument hearing, in response to the Court's question about this issue,
13 Plaintiffs' counsel indicated that more detailed descriptions relevant to the privilege log could
14 be provided. The issue that Gore raised for the first time in its reply has not been adequately
15 briefed by the parties and the Court has declined to consider it. Arguments raised for the first
16 time in a reply are generally not considered because to do so may unfairly deprive the
17 opposing party of the opportunity to make a meaningful response. See, e.g., Pacific Coast
18 Federation of Fisherman's Ass'n. v. U.S. Bureau of Reclamation, 138 F. Supp.2d 1228, 1248,
19 n.17 (N.D. Cal. 2001).

21 Certain of the parties' submissions relevant to the issues discussed in this Order have
22 been filed under seal. It does not appear to the Court, however, that it is necessary to file this
23 Order under seal. The Court will permit the parties to jointly notify the Court within five
24 days of the filing date of this Order of any request to file this Order under seal upon a
25 showing of good cause.

26 **Accordingly**,

27 **IT IS ORDERED** that Gore's renewed motion to pierce the privilege/work product
28 claims relating to the work of Dr. Volder (Doc. 324) is denied.

- 10 -

1    **IT IS FURTHER ORDERED** that the parties may jointly notify the Court within
2    five days of the filing date of this Order of any request to file this Order under seal upon a
3    showing of good cause.
4    DATED this 29th day of September, 2006.

_____
Mary H. Murguia
United States District Judge

- 11 -