1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7                   FOR THE DISTRICT OF ARIZONA

8

9   Bard Peripheral Vascular, Inc.; David)   No. CV 03-0597–PHX-MHM
    Goldfarb, M.D.,                      )
10                                       )
              Plaintiffs,                )   **ORDER**
11                                       )
    vs.                                  )
12                                       )
    W.L. Gore & Associates, Inc.,        )
13                                       )
              Defendant.                 )
14  _____   )
15  W.L. Gore & Associates, Inc.,        )
                                         )
16            Counterclaimant,           )
                                         )
17  vs.                                  )
                                         )
18  Bard  Peripheral  Vascular,  Inc.,David)
    Goldfarb, M.D., and C.R. Bard, Inc., )
19                                       )
              Counterdefendants.         )
20  _____   )

21

22

23         Presently, Gore has ten outstanding Motions for Judgment as a Matter of Law

    ("JMOL").   Gore's ten motions include the following:   (1) Gore's Motion for JMOL
24
    Regarding Plaintiffs' Claim of Willful Infringement; (2) Gore's Motion for JMOL Regarding
25
    Invalidity of the '135 Patent for Failure to Disclose Best Mode; (3) Gore's Motion for JMOL
26
    that Claims 20-27 are Invalid for Failure to Satisfy the Written Description Requirement of
27
    35 U.S.C. § 112, ¶ 1; (4) Gore's Motion for JMOL Regarding Plaintiffs' Failure to Prove that
28

Gore's Accused Products Meet the Typicality Element of Claims 20-27; (5) Gore's Motion for JMOL that Claims 20-27 are Invalid under 35 U.S.C. § 102(B) for Lack of Novelty in View of the 1973 Matsumoto <u>Surgery</u> Article; (6) Gore's Motion for JMOL Regarding Plaintiffs' Claim that Propaten Infringes the '135 Patent; (7) Gore's Motion for JMOL Regarding Invalidity for Anticipation by Dr. Norton's December 1971 Use in "Mrs. B"; (8) Gore's Motion for JMOL Regarding Invalidity for Improper Inventorship Because Cooper and Goldfarb are Joint Inventors; (9) Gore's Motion for JMOL Regarding Plaintiffs' Lack of Standing; and (10) Gore's Motion for JMOL that Claim 20 is Obvious in Light of the Volder Publication. This Order addresses the first nine of Gore's JMOL Motions. The Court will issue a separate Order addressing Gore's tenth Motion for JMOL relating to obviousness.

## LEGAL STANDARD

Rule 50, Fed.R.Civ.P., states in relevant part as follows:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>     (A) resolve the issue against the party; and
>     (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

"Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the non-moving party, allows only one reasonable conclusion . . . ." <u>Acosta v. City and County of San Francisco</u>, 83 F.3d 1143, 1145 (9th Cir. 1996); <u>see also</u> <u>Pavao v. Pagay</u>, 307 F.3d 915, 918 (9th Cir. 2002) (a motion for judgment as a matter of law should be granted only "if the evidence . . . permits only one conclusion, and that conclusion is contrary to the jury's verdict."). "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986). In other words, to grant JMOL, there most be "no scenario by which a jury could have concluded" in the nonmoving party's favor. <u>City Solutions, Inc. v.</u>

- 2 -

1  Clear Channel Commc'ns, 365 F.3d 835, 841 (9th Cir. 2004) (reversing grant of motion for
2  JMOL).

3                                    **DISCUSSION**

4  **I.    GORE'S MOTION FOR JMOL REGARDING PLAINTIFFS' CLAIM OF**
       **WILLFUL INFRINGEMENT**
5

6         Gore has moved for JMOL regarding Plaintiffs' claim of willful infringement,
7  claiming Plaintiffs did not proffer sufficient evidence to meet their burden of proving willful
8  infringement by clear and convincing evidence.

9         "[T]o establish willful infringement, a patentee must show by clear and convincing
10  evidence that the infringer acted despite an objectively high likelihood that its actions
11  constituted infringement of a valid patent." In re Seagate Tech., LLC, 497 F.3d 1360, 1368
12  (Fed. Cir. 2007).  Stated another way, "proof of willfulness . . . requires at least a showing
13  of objective recklessness." Id.  If this objective standard is satisfied, then the plaintiffs must
14  establish the existence of a separate, subjective element – the risk that the defendant's
15  conduct was objectively reckless "was either known or so obvious that it should have been
16  known to the accused infringer." Id.

17         A party seeking to establish that patent claims are invalid must overcome statutory
18  presumption of validity set forth in 35 U.S.C. § 282 by clear and convincing evidence.
19  Nystrom v. TREX co., Inc., 424 F.3d 1136, 1149 (Fed. Cir. 2005).  This presumption of
20  validity "exists at every stage of the litigation," Cannon Computer Sys., Inc. v. Nu-Kote Int'l,
21  Inc., 134 F.3d 1985, 1088 (Fed. Cir. 1998), and "is never annihilated, destroyed or even
22  weakened regardless of what facts are of record." ACS Hosp. Sys., Inc. v. Montefiore Hosp.,
23  732 F.2d 1472, 1574-75 (Fed. Cir. 1984).

24         Where the matter alleged to be invalidating was expressly considered by the PTO, the
25  party challenging validity has the "added burden . . . of overcoming the deference that is due
26  to a qualified government agency presumed to have properly done its job, which includes one
27  or more examiners who are assumed to have some expertise in interpreting the references and

28                                        - 3 -

1   to be familiar with their work with the level of skill in the art and whose duty it is to issue

2   only valid patents." <u>Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.</u>, 725 F.2d 1350, 1359

3   (Fed. Cir. 1984).

4        The trial record in this case provides sufficient evidence for the jury to have found

5   willful infringement by clear and convincing evidence. Such evidence includes the extensive

6   litigation history before the PTO – all of which has found Dr. Goldfarb to be the rightful

7   inventor and patent holder – and that Gore relied on the same references (the Soyer, Volder,

8   and Matsumoto articles) to support its invalidity defense that the PTO previously found not

9   to invalidate Dr. Goldfarb's invention. The Court finds sufficient evidence upon which a

10  reasonable jury could have found willful infringement. Accordingly, Gore's Motion for

11  JMOL Regarding Plaintiffs' Claim of Willful Infringement is denied.

12  **II.   GORE'S MOTION FOR JMOL REGARDING INVALIDITY OF THE '135**
13        **PATENT FOR FAILURE TO DISCLOSE BEST MODE**

14       Gore alleges that the '135 patent is invalid for violating the best mode requirement of

15  35 U.S.C. § 112. A best mode analysis involves two steps. "First, the factfinder must

16  determine whether, at the time of filing the application, the inventor possessed a best mode

17  for practicing the invention." <u>Eli Lilly & Co. v. Barr Labs., Inc.</u>, 251 F.3d 955, 963 (Fed.

18  Cir. 2001). "Second, if the inventor possessed a best mode, the fact finder must determine

19  whether the written description disclosed the best mode such that one reasonably skilled in

20  the art could practice it." <u>Id.</u> "The first prong involves a subjective inquiry, focusing on the

21  inventor's state of mind at the time of filing," whereas "the second prong involves an

22  objective inquiry, focusing on the scope of the claimed invention and the level of skill in the

23  art." <u>Id.</u> Both steps must be proven by clear and convincing evidence for each asserted

24  claim. <u>Liquid Dynamics Corp. v. Vaughan Co. Inc.</u>, 449 F.3d 1209, 1223 (Fed. Cir. 2006).

25       "There is no requirement in 35 U.S.C. § 112 that an applicant point out which of his

26  embodiments he considers his best mode; that the disclosure includes the best mode

27  contemplated by the applicant is enough to satisfy the statute." <u>Randomex, Inc. v. Scopus</u>

28

1  Corp., 849 F.2d 585, 589 (Fed. Cir. 1988) (internal citations omitted).  Thus, contrary to

2  Gore's assertion, the best mode requirement is satisfied when an inventor discloses a range

3  that includes his best mode.  See e.g., Ernsthausen v. Nakayama, 1 U.S.P.Q. 1539, 1549 (Bd.

4  Pat. App. & Inter. 1985) ("There is no concealment of best mode here since one of ordinary

5  skill in the art could readily determine the best operating mode . . . by producing and testing

6  display samples . . . within the rage of thicknesses disclosed by [the patent applicant]").

7      This Motion bears a striking resemblance to the arguments Gore set forth in its

8  February 2004 Motion for Partial Summary Judgment (Doc. 68 at 5-13).  The Court denied

9  that Motion.  Now, three years later, following the trial of this matter, Gore asserts the

10  argument again.

11      In support of its position, Gore cites a number of statements Dr. Goldfarb made in a

12  number of different scholarly publications.  However, Gore has not presented sufficient

13  evidence to meet its high burden that the papers were prepared prior to the filing of the

14  Goldfarb application.  Nor has Gore provided sufficient evidence to demonstrate that Dr.

15  Goldfarb actually had a "best mode" for carrying out the invention at the time the '135 patent

16  application was filed, let alone sufficient evidence to establish a violation of the best mode

17  requirement.  Gore has failed to establish that a reasonable jury would not have a legally

18  sufficient evidentiary basis to find for the Plaintiffs on this issue.  Accordingly, Gore's

19  Motion for JMOL regarding invalidity of the '135 patent for failure to disclose best mode is

20  denied.

21  **III.  GORE'S MOTION FOR JMOL THAT CLAIMS 20-27 ARE INVALID FOR**
**FAILURE TO SATISFY THE WRITTEN DESCRIPTION REQUIREMENT**
22  **OF 35 U.S.C. § 112, ¶ 1**

23      Gore asserts that Claims 20-27 of the '135 patent are invalid for violating the written

24  description requirement of 35 U.S.C. § 112.  The written description requirement of 35

25  U.S.C. § 112 requires that the patent applicant "recount his invention in such detail that his

26  future claims can be determined to be encompassed within his original creation."  Vas-Cath

27

28                                    - 5 -

1    Inc. v. Mahurkar, 935 F.2d 1555, 1561 (Fed. Cir. 1991).  "The adequacy of the written (*i.e.*,

2    the disclosure) is measured from the face of the application . . . ."  New Railhead Mfg. L.L.C.

3    v. Vermeer Mfg. Co., 298 F.3d 1290, 1295 (Fed. Cir. 2002).  In determining whether the

4    written description requirement has been satisfied, the "application considered as a whole

5    must convey to one of ordinary skill in the art, either explicitly or inherently, that [the

6    inventor] invented the subject matter claimed . . . ."  Reiffin v. Microsoft Corp., 214 F.3d

7    1342, 1346-45 (Fed. Cir. 2000).  "Although [the] applicant does not have to describe exactly

8    the subject matter claimed, the description must clearly allow persons of ordinary skill in the

9    art to recognize that [the inventor] invented what is claimed."  In re Gosteli, 872 F.2d 1008,

10   1012 (Fed. Cir. 1989).

11          Gore specifically asserts that claims 20-27 of the '135 patent are invalid for lack of

12   written description because they "encompass grafts having any wall thickness" and thus are

13   not limited to a wall thickness of 0.2 and 0.8 mm, which Gore alleges is "critical" to Dr.

14   Goldfarb's invention.  Gore's argument appears to ignore the fact that these same issues were

15   rejected by the Patent Office.

16          Gore also asserts that claims 20-27 are invalid for failure to satisfy the written

17   description requirements because the claims do not require "through the wall [*i.e.*,

18   transmural] cellular ingrowth" resulting in a neointima.  However, this Court has previously

19   considered and rejected this argument after Gore asserted it during claim construction.  The

20   Court is not persuaded by the latest assertion of this argument.

21          In view of the substantial evidence demonstrating that wall thickness is not an

22   essential element of Dr. Goldfarb's invention, and because Gore has not established that one

23   of ordinary skill would understand that the '135 patent required complete transmural

24   ingrowth, Gore has not met its burden.  Gore has not demonstrated that no reasonable jury

25   could find that the asserted claims of the '135 patent comply with the written description

26   requirement.  Accordingly, Gore's motion for JMOL is denied.

27

28
                                            - 6 -

**IV.    GORE'S MOTION FOR JMOL REGARDING PLAINTIFFS' FAILURE TO PROVE THAT GORE'S ACCUSED PRODUCTS MEET THE TYPICALITY ELEMENT OF CLAIMS 20-27**

Gore contends that it is entitled to JMOL on infringement because Plaintiffs purportedly have failed to demonstrate that the accused products satisfy the "average distance between nodes" requirement in each of the asserted claims.  Gore's motion for JMOL is based on the assertion that the claim limitation of an "average distance between nodes" is required to be applied "to all of the ePTFE portions of the prosthetic device."  This is contrary to the Court's express construction of the asserted claims as requiring ePTFE including but not limited to the microstructure recited in the claims.

The evidence established during trial establishes that a reasonable jury could find that each of Gore's accused products "includes" an ePTFE component that satisfies each of the claim limitations.  For example, Gore's employee/expert witness on the accused stent-grafts, Dr. Vonesh, testified that each of the accused Gore stent-grafts includes an ePTFE component having an average internodal distance within the claimed range.  On the other hand, the only evidence Gore offered to rebut infringement of the "average distance between nodes" limitation at trial (and as evidence to support its JMOL now) is the testimony and measurements of Gore's expert Dr. McMillian.  However, Dr. McMillin offered no testimony to contradict that the ePTFE base graft included in each of the accused products has a "typical" distance between nodes that fits within the claims.

Gore has failed to establish that a reasonable jury would not have a legally sufficient evidentiary basis to find for the Plaintiffs on this issue.  Accordingly, Gore's Motion for JMOL as to Plaintiffs' failure to prove that Gore's accused products meet the typicality elements of claims 20-27 is denied.

/////

/////

**V.     GORE'S MOTION FOR JMOL THAT CLAIMS 20-27 ARE INVALID UNDER 35 U.S.C. § 102(B) FOR LACK OF NOVELTY IN VIEW OF THE 1973 MATSUMOTO <u>SURGERY</u> ARTICLE**

Gore seeks JMOL regarding claims 20-27 of the '135 patent, claiming they lack novelty in view of the 1973 Matsumoto <u>Surgery</u> article.

If a single item of prior art discloses every element of a patent claim, that claim is "anticipated" and, hence, invalid under 35 U.S.C. § 102 for lack of novelty. <u>Karsten Mfg. Corp. v. Cleveland Golf Co.</u>, 242 F.3d 1376, 1383 (Fed. Cir. 2001). The prior art reference must also "be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and carry it into practice use." <u>In re Omeprazole Patent Lit.</u>, 483 F.3d 1364, 1379-80 (Fed. Cir. 2007) (internal citations omitted). Where the allegedly anticipatory prior art was expressly considered by the PTO, as is true here, the party challenging validity faces the "added burden . . . of overcoming the deference that is due to a qualified government agency presumed to have properly done its job." <u>Am. Hoist</u>, 725 F.2d at 1359.

The evidence establishes that the 1973 Matsumoto article was not enabling, as neither Gore nor any of the other doctors with whom Gore was working, could determine the structure disclosed in the Matsumoto article or replicate Matsumoto's results. In fact, at trial, Gore's fact witness, Mr. Detton, stated that "you couldn't figure anything" from the Matsumoto article "because the article itself did not define anything." Trial Tr., 11/27/08 at 1959:17 - 161:3 (Detton).

Gore has failed to establish that a reasonable jury would not have a legally sufficient evidentiary basis to find for the Plaintiffs on this issue. Accordingly, Gore's Motion for JMOL regarding lack of novelty in view of the 1973 Matsumoto <u>Surgery</u> article is denied.

/////
/////

## VI.    GORE'S MOTION FOR JMOL REGARDING PLAINTIFFS' CLAIM THAT PROPATEN INFRINGES THE '135 PATENT

Gore argues for JMOL with respect to its Propaten Vascular Grafts.  Gore bases its Motion on the assertion that Plaintiffs' chief infringement expert witnesses, Dr. Anderson and Mr. Calcote, did not mention Propaten during their testimony and that Dr. Becker's testimony regarding Propaten was based on Gore's 510(k) notification.  Thus, Gore contends that Plaintiffs presented no proof of infringement regarding Gore's Propaten graft.

Though it is true that Dr. Becker testified about Gore's 510(k) notification, she also testified that Gore told the FDA that Propaten Vascular Grafts had the same physical structure and tissue ingrowth characteristics as the predicate Gore-Tex Vascular Graft (K830806), Gore-Tex Stretch Vascular Graft (K903931) and FEP Ringed Gore-Tex Stretch Vascular Graft with Removable Rings (K933943) already on the market.  Dr. Becker's testimony is further confirmed by the evidence demonstrating (1) that the Propaten Vascular Grafts have an "average fibril length" that is within the claimed ranges of the '135 patent (see, e.g., PX1397.30; PX480.31; PX493.19); and (2) that the tissue ingrowth in the Propaten Vascular Grafts is the same as that observed in the underlying Gore-Tex Stretch Vascular Graft (see, e.g., PX1397.41).

In addition, there is sufficient factual evidence to support a finding that Gore's Propaten Vascular Grafts consists of an underlying Gore-Tex Stretch Vascular Graft (a product whose structure was discussed at length during the trial) with an added layer of bonded heparin molecules (see, e.g., PX1397.13).  There is also evidence to show that the addition of heparin molecules has no effect on the underlying microstructure of the ePTFE graft (see, e.g., PX305.7).  One cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device.  Amstar Corp. v. Envirotech Corp., 730 F.2d 1476, 1482 (Fed. Cir. 1984).

1    Gore has not established that a reasonable jury could not have found for Plaintiffs as

2 to their claim that Gore's Propaten Vascular Grafts infringe the '135 patent.  Accordingly,

3 Gore's Motion for JMOL on this issue is denied.

4 **VII. GORE'S MOTION FOR JMOL REGARDING INVALIDITY FOR**

5    **ANTICIPATION BY DR. NORTON'S DECEMBER 1971 USE IN "MRS. B"**

6    Gore asserts that it is entitled to JMOL that claims 20-25 and 27 of the '135 patent are

7 invalid for anticipation due to the implantation of a Gore-Tex vascular graft in a human

8 patient, "Mrs. B" in December 1971.  Gore bases its Motion on slides allegedly obtained

9 from Dr. Lawrence Norton, that Gore argues show the graft after explantation.

10    To show invalidity by anticipation, "[e]very element of the claimed invention must

11 be literally present, arranged as in the claim.  The identical invention must be shown in as

12 complete detail as is contained in the patent claim." Richardson v. Suzuki Motor Co., Ltd.,

13 868 F.2d 1226, 1236 (Fed. Cir. 1989).  Furthermore, when the anticipatory prior art being

14 relied on is a "public use," such as here, the party asserting invalidity must prove both (1) a

15 public use, and (2) that the "invention" in the public was "ready for patenting." Invitrogen

16 Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1379 (Fed. Cir. 2005).  The "ready for

17 patenting" requirement "can be satisfied in at least two ways: by proof of reduction to

18 practice before the critical date; or by proof that prior to the critical date the inventor had

19 prepared drawings or other descriptions of the invention that were sufficiently specific to

20 enable a person skilled in the art to practice the invention." Pfaff v. Wells, 525 U.S. 55,

21 67-68 (1998).  Again, where the allegedly anticipatory prior art was expressly considered by

22 the PTO, as is true here, the party challenging validity faces the "added burden . . . of

23 overcoming the deference that is due to a qualified government agency presumed to have

24 properly done its job." Am. Hoist, 725 F.2d at 1359.

25    Gore has not provided sufficient evidence to show that the Norton slides were actually

26 implanted in Mrs. B.  In fact, the evidence demonstrates significant questions about the origin

27 of slides C196X and C196Y, including Dr. Norton's testimony during the interference, Mr.

1   Lawrence Green's testimony, and considerable evidence that suggests that the slides may

2   actually have been from animal testing.  Gore has not overcome this evidence and, instead,

3   seems to assume that the slides represent the graft implanted in Mrs. B.

4           Nor has Gore met its burden to show that Dr. Norton's work was anticipatory.  In its

5   Motion, Gore has not established, nor even discussed, the "ready for patenting" requirement

6   to prove anticipation.  In contrast, the evidence shows that Dr. Norton lacked appreciation

7   of the critical elements of (i) fibril length and (ii) "a microstructure that permits tissue

8   ingrowth," as claimed in the '135 patent.  Thus, Dr. Norton's work was not "ready for

9   patenting" and cannot constitute anticipatory prior use as a matter of law.  Pfaff, 525 U.S. at

10  66.

11          Finally, a reasonable jury could find that Dr. Norton's work was experimental and,

12  thus, not a public use.  See TP Labs., Inc. v. Professional Positioners, Inc., 724 F.2d 965, 970

13  (Fed. Cir. 1984) (holding that "if a use is experimental, even though not secret, 'public use'

14  is negated").  Dr. Norton testified that he "wasn't a hundred percent sure that [the graft]

15  would work" for Mrs. B but contemplated trying the Gore-Tex tube in Mrs. B based on his

16  "experience in the laboratory" using the same material "as replacement for veins in animals."

17  Trial Tr., 11/27/07, at 2074:20-2075:13.  Plus, the Soyer et al., "A New Venous Prosthesis"

18  article in Surgery in 1972, which discusses Dr. Norton's work and his implantation of an

19  ePTFE graft in Mrs. B, describes the implantation in Mrs. B as having been conducted on an

20  "experimental basis."  DX3334.

21          The Court does not find that a reasonable jury would not have a legally sufficient

22  evidentiary basis to find in favor of the Plaintiffs on this issue.  Accordingly, Gore's Motion

23  for JMOL is denied.

24

25  /////

26  /////

27

28                                          - 11 -

1

2

## VIII.  GORE'S   MOTION   FOR   JMOL   REGARDING   INVALIDITY FOR IMPROPER INVENTORSHIP BECAUSE COOPER AND GOLDFARB ARE JOINT INVENTORS

3

4

Gore argues that it is entitled to JMOL for improper inventorship contending that Peter Cooper and Dr. Goldfarb were co-inventors.  Gore previously argued to the PTO and the Federal Circuit that Dr. Goldfarb's work should "inure" to Peter Cooper's credit. However, both the PTO and the Federal Circuit found that Dr. Goldfarb's work did not inure to Mr. Cooper or Gore's credit.  Further, the Federal Circuit found that Mr. Cooper: (1) had not conceived of the invention at the time he sent ePTFE tubes to Dr. Goldfarb, and (2) never communicated a conception or any information regarding fibril lengths to Dr. Goldfarb.

5

6

7

8

9

10

To establish its claim of joint inventorship, Gore must prove by clear and convincing evidence that Mr. Cooper "contribute[d] in some significant manner to the conception or reduction to practice of the invention." Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed. Cir. 1998).  "Conception is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is applied in practice." Cooper v. Goldfarb, 154 F.3d 1321, 1327 (Fed. Cir. 1998).  Joint inventorship can only arise when "collaboration or concerted effort occurs, that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts." Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1359 (Fed. Cir. 2004).

11

12

13

14

15

16

17

18

19

Thus, the test for joint inventorship requires more of a showing of concerted effort between co-inventors than is required to meet the test for inurement.  However, despite this standard, Gore failed to present sufficient evidence to show that a reasonable jury could not have found the patent valid notwithstanding Gore's claims of improper inventorship.  Gore has not established that a reasonable jury could have found that Mr. Cooper was not a co-inventor of the '135 patent.  Accordingly, Gore's Motion for JMOL on this issue is denied.

20

21

22

23

24

25

26

27

28

1
2

**IX.    GORE'S JMOL MOTION REGARDING PLAINTIFFS' LACK OF STANDING**

3       Gore's JMOL Motion Regarding Standing alleges that the Plaintiffs, Dr. David

4   Goldfarb, and Bard Peripheral Vascular, Inc., ("BPV"), lack standing to sue for infringement

5   of the '135 Patent.  Gore contends that there is a document in evidence from 1980 in which

6   Dr. Goldfarb granted an exclusive license of the '135 patent application to USCI Surgical

7   Products Division, C.R. Bard, Inc. ("USCI"), a division of C.R. Bard.  There also is a 1997

8   amendment that refers to a written assignment and transfer of the 1980 exclusive license from

9   USCI or C.R. Bard to Impra, which later became BPV.  However, the written assignment

10  referred to in the 1997 amendment is not in evidence, nor did Plaintiffs produce such a

11  document during discovery.  Gore asserts that without such a written instrument in evidence

12  transferring the 1980 exclusive license from USCI/C.R. Bard to Impra/BPV, the transfer is

13  invalid and Plaintiffs lack standing in this lawsuit.

14      **A.    BACKGROUND**

15      The evidence demonstrates that on October 24, 1974, Dr. Goldfarb filed a patent

16  application involving the subject matter of the '135 patent.  The '135 patent issued in Dr.

17  Goldfarb's name on August 20, 2002.  At the time this suit was filed, Dr. Goldfarb was the

18  owner of the '135 patent.

19      On September 23, 1980, Dr. Goldfarb and USCI entered into a written license

20  agreement pursuant to which Dr. Goldfarb granted USCI a "worldwide, exclusive license[],

21  with the right to sublicense, to make, use, and sell products covered by [the Goldfarb

22  Application]."  PX4; Trial. Tr., 11/7/07, at 462:10-463:4 (Goldfarb).  The 1980 license did

23  not transfer all of Dr. Goldfarb's rights to USCI.  For example, Dr. Goldfarb retained the

24  right to share in any damages recovered from enforcement or licensing of the Goldfarb

25  patent. PX4 § 5.3.  Dr. Goldfarb also retained significant reversionary rights if C.R. Bard did

26  not prosecute its rights.  Id. at §§ 3.1-3.2.  In addition, the exclusive license excluded a

27  category of products ("heart valves") from its "subject matter."  Id. at 1.1.

28                                      - 13 -

1    In September 1996, C.R. Bard acquired Impra.  Trial Tr., 11/16/07, at 1635:20-22

2  (McDermott).  At that time, USCI was no longer involved in the vascular graft business and

3  it subsequently was sold.  Id. at 1644:9-19 (McDermott).  Following C.R. Bard's purchase

4  of Impra, C.R. Bard's existing non-ePTFE vascular graft business (the Bard Vascular

5  Systems Division) was merged into Impra.  Id. at 1635:23-1636:9, 1639:24-1640:17

6  (McDermott).

7    Impra was the sole C.R. Bard division making and selling ePTFE grafts and, because

8  of this, C.R. Bard transferred responsibility for the 1980 license to Impra.  Id. at 1644:9-19

9  (McDermott.)  Dr. Goldfarb, C.R. Bard, and Impra confirmed the transfer of the license to

10  Impra in the written February 2, 1997 "Agreement Amending License Agreement." PX191.

11  Pursuant to the 1997 amendment, Impra assumed all of USCI's rights and obligations under

12  the 1980 license agreement including the payment of all royalties to Dr. Goldfarb.  Trial Tr.,

13  11/16/07, at 1644:20-1645:7 (McDermott).  In addition, the 1997 amendment also added new

14  terms to the agreement including replacing "[a]ll references" to Bard's division (USCI) in

15  the 1980 License with Impra/BPV, removing the subject matter exclusion regarding heart

16  valves, and changing the assignment clause to expressly provide Impra the right to "assign

17  . . . to any affiliate or division of C.R. Bard, Inc. . . ." PX191.

18    The '135 patent issued on August 20, 2002.  Dr. Goldfarb, as the patentee, and BPV

19  ("Impra" at that time), filed suit as co-plaintiffs in 2003.  On January 30, 2007, BPV (Impra's

20  successor) and Dr. Goldfarb entered into an Assignment of Patent Rights Agreement.

21  Pursuant to this agreement, BPV acquired "all rights, title and interest in and to the [Goldfarb

22  patent]" including the right to "sue and collect damages for violations of the [Goldfarb

23  patent]," regardless of whether the violations occurred prior to or after the execution date of

24  this Agreement." PX1476.

25    **B.    DISCUSSION**

26    Gore contends that Dr. Goldfarb lacked standing to bring the instant lawsuit because,

27  Gore asserts, Dr. Goldfarb assigned the right to enforce the '135 patent to C.R. Bard as part

28                                    - 14 -

of the exclusive license given to C.R. Bard.  Gore argues that Dr. Goldfarb retained only naked title to the '135 patent, and "cannot maintain suit in his own name."  Thus, Gore asserts, Dr. Goldfarb acting without C.R. Bard, who Gore contends remained the exclusive licensee at the time of filing suit, lacked standing to sue.  However, the 1980 license did not transfer all of Dr. Goldfarb's rights to the '135 patent.  For example, Dr. Goldfarb retained the right to share in any damages recovered from enforcement or licensing of the Goldfarb patent. PX4 § 5.3.  Dr. Goldfarb also retained significant reversionary rights if C.R. Bard did not prosecute its rights.  Id. at §§ 3.1-3.2.  In addition, the exclusive license excluded a category of products (heart valves) from its subject matter.  Id. at 1.1.  Moreover, as discussed below, C.R. Bard transferred its exclusive license to Impra/BPV.  Therefore, Dr. Goldfarb, in conjunction with Impra/BPV, had standing to enforce the patent.

The Patent Act provides that a patentee has a remedy for patent infringement by civil action.  35 U.S.C. § 281.  "This has been interpreted to require that a suit for infringement must ordinarily be brought by a party holding legal title to the patent."  Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1091, 1093 (Fed. Cir. 1998).  Yet, in Rite-Hite Corp. v. Kelly Co., Inc., 56 F.3d 1538, 1552 (Fed. Cir.1995), the Federal Circuit held as follows:

> Under certain circumstances, a licensee may possess sufficient interest in the patent to have standing to sue as a co-plaintiff with the patentee.  Such a licensee is usually an 'exclusive licensee.'  To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well.  If the party has not received an express or implied promise of exclusivity under the patent, i.e., the right to exclude others from making, using, or selling the patented invention, the party has a 'bare license,' and has received only the patentee's promise that party will not be sued for infringement.

An exclusive license need not be in writing.  A license may be written, oral, or implied-in-fact.  Waymark Corp. v. Porta Sys. Corp., 334 F.3d 1358, 1364 (Fed. Cir. 2003) (stating as follows:

- 15 -

Only assignments need be in writing under 35 U.S.C. § 261.  Licenses may be oral.   Waymark allegedly had an oral license from [a member of the partnership].  It is true that only in extremely limited circumstances can the holder of an oral transfer of patent rights sue for infringement in its own name.  However, the partnership claimed a written assignment of the patent.  *Under such circumstances, the partnership had standing to bring the action, and it was permissible to join Waymark as a plaintiff under the alleged oral exclusive license.*

(emphasis added) (citations omitted)).

Here, as in Waymark, the alleged 1996 transfer to Impra/BPV of the 1980 license, created at least an implied-in-fact transfer of the license to Impra/BPV thereby conferring standing to sue in conjunction with Dr. Goldfarb.  This implied-in-fact transfer was done in conjunction with Bard's acquisition of Impra/BPV, whereby Impra/BPV assumed all rights and responsibilities for the license including the right to sue to enforce the patent, provided it joined Dr. Goldfarb, the patent title holder at the time.  In further support of an implied-in-fact transfer of the exclusive agreement is the testimony of then-president of Impra, John McDermott, that pursuant to the transfer, Impra assumed the obligation to pay Dr. Goldfarb royalties as his licensee.  Trial Tr., 11/16/07, at 1644:20-1645:10 (McDermott).

Gore argues that any oral or implied-in-fact license to BPV is, at most, a non-exclusive license that does not confer standing.  Gore theorizes that C.R. Bard had a written exclusive license that amounted to a transfer of title because of the limited rights that Dr. Goldfarb retained.  Therefore, Gore contends, any transfer of C.R. Bard's rights would be an assignment of title, which requires a writing.

Contrary to Gore's argument, Dr. Goldfarb retained substantial rights in the 1980 agreement including, *inter alia*, the right to share in any patent damages or license fees.  Thus, the 1980 agreement granted an exclusive license, not title, to USCI/C.R. Bard.  C.R. Bard was free to orally transfer its exclusive license to BPV, thereby conveying standing to enforce the patent with Dr. Goldfarb.  See Waymark, 334 F.3d at 1364 (an oral licensee could properly join patent suit by partnering with holder of written assignment of patent);

1    Kalman v. The Berlyn Corp, 914 F.2d 1473, 1482 (Fed. Cir. 1991) (a licensee had standing

2    to sue along with the patentee because the parties had stipulated to the existence of a license);

3    Weinar v. Rollform, Inc., 744 F.2d 797, 807 (Fed. Cir. 1984) (an oral exclusive distribution

4    agreement was sufficient to create standing to sue for patent infringement).

5        In its Motion, Gore relies on Enzo APA & Son v. Geapag A.G., 134 F.3d at 1093, to

6    assert that "[a]n oral assignment of the exclusive license is ineffective."  (Gore Mot. at 2.)

7    Enzo, however, addressed the more narrow question of whether an oral exclusive licensee

8    had standing to enforce a patent in its own name where it failed to join the patentee and

9    subsequently received a *nunc pro tunc* assignment. Id. at 1092. The Federal Circuit rejected

10   this claim and, reiterating well-established precedent, held that an exclusive licensee may

11   only file suit in its own name where it is the actual or "virtual assignee" of the patent, which

12   requires written evidence of such an assignment.   Id. at 1093.   The instant case is

13   distinguishable from Enzo for a number of reasons.  Here, Dr. Goldfarb, the patent holder,

14   is a party to the lawsuit.  In addition, Dr. Goldfarb retained substantial rights to his patent

15   application.  Finally, by at least 1997, there is a writing transferring the exclusive license

16   from C.R. Bard to BPV.

17       Plaintiffs claim that the 1997 amendment, which is in evidence, not only confirms the

18   earlier agreement but serves as a new agreement because it added additional terms.  Gore,

19   on the other hand, asserts that the 1997 amendment is insufficient to create standing because

20   (1) it was not executed by C.R. Bard or USCI (the 1980 exclusive licensee) and (2) because

21   it did not assign the 1980 exclusive license, but merely conformed the alleged 1996

22   assignment for which there is nothing in the record to support.

23       Gore's argument that the 1997 amendment was not executed by C.R. Bard focuses on

24   Mr. McDermott's testimony in which he acknowledged that he had signed the 1997

25   agreement "on behalf of" Impra/BPV.  However, Mr. McDermott also testified that he signed

26   on behalf of C.R. Bard with its express consent.

27

28                                              - 17 -

1

2

> Q.      Now, did you get approval from your management at C.R. Bard, the owners of Impra, to enter into this agreement [PX191] on their behalf?

3

> A.      Yes, yeah.

4

Trial Tr., 11/16/2007, at 1647:2-5 (McDermott). [1]

5

6

7

8

9

10

11

12

13

14

In support of Gore's second argument that the 1997 assignment merely confirmed the alleged 1996 assignment, Gore filed a Notice of New Authority Relating to Plaintiffs' Lack of Standing (Doc. 825).  In Gore's Notice, Gore asserts that the recent Federal Circuit decision in Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359 (Fed. Cir. 2008), "reaffirms Gore's position that the Amendment to the license does not give BPV standing to sue" because in Mars the Federal Circuit held that a later amendment to a license "confirming" an alleged prior transfer is merely a "confirmation" and does not serve to transfer the license. Plaintiffs filed an "Objection to Gore's . . . [Allegedly] New Authority Related to Plaintiffs' Lack of Standing" (Doc. 827).  Gore filed a Response to Plaintiffs' Objection to Gore's Notice (Doc. 829) and Plaintiffs filed a Reply (Doc. 832).

15

16

17

18

19

20

21

22

In Mars, Mars owned the patent-in-suit when the complaint was filed in 1990 and undisputedly had standing.  Mars, 527 F.3d at 1363.  Mars entered into an agreement transferring "its entire interest in the Covered Intellectual Property that relates to the business of the parties" to a wholly-owned subsidiary, Mars Electronics Inc., ("MEI"), in a 1996 agreement.  Id.  The Federal Circuit ruled that the 1996 agreement operated to transfer title in the patent-in-suit from Mars to MEI such that "Mars lacked standing as of 1996."  Id. at 1370.  In 2006, Mars entered into a purchase agreement with its subsidiary in which Mars purported to reacquire title to the patent-in-suit  to correct the jurisdiction defect created in

23

24

25

26

27

> [1] The Court recognizes that Mr. McDermott testified on direct examination that he had express consent from C.R. Bard to enter into the 1997 agreement and then later on cross-examination stated that he signed the agreement as the president of Impra.  See Trial Tr., 11/16/2007, at 1647:2-5, 1690:19-20 (McDermott).  However, the Court does not find that Mr. McDermott's statement that he signed the agreement as the President of Impra negates his statement that he had C.R. Bard's consent to enter into the agreement.

28

1996.  Id.  The purchase agreement was not made part of the record.  Id. at 1364.  Instead,
Mars relied on a later dated "Confirmation Agreement" to establish the transfer of title.  Id.
The Confirmation Agreement stated as follows:

> Mars and the Buyer [MEI] do hereby acknowledge that Mars owns and retains
> the right to sue for past infringement of the Litigation Patents. To the extent
> that MEI may have or claim any rights in or to any past infringement of the
> Litigation Patents or any recovery therefor, upon the terms and subject to the
> conditions of the Purchase Agreement, MEI hereby does irrevocably assign all
> such rights to Mars.

Id. at 1371.  The Federal Circuit found this language insufficient to transfer title back to Mars
and correct the jurisdictional defect.  Id. at 1369.  It held that the first sentence of the above
paragraph was not "a transfer itself."  Id. at 1371.  It also determined that although the second
sentence did constitute a transfer, the language was insufficient to confer standing because
it was "an assignment of the right to sue for past infringement, not an assignment of title."
Id. at 1371-72.  ("We see no provision in the Confirmation Agreement that transfers title to
the [patent-in-suit] back to Mars.").

Mars is distinguishable from the instant case.  Here, the 1997 written Agreement
Amending License Agreement was not merely "confirmatory" as Gore contends.  Rather, the
1997 Agreement created a new license agreement between Dr. Goldfarb and Impra/BPV.
The terms of the 1980 License that were amended by the 1997 Agreement include the
following:

- Replacing "[a]ll references" to Bard's division (USCI) in the 1980 License with Impra/BPV;

- Removing the subject matter exclusion regarding heart valves;

- Changing the assignment clause to expressly provide Impra the right to "assign . . . to any affiliate or division of C.R. Bard, Inc. . . ."

Thus, unlike Mars where the Confirmation Agreement merely "acknowledged" that Mars
owned the patents, here, the 1997 Agreement expressly transferred in writing the rights from

1  C.R. Bard to Impra/BPV and actually enhanced those rights by granting additional rights to

2  Impra/BPV that Dr. Goldfarb had previously retained.  Moreover, also distinguishable from

3  <u>Mars</u>, here, the owner of the patent title – Dr. Goldfarb – was a plaintiff at the

4  commencement of the lawsuit and has remained a plaintiff throughout the entire litigation.

5       Gore has not established that Plaintiffs lack standing.  Accordingly, Gore's Motion

6  for JMOL Regarding Plaintiffs' Lack of Standing is denied.

7                            **CONCLUSION**

8       For the foregoing reasons,

9       IT IS ORDERED denying Gore's Motion for JMOL Regarding Plaintiffs' Claim of

10  Willful Infringement (Doc. 651).

11       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Invalidity

12  of the '135 Patent for Failure to Disclose Best Mode (Doc. 731).

13       IT IS FURTHER ORDERED denying Gore's Motion for JMOL that Claims 20-27

14  are Invalid for Failure to Satisfy the Written Description Requirement of 35 U.S.C. § 112,

15  ¶ 1 (Doc. 732).

16       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Plaintiffs'

17  Failure to Prove that Gore's Accused Products Meet the Typicality Element of Claims 20-27

18  (Doc. 734).

19       IT IS FURTHER ORDERED denying Gore's Motion for JMOL that Claims 20-27

20  are Invalid under 35 U.S.C. § 102(B) for Lack of Novelty in View of the 1973 Matsumoto

21  <u>Surgery</u> Article (Doc. 736).

22       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Plaintiffs'

23  Claim that Propaten Infringes the '135 Patent (Doc. 737).

24       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Invalidity

25  for Anticipation by Dr. Norton's December 1971 Use in "Mrs. B" (Doc. 740).

26       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Invalidity

27  for Improper Inventorship Because Cooper and Goldfarb are Joint Inventors (Doc. 741).

28

1    IT IS FURTHER ORDERED denying Gore Motion for JMOL Regarding Plaintiffs'

2  Lack of Standing (Doc. 652).

3    DATED this 29th day of July, 2008.

4

5

6  _____

7    Mary H. Murguia
   United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                         - 21 -