1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                        FOR THE DISTRICT OF ARIZONA
8
9    Bard  Peripheral  Vascular,  Inc.;  David)    No. CV 03-0597–PHX-MHM
     Goldfarb, M.D.,                          )
10                                            )
                  Plaintiffs,                 )    **ORDER**
11                                            )
     vs.                                      )
12                                            )
     W.L. Gore & Associates, Inc.,           )
13                                            )
                  Defendant.                  )
14   _____       )
15   W.L. Gore & Associates, Inc.,           )
                                              )
16                Counterclaimant,            )
                                              )
17   vs.                                      )
                                              )
18   Bard  Peripheral  Vascular,  Inc.,David)
     Goldfarb, M.D., and C.R. Bard, Inc.,     )
19                                            )
                  Counterdefendants.          )
20   _____       )
21
22
23        Following a jury verdict for Plaintiffs, Bard Peripheral Vascular and David Goldfarb,

24   M.D. ("Plaintiffs"), in this patent infringement case involving United States Patent No.

25   6,436,135 (the "'135 patent"), W.L. Gore & Associates, Inc.'s ("Gore" or Defendant"),

26   inequitable conduct claims were tried to the Court during a bench trial that occurred on

27   December 7, 11, and 12, 2007.  Since that time, the parties have filed post-trial briefs,

28   including proposed findings of fact and conclusions of law, and have presented oral

argument. After considering the trial testimony, oral argument, and the papers submitted, the Court enters this Order addressing the merits of Defendant's claims of inequitable conduct.

Gore claims patent invalidity based on inequitable conduct. In support of its position, Gore asserts seven claims of alleged non-disclosure, misleading disclosure, and false statements during the patent application process that Gore argues support finding the patent unenforceable. Specifically, Gore asserts it can prove the following claims to establish inequitable conduct:

1. Plaintiffs and their attorneys failed to advise the Patent Office of Dr. Volder's connections with Impra in his 1976 affidavit in which he expressed his opinion on the issue of obviousness as a presumably impartial person skilled in the art.

2. Plaintiffs and their attorneys failed to advise the Patent Office at any time prior to withdrawal of the rejection of Claims 1 to 10 of the Goldfarb patent application, that in 1978 Lenox Baker, M.D., withdrew and repudiated paragraph 6 of his 1976 affidavit filed with the Patent Office.

3. The filing of and reliance on two 1976 affidavits from D. Dan Detton, notwithstanding Mr. Detton's repudiation of those affidavits before they were filed, and Plaintiffs' subsequent failure to advise the Patent Office of Mr. Detton's 1978 repudiation of his 1976 affidavits.

4. Plaintiffs' reliance on an error that the Patent Office made in connection with the Matsumoto publication in Surgery, in which the Patent Office Examiner mistakenly interpreted the wall thickness in that publication to be 1 millimeter ("mm") rather than 0.5 mm.

5. Plaintiffs and their attorneys failed to provide information to the Patent Office about Dr. Volder's work and his possible role as an inventor or co-inventor, including the failure to disclose the existence of and the subsequent destruction of the Volder notebook.

6. Plaintiffs' and their attorneys' failed to comply with the Patent Office order

requiring production of material information from the <u>Goldfarb v. Impra</u> litigation.

7.     Plaintiffs and their attorneys failed to advise the Patent Office Examiner of the existence of the Gore shipping log, which contained information about prior art vascular graft wall thicknesses that was inconsistent with the 1976 affidavits of Harold Green and Mr. Detton, and inconsistent with the argument made by Dr. Goldfarb and Mr. Sutton in persuading the Patent Office Examiner to withdraw the November 1975 rejection of Claims 1 to 10.

**FINDINGS OF FACT**

**I.    PRE-INTERFERENCE *EX PARTE* PROSECUTION OF THE GOLDFARB APPLICATION**

       **A.     FORMATION OF IMPRA**

1.    In approximately May 1974, Dr. Goldfarb and others, who would later become associated with a company called International Medical Prosthetics Research Associates, Inc. ("Impra"), retained attorney Samuel J. Sutton to assist them in preparing a patent application. Trial Tr., 12/7/07, at pp. 3830-31 (Sutton).

2.    One of the reasons Impra retained Mr. Sutton was to help it get a patent on the ePTFE graft. Trial Tr., 11/30/07, at p. 2598 (Sutton). Impra determined that such a patent was critical to its survival. Trial Tr., 12/5/07, at p. 3204 (Gall).

3.    In the course of preparing the patent application, Mr. Sutton conducted a thorough investigation into inventorship, during which he met with J.G.R. Volder, M.D., several times between June and August 1974 for the purpose of investigating inventorship. Trial Tr., 11/30/07, at p. 2597 (Sutton). Mr. Sutton also met extensively with Dr. Goldfarb, who gave Mr. Sutton full access to his laboratory research. Trial Tr., 11/07/07, at pp. 416-17 (Goldfarb); Trial Tr., 11/30/07, at pp. 2601-04 (Sutton).

4.    In September 1974, there were many claims and contenders for the position of

- 3 -

1    inventor, including Dr. Goldfarb and Dr. Volder.  Trial Tr., 12/7/07, at p. 3826

2    (Sutton); Trial Tr., 11/7/07, at pp. 415-16, 588 (Goldfarb); Trial Tr., 11/30/07, at pp.

3    2606-07 (Sutton).

4    5.    Mr. Sutton and Impra were concerned in the summer of 1974 that the University of

5    Utah might have an ownership claim to the ePTFE patent if Dr. Volder were the sole

6    inventor or even a co-inventor.  Trial Tr., 11/27/07, at pp. 1976-77 and 1983-85

7    (Baker); Trial Tr., 11/30/07, at pp. 2598-99 (Sutton).

8    6.    At that same time, Mr. Sutton also was concerned about Dr. Goldfarb's relationship

9    with Arizona State University and the Arizona Heart Institute ("AHI") and whether

10    either entity may have an ownership claim to the patent application Mr. Sutton was

11    preparing.  Trial Tr., 11/30/07, at pp. 2598-99 (Sutton).

12    7.    On September 4, 1974, Mr. Sutton received a letter from William H. Drummond, Dr.

13    Volder's personal attorney.  DX3048.  In that letter Mr. Drummond asserted that "Dr.

14    Volder has kept some fairly accurate and complete records of conception, reduction

15    to practice and diligence . . . [which] leads me to the opinion that Dr. Volder is the

16    sole inventor."  Id.

17    8.    After receiving Mr. Drummond's letter, on September 9, 1974, Mr. Sutton met with

18    Drs. Volder and Goldfarb, as well as Don Gall, M.D., Mr. Harold Green, and Richard

19    Mendenhall, to discuss the draft patent application and to investigate inventorship.

20    Trial Tr., 11/07/07, at pp. 412-19 (Goldfarb); Trial Tr., 11/27/07 at pp. 2003-04 (H.

21    Green); Trial Tr., 11/30/07, at p. 2604 (Sutton); Trial Tr., 12/05/07, at pp. 3191-92,

22    3197-99 (Gall).

23    9.    At the conclusion of this meeting it was unanimously agreed by all attendees, without

24    objection, that Dr. Goldfarb was the sole inventor.  Trial Tr., 12/05/07, at pp. 3191-92,

25    3197-99 (Goldfarb); Trial Tr., 11/27/07, at pp. 2004-05 (H. Green); Trial Tr.,

26    12/05/07, at 3199 (Gall).

27    10.    The conclusion that Dr. Goldfarb was the inventor was reached solely on the scientific

28                                              - 4 -

1    merits of Dr. Goldfarb's work, and appears not to be based on an "election."  Trial

2    Tr., 11/07/07, at pp. 418-19 (Goldfarb); Trial Tr., 11/27/07, at pp. 2004-05 (H.

3    Green); Trial Tr., 12/05/07, at p. 3200 (Gall).

4   11.   Mr. Sutton summarized the outcome of this meeting in a September 10, 1974

5    memorandum that stated that it was "unanimously determined that Impra's patent

6    application should be filed in the name of Dr. Goldfarb."  PX2.

7   12.   Dr. Volder signed Mr. Sutton's memorandum affirming that it "accurately

8    summariz[ed] the substance of [the] September 9, 1974 discussions."  PX2.  There is

9    no evidence to suggest that Dr. Volder has ever repudiated this signed

10    acknowledgment.

## B.   GORE'S ACTIVITIES IN RELATION TO ePTFE

13.   In 1972, research began into the use of expanded polytetrafluoroethylene ("ePTFE")

as a vascular graft, when Gore and several surgeons experimented to determine the

suitability of ePTFE as a vascular graft.  Cooper v. Goldfarb, 154 F.3d 1321, 1324

(Fed. Cir. 1998).

14.   During 1972-73, Gore manufactured and sent these ePTFE vascular grafts to

numerous surgeons to evaluate the material's suitability for use as a vascular

prosthesis.  Cooper, 154 F.3d at p. 1324; Trial Tr., 11/8/07, at p. 633 (Goldfarb).

15.   One of the surgeons to receive ePTFE vascular grafts from Gore was Dr. Volder, then

at the University of Utah.  Trial Tr., 11/8/07, at p. 633 (Goldfarb).  Dr. Volder

co-authored one article concerning his results with this material:  Volder, et al., "A-V

Shunts Created in New Ways," Trans. Amer. Society for Artificial Organs, Vol. XIX,

pp. 38-42 (published by Aug. 6, 1973) ("the Volder A-V Shunts Article").  PX115JJ

at p. PX115.2667-71; DX3247.

16.   Dr. Goldfarb also received ePTFE tubing from Gore.  H. Green Dep., 7/12/88, at p.

265 (PX116.8867).

17.   In 1973 Gore hired Mr. Detton as a "communicator" between the doctors to whom

1    Gore was sending ePTFE tubing for testing and the engineers at Gore.  Detton Dep.,

2    6/19/75, at pp. 5-6 (PX115.874-75); Trial Tr., 11/27/07, at p. 1844 (Detton).  Mr.

3    Detton reported directly to Peter Cooper, the plant manager at Gore.  Trial Tr.,

4    11/27/07, at pp. 1844-45 (Detton).  In April 1974 Mr. Detton was fired by Gore and,

5    for a short time thereafter, had limited involvement with the formation of Impra until

6    he went to Alaska in June 1974 and had no involvement.  Detton Dep., 6/19/75, at p.

7    102 (PX115.971); Trial Tr., 11/27/07, at pp. 1890-93 (Detton).

8    **C.    GORE SUES IMPRA**

9    18.    Shortly after its formation, Impra and certain individuals associated with Impra, were

10        sued by Gore for allegedly misappropriating Gore's trade secrets.  Gore v. Impra, No.

11        74-778 PXH WEC (D. Ariz. 1974) (PX115.341-61).  During the course of this

12        litigation, Mr. Detton and Mr. Harold Green were both deposed in 1975.  Detton Dep.,

13        6/19/75 (PX115.870-1005); H. Green Dep., 7/17 18/75 (PX115.1006-1227).

14    19.    Mr. Sutton met with Mr. Detton for about an hour before his deposition.  Trial Tr.,

15        12/12/07, at p. 4314 (Detton).  Mr. Sutton "did not ask [Mr. Detton] to lie or anything

16        like that."  Id. at pp. 4314, 4317.

17    20.    In his 1975 deposition, Mr. Detton testified that he received a specific request from

18        Dr. Goldfarb in mid-June 1973 for an ePTFE graft with certain specifications.  Detton

19        Dep., 6/19/75, at p. 32 (PX115.901).  Mr. Detton further testified that he and Mr.

20        Harold Green (then the Gore employee responsible for fabricating ePTFE tubing)

21        immediately started working on adjusting Gore's production control variables in order

22        to make the grafts specified by Dr. Goldfarb, and that grafts satisfying Dr. Goldfarb's

23        specifications were delivered to him in mid-July 1973.  Detton Dep., 6/19/75, at pp.

24        21-32 (PX115.890-901).

25    21.    Mr. Detton also testified that in February 1974, he completed and presented internally

26        at Gore a memorandum that was a compilation of the research performed by the

27        various medical researchers, including Drs. Goldfarb and Volder, who were receiving

28                                                    - 6 -

1    ePTFE tubing from Gore (the "1974 Detton Memorandum").  Detton Dep., 6/19/75,

2    at pp. 42-47 (PX115.911-16).

3    22.    Mr. Harold Green was deposed after Mr. Detton on July 17-18, 1975.  H. Green Dep.,

4    7/17-18/75 (PX115.1006-1227).  Mr. Green stated that in either June or July 1973 Mr.

5    Detton informed him of what came to be known at Gore as the "Goldfarb Structure."

6    H. Green Dep., 7/17-18/75, at pp. 54-58 (PX115.1061-68).   He identified the

7    "Goldfarb Structure" as that described in the claims of Dr. Goldfarb's patent

8    application.  Id.  Mr. Green independently confirmed the physical specifications

9    received from Mr. Detton by calling Dr. Goldfarb directly because the requested

10   grafts were so different then any of the ePTFE tubing that Gore had previously

11   manufactured.   PX115O at p. PX115.280.   This telephone conversation was

12   corroborated by Dr. Goldfarb.  Trial Tr., 11/07/07, at p. 399 (Goldfarb).  Mr. Green

13   then used Dr. Goldfarb's specifications to prepare grafts for Dr. Goldfarb in the

14   summer of 1973.  H. Green Dep., 7/17-18/75, at p. 60 (PX115.1067); Trial Tr.,

15   11/07/07, at pp. 399-400 (Goldfarb).

16   **D.    PTO PATENT APPLICATION**

17   23.    On October 24, 1974, Mr. Sutton filed a patent application with the PTO in the name

18   of Dr. Goldfarb entitled "Prosthetic Vascular Graft" (the "Goldfarb Application").

19   PX115A.  Around the time the Goldfarb Application was filed, Dr. Goldfarb agreed

20   to assign all of his rights in the Goldfarb Application to Impra, which agreement

21   subsequently was memorialized in writing on January 9, 1976. PX1; PX3; PX115M;

22   PX1356; Trial Tr., 11/07/07, at pp. 420-23, 421, 435-37 (Goldfarb).  Mr. Sutton was

23   the attorney-of-record for the application.  PX115M at p. 115.1.

24   24.    All original claims 1-10 of the '135 patent application were directed to ePTFE

25   vascular grafts, and each required a wall thickness within a particular range. PX115A

26   at p. 115.44-48.

27   25.    On November 26, 1975, the Patent Office mailed its first Office Action in the

- 7 -

1    Goldfarb Application to Mr. Sutton. PX115B at p. PX115.190-92. The Office Action
2    was signed by Examiner R.L. Frinks - the same examiner  assigned to the Cooper
3    Application.  (See I.K. Cooper Patent Application *infra*.) (who, in fact, mailed an
4    Office Action in the Cooper Application that same day based on three of the same
5    references (PX117.119-23)).  Examiner Frinks rejected the Goldfarb Application as
6    being unpatentable as obvious in view of four articles:  (i) Soyer, et al., "A New
7    Venous Prosthesis," Surgery, Vol. 72, page 864 (Dec. 1972) ("the Soyer Article"); (ii)
8    Matsumoto, et al., "A New Vascular Prosthesis for Small Caliber Artery," Surgery,
9    Vol. 74, page 519 (Oct. 1973) ("the Matsumoto III Article"); (iii) the Volder A-V
10    Shunts Article; and (iv) Poth, et al., "The Use of Plastic Fabrics as Arterial
11    Prostheses," Annals of Surgery, Vol. 142, No. 4, pp. 524-632, (Oct. 1955). DX3334,
12    DX3247, DX3009.

13    26.    Mr. Sutton had previously identified the Soyer and Matsumoto III Articles as prior art
14    both in the specification of the Goldfarb Application (PX115A at p. PX115.31.), and
15    in a "Pre-Examination Amendment and Citation of Prior Art," received by the PTO
16    on April 21, 1975.  PX115RR at p. PX115.57.

17    27.    In response to the PTO examiner's rejection of the Goldfarb Application, Mr. Sutton
18    submitted five affidavits to the PTO in 1976 – one by Mr. Harold Green, one by Dr.
19    Baker, two by Mr. Detton, and one by Dr. Volder.  PX115C and PX115Q.

20    28.    Mr. Sutton, who drafted the Green, Baker, and Volder affidavits and submitted them
21    to the Patent Office, testified that those affidavits formed a material portion of the
22    Patent Office files relating to the '135 patent application, and if those affidavits were
23    incorrect, that would be material to the prosecution of the Goldfarb patent application.
24    Trial Tr., 12/7/07, 3854-3855, 3884 (Sutton).  Dr. Goldfarb was familiar with these
25    affidavits, he disagreed with at least some of their content, but they were still filed on
26    his behalf in 1976.  Trial Tr., 11/7/07, at pp. 537, 540 and 545-46 (Goldfarb).

27

28                                              - 8 -

E.      THE 1976 AFFIDAVITS

1.      DR. VOLDER'S 1976 AFFIDAVIT

29.    Dr. Volder's 1976 Affidavit was executed on July 29, 1976.   PX115Q at p. PX115.311.

30.    In his affidavit, Dr. Volder stated that he was the author of the Volder A-V Shunts Article relied on by the examiner and:

> That, as a result of his early work at the Division of Artificial Organ in the Department of Surgery of the University of Utah, reported in the 1973 ASAIO [Volder A-V Shunts Article], he was able to speculate . . . that "It is believed that by increasing the average pore size of the material, at the moment 5, it will be possible to accelerate the process of tissue infiltration and development of capillaries."

PX115Q at p. PX115.308.

31.    The 1976 Volder Affidavit further describes how, after the preparation of the Volder A V Shunts Article, Dr. Volder requested that Mr. Detton prepare "thick wall" tubing "including a large number of randomly spaced perforations produced by repeatedly running the tubular structure through a sewing machine …" and that "his research efforts were, and continue to be, in the direction of vascular grafts having open superstructure, characterized by interstitial distances substantially greater than one hundred microns."  Id. at p. PX115.308-09.  Dr. Volder also stated that he had reviewed the claims of the Goldfarb Application prior to its filing in an effort, *inter alia*, to "ascertain whether any technical overlap or conflict existed between the subject matter claimed … [and] the work described in the 1973 ASAIO article [Volder A-V Shunts Article]" and that following such review:

> [H]e [was] of the unqualified opinion that the prosthetic vascular structure conceived and developed by the applicant, while seemingly apparent when viewed with the aid of hindsight, was by no means obvious to those actively conducting research on expanded PTFE vascular structures during 1972 and 1973.

Id. at p. PX115.310.  Dr. Volder never withdrew this affidavit after he signed it.

32.     Dr. Volder was a founding director of Impra.  DX3380 at pp. I00376-77; Trial Tr., 12/5/07, at pp. 3207-08 (Gall); PX116III at pp. 116:12853-54, 116:12933.  Dr. Volder also owned stock in Impra and was on its Medical Advisory Board.  DX3379, DX3380 at p. 00381; Trial Tr., 12/5/07, at pp. 3200-01 (Gall); PX116III at pp. 12854-55, 116.12965-66.

33.     Although Dr. Volder was a shareholder of Impra at the time he signed his affidavit, the 1976 Volder Affidavit does not discuss this affiliation with Impra.  PX115Q.  In contrast, Mr. Sutton disclosed both Mr. Harold Green's and Mr. Baker's affiliation with Impra.  Trial Tr., 12/12/07, at pp. 4262-63 (Thesz).

34.     However, there is no evidence that Dr. Volder was an officer of Impra at the time he signed his affidavit.  Trial. Tr., 12/17/2007, at pp. 4135, 4137-38 (Bjorge).

35.     Moreover, there is no evidence that Mr. Sutton, who drafted Dr. Volder's affidavit, knew of Dr. Volder's ownership interest in Impra at or before the time the affidavit was submitted, or at any time before 1996.   Trial Tr., 12/12/07 at pp. 4263, 4306 (Thesz).  Nor is there any evidence that either Dr. Volder or Dr. Goldfarb were aware that Dr. Volder's ownership interest in Impra possibly should have been disclosed in Dr. Volder's affidavit.

## 2.     DR. BAKER'S 1976 AFFIDAVIT

36.     Dr. Lenox Baker executed his affidavit in support of the Goldfarb Application on March 15, 1976.  In his affidavit Dr. Baker stated:

> Under no conditions presently known to him would he use or recommend the use of a graft characterized by a wall thickness greater than approximately .75 mm, since "thick wall" grafts of this type are surgically unacceptable and accordingly subject the patient to an unreasonably high risk of clinical failure.

PX115F at p. PX115.285.

37.     Mr. Sutton disclosed in Dr. Baker's affidavit that Dr. Baker was an officer of Impra. PX115F at p. PX115.283.

38.   On April 22, 1976, Mr. Sutton argued to the Patent Office on behalf of Dr. Goldfarb that the 0.2 to 0.8 mm wall thickness range of the claims was an "extremely important" and non-obvious distinction over the prior art.  That argument expressly quoted paragraph 6 of Dr. Baker's affidavit to establish the criticality of a wall thickness range of 0.2 to 0.8 mm and asked the Patent Office to withdraw the pending obviousness rejection. PX115C at pp. 115.219-20; Trial Tr., 12/11/07, at pp. 3949-51 (Bjorge).

39.   By February 1978, Dr. Baker believed that his April 1976 affidavit was untrue or inaccurate, and this was communicated to Dr. Goldfarb and his counsel.  DX3055 at p. G-11106; Trial Tr., 12/7/07, at p. 3874 (Sutton); Trial Tr., 12/11/07, at pp. 3951-52 (Bjorge).

40.   By at least July 1978, Mr. Cates, Dr. Goldfarb's attorney, was aware of the inaccuracy of Dr. Baker's April 1976 affidavit.  Trial Tr., 12/11/07, at 3958-3959 (Bjorge); DX3481.

41.   On November 9, 1978, Dr. Baker was deposed for a second time in the Goldfarb v. Impra litigation.  Trial Tr., 11/27/07, at pp. 1978-85 (Baker).  During that deposition, Dr. Baker indicated that he wanted to change all of Paragraph 6 of his 1976 Affidavit because he "now believed that our thinking at that time was not correct."  Trial Tr., 11/27/07, at pp. 1978-79 (Baker).  Dr. Baker was advised the "most proper way" of describing the inaccuracy of paragraph 6 of his March 1976 affidavit would be "at this deposition" because he understood that it "would undoubtedly end up in the U.S. Patent Office in relation to [the '135] patent application."  Trial Tr., 11/27/07, at pp. 1980-81 (Baker).  Dr. Goldfarb was present during that testimony and thereafter read the transcript.  PX117 at p. 117.2994, DX3110; Trial Tr., 12/11/07, at p. 4043 (Bjorge).

42.   Dr. Baker confirmed, however, that he did not hold these beliefs at the time he signed the affidavit in 1976 and that he believed the affidavit to be true and correct at the

1   time he signed it.  Trial Tr., 11/17/07, at p. 1978 (Baker).

2   **3.    THE 1976 DETTON AFFIDAVITS**

3   43.   Two affidavits, signed by Mr. Detton on January 23, 1976, also were filed in April

4         1976 by Mr. Sutton as part of the argument against the November 1975 Patent Office

5         rejection of Dr. Goldfarb's application.  PX115N; PX115P.  These affidavits stated

6         what Dr. Goldfarb purportedly told Mr. Detton about the desirable properties of grafts

7         and what Mr. Detton knew about the wall thickness of grafts purportedly

8         manufactured by Gore before Dr. Goldfarb's input.  PX115P.  However, Mr. Detton

9         testified at trial that both such statements in his affidavit were false.  Trial Tr.,

10        11/27/07, at pp. 1895-97, 1897-98, 1919 (Detton).

11  44.   On January 23, 1976, in the presence of Mr. Sutton, Mr. Harold Green and Mr.

12        Detton's then wife Joanie Prestis, Mr. Detton signed the two affidavits that were later

13        submitted to the Patent Office by Mr. Sutton on behalf on Dr. Goldfarb.  These

14        affidavits were drafted by Mr. Sutton.  Trial Tr., 12/7/07, at pp. 3853-54 (Sutton).

15  45.   At first Mr. Detton refused to sign the affidavits.  According to Mr. Detton, Mr.

16        Harold Green pressured Mr. Detton to sign the affidavits.  Trial Tr., 12/12/07, at p.

17        4311.  Mr. Detton testified that on the drive home after signing the affidavits he

18        decided that they should not be submitted to the Patent Office because they were "so

19        fallacious."  Trial Tr., 11/27/07, at p. 1898 (Detton); Trial Tr., 12/12/07, at pp. 4311,

20        4317-18 (Detton).

21  46.   On January 26, 1976, the following Monday, Mr. Detton claims to have contacted Mr.

22        Sutton by telephone to request that the affidavits be withdrawn.  Trial Tr., 11/27/07,

23        at p. 1898 (Detton).  Mr. Detton testified that he told Mr. Sutton that the affidavits had

24        been signed under duress, that he was sending him a letter to that effect, and that he

25        highly objected to them being submitted to the Patent Office.  Trial Tr., 12/12/07, at

26        pp. 4311-12 (Detton).

27  47.   Also on January 26, 1976, Mr. Detton sent a letter to Mr. Sutton requesting the

28

1  withdrawal of the affidavits that he had executed on January 23, 1976 on the basis that

2  he "signed them under duress and anger" and because "the claims contained within

3  those affidavits … are not totally true."  DX3084; Trial Tr., 11/27/07, at pp. 1898-99,

4  1899 (Detton).  The letter was copied to Dr. Goldfarb.  DX3084; Trial Tr., 11/27/07,

5  at p. 1899 (Detton).

6  48.    Mr. Sutton denies having received the letter, DX3084, from Mr. Detton.  Trial Tr.,

7         12/7/07, at p. 3859 (Sutton).

8  49.    Mr. Sutton submitted the two Detton affidavits to the Patent Office in April 1976 and

9         relied on them to overcome the 1975 rejection. PX115P.

10  50.   In January or February of 1978 a meeting occurred at the Golden Eagle restaurant

11        between Messrs. Detton, Sutton and Harold Green.  H. Green Dep., 11/9/78,

12        (PX115.1652-61).  At this meeting, Mr. Detton purportedly indicated that he was

13        "uncomfortable" with his 1976 Affidavits, and asked for the best way to repudiate

14        them.  Id.  At this meeting, Mr. Detton did not specifically identify anything in his

15        affidavits that he believed to be incorrect, false or otherwise improper. Id. Mr. Sutton

16        told Mr. Detton that he was no longer involved in the prosecution of the Goldfarb

17        Application and that he should retain a lawyer or submit a paper directly to the PTO

18        if he wished to recant his affidavits.  Trial Tr., 12/07/07, at pp. 3864-65 (Sutton).  Mr.

19        Detton never did so.

20  51.   Impra disclosed this communication to Dr. Goldfarb in an interrogatory response in

21        the Goldfarb v. Impra litigation, verified by Mr. Harold Green on September 11,

22        1978, which stated that: "During February of 1978, Mr. Detton clearly and

23        unequivocally stated to Mr. Green and … Samuel J. Sutton, that he (Detton) wishes

24        to repudiate his affidavit and thereby purge the record of any statements that might

25        be false, misleading or ambiguous."  DX3051.  Despite repeated requests from Dr.

26        Goldfarb's attorneys, Impra never provided any details regarding what Mr. Detton

27        believed to be incorrect, false or otherwise improper in his 1976 Affidavits.  Trial Tr.,

28

1    11/07/07, at pp. 444, 448 (Goldfarb).

2    52.   Mr. Sutton recalled that this meeting took place in April, May, or June 1978, after Mr.

3          Sutton's February 1978 withdrawal as Dr. Goldfarb's patent counsel. Trial Tr.,

4          11/30/07, at p. 2618 (Sutton).

5    53.   On November 9, 1978, Mr. Harold Green was deposed in <u>Goldfarb v. Impra</u>. Mr.

6          Green testified that the Golden Eagle meeting occurred in January or February 1978.

7          PX116 at p. 116.19059. Mr. Harold Green testified that Mr. Detton said with Mr.

8          Sutton present that he wanted to repudiate his affidavit:

9              [Detton] no longer felt comfortable with the affidavit that he had signed
               related to the [Goldfarb] patent application and was seeking advice on
10             how best to repudiate that affidavit ….

11         PX116 at pp. 116.19059-60. Mr. Green stated that if Mr. Detton withdrew his 1976

12         Affidavits this may cast a "shadow" over those paragraphs in the 1976 Green

13         Affidavit referring to Mr. Green's conversations with Mr. Detton. <u>Id.</u> at pp.

14         PX115.1663-66, 1671,1674.

15   54.   Mr. Sutton's secretary and business partner, Jane Shrum, confirmed that Mr. Sutton

16         learned in or about 1978 that Mr. Detton wanted to change parts of his affidavits.

17         Trial Tr., 12/12/07, at p. 4152 (Shrum).

18   55.   In October of 1978, Dr. Goldfarb and his litigation counsel, Harold Swenson, met

19         with Mr. Detton at the airport in Prescott. PX1308 at p. 1308.3; Trial Tr., 11/07/07,

20         at p. 441 (Goldfarb). At this one-and-a-half to two hour meeting Mr. Detton told Mr.

21         Swenson that he did not want to repudiate either of his 1976 Affidavits, and that he

22         was upset that Impra had made such a claim. PX1308 at p. PX1308.3-4; Trial Tr.,

23         11/07/07, at p. 441 (Goldfarb); Trial Tr., 12/12/07, at pp. 4109-12 (Swenson).

24   56.   Mr. Harold Green testified that if Mr. Detton wished to repudiate his affidavits,

25         paragraphs 3, 7, and 9 of Mr. Harold Green's affidavit would no longer be correct

26         because the information contained therein came from Mr. Detton. PX116 at pp.

27

28                                            - 14 -

1      116.19071-83.

2   57.   In discussions with Dr. Baker and Mr. Harold Green at different times before Mr.

3         Sutton withdrew as Goldfarb's patent counsel, Mr. Sutton learned that they were

4         worried about their affidavits because they had been based on Mr. Detton's affidavits,

5         and that if something was wrong with Detton's affidavits it could have a "domino

6         effect" on the other affidavits.  Trial Tr., 12/7/07, at p. 3874 (Sutton).

7   58.   Dr. Goldfarb was aware of Mr. Detton's repudiation, because he was present during

8         Mr. Harold Green's deposition where it was discussed.  PX116 at p. 116.19031; Trial

9         Tr., 11/7/07, at p. 569 (Goldfarb).  Dr. Goldfarb also read the transcript of Mr. Harold

10        Green's deposition by at least July 25, 1979.  DX3110.

11  59.   On September 11, 1978, Impra filed sworn Interrogatory responses stating that "Mr.

12        Detton has on numerous occasions prior to February 1978 conveyed to Mr. Harold

13        Green an uneasiness regarding the accuracy of [Detton's] affidavit."  DX3051 at

14        WGS000449.  The sworn interrogatory answers further stated that "[d]uring February

15        1978, Mr. Detton clearly and unequivocally stated to Mr. Green and the corporate

16        defendant's patent counsel, Samuel J. Sutton, that [Detton] wished to repudiate his

17        affidavit and thereby purge the record of any statements which might be construed to

18        be false, misleading, or ambiguous."  DX3051 at p. WGS000449.  The interrogatory

19        answers were executed by Mr. Harold Green, then president of Impra.  Trial Tr.,

20        11/27/07, at pp. 1991-92 (H. Green).

21  60.   On February 5, 1980, Mr. Detton executed an affidavit stating that "he questioned the

22        correctness of [the] statements" of his 1976 affidavit and that he "was pressured into

23        signing the affidavit."  PX115X at p. 115.615.  That affidavit also confirms that Mr.

24        Sutton was informed in January 1976 that the Detton affidavit "was not correct," was

25        signed "under duress" and "[Detton] wanted the Patent Office to be informed of this."

26        PX115X at p. 115.615; Trial Tr., 12/12/07, at pp. 4317-18 (Detton).  Thus, the 1980

27        Detton Affidavit provides in its entirety as follows:

28                                          - 15 -

The undersigned D. Dan Detton deposes and says:

(1)     That he is presently a resident of the State of Colorado residing at 10 Spruce Drive, Montrose, Colorado.

(2)     That he executed an affidavit entitled "Affidavit of D. Dan Detton Relating to Source and Origin of Material Comprising Specification of the Cooper Application" (copy attached) January 23, 1976, which he understands was filed in the patent application for David Goldfarb, Serial No. 517,415, filed October 24, 1974.

(3)     That before execution, he questioned the correctness of statements included in said Affidavit, which had been prepared by representatives of IMPRA, then assignee of the Goldfarb application, but was pressured into signing the Affidavit.

(4)     That he informed Mr. Sutten [sic], counsel for IMPRA, by telephone communication on January 26, 1976, (copy of text attached) that he felt that the Affidavit was not correct, that he had signed it under duress, and that he wanted the patent office to be informed of this.

(5)     That the vascular structures reported in his memorandum entitled "Gore-Tex® Medical Product Developments:  A Summary of Current Research Findings" (February 1974) as being successful, and the specifications of those structures including wall thickness, density, fibril length and the like, were determined as a result of the investigations reported in the memorandum, and had not been predicted by any of the medical investigators prior to institution of the reported work, and specifically, that neither David Goldfarb nor Peter Cooper described to him prior to the investigation at Arizona Heart Institute which commenced during the Summer of 1973 those specifications such as wall thickness, density and fibril length of a vascular graft that would be successful.

PX115X at p. PX115.615-16.

61.     On September 13, 1985, Mr. Lawrence Green, one of Dr. Goldfarb's patent attorneys, met with Mr. Detton.  DX3209.  After the meeting, Mr. Lawrence Green sent a letter to Mr. Detton requesting that Mr. Detton sign another affidavit in order to clarify his position with respect to the 1976 Affidavits.  Id.  Mr. Detton failed to respond to this letter.

1

### 4.    HAROLD GREEN'S 1976 AFFIDAVIT

2    62.    The 1976 Green Affidavit was executed on March 2, 1976 after Mr. Harold Green had

3          left Gore's employ. PX115C at p. PX115.279-282.  There is no evidence that once

4          Mr. Green left Gore, he had access to Gore's internal documents, including any

5          production or shipping logs that might have evidenced the work he did while at Gore.

6          The 1976 Green Affidavit states:  "based upon his personal knowledge of prior art

7          efforts to achieve an operative prosthetic, he believes that all prior research was

8          directed to and incorporated 'thick wall' tubes having wall thicknesses equal to or

9          greater than approximately one milimeter [sic] (1mm)."  PX115C at p. 115.281.

10   63.    The 1976 Green Affidavit, also mirrored Mr. Harold Green's 1975 <u>Gore v. Impra</u>

11         testimony regarding Dr. Goldfarb's inventorship stating, among other things, that: (i)

12         Mr. Detton communicated the "Goldfarb Specifications" to him  in the spring and

13         early summary of 1973; (ii) Mr. Green independently verified the specifications by

14         contacting Dr. Goldfarb directly because such structures "were at substantial variance

15         with the structures previously used and requested by other cardiovascular

16         researchers;" and (iii) having confirmed Dr. Goldfarb's specifications Mr. Green

17         immediately began making the requested grafts.  PX115O at p. 115.280.

18   64.    Mr. Sutton disclosed in Mr. Green's affidavit that Mr. Green was an officer of Impra,

19         the assignee of the Goldfarb Application at the time he signed the affidavit. PX115C

20         at p. PX115.279.

21   F.    PTO'S MISTAKE ABOUT MATSUMOTO WALL THICKNESS

22   65.    The Matsumoto <u>Surgery</u> article shows a graft wall thickness of 0.5 mm.  Trial Tr.,

23         11/8/07, at p. 653 (Goldfarb); Trial Tr., 11/28/07, at pp. 2101-02 (Goldfarb).

24         However, the Patent Examiner mistakenly believed that the Matsumoto III article

25         disclosed a graft wall thickness of 1 mm.  DX3055 at p. G-11106; Trial Tr., 12/4/07,

26         at pp. 2893-94 (Bjorge).

27   66.    In his remarks in the Office Action, Examiner Frinks noted the following:

28                                          - 17 -

to further make wall thickness 1 mm or less for small diameters such as taught by [the Matsumoto III Article] would be obvious.  Applicant's specific wall thickness of 0.2-0.8 mm is not seen to be a patentable distinction over wall thickness of [the Matsumoto III Article] in the absence of proven criticality.

PX115SS at p. PX115.191.

Although Examiner Frinks had the Matsumoto III Article, from which a wall thickness of 0.5 mm could readily be calculated (Trial Tr., 11/08/08, at pp. 653-54 (Goldfarb); Trial Tr., 11/28/07, at p. 2174 (Wheeler); DX 3009 at p. 519), he apparently misinterpreted the Matsumoto III Article as disclosing a wall thickness of 1.0 mm.  Mr. Sutton testified as to the "substantial confusion" concerning the wall thickness disclosed in the Matsumoto III Article at the time he filed the Goldfarb Application.  Trial Tr., 11/30/07, at p. 2612 (Sutton).

67.   The Patent Office Examiner, in the November 1975 rejection, effectively asked for a showing that the claims range of 0.2 to 0.8 mm was "critical" compared to the prior art.  Trial Tr., 12/4/07, at pp. 2893-94 (Bjorge).

68.   Mr. Sutton acting for Dr. Goldfarb provided such a showing by relying on the 1976 Baker affidavit and Mr. Harold Green's 1976 affidavit, asserting that all prior art vascular grafts "incorporated 'thick wall' tubes having wall thicknesses equal to or greater than approximately one millimeter."  PX115O.  Summarizing, Mr. Sutton stated in his April 1976 response to the Patent Office that:  "all prior art efforts (including those of Dr. Volder) were based upon the use of 'thick-walled' commercial PTFE tubing characterized by wall thicknesses greater than 1 mm."  PX115E at pp. 115.217.

69.   After the Patent Office rejected Dr. Goldfarb's patent application, Mr. Sutton sought to distinguish the Matsumoto III Article by arguing that:

Applicant finds no teaching as to the importance of uniform distribution of nodes and no teaching of the important relationship between wall thickness and internodular distance.

- 18 -

> Matsumoto [III] refers to "porosity" for a definition of internodular distance; however, it is possible to have an eighty percent porous sample of PTFE which has either a few very large nodes or many small nodes per unit volume.

PX115E at p. PX115.218.

70. Impra's February 1978 letter to Dr. Goldfarb's counsel acknowledged the Patent Office Examiner had made a mistake as to wall thickness. DX3055 at p. G-11106. Dr. Goldfarb's counsel, Mr. Cates, conceded the error as well. PX1236 at p. 1236.3 (acknowledging that Matsumoto has a 0.5 mm wall thickness).

71. Dr. Goldfarb disclosed the correct wall thickness during the interference. PX116W at p. PX1116.2676. The PTO found wall thickness not to be a critical or material factor in the invention. See PX116 at p. 116.7300; PX116 at p. 116.4175-77.

## G.  DR. VOLDER'S INVENTORSHIP CLAIMS AND NOTEBOOK

72. On September 4, 1974, Dr. Volder's personal attorney, Mr. Drummond, wrote to Mr. Sutton asserting that, based on Volder's "fairly accurate and complete records" (the "Volder Notebook"), Mr. Drummond believed Dr. Volder to be "the sole inventor" of "developments relating to the artificial blood vessel." DX3048.

73. At some point, Dr. Volder provided Mr. Sutton with a copy of the Volder Notebook which he asked Mr. Sutton to retain "in confidence." Trial Tr.,12/07/07, at p. 3825 (Sutton). Mr. Sutton claims Dr. Volder provided the Notebook to him in approximately April 1977. Id.

74. Mr. Sutton – the only person apart from Dr. Volder and his attorney known to have personally reviewed these notes – described the Volder Notebook as reflecting Dr. Volder's early work on ePTFE grafts, documenting "many failures," and having a "delightful and close correlation" with the Volder A-V Shunts Article which was a "publication of [the] same data." Trial Tr., 11/30/07, at pp. 2595-96 (Sutton); Trial Tr., 12/07/07, at p. 3739 (Sutton).

1   75.   Dr. Goldfarb asserted under oath in 1979 that Mr. Sutton had possession of the actual

2         Volder notebook in September 1974.  DX3110.  Mr. Sutton denies he had the

3         notebook before April 1977, when he claims to have received it from Dr. Volder in

4         confidence for safekeeping.  DX3062; Trial Tr., 12/7/07, 3825 (Sutton).  Mr. Sutton

5         did not advise the Patent Office of the existence of the Volder notebook before he

6         withdrew as Impra's counsel in February 1978.

7   76.   On January 18, 1982, Dr. Goldfarb's attorney Mr. Cates sent a letter to Mr. Harold

8         Green noting that neither Impra, nor Mr. Sutton, had provided a copy of the Volder

9         Notebook and again asking for Impra, or Mr. Sutton, to provide the requested

10        materials.  DX3060.  On January 22, 1982, Mr. Sutton responded to Mr. Cates' letter

11        stating that he had received a copy of the Volder Notebook "under conditions of

12        confidentiality."  DX 3062.  Mr. Sutton also told Mr. Cates that the Volder notebook

13        contained "detailed, fully witnessed entries which evidenced Dr. Volder's work on

14        ePTFE structures dating back to the early 1970's" and that the contents of the

15        notebook was one of the factors that "precipitated Impra's decision to cease further

16        prosecution of the [Goldfarb] application."  DX3062.  Further, Mr. Sutton informed

17        Mr. Cates that he could not release his copy of the Volder Notebook "without Dr.

18        Volder's express consent" but that Mr. Cates was "free to contact Dr. Volder directly

19        and seek his permission" to obtain the Volder Notebook.  Id.  Mr. Cates did not tell

20        the Patent Office about the existence of the Volder notebook.

21  77.   Mr. Sutton retired from the practice of law in the early 1990s.  Trial Tr., 12/07/07, at

22        pp. 3822-23 (Sutton).  In the course of winding up his legal practice between 1990

23        and 1995 Mr. Sutton had hundreds of boxes of files sent to a paper mill for recycling.

24        Id.; Trial Tr., 11/30/07, at p. 2627 (Sutton).  The Volder Notebook in Mr. Sutton's

25        possession was likely included among these files.  Trial Tr., 11/30/07, at pp. 2594-96

26        (Sutton); Trial Tr., 12/07/07, at p. 3825 (Sutton).

27  78.   No one had requested the Volder Notebook from Mr. Sutton in over 15 years, and Dr.

28

1   Volder had not given him permission to release it.  Trial Tr., 11/30/07, at pp. 2627-28

2   (Sutton).   Gore's patent law expert, Mr. Bjorge, testified that as a matter of PTO

3   practice and procedure, a presumption has emerged that an invention is "abandoned,

4   suppressed or concealed," and thus is not prior art, if it is kept secret for "a period of

5   18 months to two years."  Trial Tr., 12/04/07, at pp. 2954-55 (Bjorge).  Mr. Thesz

6   agreed with Mr. Bjorge that the so-called Volder Notebook would "satisfy the patent

7   office definition of material that would be considered abandoned, suppressed or

8   concealed," and thus would not constitute prior art.  Trial Tr., 12/05/07, at pp.

9   3311-12 (Thesz); Trial Tr., 12/12/07, at pp. 4261-62 (Thesz).

10   79.   On August 26, 1996, immediately prior to Bard's acquisition of Impra, James Polese,

11   an attorney for Impra, wrote to Mr. Lawrence Green noting that he had been in touch

12   with Dr. Volder and asking if Mr. Green would like the Volder Notebook which Dr.

13   Volder had indicated he was "confident … would confirm that Dr. Goldfarb is not the

14   inventor of the Goldfarb invention."  DX 3864.  At the time of writing his letter Mr.

15   Polese had never seen the Volder Notebook and had no knowledge of its contents or

16   its relevance to the Goldfarb Application.  Trial Tr., 11/30/07, at p. 2640 (Polese).

17   80.   Although Mr. Lawrence Green did not believe that Dr. Volder's claim of inventorship

18   was credible, because it was inconsistent with Peter Cooper's representations that "he

19   was quite familiar with all of the work of all of these doctors, including Dr. Volder,

20   and that none of these doctors had done anything inventive and that none of them had

21   made any contribution to his invention," he asked to see a copy of the Volder

22   Notebook.  Trial Tr., 12/12/07, at p 4221 (L. Green).  Accordingly, in October of

23   1996, Mr. Polese wrote to Dr. Volder requesting that Dr. Volder send his notebook

24   directly to Mr. Green, or to have Mr. Sutton or the "current holder" of the Volder

25   Notebook (or a copy) send a copy.  DX3160; Trial Tr., 11/30/07, at pp. 2632-36;

26   2641-42 (Polese).  Dr. Volder did not send the notebook do so and maintained the

27   confidentiality of the Volder Notebook.  Trial Tr., 11/30/07, at pp. 2640-41 (Polese);

28

1    Trial Tr., 12/12/07, at pp. 4221-22 (L. Green).

2    81.   Mr. Lawrence Green never told the Patent Office of Dr. Volder's claim and in 2001,

3          when the Goldfarb Application was returned to the patent examiner following the

4          resolution of the interference, Mr. Green testified he had forgotten about letter.  Trial

5          Tr., 12/12/07, at p. 4219 (L. Green).

6    82.   In September 1996, after Dr. Volder received payment from Bard for his shares of

7          Impra, Dr. Volder contacted Mr. Sutton and sought his aid in using the content of the

8          notebook he believed to be in Mr. Sutton's possession to "KO"[1] the Goldfarb patent.

9          DX3095.  Mr. Sutton declined to assist Dr. Volder.  DX3096.

10   83.   Mr. Sutton was unable to produce the Volder notebook in this litigation.  Mr. Sutton

11         testified that he destroyed the notebook during his retirement from law practice at or

12         about the time that C.R. Bard, Inc. ("Bard") agreed to acquire Impra's stock.  Trial

13         Tr., 11/30/07, at pp. 2628-29 (Sutton); Trial Tr., 12/7/07, at p. 3823 (Sutton); Trial

14         Tr., 12/12/07, at pp. 4168-70 (Shrum).

15   **H.   GOLDFARB SUES IMPRA**

16   84.   On September 20, 1977, Dr. Goldfarb sued Impra (then the exclusive licensee of the

17         Goldfarb Application), and subsequently terminated Impra's license to the Goldfarb

18         Application in December 1977.  Goldfarb v. Impra, No. C-3568330 (Ariz. Sup. Ct.,

19         Maricopa 1977) (PX3); Trial Tr., 11/07/07 at pp. 431-37 (Goldfarb).  At that point in

20         time, Dr. Goldfarb's and Impra's interests in the Goldfarb Application diverged and

21         they became adverse to each other.  Trial Tr., 12/12/07, at p. 4108 (Swenson).  Dr.

22         Goldfarb confirmed that the relationship between he and Impra deteriorated following

23         the lawsuit and that "[t]here was no relationship.  Basically a very bad one," between

24         he and Impra, and that "what IMPRA [was] trying to do is undermine my patent

25         application with me as the inventor."  Trial Tr., 11/07/07, at pp. 437, 440 (Goldfarb).

26

27         [1] "KO" is an abbreviation for "knock out."

28                                    - 22 -

85. Because Mr. Sutton was Impra's attorney and "appeared to be involved in the efforts to make things very difficult for me to pursue the patent prosecution," (Id. at p. 439), Dr. Goldfarb revoked Mr. Sutton's power of attorney to prosecute the Goldfarb Application on January 6, 1978, and granted power of attorney to Mr. Charles Cates in his place. PX115T. Mr. Sutton signed his withdrawal as Dr. Goldfarb's counsel before the PTO on February 21, 1978. PX115.582. Mr. Sutton's involvement in the prosecution of the Goldfarb Application effectively ceased in January when his power of attorney was revoked by Dr. Goldfarb. Trial Tr., 12/12/07, at pp. 4248-50 (Thesz). The relationship between Mr. Cates and Mr. Sutton was neither cooperative nor amicable and they did not collaborate on the prosecution of the Goldfarb Application. Trial Tr., 12/07/07, at pp. 3877, 3886 (Sutton).

86. Testimony during depositions in the Goldfarb v. Impra litigation established that, as of that time, Dr. Volder was still asserting his claim of inventorship. Trial Tr., 11/27/07, at pp. 1977-78 (Baker).

87. Interrogatory responses by Impra in that case established Dr. Volder's claim of inventorship, the existence of Dr. Volder's notebook and Impra's belief in Dr. Volder's claim. DX3051.

88. Dr. Goldfarb and Impra settled their lawsuit in 1979, and in an assignment dated May 21, 1979, Impra assigned to Dr. Goldfarb all rights in the Goldfarb Application. DX3475. Subsequent to the settlement of the Goldfarb v Impra lawsuit, Mr. Cates wrote a letter to Dr. Goldfarb's Australian patent counsel summarizing his understanding of the various allegations made by Impra in the Baker and Harold Green deposition testimony and the interrogatory responses provided in that lawsuit. DX3481. In that letter, Mr. Cates noted:

> From these documents, the evasiveness and lack of candor of IMPRA and the deponents emerges clearly. The witnesses' motivations should also be clear: They are heavily interested in IMPRA which is a company that makes essentially one product, and the assignment of the

1
2

> patents and patent applications covering that product was cancelled. They are highly motivated to detract as much as they can from Dr. Goldfarb's patent position.

3
4

Id. at p. IVG6083138.

## I.  VERMEIRE LETTER AND GOLDFARB'S DUTY TO THE PTO

5
6
7
8

89.   On February 21, 1978, in conjunction with Dr. Goldfarb assuming responsibility for prosecution of the Goldfarb Application, Mr. Albert A. Vermeire, Impra's litigation counsel in the Goldfarb v. Impra suit, sent all prosecution files to Mr. Swenson, Dr. Goldfarb's litigation counsel.  DX3055.

9
10
11
12

90.   The Vermeire letter referred to Mr. Detton's repudiation of both of his affidavits.  The letter stated, "Mr. Detton has indicated to various persons, including Dr. Goldfarb, that he wishes to repudiate portions of his affidavits."  DX3055 at p. G-11106.

13
14
15
16
17
18

91.   The Vermeire letter also stated that Impra had decided to file "expanded or correct affidavits from Messrs. Baker, Detton, Goldfarb, Green and Volder."  As to Dr. Baker, Impra's attorney wrote:  "Dr. Baker has indicated that certain statements in his affidavit relating to the criticality of wall thickness, although correct when made, are misleading if not totally incorrect in view of later information which has been developed on wall thickness."  DX3055 at p. G-11106.

19
20
21
22
23
24

92.   In addition, the Vermeire letter stated that "the Matsumoto article as finally published includes reference to wall thicknesses of 0.5 mm, which is within the range of wall thicknesses claimed by IMPRA."  DX3055 at p. G-11106.  Mr. Vermeire stated that: "it seems appropriate to at least clear the record on this point by advising the examiner regarding the wall thickness reference in the later published Matsumoto reference."  DX3055 at p. G-11106.

25
26
27

93.   The Vermeire letter further stated that "[t]here appears to be a substantial claim to prior or concurrent inventorship by Dr. Volder.  This is evidenced by certain entries in his log-book which purport to have been dated and witnessed in 1971."  DX3055

28

- 24 -

1          at p. G-11105.

2    94.   The Vermeire letter concluded with a statement of the duty of disclosure to the Patent

3          Office:  "it is our strongest recommendation that the various Patent Offices be fully

4          informed regarding the matters set forth above since failure to do so may irreversibly

5          affect the validity or enforceability of any patent rights which IMPRA may ultimately

6          obtain."  DX3055 at p. G-11107.

7    95.   Dr. Goldfarb acknowledges that he was aware of the Vermeire letter and its

8          allegations, as was his attorney, Mr. Cates, and as was Mr. Sutton.  Trial Tr., 11/7/07,

9          438-439, 561-562 (Goldfarb); Trial Tr., 11/30/07, 2619-2620 (Sutton); Trial Tr.,

10         12/7/07, 3885 (Sutton); Trial Tr., 12/12/07, 4109 (Swenson); PX1236.

11   96.   Mr. Vermiere's letter did not provide any details or evidence to support these

12         allegations.  Mr. Harold Green testified that this letter, and other disclosures provided

13         by Impra in connection with the Goldfarb v. Impra litigation, were part of an effort

14         by Impra to "torpedo" the Goldfarb Application in order to avoid potential litigation

15         in the future.  Trial Tr., 11/27/07, 2001 (H. Green); Trial Tr., 11/07/07, at p. 440

16         (Goldfarb).

17   97.   Dr. Baker, the largest shareholder of Impra, with approximately 25 percent of the

18         shares, as well as an officer of Impra and chairman of its board, was deposed the day

19         after the date on the Vermiere letter (i.e., February 22, 1978) in the Goldfarb v. Impra

20         litigation.  Trial Tr., 11/27/07, at pp. 1975-76 (Baker).  During his deposition Dr.

21         Baker stated that there were several claims to inventorship of the Goldfarb

22         Application, including those of Dr. Volder, Dr. Campbell, Mr. Harold Green and Mr.

23         Detton, but that Dr. Goldfarb had been "elected" inventor at the September 9, 1974

24         meeting.  Id. at p. 1977.  Dr. Baker, however, admitted that he had no personal

25         knowledge of anyone with a claim of inventorship to the Goldfarb Application other

26         than Dr. Goldfarb, and that he was not present at the September 9, 1974 meeting when

27         the so-called "election" occurred.  Id.  Dr. Baker also never testified that he believed

28                                              - 25 -

1   that the determination of inventorship was false, or that there was a purposeful
2   misstatement of inventorship.  Id. at pp. 1977, 1982-83.

3   98.  Following receipt of Mr. Vermiere's February 21, 1978 letter, Mr. Swenson wrote to
4        Mr. Vermiere on March 10, 1978, noting that "[t]he opinions now expressed by your
5        principals in this obtuse fashion are highly suspect, coming as they do from biased
6        parties to a lawsuit."  PX1233; Trial Tr., 11/07/07, at pp. 442-45 (Goldfarb).  In his
7        letter, Mr. Swenson asked Impra:  "[I]f you have facts to support your self-serving
8        opinions and innuendos, please make them known to us."  PX1233 at p. PX1233.2
9        (emphasis original).   In particular, Mr. Swenson asked for Impra to "send a copy of
10       the Volder notes" so that they could "draw our own conclusions."  Id. at p. PX1233.1.
11       As Dr. Goldfarb explained, this letter was the start of a series of attempts "to get from
12       IMPRA or Dr. Volder or both the objective evidence from them to support their
13       allegations."  Trial Tr., 11/07/07, at pp. 447-49 (Goldfarb).  However, Dr. Goldfarb
14       and his attorneys were never able to get a clear understanding of Impra's allegations.
15       Id. at p. 449.

16  99.  On July 19, 1978, having received no response from Mr. Vermeire, Mr. Cates sent a
17       letter to Mr. Sutton requesting copies of the Volder Notebook.  PX1236; Trial Tr.,
18       11/07/07, at pp. 446-48 (Goldfarb).  In his letter, Mr. Cates stated that if the Volder
19       Notebook was indeed "confidential" and undisclosed, then it would not qualify as
20       invalidating prior art.  PX1236.  Mr. Cates' letter also requested that Mr. Sutton
21       provide "candid and unequivocal answers" to the questions relating to the Baker,
22       Green, Detton and Volder affidavits, and Dr. Volder's claim to prior or concurrent
23       inventorship, raised in Mr. Vermiere's letter.  Id.  Mr. Cates never received any
24       substantive response to this letter.  Trial Tr., 11/07/07, at p. 452 (Goldfarb).  Mr.
25       Sutton responded by saying that he could not provide any answers because he had not
26       received the earlier letters between Mr. Vermiere and Mr. Swenson.  Id.; PX1237.

27  100.  On April 9, 1979, Mr. Cates sent a letter directly to Dr. Volder in the Netherlands

28                                              - 26 -

1  requesting that Dr. Volder "waive confidentiality of [the Volder Notebook] and

2  permit Mr. Sutton to let us make copies and inspect the original." DX3058; Trial Tr.,

3  11/07/07, at pp. 455-57 (Goldfarb).  Neither Dr. Goldfarb nor his attorneys received

4  a reply to this letter from Dr. Volder.  Trial Tr., 11/07/07, at p. 456 (Goldfarb).  On

5  June 27, 1979, Mr. Sutton wrote to Mr. Cates directing him to "terminate all further

6  direct communications with Dr. Volder," and to contact Mr. Sutton if he wished to

7  pursue further the matter of the Volder Notebook.  PX1307; Trial Tr., 11/07/07, at pp.

8  456-58 (Goldfarb).  Mr. Sutton re-emphasized that he had "received Dr. Volder's

9  logbook in confidence."  PX1307.

10  **J.     CONTINUED EXAMINATION BY THE PTO**

11  101.  On September 23, 1980, Dr. Goldfarb licensed his rights in the Goldfarb Application

12  to Bard (*i.e.* C.R. Bard).  Trial Tr., 11/7/07, 461-462 (Goldfarb); PX4.  On June 24,

13  1981, Mr. Arthur Bookstein, a patent attorney representing Bard, was appointed as an

14  additional attorney in the Goldfarb patent application.  PX.115.606.  Mr. Bookstein

15  assumed the lead responsibility for the prosecution of the Goldfarb Application and

16  Mr. Cates' involvement in the prosecution of the Goldfarb Application thereafter was

17  "zero." Trial Tr., 12/12/07, at p. 4252 (L. Green); Trial Tr., 12/12/07, at pp. 4251-52

18  (Thesz).  As with Mr. Cates, Mr. Bookstein, never met with Impra's lawyer, Mr.

19  Sutton, while Impra was adverse to Dr. Goldfarb.  Trial Tr., 12/07/07, at p. 3794

20  (Bookstein).

21  102.  On July 16, 1979, Mr. Cates, acting as Dr. Goldfarb's attorney, filed in the Patent

22  Office a "Motion to Return File to Examiner for Determination of Patentability

23  Issues," disclosing the existence of the <u>Goldfarb v. Impra</u> litigation and requesting

24  that the Goldfarb Application be returned to the Examiner for continued prosecution.

25  PX115U at p. 115.585.  In disclosing the existence of the <u>Goldfarb v. Impra</u> litigation,

26  Mr. Cates specifically noted that "the record of [the lawsuit] is available to the Patent

27  and Trademark Office" and that the "[a]pplicant desires that the record of those

28

1    proceedings along with the records of the Gore case (in Federal District Court) and

2    Cooper case (in Arizona State Court), both previously referred to in this application

3    file, be made available to the Commission for consideration." Id.

4    103.   On December 11, 1979, the Assistant Commissioner for Patents granted Dr.

5    Goldfarb's motion to return the file to the Patent Office Examiner, PX115V, and

6    stated that "[Goldfarb] and his attorney [were] required to submit portions of the

7    record, including depositions, pleadings, etc. in connection with the [Goldfarb v.

8    Impra] litigation, and any other information that they were aware of which was

9    material to the examination of the application." PX115 at p. 115.593.

10   104.   In the time between the December 11, 1979 Order of the Assistant Commissioner

11   (PX115V), which required production of material from the Goldfarb v. Impra case,

12   and the July 8, 1981 decision (PX115W), neither Dr. Goldfarb nor his attorney

13   submitted the requested documentation from the Goldfarb v. Impra case.  Trial Tr.,

14   12/11/07, 3954, 4058-4060, 4061 (Bjorge).

15   105.   PTO Examiner William Pieprz mailed the second Office Action twice:  once on April

16   29, 1981 and again on July 8, 1981.  PX115W.  Examiner Pieprz – who also assumed

17   responsibility for the Cooper Application (PX117.3699-714) – determined that "the

18   record developed in this application, taken as a whole totally and fully supports the

19   conclusion that Dr. Goldfarb is properly named as the inventor of this application,"

20   thus withdrawing the November 1975 rejection of Goldfarb's claims 1 to 10.

21   PX115W at p. 115.603.

22   106.   In that second Office Action relating to the Goldfarb Application, Examiner Pieprz

23   withdrew his prior rejection of the claims over the Soyer, Volder A-V Shunts and

24   Matsumoto III articles without explanation and instead rejected claims 1-6 as obvious

25   over an article by Dr. Campbell, "Expanded Polytetrafluoro-Ethylene as a Small

26   Artery Substitute," dated 1974 (the "Campbell Article"). PX115.2589-93.  Consistent

27   with PTO practice and procedure, the examiner treated the Campbell article as prior

28

art to the Goldfarb Application, even though it was dated 1974, and the burden was placed on Dr. Goldfarb to "go find the information and argue about whether it was a proper – proper prior art reference or not."  Trial Tr., 12/12/07, at p. 3286 (Thesz).

107.   Mr. Bookstein responded to Examiner Pieprz's Office Action on December 10, 1981, arguing that the Campbell Article was not prior art because it was not published until January 1975.  PX115X at pp. 115.609-14.  In addition, although noting that he had "some reasons to believe that the examiner already may be aware of this document because it may have been filed in connection with the 'Cooper Application'," Mr. Bookstein submitted a copy a the February 5, 1980 Detton Affidavit that he had obtained from the Australian Patent Office.  PX115X; PX116GGG at p. PX116.3718. In submitting the 1980 Detton Affidavit, Mr. Bookstein noted that "applicant submits it without vouching in any way for the authenticity of the document or for anything else concerning the document or any subject matter stated or suggested therein," and further noted that the 1980 Detton Affidavit "does not appear to seek to contradict or vary the Second Detton affidavit or the Green affidavit . . . ."  PX115X at p. PX115.611.

108.   Mr. Bookstein further disclosed to the PTO that there were deposition transcripts from the <u>Gore v. Impra</u>, <u>Goldfarb v. Impra</u>, and <u>Goldfarb v. Gore</u> litigations that were "potentially relevant" to the Goldfarb Application.  PX115X at pp. 115.611-13. Noting that it was "applicant's understanding that the examiner may have obtained and reviewed numerous volumes of deposition transcripts" already,  Mr. Bookstein identified three lists of deposition transcripts in order "to confirm that the examiner has had an opportunity to review all potentially relevant deposition transcripts."  <u>Id.</u> at p. 115.611.

109.   One list identified those transcripts from the <u>Gore v. Impra</u> litigation that were filed under seal which "it is believed that the examiner already may have reviewed … and, therefore, it is unnecessary for applicant to make further efforts to duplicate them for

1    the examiner." PX115X at p. 115.612. A second list identified those transcripts

2    which were not under seal and which were available to the examiner "although

3    applicant's undersigned counsel does not consider them to be particularly relevant or

4    a variance with any conclusion which the examiner has come to." PX115X at p.

5    115.613. This second list included the November 1978 Dr. Baker deposition and the

6    November 1978 Harold Green deposition, which had already been provided to

7    Examiner Pieprz in the Cooper Application. PX117.2992-3054; PX117.3544-630.

8    110.  On May 18, 1982, Examiner Pieprz issued his third Office Action pertaining to the

9    Goldfarb Application, in which he maintained his prior rejection over the Campbell

10   Article based on his understanding that the substance of the article was presented

11   orally in April 1974. PX115Y. Examiner Pieprz also stated his reliance on Mr.

12   Bookstein's representations concerning the depositions in the Goldfarb v. Impra

13   litigation. He stated as follows:

14   -   Even though Mr. Bookstein had just provided the 1980 Detton Affidavit, it had

15       "been considered in formulation of the prior Office Action" and that it "is not

16       considered to have any effect on the status of [the Goldfarb Application]";

17   -   He had reviewed all but two of the Gore v. Impra deposition transcripts, but

18       did not need copies of these documents because they would not "yield any

19       significant new, information relevant to the [Goldfarb Application]"; and,

20   -   He had not reviewed "most" of the Goldfarb v. Impra and Goldfarb v. Gore

21       deposition transcripts and would accept Mr. Bookstein's representation

22       regarding their relevance "at face value."

23   -   Mr. Bookstein, as counsel for the applicant, is the "final arbiter" of what

24       documents from the Goldfarb v. Impra litigation must be submitted to the

25       Patent and Trademark Office "in satisfaction of his 'duty to disclose.'"

26   PX115Y at pp. PX115.640-41.

27   111.  Examiner Pieprz had, however, reviewed the 1978 deposition transcripts of Mr.

28

Harold Green and Dr. Baker from the <u>Goldfarb v. Impra</u> litigation in connection with the Cooper Application.  PX117.2992-3052; PX117.3055-283.

112.   A telephonic interview was held on May 27, 1982, during which Mr. Bookstein argued that the Campbell Article was not prior art because Dr. Goldfarb invented the subject matter of the Goldfarb Application prior to the April 1974 disclosure. PX115.642.  As support, Mr. Bookstein relied on the Second Detton Affidavit and the 1976 Green Affidavit.  PX115O.

113.   On August 27, 1982, Examiner Pieprz withdrew his previous rejections and accepted Mr. Bookstein's argument.   The prior rejection over the Campbell article was withdrawn due to the  Detton Affidavits and the 1976 Green Affidavit, which "makes clear that applicant had already invented the claimed subject matter prior to the date of the above noted oral presentation."  PX115DD at p. 115.692.

**K.     COOPER PATENT APPLICATION**

114.   On April 2, 1974, Gore filed a patent application entitled "Artificial Vascular Prostheses" naming Peter Cooper as the sole inventor ("the Cooper Application"). PX117.5-18.  Just before such filing, on March 27, 1974, Mr. Cooper assigned all interest in the Cooper Application to Gore.  PX117.20-21.

115.   The Cooper Application was initially assigned to Examiner Frinks - the same examiner originally assigned to the Goldfarb Application.

116.   In July 1975, Gore filed a Petition to Withdraw From Issuance under the provisions of 35 C.F.R. § 1.313.  PX117.110-16.  The basis for the motion was that allegations in the <u>Gore v. Impra</u> litigation raised questions as to whether Mr. Cooper and Gore had committed fraud in filing the Cooper Application and, in particular, whether the Cooper Application "plagiarized its working examples from a memorandum which described the work of Dr. David Goldfarb and that all of the working examples in the application were, in fact, based on the work of Dr. David Goldfarb and not the work of [Mr. Cooper]."  <u>Id.</u> at p. PX117.114.

- 31 -

117.   The PTO granted the petition to withdraw the Cooper Application on July 29, 1975, before Examiner Frinks had issued any Office Action in the Goldfarb Application. Id. at p. PX117.118.  On November 26, 1975 – the same day the first Office Action in the Goldfarb Application was mailed – Examiner Frinks issued an Office Action in the Cooper Application rejecting all pending claims under 35 U.S.C. § 102(f) on the grounds that Mr. Cooper was "not in fact the proper inventor," and further in view of the Matsumoto III Article or, in the alternative, the Volder A-V Shunts Article. Id. at pp. PX117.119-23.  With respect to the Volder A-V Shunts Article, Examiner Frinks specifically noted that it disclosed "increasing pore size (which is directly related to fibril length) beyond 5 microns."  PX117.121.

118.   On March 4, 1977, the Office of Assistant Commissioner mailed a "Requirement for Information" to Mr. Finnegan acknowledging that there "were substantial questions … regarding the present [Cooper] application and its inventorship," and that Gore had failed to fully set forth the details regarding the charges of fraud on the Patent Office raised in the Gore v. Impra litigation.  Id. at pp. PX117.187-12.  Mr. Finnegan responded to the Requirement for Information on October 4, 1977, by submitting an affidavit and declaration of inventorship from Mr. Cooper, responses to questions from Mr. Uebler,  and various papers from the Gore v. Impra litigation including the deposition transcripts of Mr. Harold Green and Dr. Lenox Baker.  Id. at pp. PX117.226-34.  Through these papers Mr. Finnegan asserted the following:

-     Mr. Cooper still considered himself to be "the original, first, and sole inventor of the subject matter claimed in this application."  Id. at p. PX117.2068.

-     The 1974 Detton Memorandum was used in the preparation of the Cooper Application and the original claims, but that such use was proper because Mr. Cooper's invention allegedly pre-dated any disclosure by Dr. Goldfarb to Gore.  PX117F at pp. PX117.2069-76.

-     "With respect to the surgeons [Mr. Cooper], as Plant Manager of the Gore

- 32 -

1  Flagstaff facility, was generally responsible for manufacturing and supplying

2  the surgeons with expanded PTFE vascular grafts for evaluation purposes. …

3  [Mr. Cooper] worked closely with the surgeons, supplied them with Gore

4  vascular grafts having different structures for implantation and eventual

5  harvesting, and reviewed the experimental results.  [Mr. Cooper] participated

6  in many personal and telephone conferences with these surgeons, either

7  directly or through liaison personnel at Gore." Id. at p. PX117.2079.

8  -   Dr. Volder had "questioned whether Peter B. Cooper was the inventor.  [Mr.

9  Uebler] thereupon conducted an additional search to develop any further

10  documents that might be relevant to the question of inventorship and discussed

11  this matter with W.L. Gore.  It was again concluded that Peter B. Cooper was

12  the inventor."  Id. at p. PX117.2111.

13  -   That the Soyer and Volder A-V Shunts Articles were "irrelevant" to the

14  Cooper Application (id. at p. PX117.2114) because "pore size" as used in

15  those articles "bears no relationship to fibril length" (id.) as demonstrated by

16  the Affidavit of Wilbert L. Gore, which established that:  "[t]he measurement

17  'pore size,' as used in the Soyer, et al., article, is not the same as fibril length,

18  as used in the Cooper Application, which is defined as the spacing or distance

19  between the nodes or the internodular distance."   PX117.2127-37 at p.

20  117.2133.

21  119.  The Assistant Commissioner issued a second Request for Information on March 10,

22  1978 seeking information as to why Dr. Kelly was not a named inventor and as to

23  whether the Cooper Application was unpatentable over certain Matsumoto articles.[2]

24

25  [2]  In response to the November 26, 1975 Office Action, Gore employee Ernest A.
26  Uebler had disclosed two articles by Matsumoto - Matsumoto, et al., "Application of Porous
Polytetraflouroethylene to Artificial Blood Vessel, First Report:  Application to the
27  Peripheral Artery," Artificial Organs, 1972 ("the Matsumoto I Article") and Matsumoto, et

28

1    PX117.2819-27.  Albert J. Santorelli, who had assumed primary responsibility for the
2    Cooper Application from Mr. Finnegan, responded by arguing that Dr. Kelly was not
3    an inventor because he had not recognized that fibril length (which was key to tissue
4    ingrowth) was the key parameter of a successful ePTFE graft, and that the Matsumoto
5    III Article did not render the Cooper Application unpatentable because it "is not
6    understood … as disclosing the criticality of fibril length with respect to tissue
7    ingrowth."  PX117.2831-.53 at p. PX117.2840.

8    120.   Mr. Santorelli also submitted a number of papers entitled "Applicant's Position with
9           Respect to Inventorship and the Rule 131 Affidavit."  In the first paper, Mr. Santorelli
10          disclosed the existence of the Goldfarb v. Impra lawsuit and quoted from Impra's
11          brief opposing Dr. Goldfarb's request to unseal the deposition transcripts (for
12          purposes of submitting them to the PTO) in which Impra argued that:  "it has recently
13          been testified to by Mr. [Harold] Green and Dr. Lenox Baker that there now exists
14          information which may wholly invalidate the patent application and render certain
15          statements contained in the depositions of Mr. Cooper and Mr. Detton completely
16          stale and misleading."  PX117 at p. 117.3669.

17   121.   In a "First Supplement" to this paper Mr. Santorelli submitted copies of Mr. Harold
18          Green's and Dr. Baker's deposition transcripts and exhibits from the Goldfarb v.
19          Impra litigation and specifically noted that: "[i]t is evident from these depositions that
20          IMPRA, formerly assignee of the Goldfarb Application and responsible for the
21          prosecution of that application now (1) repudiates its previous allegation that Dr.
22          Goldfarb is the inventor of the subject matter of the Cooper application; and (2)
23          doubts the veracity of affidavits filed by IMPRA in the Goldfarb Application … ."

24

25   al., "Experimental Studies on Expanded Polytetrafluoroethylene As Vascular Prosthesis -
26   The Second Report:  Its Applicability To Veins," Artificial Organs, 1973 ("the Matsumoto
     II Article") - and asserted that the Cooper Application was unpatentable in view of their
27   disclosures.  PX117.127-33.

28

1    PX117.2990-91.

2    122.   On March 18, 1980, Mr. Santorelli submitted a "Second Supplement" which was

3    received by Examiner Pieprz – the same patent examiner responsible for the Goldfarb

4    Application.  PX117.3644-51.  The Second Supplement attached the 1980 Detton

5    Affidavit with both of its attachments (PX117.3675-82) and asserted that:  "In light

6    of the recent deposition testimony of Green and Baker and the February 5, 1980

7    affidavit of Detton, their affidavits submitted in the Goldfarb application and the

8    deposition testimony of Detton and Green in the [Gore v. Impra] trade secret litigation

9    cannot possibly be relied on to support a determination that proper inventorship in this

10   case lies solely or jointly in Goldfarb.  On the contrary, the record shows that Cooper

11   is the inventor."  PX117.3649.

12   123.   On December 11, 1979, the Assistant Commissioner returned both the Goldfarb and

13   Cooper Applications to the Primary Examiner with directions to determine who the

14   proper inventor was and whether there were any grounds to reject the pending claims.

15   PX115V; PX117.3631-43.

16   124.   In an Office Action dated March 10, 1981, Examiner Pieprz addressed the various

17   contributions of the persons identified by the Assistant Commissioner and concluded

18   that Dr. Campbell was "a sole inventor rather than a joint inventor with Peter

19   Cooper."  PX117E at p. PX117.3712.  With respect to Mr. Detton's contribution,

20   Examiner Pieprz expressly  noted:

21           Incidentally, a deposition by Detton in the Gore v. IMPRA lawsuit
22           contained statements to the effect that Dr. D. Goldfarb defined the
             successful graft structure.  These statements have since been retracted
23           by Mr. Detton in an affidavit dated February 5, 1980.

24   PX117E at p. 117.3701.  Examiner Pieprz further rejected the pending claims under

25   35 U.S.C. § 103 based, *inter alia*, on his conclusion that the Matsumoto III Article

26   had a "photograph [that] appears to show fibril lengths within this preferred range."

27

28                                       - 35 -

1    PX117E at p. 117.3713.

2  125.  On March 17, 1981, Mr. Santorelli responded to Examiner Pieprz's Office Action,

3         objecting to the determination that Dr. Campbell was the sole inventor because Mr.

4         Cooper purportedly invented the subject matter of the Cooper Application before Dr.

5         Campbell started working with Gore's ePTFE grafts. PX117.3719-40. Mr. Santorelli

6         further argued that the Matsumoto III Article did not render the Cooper Application

7         obvious because it contains "absolutely no reference to the term fibril length or

8         distance between nodes. It is unreasonable to hold that a reference that doesn't even

9         mention fibril length makes obvious an invention that specifically equates fibril length

10        to tissue ingrowth and discloses specific ranges for fibril length." PX117.3739.

11 126.  In an interview held on March 29, 1982, between Examiner Pieprz and Messrs.

12        Cooper, W.L. Gore, Campbell and Santorelli, Mr. Santorelli again argued that the

13        Matsumoto III Article "does not even mention fibril length, let alone teach the

14        criticality of this parameter in connection with the promotion of tissue ingrowth."

15        PX117C at p. PX117.3798.  Based on these arguments, Examiner Pieprz found the

16        Cooper Application allowable over the Matsumoto III Article concluding that: "The

17        references, alone or combined, do not evidence attachment of any criticality to the

18        fibril length range of the expanded PTFE.  Thus not recognizing the relationship

19        between fibril length and tissue ingrowth, the references cannot render the instant

20        claims unpatentable." PX117D at p. 117.3807.  Prosecution on the merits was closed

21        and the Cooper Application was referred to the Assistant Commissioner for further

22        consideration regarding the question of inequitable conduct by Mr. Cooper. PX117D

23        at p. 117.3807.

24

25 /////

26 /////

27

28

## II.    THE *INTER PARTES* INTERFERENCE[3]

127.    On May 18, 1983, Examiner Pieprz mailed a communication to Mr. Bookstein suggesting that the following claim, found allowable, be adopted for the purpose of interference:

> An artificial vascular prosthesis comprising expanded, porous, polytetraflouroethylene having a microstructure consisting of nodes interconnected by fibrils which permits tissue ingrowth, wherein said fibrils are above about 5 microns in length.

PX 115J.  Notably, the PTO determined that the invention described in Dr. Goldfarb's patent application included allowable claims for an ePTFE vascular prosthesis without wall thickness or density limitations.  Id.  Mr. Bookstein amended the Goldfarb Application on July 1, 1983, to add the claim suggested by Examiner Pieprz. PX115.695-98.

128.    On September 19, 1983, the PTO Board of Patent Appeals and Interferences declared an interference between the Goldfarb Application and the Cooper Application, assigning it Interference No. 101,100 ("the Interference"). PX115GG. Dr. Goldfarb, as the later filing party, was designated the "Junior Party," with Mr. Cooper designated the "Senior Party."   The initial count of the Interference was identical to the claim that Examiner Pieprz had suggested Mr. Bookstein copy into the Goldfarb Application to initiate the interference.

### A.    PARTIES MOVE TO DISPOSE OF THE INTERFERENCE

129.    On April 30, 1984, both Mr. Santorelli and Mr. Bookstein filed and served various preliminary motions pursuant to 37 C.F.R. § 1.231 which sought to dispose of the Interference.

---

[3]  An "interference" is "a proceeding instituted for the purpose of determining the question of priority of invention between two or more parties claiming substantially the same patentable invention. . . ." 37 C.F.R. § 1.201(a) (1984).

1                      **1.    COOPER'S MOTION TO DISSOLVE**

2   130.   Mr. Cooper filed a Motion Under 37 C.F.R. § 1.231 To Dissolve the Interference

3          based on the allegation that Dr. Goldfarb had committed inequitable conduct by: (i)

4          filing the Detton Affidavits even through Mr. Sutton allegedly knew they were not

5          correct; and (ii) withholding from the PTO the 1978 deposition testimony of Mr.

6          Harold Green and Dr. Baker that raised questions regarding their 1976 affidavits.

7          PX116.2448-65.  Attached to Mr. Cooper's motion were the previously-submitted

8          1980 Detton Affidavit and relevant excerpts from Harold Green's and Dr. Baker's

9          1978 deposition testimony.  PX116.2552-59; PX116.2561-93; PX116.2595-613.

10  131.   Mr. Bookstein personally prepared the response to Mr. Cooper's Motion to Dissolve.

11         Trial Tr., 12/12/07, at p. 4187 (L. Green).  In his opposition to Mr. Cooper's Motion

12         to Dissolve Mr. Bookstein made four basic arguments refuting Gore's allegations of

13         inequitable conduct.  The four arguments he made are as follows:

14         a.     Both the 1976 Detton Affidavits were filed in the belief that they were correct;

15                Mr. Cooper had failed to indicate how either affidavit was materially incorrect;

16                the affidavits were independently supported by Mr. Detton's sworn testimony

17                in the <u>Gore v. Impra</u> litigation (which he did not repudiate) as corroborated by

18                the testimony of Harold Green and Richard Mendenhall; and Goldfarb had

19                submitted the 1980 Detton Affidavit which Examiner Pieprz had concluded

20                "was of no effect on the Goldfarb application."

21         b.     The deposition testimony of Harold Green and Dr. Baker did not repudiate

22                their respective affidavits in any material respect, nor did they raise any serious

23                questions concerning Dr. Goldfarb's inventorship; Harold Green never

24                withdrew the 1976 Green Affidavit; any repudiation by Detton was immaterial

25                as Mr. Green had independently verified Dr. Goldfarb's specifications; Dr.

26                Baker never contradicted his 1976 affidavit because he never stated that a wall

27                thickness of 0.5 mm was critical, merely that it was optimal; and Dr. Baker's

28                                               - 38 -

1   other testimony concerning Dr. Goldfarb's inventive contribution was based

2   on a lack of personal knowledge and mere speculation.

3   c.   The Examiner had been made aware of, and had read the 1978 deposition

4   transcripts of Harold Green and Dr. Baker, and the Examiner had still found

5   Dr. Goldfarb to be the sole inventor after having considered such testimony

6   thereby indicating that it was not material.

7   d.   Dr. Goldfarb did not withhold affidavit retractions claimed to have occurred

8   during the Green and Baker depositions, and made no misrepresentations

9   concerning the scope of the deposition testimony but made good faith efforts,

10   in consultation with the Examiner and in accordance with the Examiner's

11   directions, to avoid duplicate submissions of voluminous deposition transcripts

12   that the Examiner already had available to him in the Cooper Application.

13   PX116GGG.

14   132.   Further, with respect to the 1980 Detton Affidavit, Mr. Bookstein also argued that it

15   "refers back and relates only to the [Detton-Cooper Source Affidavit]" and that "the

16   1980 affidavit cannot and should not be considered as being intended to include the

17   [Second Detton Affidavit]."  PX116GGG at p. PX116.3719.  Both Mr. Bjorge and

18   Mr. Thesz agreed that after reading the 1980 Detton Affidavit a reasonable examiner

19   could conclude that Mr. Detton had misgivings about one of his 1976 affidavits.  Trial

20   Tr., 12/04/07, at p. 2936 (Bjorge); Trial Tr., 12/12/07, at p. 4273 (Thesz).

21   **2.   GOLDFARB'S MOTION TO DISSOLVE, AMEND, SUBSTITUTE COUNTS, OR STRIKE**

22

23   133.   Mr. Bookstein also filed a preliminary motion to dissolve the Interference (PX116J),

24   arguing that it was unpatentable in light of, *inter alia*:  (i) the Matsumoto I Article

25   which he asserted, based on the declaration of Dr. Fredrick Schoen, disclosed a node

26   and fibril microstructure in Figure 1 exhibiting tissue ingrowth with an internodal

27   distance in the "order of 50 microns"   (PX116J at pp. PX116.3010-15); (ii) a

28   - 39 -

photomicrograph in the Matsumoto II Article with a ten micron dimensional scale (Id. at p. PX116.3025); (iii) the Soyer Article, which Mr. Bookstein argued disclosed a range of "pore sizes" between .5 and 2.5 microns, and that one of skill in the art would have understood "pore size" to be synonymous with fibril length (id. at pp. PX116.3015-24); and (iv) the Volder A-V Shunts Article which Mr. Bookstein argued disclosed an ePTFE vascular graft with a "pore size" within the claimed range (Id. at pp. PX116.3026-28.)

134.   Mr. Santorelli opposed Goldfarb's Motion to Dissolve (PX116AAA) arguing that Matsumoto II was not prior art because it was published in October 1973 (the same time as the Matsumoto III Article), and that Matsumoto I was not anticipatory because it "does not even mention fibrils or fibril length and is silent as to any significance of fibril length, does not in any way teach that tissue ingrowth is functionally related to fibril length, [and] does not describe the fibrils or the fibril length of the graft sections depicted … ." PX116AAA at p. PX116.3819.  With respect to the Soyer and Volder A-V Shunts Articles, Mr. Santorelli argued that the term "pore size" used in those articles does not have, and would not be understood by one of skill in the art to have, the same meaning as "fibril length" or "internodular distance" (PX116AAA at pp. PX116.3831-.3834 and PX116.3838-40) and submitted the declaration of Carleton Angelo Sperati, M.D., in support.  PX116.3885-94.

135.   In the alternative to dissolving the Interference, Mr. Bookstein moved to substitute or add new counts to the Interference, which included an upper limit for fibril length and ranges for wall thickness and density that Mr. Bookstein argued was not disclosed or suggested in the prior art.  PX116VV.  In particular, with regard to the Matsumoto III Article, Mr. Bookstein noted that it "discloses on page 519 the inside and outside diameters of a graft from which one may calculate that the particular wall thickness was .5 mm," but otherwise failed to "teach any specific criticality attaching to the wall thickness," failed to "suggest that any particular importance is to be applied to

internodal distance (fibril length) or that a range of fibril lengths is critical," and failed to teach "that the combination of wall thickness and fibril length is an important characteristic." PX116VV at p. PX116.2676.

136. Mr. Santorelli opposed the Motion to Amend by arguing that "the present count or the contingent count is broader than either count proposed by Goldfarb, [and thus] substitution of Goldfarb's proposed counts would be improper," because "[a]n interference should always be determined on the broadest count which is available." PX116.3794-95. Mr. Santorelli further argued that Dr. Goldfarb had admitted that the Matsumoto III Article was prior art to the Goldfarb Application which disclosed a wall thickness of 0.5 mm (within the claimed range of Dr. Goldfarb's proposed count), and that wall thickness was not a critical or patentably distinct limitation. PX116.3797-98. In the alternative, Mr. Santorelli filed a contingent motion to substitute count 2 by adding an upper limit of 100 microns to the fibril length. PX116.3945-47.

137. Mr. Bookstein also moved to strike the Cooper Application based on inequitable conduct in deriving the Cooper Application from the 1974 Detton Memorandum which was itself based, in part, on the results of Dr. Goldfarb's work. PX116.2721-25. Mr. Santorelli opposed the Motion to Strike on the grounds that the Patent Interference Examiner did not have authority to consider such a motion because it related to the question of derivation, over which the Board of Patent Appeals and Interferences had exclusive jurisdiction. PX116.3948-56.

## B. PTO DETERMINATION

138. Patent Interference Examiner Michael Sofocleous preliminarily evaluated the motions made by Mr. Cooper and Dr. Goldfarb in an order dated February 1, 1985, dismissing Mr. Cooper's Motion to Dissolve and Goldfarb's Motion to Strike and referring the remaining motions to Examiner Pieprz for decision. PX116.4171-73. Examiner Pieprz issued a final decision on the motions in which he denied Goldfarb's Motion

1    to Dissolve and Motion to Amend, and granted Mr. Cooper's Contingent Motion to

2    Substitute.  PX116O.

139.  With respect to the Matsumoto I and II Articles, Examiner Pieprz found that neither

article "discloses any recognition of the criticality of 5 microns as the lower limit for

fibril length.  Neither of these articles discuss fibril length at all - but rather pore size.

Whether pore size is identical to fibril length as alleged has not been proven."

PX116O at p. 116.4175.  He further found that fibril length was the critical variable

to the claimed subject matter, and that wall thickness and density ranges were not

patentably distinct limitations.  PX116O at pp. 116.4176-77.

140.  Dr. Goldfarb asked for supervisory review of Examiner Pieprz's decision, which

resulted in a third count, having a wall thickness limitation of 0.2 to 0.8 mm being

added to the Interference.  Thus:

> A prosthetic vascular graft of expanded polytetrafluoroethylene having
> a microscopic structure of nodes interconnected by fibrils, said graft
> comprising:
>
> a wall thickness greater than about 0.2 millimeters and less than about
> 0.8 millimeters; and
>
> an average distance between the nodes in the range of between about
> 5 to 100 microns.

PX116.4185-98, PX116.4228-48, PX116WW, PX116CCC.

**C.    MR. HAROLD GREEN REAFFIRMS HIS 1976 AFFIDAVIT**

141.  Harold Green was deposed for a fifth time on July 12, 1988 as part of the Interference.

During his deposition Mr. Green testified that:  (i) although Mr. Detton expressed

some "discontent" with his 1976 Affidavits he "didn't know, and don't know today,

what the specific problem was that he was uncomfortable with"; (ii) he did not recall

any conversation with Mr. Detton where he indicated he wanted to withdraw his 1976

Affidavits; (iii) he was comfortable with the 1976 Green Affidavit; and (iv) he

- 42 -

1  recalled at least one conversation with Dr. Goldfarb regarding the "Goldfarb
2  Structure," and that he had called Dr. Goldfarb directly because the specifications
3  were unlike any he had made before.  H. Green Dep., 7/12/88, at pp. 288-97, 312,
4  352-54 (PX116.8890-99, 8914, 8954-56).

5  142.  A sixth deposition of Harold Green was taken on December 8, 1988.  During this
6  deposition Mr. Green confirmed that his November 9, 1978 deposition was mostly
7  true but that "one also has to remember that the lawsuit that was involved here,
8  Goldfarb versus Impra, was acrimonious, at best, and there were a lot of personal
9  feelings involved here.  So perhaps some of these statements may be a bit overstated
10 as we sit here today."  H. Green Dep., 12/8/88, at p. 434 (PX116.9020).  Mr. Green
11 also reaffirmed the 1976 Green Affidavit regarding small diameter grafts and that
12 0.7-0.8 millimeters would have been an upper limit for wall thickness at the time of
13 his affidavit.  Id. at p. 452 (PX116.9038).

14 **D.     THE PTO AWARDS PRIORITY TO DR. GOLDFARB**

15 143.  The parties submitted their final briefs in the Interference in the second half of 1990.
16 Mr. Lawrence Green, who had assumed primary responsibility for the Goldfarb
17 Application, argued that Dr. Goldfarb was entitled to priority based on conception,
18 diligence and reduction to practice without relying on any of Mr. Detton's deposition
19 testimony or his 1976 Affidavits.  PX116.6813-62.  Mr. Santorelli argued that Mr.
20 Cooper was entitled to priority based on an earlier conception and reduction to
21 practice (PX116HHH at pp. PX116.6924-83), and further argued that count 3, which
22 added a wall thickness limitation, should be dissolved because the claimed wall
23 thickness was known in the prior art and was not patentably distinct from the other
24 counts.  PX116HHH at pp. PX116.6983-91.  Finally, Mr. Santorelli argued that
25 "Cooper was fully entitled to rely on and use the work of the various evaluators who
26 implanted and harvested expanded PTFE grafts [including Dr. Volder] provided they
27 made no inventive contribution to the counts.  None did."  PX116.6971.

28

144.   The final hearing in the Interference occurred on November 21, 1991, with the Final Decision not issuing until almost four years later on October 18, 1995. PX116.7227, PX116D. The Board found that count 3 – which contained a wall thickness limitation – was not patentably distinct from count 2 and dissolved it from the Interference. PX116D at p. 116.7300. The Board determined that Dr. Goldfarb was the first to invent and awarded priority to Dr. Goldfarb based on a conception and reduction to practice date no later than July 1973 finding that, although Mr. Cooper may have established a June 5, 1973 conception, Mr. Cooper had not alleged any diligence to a reduction to practice. PX116D at p. 116.7328. The Board did not base its decision on Mr. Detton's deposition testimony or affidavits but instead cited and relied upon the testimony of others, including Harold Green, who the Board noted had "confirmed the truth of his 1976 affidavit and 1975 deposition," and Mr. Mendenhall. PX116D at pp. 116.7318-21.

145.   The Board's decision finding Dr. Goldfarb the first to invent was upheld by the Federal Circuit on September 1, 1998, which remanded the case back to the Board to consider whether Dr. Goldfarb's activities inured to the benefit of Gore. Cooper v. Goldfarb, 154 F.3d 1321 (Fed. Cir. 1998). On remand, the Board found no inurement to Mr. Cooper for Dr. Goldfarb's work. That decision was upheld by the Federal Circuit on March 2, 2001. Cooper v. Goldfarb, 240 F.3d 1378, 1386 (Fed. Cir. 2001). Having lost the Interference and its multiple appeals disputing the PTO's finding that Dr. Goldfarb was the first to invent, Gore abandoned the Cooper Application. PX117.4008-09.

E.     PLAINTIFFS' EFFORTS TO OBTAIN THE VOLDER NOTEBOOK

146.   On January 6, 1986, Mr. Harold Green, then Impra's CEO, wrote to Dr. Volder seeking permission to disclose the Volder Notebook to the PTO in order to disprove both Mr. Cooper's and Dr. Goldfarb's claims of inventorship. DX3052. Despite the fact that Impra was adverse to Dr. Goldfarb, and thus it "would have been in [Dr.

1    Volder's] financial interests" to disclose his notebook, Dr. Volder never gave

2    permission to do so.  Trial Tr., 11/27/07, at p. 2002 (H. Green) ; Trial Tr., 12/12/07,

3    at p. 4261 (Thesz).   Mr. Green subsequently wrote to Dr. Volder on July 14, 1986

4    noting that Dr. Volder's refusal to release his notebook was "a great disappointment"

5    as it "supposedly describes experiments to predate both the Cooper (Gore) and

6    Goldfarb patent applications." DX3053. Mr. Harold Green testified that he had never

7    read or reviewed the Volder Notebook, and had "no idea what it is" or any knowledge

8    of its contents.  Trial Tr., 11/27/07, at pp. 2002-03 (H. Green); Trial Tr., 12/12/07, p.

9    4177 (H. Green).

10   147.   C.R. Bard acquired Impra on September 16, 1996.  Trial Tr., 11/16/07, at p. 1365

11          (McDermott).  This acquisition extinguished the adverse relationship between Dr.

12          Goldfarb and Impra.  Trial Tr., 11/07/07, at p. 491 (Goldfarb).

13   148.   On August 26, 1996, immediately prior to Bard's acquisition of Impra, Mr. James

14          Polese (Impra's counsel) wrote to Mr. Lawrence Green, noting that he had been in

15          touch with Dr. Volder and asking if Mr. Green would like the Volder Notebook which

16          Dr. Volder had indicated he was "confident … would confirm that Dr. Goldfarb is not

17          the inventor of the Goldfarb invention."   DX3864.  At the time of writing his letter

18          Mr. Polese had never seen the Volder Notebook and had no knowledge of its contents

19          or its relevance to the Goldfarb Application.  Trial Tr., 11/30/07, at p. 2640 (Polese).

20   149.   Mr. Lawrence Green asked to see a copy of the Volder Notebook, despite not

21          believing Dr. Volder's claim of inventorship because it was inconsistent with Mr.

22          Cooper's representations that "he was quite familiar with all of the work of all of

23          these doctors, including Dr. Volder, and that none of these doctors had done anything

24          inventive and that none of them had made any contribution to his invention."  Trial

25          Tr., 12/12/07, at p. 4221 (L. Green).

26   150.   In October of 1996, Mr. Polese wrote to Dr. Volder requesting that Dr. Volder send

27          his notebook directly to Mr. Green, or to have Mr. Sutton or the "current holder" of

28                                        - 45 -

1   the Volder Notebook (or a copy) send a copy.  DX3160; Trial Tr., 11/30/07, at pp.

2   2632-36; 2641-42 (Polese).   Dr. Volder did not send the notebook, thereby

3   maintaining the confidentiality of the Volder Notebook.  Trial Tr., 11/30/07, pp.

4   2640-41 (Polese); Trial Tr., 12/12/07, at pp. 4221-22 (L. Green).

151.   Indeed, only a month prior to Mr. Polese's October letter Dr. Volder had written to

Mr. Sutton (who, for many years, had neither represented Impra nor been involved in

the prosecution of the Goldfarb Application) confirming that he desired to maintain

the confidentiality of the Volder Notebook and any copies.  DX3095.  When the

Goldfarb Application was returned to the patent examiner following the resolution of

the interference in 2001, Mr. Green had forgotten about Mr. Polese's letters from five

years earlier regarding Dr. Volder.  (L. Green Trial Tr., 12/12/07, at p. 4219.)

## III.   POST-INTERFERENCE PROSECUTION

### A.   PTO EXAMINER CONSIDERS ALLEGATIONS OF INEQUITABLE CONDUCT

152.   On September 27, 2000, prior to the second Federal Circuit's decision, Mr. Lawrence

Green filed a "Submission Pursuant to 37 C.F.R. § 1.56" ("Information Disclosure

Statement") which attached a declaration and complaint filed by Glenn Kelly, M.D.,

of Denver General Hospital and the University of Colorado, against Gore, Dr.

Goldfarb, and Bard alleging that Dr. Kelly was the inventor of the subject matter of

the Goldfarb Application.  Dr. Glenn Kelly v. W.L. Gore & Associates, Inc. et al.,

Civil Action No. 00-N-1691 (D. Colo) (PX115.1515-33).

153.   Using the standard forms of his law firm, Mr. Green submitted a second Statement

Filed Pursuant to the Duty of Disclosure Under 37 C.F.R. §§ 1.56, 1.97 and 1.98 on

April 18, 2001, which attached three PTO-1449 forms. Trial Tr., 12/12/07, at pp.

4189-90 (L. Green).  To prepare this Second Information Disclosure Statement and

the accompanying PTO-1449 forms, Mr. Green gathered information to disclose to

the PTO by contacting Mr. Cates, people at Impra, prior counsel from England, and

- 46 -

by attempting to contact Mr. Sutton.  Trial Tr., 12/12/07, at p. 4190 (L. Green).  In

addition, Mr. Green and his colleagues "went back through the interference record

and picked out things that we thought would be material to the prosecution of the

[Goldfarb] application."  Id. at p. 4192.

154.  Mr. Green did not disclose every document from the approximately 19,000 page

Interference record.  For instance, Mr. Green did not disclose the Gore shipping logs

(PX116.17943-52) that were produced during the Interference.  Trial Tr., 12/12/07,

at p. 4214 (L. Green).  Gore kept a "shipping log" of the ePTFE vascular grafts that

it sent to various hospitals and surgeons, including Dr. Volder, prior to Dr. Goldfarb's

invention date.  DX3028; Trial Tr. 11/16/07, 1770-1771, 1782 (Cooper).  The log

recorded at least 34 instances in which Gore manufactured and shipped vascular grafts

having wall thicknesses less than 1.0 mm before February 13, 1973, when Gore sent

the first ePTFE vascular grafts to Dr. Goldfarb.  DX3028.

155.  Gore did not present any evidence, however, that any of the doctors who received

these "thin wall" ePTFE tubes actually used them in any of their research.  Mr. Green

testified that he did not disclose the Gore shipping logs because:

> [T]he only thing they related to was wall thickness.  And the patent
> office had already determined that the wall thickness was not material,
> that it couldn't form the basis for a separately patentable claim.  So
> anything that related to wall thickness, in my view, was no longer
> material. … I didn't think they were material at all.

Trial Tr., 12/12/07, at pp. 4214, 4216 (L. Green).

156.  Mr. Green also did not disclose the copy of the Matsumoto III Article that was

obtained during the Interference with a date stamp of October 11, 1973.  PX116BBB.

Mr. Green did not disclose this copy because he was "surprised" that anyone would

allege that the Matsumoto III Article was not "dated more than one year  prior to the

filing date of the Goldfarb application."  Trial Tr., 12/12/07, at p. 4217 (L. Green).

Mr. Green did not believe there was "any confusion at all" and confirmed that

- 47 -

Matsumoto III Article had always been treated as "102(b) prior art to [the] Goldfarb [Application]."  Id.

157.  Mr. Green also "did not make a special point of pointing" out that the Matsumoto III Article disclosed a graft with a wall thickness of 0.5 mm.  (Id. at p. 4218.)  In particular Mr. Green testified that he did not specially point out the wall thickness of the Matsumoto III Article because:

> Well, in the first place wall thickness was no longer an important parameter, it was no longer material.  And secondly, the article - the examiner had the article… it was a very easy calculation to make.  And I didn't see any need to point it out to the examiner that the wall thickness was .5 millimeters.

Id.

158.  As filed with the PTO, the Second Information Disclosure Statement and the PTO-1449 forms included:  (i) those documents previously made of record prior to the requirement to use the PTO-1449 form; (ii) references uncovered or relied upon during the Interference; and (iii) documents produced by Dr. Kelly in the Kelly v. Gore litigation. PX115I at pp. PX115.1594-98; Trial Tr., 12/12/07, at pp. 4189-94 (L. Green).  The April 18, 2001 Statement also made of record both Motions to Dissolve filed by Mr. Cooper and Dr. Goldfarb in the Interference, and evidence of a potentially successful alleged use of an ePTFE graft in a human in 1971 by Dr. Norton.  PX115I at pp. PX115.1595-96.  Examiner Milano initialed all of the PTO-1449 forms with a date of "7/2001" indicating that all disclosed information had been considered.  PX115JJ at pp. PX115.1599-1604.

159.  Mr. Green did not disclose to the PTO Mr. Cooper's Motion to Dissolve the Interference based on Dr. Goldfarb's alleged misconduct in an attempt to cure inequitable conduct because Mr. Green "didn't believe inequitable conduct had occurred."  Trial Tr., 12/12/07, at p. 4194 (L. Green).  Instead, he submitted Mr. Cooper's Motion to Dissolve and its attachments "to get the underlying documents

before the examiner so the examiner could consider them in the prosecution of the application." Id. at p. 4193.

## B. INEQUITABLE CONDUCT AND PATENTABILITY ISSUES RAISED DURING THE INTERFERENCE

160. On June 27, 2001, Mr. Lawrence Green and others attended an interview with Supervisory Patent Examiner Corrine McDermott in Ms. McDermott's office, which lasted for several hours. PX115KK; Trial Tr., 12/12/07, at pp. 4197-99 (L. Green) . Among the other persons present at the interview was Patent Examiner Steven Marcus who was an interference practice specialist that had been specifically assigned to assist Examiner McDermott with respect to interference matters concerning the Goldfarb Application. Trial Tr., 12/12/07, at pp. 4198-99 (L. Green).

161. At the interview, Mr. Green raised the Information Disclosure Statements because he "felt that the [PTO] needed to consider all of these in making a determination of patentability." Id. at p. 4203. Mr. Green and the interference practice specialist advised Examiner McDermott of the need to consider the materials raised by Mr. Green in the Information Disclosure Sheets already filed and any future Information Disclosure Sheets Mr. Green filed. Id. at pp. 4203-04. Mr. Lawrence Green testified that Examiner McDermott agreed that "she would review the information disclosure statements." Id.

162. Pursuant to the agreement from the interview, Mr. Lawrence Green filed an amendment on July 6, 2001 amending claims 20-23, cancelling claim 25 and adding claims 25-28. PX115K; Trial Tr., 12/12/07, at pp. 4201-03 (L. Green). With respect to claim 20, Mr. Green informed the Examiner that Dr. Goldfarb had been required to add this claim in 1983 for the purpose of an interference and that the amendments were being made to address potential patentability issues with respect to the claim. PX115K at pp. PX115.3775-78. Mr. Green filed a Supplemental Statement Filed Pursuant to the Duty of Disclosure Under 37 C.F.R. §§ 1.56, 1.97 and 1.98 on July

- 49 -

12, 2001, which included certain foreign language documents, further information concerning the <u>Kelly v. Gore</u> lawsuit, new allegations of inventorship in a lawsuit between Dr. Diethrich and Dr. Goldfarb and Bard (<u>Goldfarb v. Diethrich</u>, Civil Action No. 01-2161-PHX-SRB (D. Ariz.), and copies of previously-filed submissions by Dr. Campbell regarding inventorship.  Trial Tr., 12/12/07, at pp. 4206-10 (L. Green).

## C.    DISCLOSURE OF ADDITIONAL DOCUMENTS TO THE PTO

163.    Mr. Lawrence Green filed a Second and Third Supplemental Statement Pursuant to the Duty of Disclosure on August 14, 2001 and January 16, 2002.  PX115OO; PX115PP.  The submissions disclose, *inter alia*, certain abstracts and additional information concerning the <u>Goldfarb v. Diethrich</u> litigation.    Mr. Green also submitted substitute PTO-1449 forms which were not in the correct format that were initialed by the Examiner on January 31, 2002.  Trial Tr., 12/12/07, at pp. 4206-08 (L. Green).

164.    At one point Mr. Green also called the Examiner and realized that he did not receive one of the information disclosure statements.  <u>Id.</u> at p. 4211.  Mr. Green then photocopied everything again and re-submitted it, with the Examiner's assurance that "he would consider it when it arrived."  <u>Id.</u>  Mr. Green testified that during this time he "[t]ried to disclose everything [he] thought was material to the examiner."  <u>Id.</u>

165.    The Notice of Allowance was mailed on July 15, 2001 (PX115.4017) and the issue fee paid on October 10, 2001 (PX115.4318).

## D.    MR. DETTON'S 2002 DEPOSITION

166.    On August 12, 2002, Mr. Detton was deposed in connection with the <u>Diethrich v. Goldfarb</u> litigation.  Trial Tr., 11/27/07, at pp. 1900-01 (Detton); PX115QQ at p. PX115.4408.  Mr. Lawrence Green attended Mr. Detton's August 12, 2002 deposition.  Trial Tr., 12/12/07, at p. 4212 (L. Green).  At his deposition Mr. Detton gave testimony that Mr. Lawrence Green had not previously heard about how Mr. Detton thought his affidavits were "untruthful and [that] they were signed under

1    duress." Id.

2    167.  Upon hearing Mr. Detton's testimony regarding the 1976 Affidavits, Mr. Green

3          immediately requested the PTO to withdraw the Goldfarb Application from issuance

4          so that it could consider Mr. Detton's 2002 deposition testimony. PX115QQ. Mr.

5          Green testified that he "felt that it was important to bring [the testimony] to the

6          attention of the patent office." Trial Tr., 12/12/07, at p. 4212 (L. Green). In

7          submitting this request Mr. Green stated that he did not have a copy of the transcript

8          at present and thus could not "make any representation as to whether Mr. Detton's

9          recent testimony is cumulative of the information previously considered by the Office

10         in [the 1980 Detton Affidavit]" or whether "a Rule 56 violation has occurred."

11         PX115QQ at p. 115.4409.

12   168.  The petition to withdraw the application from issue was dismissed by the PTO as not

13         meeting the condition for withdrawal of the application that Mr. Green "actually

14         assert that the patent is either invalid or unenforceable." PX115QQ at pp.

15         115.4412-14; Trial Tr., 12/12/07, at p. 4213 (L. Green). Mr. Green did not make that

16         representation in the petition because he did not believe inequitable conduct had

17         occurred. Trial Tr., 12/12/07, at p. 4213 (L. Green).

18   169.  The Goldfarb Patent issued on August 20, 2002 as United States Patent No.

19         6,436,135. PX1.

20   **IV.   POST-ISSUANCE DEVELOPMENTS**

21   170.  Shortly after his 2002 deposition testimony, Mr. Detton entered into a consulting

22         agreement with Gore pursuant to which he was paid an up front fee of $10,000 and

23         an hourly rate of $250 for his "background knowledge … with respect to events

24         during and after his employment at Gore." DX3814. Mr. Detton has been paid

25         around $60,000 or $70,000 by Gore for his "consulting" since October 2002. Trial

26         Tr., 11/27/07, at p. 1903 (Detton).

27   171.  Mr. Detton has admitted committing perjury in the past. Id. at pp. 1914-15.

28
                                          - 51 -

172.   According to Mr. Detton's trial testimony here, he executed the 1976 Affidavits in front of Mr. Harold Green and Mr. Sutton, he signed them under duress, and he spoke to Mr. Sutton and wrote him a letter the following Monday repudiating his 1976 Affidavits.   Trial Tr., 12/12/07, at pp. 4309-11 (Detton).

173.   In 2004, Mr. Detton produced, for the first time, the "repudiation" letter he purportedly sent to Mr. Sutton in 1976.  The letter Mr. Detton produced in 2004 was similar to the documents he signed in 1976, but there were notable differences.  DX 3084; Trial Tr., 11/27/07, at pp. 1953-56 (Detton).  For example, the 2004 version of the 1976 "repudiation" letter is signed "Dan Detton" and the 1976 Detton Affidavits and his 1980 affidavit are signed "D. Dan Detton."   DX 3084; PX 115N at PX 115.236; PX 115P at PX 115.291; PX 115X at PX 115.615.

174.   Mr. Detton's testimony regarding his signing of the 1976 Affidavits was corroborated to some extent by Ms. Prestis, his ex-wife.  Trial Tr., 12/11/07, at 4010-13 Prestis).  Ms. Prestis, however, testified that Mr. Detton made a "demand for stock" from Harold Green at the meeting and that Mr. Green's refusal of that demand is what caused Mr. Detton to become angry.  Id. at 4019.

175.   Mr. Detton's testimony was contradicted by Mr. Sutton who testified that he was not present when Mr. Detton signed the 1976 Affidavits, and that he did not speak to or receive any correspondence from Mr. Detton in the days or weeks following the signing of the 1976 Affidavits.  Trial Tr., 12/07/07, at pp. 3854-56, 3858-59 (Sutton).   Mr. Sutton's testimony was corroborated by his secretary, Ms. Shrum, who testified that neither Mr. Sutton nor Mr. Harold Green were present when Mr. Detton signed his 1976 Affidavits, which she personally notarized.  Trial Tr., 12/12/07, at pp. 4157-59 (Shrum).  Ms. Shrum also confirmed that Mr. Detton did not call or send a letter to Mr. Sutton seeking to withdraw his affidavits and that, if he had done so, she was "fairly sure I would have recalled [it]," because it was "so soon after signing the affidavits … [a]nd he's talking about the affidavits and grave doubts, and it's

1    something I think I would have remembered." <u>Id.</u> at pp. 4161-63.

2    176.   Mr. Sutton's testimony was further corroborated by Mr. Harold Green who testified

3    that he could not recall being present at any meeting where Mr. Detton signed his

4    affidavits.  Trial Tr., 12/12/07, at 4179 (H. Green).

5    177.   Mr. Harold Green also again confirmed the accuracy of his 1976 affidavit and, even

6    after being shown numerous documents which Gore asserts contradict his sworn

7    statements, testified that "I don't know of any – reading through this document, I

8    don't know of anything that I read here that I would be inclined to change."  Trial Tr.,

9    12/12/07, at p. 4180 (H. Green).

10   178.   On November 2, 2007, a jury trial commenced to decide the infringement portion of

11   the instant lawsuit.  On December 11, 2007, the Jury returned a verdict for the

12   Plaintiffs on all counts and all claims, including willful infringement.  <u>See</u> Jury

13   Verdict, Doc. 771.

## CONCLUSIONS OF LAW

## I.   LEGAL STANDARD

16   179.   Stated generally, patent applicants and their patent attorneys have a duty of candor,

17   good faith and honesty in their dealings with the PTO. 37 C.F.R. § 1.56(a) (1989).

18   The duty of candor, good faith and honesty includes the duty to submit truthful

19   information and the duty to disclose to the PTO information known to the patent

20   applicants or their attorneys which is material to the examination of the patent

21   application. <u>Elk Corp. of Dallas v. GAF Bldg. Materials Corp.</u>, 168 F.3d 28, 30

22   (Fed.Cir.1999); 37 C.F.R. § 1.56(a) (1989). The duty of candor extends throughout

23   the patent's entire prosecution history. <u>Fox Industries v. Structural Preservation</u>

24   <u>Systems, Inc.</u>, 922 F.2d 801, 803 (Fed.Cir.1991).

25   180.   Breach of the duty of candor, good faith and honesty may constitute inequitable

26   conduct. <u>Id.</u> If it is established that a patent applicant engaged in inequitable conduct

27   before the PTO, the entire patent application so procured is rendered unenforceable.

1   Kingsdown Medical Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 877 (Fed. Cir.

2   1988).

3   181.   "To prove that a patent is unenforceable due to inequitable conduct, the [] infringer

4   must provide clear and convincing evidence of (1) affirmative misrepresentations of

5   a material fact, failure to disclose material information, or submission of false material

6   information, and (2) and intent to deceive." Impax Labs., Inc. v. Aventis Pharms.,

7   Inc., 468 F.3d 1366, 1374 (Fed. Cir. 2006).

8   182.   Information is deemed material if there is a substantial likelihood that a reasonable

9   examiner would have considered the material important in deciding whether to issue

10   the application as a patent. See Elk Corp., 168 F.3d at 31; 37 C.F.R. § 1.56(a).

11   Accordingly, a reference does not have to be prior art to be material information that

12   must be disclosed to the PTO. See 37 C.F.R. § 1.56(a) (1989). "The [information]

13   need only be within a reasonable examiner's realm of consideration." Merck & Co.,

14   Inc. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1421 (Fed. Cir. 1989).

15   183.   Submission of a false affidavit may be determined to be "inherently material." Digital

16   Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1318 (Fed. Cir. 2006).

17   184.   "[A]n otherwise material reference need not be disclosed if it is merely cumulative of

18   or less material than other references already disclosed." Elk Corp., 168 F.3d at 31.

19   185.   While "[m]ateriality does not presume intent, which is a separate and essential

20   component of inequitable conduct" (Allen Eng'g Corp. v. Bartell Indus., Inc., 299

21   F.3d 1336, 1352 (Fed. Cir. 2002) (internal quotes and citation omitted)), the

22   materiality of a reference may lead to an inference of intent. Bruno Indep. Living

23   Aids, Inc. v. Acorn Mobility Servs., 394 F.3d 1348 (Fed. Cir. 2005) ("in the absence

24   of a credible explanation, intent to deceive is generally inferred from the facts and

25   circumstances surrounding a knowing failure to disclose material information").

26   186.   Intent to deceive is rarely established by direct evidence, and therefore, may be

27   inferred from the facts and circumstances surrounding the applicant's overall conduct.

28   - 54 -

Molins PLC v. Textron, Inc., 48 F.3d 1172, 1180 (Fed. Cir. 1995) (intent to deceive is most often proven "by a showing of acts, the most natural consequence of which are presumably intended by the actor"). For example, "intent may be inferred where a patent applicant knew, or should have known, that withheld information would be material to the PTO's consideration of the patent application." Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1256 (Fed. Cir. 1997).

187. "Intent to deceive, however, cannot be 'inferred solely from the fact that information was not disclosed;' there must be a factual basis for a finding of deceptive intent." Purdue Pharma L.P. v. Endo Pharm., 438 F.3d 1123, 1133-34 (Fed.Cir.2006).

188. Moreover, if the failure to disclose or misrepresentation occurred due to "[s]imple negligence, oversight, or an erroneous judgment made in good faith," the intent element is not satisfied. Speciality Composites v. Cabot Corp., 845 F.2d 981, 982 (Fed. Cir. 1988). A finding of "gross negligence," likewise, "does not itself justify an inference of intent to deceive." Kingsdown, 863 F.2d at 876. However, a patent applicant cannot "cultivate ignorance, or disregard numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art." FMC Corp. v. Hennessy Industries, Inc., 836 F.2d 521, 526 n.6 (Fed. Cir. 1987).

189. In determining whether the applicant's overall conduct evidences an intent to deceive the PTO, the Federal Circuit has emphasized that "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc., 984 F.2d 1182, 1189 (Fed. Cir. 1993) (internal quotations and citation omitted).

190. Once materiality and intent have been established, the court must conduct a balancing test to determine "whether the scales tilt to a conclusion that 'inequitable conduct' occurred." Critikon, 120 F.3d at 1256. Generally, "when the misrepresentation or

1   withheld information is highly material, a lesser quantum of proof is needed to

2   establish the requisite intent, ... In contrast, the less material the information, the

3   greater the proof must be." Purdue Pharma L.P., 438 F.3d at 1128-29 (internal

4   citations omitted).

5   191.   Ultimately, the question of whether inequitable conduct occurred is equitable in

6   nature.  The court must make the "equitable judgment concerning whether the

7   applicant's conduct is so culpable that the patent should not be enforced." Life

8   Techns., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1324 (Fed. Cir. 2000).  During

9   this step of the analysis, the court determines "whether the material

10   misrepresentations or omissions in question are sufficiently serious in light of the

11   evidence of intent to deceive, under all the circumstances, to warrant the severe

12   sanction of holding the patent unenforceable." Hoffman-La Roche, Inc. v. Promega

13   Corp., 323 F.3d 1354, 1372 (Fed. Cir. 2003).

14   **II.   THE ACCUSED CONDUCT**

15   **A.   ALLEGED FAILURE TO ADVISE THE PTO OF DR. VODER'S CONNECTION WITH IMPRA IN HIS 1976 AFFIDAVIT**
16

17   192.   Gore asserts that Dr. Goldfarb and/or his attorneys committed inequitable conduct

18   with regard to Dr. Volder's 1976 Affidavit by (i) failing to disclose to the PTO Dr.

19   Volder's affiliation with Impra in the 1976 Volder Affidavit, (ii) by not describing the

20   full scope of Dr. Volder's work with ePTFE grafts in the 1976 Volder Affidavit.

21   **1.   MATERIALITY**

22   193.   The 1976 Volder Affidavit was not submitted to the PTO in response to a request for

23   an impartial affidavit from the patentee.  Instead, Mr. Sutton submitted the 1976

24   Volder Affidavit without any direction from the PTO.

25   194.   Plaintiffs had a duty to disclose the connection between Dr. Volder and Impra.  See

26   Ferring B.V. v. Barr Lab., Inc., 437 F.3d 1181, 1195 (Fed. Cir. 2006) (finding that an

27   inventor and his assignee must "disclose the known relationships and affiliations of

28

1   the declarants so that those interests can be considered in weighing the

2   declarations").[4]

3   195.   The 1976 Volder Affidavit does not state that Dr. Volder has no ownership interest

4          in Impra, or that he is merely a disinterested researcher.

5   196.   Moreover, there is no evidence that Dr. Volder was an officer of Impra at the time he

6          signed his 1976 affidavit.

7   197.   Dr. Volder and Impra became adverse to Dr. Goldfarb in September 1977 –

8          approximately one year after Dr. Volder signed his 1976 Volder Affidavit and nearly

9          one year prior to the next responsive Office Action.  At the time the PTO considered

10         the 1976 Volder Affidavit, Dr. Volder had no interest in the Goldfarb Application.

11  198.   Despite it being in Dr. Volder's and Impra's financial interests,  Dr. Volder never

12         repudiated his affidavit once his interests became adverse to Dr. Goldfarb, or at any

13         other time.

14  199.   Based on these facts, the omission of Dr. Volder's ownership interest in Impra was

15         not material.

16              **2.   INTENT**

17  200.   Gore cites Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1191 (Fed.

18         Cir. 1993), to assert that the Court should find inequitable conduct here because in

19         Paragon the Federal Circuit affirmed the district court's finding of intent to mislead

20

21  _____

22      [4] In Ferring the patent applicant submitted affidavits from a number of scientists, but
    failed to disclose to the PTO that those scientists had either received research funding from,
23  or had previously worked for, the applicant. 437 F.3d 1184.  Plaintiffs distinguish Ferring
    by asserting that these affidavits were submitted at the examiner's prompting, thereby putting
24  the applicant on notice as to the materiality of the affiant's relationship.  437 F.3d at 1184.
    However, Ferring is not so limited.  In fact, in Espeed, Inc. v. Brokertec USA, L.L.C., 480
25  F.3d 1129, 1136 (Fed. Cir. 2006), the Federal Circuit treated Ferring more expansively,
    stating, "we concluded that the failure to disclose possible bias of the declarants constituted
26  a material omission where the declarations were submitted to overcome a prior art rejection."
    Thus, Ferring applies here.
27

28                                    - 57 -

1     the PTO by the applicant's failure to disclose that three affiants either owned stock

2     in, or had been engaged as a consultant by, the assignee.  However, Gore fails to note

3     that in <u>Paragon</u>, the PTO examiner specifically requested an "affidavit from a

4     disinterested third party" for the purpose of assessing obviousness.  <u>Id.</u>  The three

5     affidavits the applicant submitted were from professionals in the field which

6     affirmatively stated that the affiant had not "been in the past employed by nor do I

7     intend in the future to become employed by" the assignee.  <u>Paragon</u> is distinguishable

8     in that, here, there is not evidence of active misleading statements made to the PTO.

9     Though it is true that Dr. Volder's stock ownership was not disclosed, the number of

10     shares Dr. Volder owned was not sizable and, more importantly, it is unclear whether

11     anyone knew that Dr. Volder owned these shares or whether Dr. Volder had ever

12     informed Mr. Sutton, who drafted Dr. Volder's affidavit, as to his stock ownership.

13 201.    There is no evidence that Mr. Sutton was aware of Dr. Volder's ownership interest

14     in Impra at the time he submitted the 1976 Volder Affidavit.  To the contrary, Mr.

15     Sutton included in the 1976 Green and Baker affidavits the fact that both affiants were

16     affiliated with Impra.  It does not appear that Mr. Sutton was trying to hide any

17     affiliations, rather, he apparently took steps to disclose an affiant's relationship to

18     Impra when he was aware of it.

19 202.    Nor is there any evidence that either Dr. Goldfarb or Dr. Volder were aware that Dr.

20     Volder should disclose such ownership interest in the 1976 Volder Affidavit.

21 203.    There is no duty to disclose information of which a person reasonably was not aware.

22     <u>See</u> the Manual of Patent Examination and Procedure, § 2001.04 (5th ed. rev.3, 1986)

23     (stating that there is a duty to disclose to the Patent and Trademark Office *<u>all material</u>*

24     *<u>information a party is aware of, or reasonably should have been aware of</u>*, regardless

25     of the source of or how the party became aware of the information).

26 204.    The Court notes that Mr. Sutton is a member in good standing of the Arizona bar, he

27     has taught at the Arizona State University law school, and the record appears to

28

1   support that the PTO found him credible.  Based on Mr. Sutton's deposition testimony
2   presented during trial, his character, and his demeanor there appears to be no basis for
3   the Court to find Mr. Sutton not credible.

4   205.   Accordingly, because there is no evidence that Mr. Sutton knew of Dr. Volder's
5   ownership interest in Impra at the time he filed the 1976 Volder Affidavit; there is no
6   evidence that Drs. Volder or Goldfarb were aware that such information was material;
7   there is no evidence that Mr. Sutton or Drs. Goldfarb and Volder intentionally omitted
8   information regarding Dr. Volder's ownership interest from the 1976 Volder
9   Affidavit; and because the Court finds Mr. Sutton's testimony credible, Gore has
10   failed to establish an intent to mislead or deceive the PTO by clear and convincing
11   evidence.

12   **3.   BALANCE**

13   206.   The Court concludes that Dr. Goldfarb and his attorneys did not commit inequitable
14   conduct with respect to Dr. Volder's affiliation and his 1976 Volder Affidavit because
15   there was no misrepresentation in the 1976 Volder Affidavit, any omission was not
16   material to the prosecution of the '135 patent, and no intent to mislead or deceive the
17   PTO has been demonstrated.  Thus, Gore has failed to establish the existence of
18   inequitable conduct with regard to Dr. Volder's 1976 Affidavit by clear and
19   convincing evidence.

20   **B.   ALLEGED FAILURE TO ADVISE THE PTO THAT DR. BAKER
21   WITHDREW AND REPUDIATED PARAGRAPH 6 OF HIS 1976
     AFFIDAVIT**

22
23   207.   The 1976 Baker Affidavit states that "[u]nder no conditions presently known …
24   would [Dr. Baker] use or recommend the use of a graft characterized by a wall
     thickness of greater than approximately .75 mm … ."

25   208.   At his 1978 deposition, Dr. Baker confirmed that this statement was true and correct
26   at the time he signed his 1976 affidavit, but that subsequent clinical experience has
27

28   - 59 -

1    led him to want to change all of Paragraph 6 of his 1976 affidavit because he "now

2    believed that our thinking at that time was not correct." Such later-acquired scientific

3    knowledge is not relevant to a determination of patentability, which is concerned with

4    the scientific knowledge at the time of the filing or invention date of the Goldfarb

5    Application (Kopykake Enters., Inc. v. Lucks Co., 264 F.3d 1377, 1383

6    (Fed.Cir.2001), which was four years earlier than Dr. Baker's deposition testimony.

7    209.   The 1978 deposition testimony of Dr. Baker from the Goldfarb v. Impra litigation was

8    disclosed to the PTO on at least three separate occasions, including:

9    -        In or around 1980, as part of the Cooper Application in an attempt to show that

10             Dr. Goldfarb was not the inventor of the claimed subject matter;

11   -        In or around 1984, as part of Mr. Cooper's Motion to Dissolve filed during the

12             Interference; and

13   -        In 2001 or 2002, during the resumed *ex parte* prosecution of the Goldfarb

14             Application following the completion of the Interference in which Mr.

15             Cooper's Motion to Dissolve was disclosed and expressly discussed with the

16             examiner.

17   210.   Information that is disclosed to the PTO cannot be considered to be withheld. Scripps

18   Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1582 (Fed. Cir. 1991)

19   ("When a reference was before the examiner, whether through the examiner's search

20   or the applicant's disclosure, it can not be deemed to have been withheld from the

21   examiner.").

22   211.    Accordingly, Gore has not demonstrated that Dr. Goldfarb and his attorneys withheld

23   information, let alone material information, from the PTO regarding Dr. Baker's 1978

24   deposition testimony.

25             **1.    MATERIALITY**

26   212.   Further, both the PTO and the Federal Circuit expressly determined that wall

27   thickness was not a patentable distinction with respect to the claimed subject matter

28                                        - 60 -

1   and that wall thicknesses in the 0.2 to 0.8 mm range were either known or obvious

2   from the prior art.

3   213.   Accordingly, because Dr. Baker's 1978 deposition testimony does not contradict or

4   vary the statements made in the 1976 Baker Affidavit; Dr. Baker's 1978 deposition

5   refers only to later developed scientific knowledge which is not relevant to the

6   determination of patentability; and the PTO and Federal Circuit determined that wall

7   thickness is not a patentable distinction, Dr. Baker's 1978 deposition testimony is not

8   material to the prosecution of the '135 patent.

9   **2.    INTENT**

10  214.   There is no evidence that Dr. Goldfarb or his attorneys intended to withhold the 1978

11  deposition testimony of Dr. Baker from the PTO.  To the contrary, the evidence shows

12  that:  (i) Mr. Cates first disclosed the existence of the Goldfarb v. Impra lawsuit to the

13  PTO and sought to make "the record of those proceedings … available to the

14  Commissioner for consideration"; (ii) Mr. Bookstein again disclosed the Goldfarb v.

15  Impra litigation to the PTO and, knowing that the examiner already had read

16  numerous transcripts from the Cooper Application, disclosed the 1978 Baker

17  deposition and sought to make it available to the examiner should he wish to review

18  it; and (iii) Mr. Lawrence Green expressly disclosed Mr. Cooper's Motion to Dissolve

19  to the PTO, which contained Dr. Baker's testimony, and informed the PTO that it

20  needed to consider this motion.

21  215.   The evidence further shows that Dr. Goldfarb and his attorneys did not believe that

22  the 1978 deposition testimony of Dr. Baker was material to the patentability of the

23  Goldfarb Application.  Specifically:  (i) Mr. Cates wrote a letter to his Australian

24  counterpart noting the "lack of candor" and "evasive and nonspecific" answers

25  provided by Dr. Baker; (ii) Mr. Bookstein informed the PTO that he did not

26  understand the Baker deposition testimony to repudiate or contradict the 1976 Baker

27  Affidavit in any material respect; and (iii) the PTO and Federal Circuit had

28

1   determined that wall thickness was not a patentable distinction, and thus Mr.

2   Lawrence Green believed that "anything that related to wall thickness, in my view,

3   was no longer material."

4   216.   Mr. Lawrence Green testified during trial.  His testimony appeared sincere and

5   forthcoming.  There was nothing in Mr. Green's testimony to give the Court a basis

6   to question his credibility.

7   217.   There can be no intent to mislead or deceive when information is disclosed to the PTO

8   and a good faith belief as to lack of materiality is established.  Speciality Composites,

9   845 F.2d at 982.  Accordingly, because Dr. Goldfarb and his attorneys expressly

10  disclosed the Goldfarb v. Impra litigation and the 1978 Baker deposition testimony

11  to the PTO; and Plaintiffs have presented substantial evidence demonstrating that Dr.

12  Goldfarb and his attorneys had a good faith belief that the 1978 Baker deposition was

13  not material to the prosecution of Goldfarb Application, Gore has failed to

14  demonstrate an intent to mislead or deceive the PTO by clear and convincing

15  evidence.

16                          **3.   BALANCE**

17  218.   Gore has failed to establish the existence of inequitable conduct by clear and

18  convincing evidence for the following reasons:  (1) the 1978 deposition testimony of

19  Dr. Baker was disclosed to the PTO at various times; (2) the PTO found wall

20  thickness not material to the prosecution of the '135 patent; and (3) no intent to

21  mislead the PTO has been demonstrated.

22  219.   Without clear and convincing evidence of inequitable conduct, there was no

23  compelling need for Mr. Lawrence Green to cure any inequitable conduct by

24  expressly disclosing the 1978 Baker deposition testimony and any related alleged

25  inequitable conduct to the PTO during the resumed ex parte prosecution following the

26  conclusion of the Interference.

27

28

### C.    FILING AND RELYING ON TWO 1976 DETTON AFFIDAVITS

220.  Gore asserts that Dr. Goldfarb and/or his attorneys committed inequitable conduct by failing to disclose to the PTO that Mr. Detton allegedly repudiated his 1976 Affidavits.

#### 1.    KNOWLEDGE OF ALLEGED REPUDIATION

221.  Mr. Detton asserts that he sought to withdraw his affidavits before they were submitted to the PTO and that he informed Mr. Sutton of this by telephone and letter within a day or two after signing them.

222.  Mr. Detton's testimony is directly contradicted by the testimony of three witness: Mr. Sutton, Ms. Shrum and Mr. Harold Green.

223.  Mr. Detton has admitted to perjuring himself in the past.

224.  Since 2002, Gore has paid Mr. Detton over $60,000 for his cooperation with regard to the '135 patent proceedings.

225.  Dr. Goldfarb and his then attorney, Mr. Swenson, a member in good standing of the Arizona bar, further testified that Mr. Detton denied wishing to change his 1976 affidavits.

226.  Gore has not demonstrated by clear and convincing evidence that Dr. Goldfarb and his attorneys submitted the 1976 Detton Affidavits knowing that Mr. Detton had repudiated them.

#### 2.    MATERIALITY

227.  The 1980 Detton Affidavit was provided to the Examiner by Mr. Bookstein in a December 10, 1981 response to an Office Action.  This affidavit expressly stated that the Detton-Cooper Source Affidavit, which incorporated the Second Detton Affidavit, was "not correct" had been signed "under duress."  The Examiner acknowledged having already received and considered the 1980 Detton Affidavit – which he recognized retracted Mr. Detton's testimony regarding Dr. Goldfarb's inventorship – in the prior office action.  Dr. Goldfarb and his attorneys thus expressly disclosed,

1    and the PTO acknowledged, Mr. Detton's repudiation of his 1976 Affidavits to the

2    PTO.  In addition, the 1980 Detton Affidavit was submitted again in 2001.

3    228.    Mr. Bookstein further did not misrepresent the 1980 Detton Affidavit to the PTO.  Mr.

4            Bookstein did not state that he "could not" vouch for the affidavit or that it "does not"

5            seek to vary or contradict the 1976 Detton Affidavits.  To the contrary, he merely

6            stated that the 1980 Detton Affidavit was submitted to the PTO "without vouching"

7            for it and noted that it "does not appear" to contradict or vary the Second Detton

8            Affidavit.  A reasonable examiner would have reviewed the 1980 Detton Affidavit

9            and formed his or her own opinions, including that the 1980 Detton Affidavit was

10           repudiating both, one, or none of his 1976 affidavits, and thus Gore has not

11           demonstrated by clear and convincing evidence any misrepresentation by Mr.

12           Bookstein concerning the 1980 Detton Affidavit.

13   229.    The 1978 deposition transcripts of Mr. Harold Green and Dr. Baker concerning Mr.

14           Detton's statements at the Golden Eagle restaurant were also disclosed to the PTO.

15           First, they were disclosed to the Examiner in the Cooper Application.  Second, they

16           were disclosed to the PTO during the Interference during the preliminary motion

17           period in Mr. Cooper's Motion to Dissolve.  Third, Mr. Lawrence Green disclosed

18           Mr. Cooper's Motion to Dissolve to the PTO after the Interference, which the PTO

19           considered.  Thus, Gore has not demonstrated by clear and convincing evidence that

20           Dr. Goldfarb and his attorneys withheld any information, let alone material

21           information, concerning Mr. Detton's repudiation of his 1976 Affidavits from the

22           PTO.

23   230.    Mr. Detton's repudiation of his 1976 Affidavits would only affect his testimony

24           regarding his receipt of Dr. Goldfarb's specifications.  Dr. Goldfarb's inventorship,

25           however, was independently and separately corroborated by the 1976 Green Affidavit,

26           which has never been repudiated or said to be incorrect, and the deposition testimony

27           of Mr. Harold Green and Mr. Mendenhall.  The 1976 Detton Affidavits are thus not

28

material to the prosecution of the '135 patent, which the Examiner himself expressly recognized in holding the 1980 Detton Affidavit to be of "no effect" on the status of the Goldfarb Application.

231. The 1978 deposition transcripts of Mr. Harold Green and Dr. Baker do not establish that Mr. Detton repudiated his 1976 Affidavits, only that he was uncomfortable with certain aspects of them and that he wanted to know the best way to withdraw them. The 1978 deposition testimony also fails to identify any facts that Mr. Detton alleged to be incorrect, false or misleading in his 1976 Affidavits. These deposition transcripts, therefore, are cumulative of the 1980 Detton Affidavit and thus not material to the prosecution of the '135 patent.

### 3. INTENT

232. There is no evidence that Dr. Goldfarb and his attorneys intended to mislead the PTO regarding Mr. Detton's repudiation of his 1976 Affidavits. To the contrary, the facts show that:

- Mr. Detton never identified what he alleged was incorrect, false or misleading about his 1976 Affidavits prior to his 2002 deposition.

- Mr. Detton expressly told Dr. Goldfarb and his attorneys that he did not want to repudiate his affidavits.

- Dr. Goldfarb and his attorneys offered Mr. Detton multiple opportunities to clarify his 1976 Affidavits, which he declined to do.

- Dr. Goldfarb's attorneys had a good faith belief that Mr. Detton's repudiation of his 1976 Affidavits was immaterial to the determination of Dr. Goldfarb's inventorship.

- Dr. Goldfarb's attorneys disclosed the 1980 Detton Affidavit to the PTO.

- The 1978 deposition testimony of Mr. Harold Green and Dr. Baker was disclosed to the PTO.

233. Thus, Gore has not demonstrated by clear and convincing evidence that Dr. Goldfarb

or his attorneys intended to withhold any information regarding Mr. Detton's repudiation of the 1976 Detton Affidavits from the PTO.

### 4. BALANCE

234. The Court notes that Mr. Detton has perjured himself previously. The Court finds his testimony highly suspect and lacking in credibility.

235. As stated above, the "repudiation" letter Mr. Detton produced in 2004, which he claims he signed in 1996, was similar to the other documents he signed in 1976, but there are notable differences. DX 3084; Trial Tr., 11/27/07, at pp. 1953-56 (Detton). For example, the 2004 version of the 1976 "repudiation" letter is signed "Dan Detton" and the 1976 Detton Affidavits and his 1980 affidavit are signed "D. Dan Detton." DX 3084; PX 115N at PX 115.236; PX 115P at PX 115.291; PX 115X at PX 115.615.

236. Because Mr. Detton's claimed repudiation of his 1976 Affidavits was disclosed to the PTO, is not material to the prosecution of the '135 patent, and no intent to mislead the PTO has been demonstrated, Gore has not established the existence of inequitable conduct by clear and convincing evidence.

### D. ALLEGED RELIANCE ON THE PTO'S ERROR IN CONNECTION WITH WALL THICKNESS OF THE PRIOR ART MATSUMOTO PUBLICATION

237. Gore asserts that Dr. Goldfarb and/or his attorneys committed inequitable conduct with respect to the Matsumoto III Article by failing to correct the examiner's apparent misinterpretation of the Matsumoto III article as having a wall thickness of 0.5 mm.

### 1. REPRESENTATION

238. Dr. Goldfarb and his attorneys expressly disclosed the Matsumoto III Article as prior art to the PTO, both in the specification of the Goldfarb Application and in a Pre-Examination Amendment and Citation of Prior Art.

239. The examiner had the Matsumoto III Article which discloses an inside and outside diameter of the ePTFE grafts used from which one of ordinary skill can readily

- 66 -

1    calculate a wall thickness of 0.5 mm.

2    240.  Neither in Dr. Goldfarb's 1976 "amendment" response to the PTO's office action

3    concerning the Matsumoto III Article, nor at any time thereafter, did Dr. Goldfarb or

4    his attorneys ever represent to the PTO that the Matsumoto III Article had a wall

5    thickness different than 0.5 mm.  Rather, during the Interference Dr. Goldfarb's

6    attorney, Mr. Bookstein, expressly represented to the PTO that wall thickness of the

7    Matsumoto III Article could readily be calculated as 0.5 mm.

8    241.  Information that is disclosed to the PTO cannot be considered withheld or

9    misrepresented.   Scripps Clinic, 927 F.2d at 1582.

10   242.  In his April 1976 response to Examiner Frinks's rejection, Dr. Goldfarb never

11   asserted that the wall thickness of the graft disclosed in the Matsumoto III article was

12   1.0 mm and there is no evidence that Dr. Goldfarb or his lawyers recognized in April

13   1976 that the Examiner was wrong.  Although Dr. Goldfarb's counsel argued the

14   importance of wall thickness, he did not distinguish Matsumoto III solely based on

15   wall thickness but argued that the claims were allowable because the article failed to

16   disclose the "relationship between internodal distance and wall thickness" and that

17   "these two parameters are not independent."

18   243.  Dr. Goldfarb testified to the best of his recollection as to things that happened many

19   years in the past.  Dr. Goldfarb appeared sincere in his testimony.  There was nothing

20   in Dr. Goldfarb's testimony that would lead the Court to question his credibility.

21   244.  Accordingly, because the Matsumoto III Article, from which wall thickness could

22   readily be calculated, was disclosed to the PTO; Dr. Goldfarb and his attorneys did

23   not misrepresent the wall thickness of the Matsumoto III Article; the correct wall

24   thickness of the Matsumoto III Article was disclosed to the PTO during the

25   Interference; and because the Court finds Dr. Goldfarb's testimony credible, Gore has

26   failed to present clear and convincing evidence that Dr. Goldfarb and his attorneys

27   misrepresented or withheld information from the PTO.

28

### 2.   MATERIALITY

245.   During the Interference, the PTO determined that the count was patentable over the Matsumoto III Article despite the disclosure by Dr. Goldfarb's attorneys that the Matsumoto III Article had a wall thickness of 0.5 mm.  In particular, the PTO also determined that wall thickness was not a patentable distinction with respect to the claimed subject matter and that wall thicknesses in the 0.2 to 0.8 mm range were either known or obvious from the prior art.

246.   Accordingly, because wall thickness is not a patentable distinction and because the PTO expressly determined the count of the Interference to be patentable over the Matsumoto III Article knowing that it disclosed a wall thickness of 0.5 mm, the wall thickness of the Matsumoto III Article is not material to the prosecution of the '135 patent.

### 3.   INTENT

247.   Gore has not present sufficient evidence to show that Dr. Goldfarb and his attorneys were aware of the correct wall thickness of the Matsumoto III Article when they disclosed the Matsumoto III Article to the PTO, or that they were aware of the examiner's error in calculating the wall thickness of the Matsumoto III Article at or about the time of the response to the first office action.  Indeed, Dr. Goldfarb's attorney noted that there was "substantial confusion" regarding the wall thickness of the Matsumoto III Article at this time.

248.   Dr. Goldfarb and his attorneys disclosed the correct wall thickness to the PTO during the Interference.

249.   Following the conclusion of the Interference, Dr. Goldfarb and his attorneys did not feel the need to specifically point out the wall thickness of the Matsumoto III Article because the PTO had determined that wall thickness was not a patentable distinction.

250.   Accordingly, because there is no evidence that Dr. Goldfarb or his attorneys were aware of the correct wall thickness of the Matsumoto III Article prior to the response

- 68 -

in the first office action; Dr. Goldfarb and his attorneys explicitly disclosed the correct wall thickness to the PTO during the Interference; and Dr. Goldfarb and his attorneys did not believe that it was necessary to specifically point out the wall thickness of the Matsumoto III Article after the Interference, Gore has failed to establish by clear and convincing evidence that Dr. Goldfarb and his attorneys intentionally misrepresented or withheld any information from the PTO.

### 4.    BALANCE

251. Because Dr. Goldfarb and his attorneys did not misrepresent to the PTO, or withhold from the PTO, the wall thickness of the Matsumoto III Article, the wall thickness of the Matsumoto III Article is not material to the prosecution of the '135 patent, and no intent to mislead or deceive the PTO has been demonstrated, Gore has not established the existence of inequitable conduct by clear and convincing evidence.

### E.    ALLEGED FAILURE TO PROVIDE THE PTO WITH DR. VOLDER'S WORK, NOTEBOOK, AND POSSIBLE ROLE AS AN INVENTOR OR CO-INVENTOR

252. Gore asserts that Dr. Goldfarb and/or his attorneys committed inequitable conduct by failing to disclose to the PTO the Volder Notebook and Dr. Volder's other alleged claims of inventorship.

### 1.    MATERIALITY

253. A short time line concerning Dr. Volder's Notebook and work provides understanding into the materiality of the Volder Notebook.  Thus:

-    Early 1970s - Dr. Volder was one of several researchers who received ePTFE tubes from Gore to research its use as an artificial vascular graft.

-    July 1973 - Dr. Goldfarb conceived and reduced to practice his invention.

-    August 1973 - Dr. Volder published the Volder A-V Shunts Article.

-    Summer 1974 - Dr. Volder met with Mr. Sutton several times to discuss and investigate inventorship.

-    September 4, 1974 - Dr. Volder's personal attorney, Mr. Drummond, sent a

letter to Mr. Sutton claiming that Dr. Volder should be the named inventor.

- September 9, 1974 - Mr. Sutton met with Drs. Volder, Goldfarb and Gall, as well as Messrs. Harold Green and Richard Mendenhall to discuss inventorship of the draft application.  During that meeting it was determined that Dr. Goldfarb was the inventor of the subject matter at issue.

- September 10, 1974 - Mr. Sutton summarized the September 9, 1974 meeting in a memorandum, signed by Dr. Volder, stating that it was "unanimously determined that IMPRA's patent application should be filed in the name of Dr. Goldfarb."

- Either September 1974 or April 1977 - Dr. Volder provided to Mr. Sutton a copy of the Volder Notebook to retain "in confidence."  Mr. Sutton describes the Volder Notebook as having a "delightful correlation" with the Volder A-V Shunts article.   The Volder Notebook appears to be cumulative of the Volder A-V Shunts article and, therefore, is not material to the prosecution of the '135 patent.

- July 26, 1976 - Dr. Volder signed his affidavit and submitted it to the PTO stating that Dr. Goldfarb's invention was "by no means obvious."

- October 4, 1977 - after conducting an additional search, Gore represented to the PTO that Mr. Cooper – who "worked closely with the surgeons" and had access to all of their work, including Dr. Volder's – was the proper inventor.  Later during the Interference, Gore repeated the position that none of the surgeons made any inventive contribution, including Dr. Volder.[5]

---

[5] If Dr. Volder's work and the Volder Notebook were material to the '135 patent as Gore asserts, Gore logically would have relied on Dr. Volder's work for the Cooper Application and recognized Dr. Volder as an inventor.  Instead, Gore asserted that Mr. Cooper was the inventor.  This assertion eventually was rejected by the Board of Patent Appeals and Interferences and the Federal Circuit.  Goldfarb v. Cooper, Interference No. 101,100 (Bd. Pat. App. & Int. Oct. 18, 1995) (Final Decision); Goldfarb v. Cooper, Patent

1       -     February 1978 - After being sued by Dr. Goldfarb, Impra alleges through

2               letters, interrogatories and the deposition testimony of Dr. Baker, that Dr.

3               Volder was making claims to the inventorship of the Goldfarb Application.

4               Impra however, never presented any first hand or documentary evidence of

5               these claims.

6       -     Late-1970s and early-1980s - Dr. Goldfarb's counsel made repeated attempts

7               to obtain the Volder Notebook from Mr. Sutton, Mr. Green (Impra's president

8               at the time), and Dr. Volder himself.  No response is received to any of these

9               attempts, as Dr. Volder continued to maintain the confidentiality of the Volder

10              Notebook.

11      -     In 1986, Mr. Green attempted to obtain the Volder Notebook, despite having

12              no knowledge of its contents, in the hope that it would somehow help him

13              "torpedo" both the Goldfarb and Cooper Applications.  Despite the fact that

14              as a shareholder of Impra it would have been in Dr. Volder's interest to prevent

15              the Goldfarb Application from issuing as a patent, he still did not give

16              permission for Mr. Green to have the Volder Notebook.

17      -     Early 1990s - Mr. Sutton began to wind down his law practice and recycle old

18              documents as a result.  At this point, because no one had requested the copy

19              of the Volder Notebook from him for over ten years and he had no legal or

20              ethical obligation to maintain it, he likely destroyed the copy of the Volder

21              Notebook as he closed up his practice.

22      -     In 1996, Mr. Lawrence Green asked Mr. Polese to obtain the Volder Notebook

23              for his review.  Dr. Volder did not provide his notebook but instead told Mr.

24              Sutton to maintain the confidentiality of his copy of the Volder Notebook.

25

26

27

Interference No. 101,100 (Bd. Pat. App. & Int. Dec. 19, 1996) (Reconsideration Decision).  Cooper v. Goldfarb, 154 F.3d 1321 (Fed. Cir. 1998).

28

1
2
3
-       In 2001, Mr. Lawrence Green, who never believed any claim of Dr. Volder's inventorship, forgot about Mr. Polese's 1996 letter when preparing information disclosure sheets to submit to the PTO.

4   254.   For the above reasons, neither the Volder Notebook, nor the various unsubstantiated
5          third party claims of Dr. Volder's inventorship are material to the prosecution of the
6          '135 patent.

7   255.   Gore has not met the materiality prong with regard to Dr. Volder's claims of
8          inventorship, especially in light of Dr. Volder's affidavit and the testimony of
9          numerous people who attended the September 9, 1974 meeting.  Dr. Volder and
10         others present, including Dr. Gall, Mr. Harold Green, Mr. Mendenhall, and Dr.
11         Goldfarb, have signed affidavits or testified that the outcome of that September 1974
12         meeting was the determination that Dr. Goldfarb was the inventor based on the
13         scientific merits of his research.

14  256.   Moreover, Gore's attorneys met with Dr. Volder in the Netherlands, yet failed to
15         memorialize his testimony, despite the fact that Dr. Volder was "available" during the
16         fact discovery period of this litigation and was paid $1,000 a day by Gore for his
17         cooperation.  Trial Tr., 11/30/07, at 2664-65 (Kröner).  Such testimony could have
18         established whether Dr. Volder had a valid claim of inventorship.[6]

19  257.   Indeed, Dr. Volder was never deposed in this or any of its preceding litigation.

20                          **2.     INTENT**

21  258.   Mr. Sutton conducted an investigation of Dr. Volder's inventorship claim prior to
22         filing the Goldfarb Application, the result of which was that Dr. Volder signed an
23         acknowledgment that Dr. Goldfarb was the sole inventor.  Dr. Volder has never
24         withdrawn that written acknowledgment.  As a result of his investigation, Mr. Sutton

25  _____

26      [6] Such testimony also could have shown if someone knew in 1976 that Dr. Volder
27  was a shareholder of Impra and that this information should have been disclosed to the PTO.
    See II.A. above.

28                              - 72 -

1    did not believe that there would be an inventorship claim by Dr. Volder because "I

2    knew precisely that he fell outside the claim."

259.    Mr. Sutton also reviewed the Volder Notebook and concluded that it contained the

same information as was published in the Volder A-V Shunts Article.  Mr. Sutton,

thus, had a good faith belief that the Volder Notebook was cumulative to the prior art

already before the PTO, and, thus, immaterial to the prosecution of the '135 patent.

260.    Mr. Sutton received a copy of the Volder Notebook "in confidence" in April 1977[7]

and never received permission from Dr. Volder to disclose it.  Thus, the Volder

Notebook has been suppressed for over 30-years.  Because work that has been

"abandoned, suppressed, or concealed" is not prior art (E.I. du Pont de Nemours &

Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1437 (Fed. Cir. 1988); see also Trial

Tr., 12/04/07, at 2954-55 (Bjorge).  Trial Tr., 12/05/07, at 3311-12 (Thesz); Trial Tr.,

12/12/07, at 4261-62 (Thesz)), Dr. Goldfarb and his attorneys had formed a good faith

belief that the Volder Notebook was immaterial.

261.    The Court again notes that Mr. Sutton is a member in good standing of the Arizona

bar, he has taught at the Arizona State University law school, and the record appears

to support that the PTO found him credible.  Based on Mr. Sutton's deposition

testimony presented during trial, his character, and his demeanor, there appears to be

no basis for the Court to find Mr. Sutton not credible.

262.    Mr. Sutton's power of attorney to prosecute the Goldfarb Application was revoked in

January 1978, at which point in time Mr. Sutton become adverse to Dr. Goldfarb.

Neither Dr. Goldfarb nor his new attorneys have ever seen a copy of the Volder

Notebook, despite diligent efforts over a period of years to obtain a copy or gain

access to a copy from Impra and Dr. Volder himself.  Because there is no obligation

---

[7] The date Mr. Sutton was given a copy of the Volder Notebook is controverted.  Mr. Sutton testified that he received it in April 1977, whereas Dr. Goldfarb testified that Mr. Sutton had it in April 1974.

1  to disclose what you do not know or have, there is no evidence that Dr. Goldfarb and

2  his attorneys intentionally withheld any information concerning the Volder Notebook

3  from the PTO.

4  **3.    BALANCE**

5  263.  Gore has not established that the claims about Dr. Volder's alleged inventorship and

6  the Volder Notebook are material to the prosecution of the '135 patent.

7  264.  There is no evidence that Dr. Goldfarb, Impra, or their counsel intended to mislead

8  the PTO about the existence or content of the Volder notebook.

9  265.  Gore has not established the existence of inequitable conduct by clear and convincing

10  evidence.

11  **F.    ALLEGED FAILURE TO PRODUCE MATERIAL INFORMATION FROM <u>GOLDFARB V. IMPRA</u> AS ORDERED BY THE PTO[8]**

12

13  266.  Gore asserts that Dr. Goldfarb and/or his attorneys committed inequitable conduct

14  with respect to information obtained in the <u>Goldfarb v. Impra</u> litigation by: (i) failing

15  to disclose to the PTO that the 1976 Baker Affidavit was not correct in light of Dr.

16  Baker's 1978 deposition testimony; and (ii) failing to disclose to the PTO Dr.

17  Volder's claims of inventorship, Mr. Detton's repudiation of his 1976 affidavits, the

18  Baker and Harold Green deposition transcripts from the <u>Goldfarb v. Impra</u> litigation,

19  and the 1978 Vermeire letter.

20  267.  Section 2001.06(c) of the Manual of Patent Examining Procedure ("MPEP") as it

21  existed in April 1980 (DX3965), required disclosure of information from related

22  litigation.  For example, the manual required disclosure of evidence of possible prior

23  public use or sales, questions of inventorship, prior art, allegations of "fraud" or

24  violations of the duty of disclosure.

25  _____

26  [8] These issues have been addressed previously.  Nevertheless, the Court will discuss
them again in the context of Plaintiffs' alleged failure to produce material information from

27  the <u>Goldfarb v. Impra</u> litigation as ordered by the PTO.

28

1

### 1.   DR. BAKER'S 1978 DEPOSITION TESTIMONY

2

#### a)   MATERIALITY

3  268.  Again, Dr. Baker's 1978 deposition testimony in the <u>Goldfarb v. Impra</u> litigation was

4  disclosed to the PTO on at least three separate occasions, including the following:

5  -   As part of the Cooper Application in an attempt to show that Dr. Goldfarb was

6  not the inventor of the claimed subject matter;

7  -   As part of Cooper's Motion to Dissolve filed during the Interference; and

8  -   During the resumed ex parte prosecution of the Goldfarb Application

9  following the completion of the Interference in which Cooper's Motion to

10  Dissolve was disclosed and expressly discussed with the examiner.

11  269.  Information that is disclosed to the PTO cannot be considered to be withheld.  <u>Scripps</u>

12  <u>Clinic</u>, 927 F.2d at 1582.

13  270.   Accordingly, Gore has failed to demonstrate that Dr. Goldfarb and his attorneys

14  withheld any information, let alone material information, from the PTO regarding Dr.

15  Baker's 1978 deposition testimony.

16  271.  Again, the 1976 Baker Affidavit states that "[u]nder no conditions presently known

17  … would [Dr. Baker] use or recommend the use of a graft characterized by a wall

18  thickness of greater than approximately .75 mm … ."

19  272.  At his 1978 deposition, Dr. Baker confirmed that this statement was true and correct

20  at the time he signed his 1976 affidavit, but that subsequent clinical experience

21  suggested that a wall thickness less that 0.75 mm might not be appropriate for all

22  indications.   Such later acquired scientific knowledge is not relevant to a

23  determination of patentability, which is concerned with the scientific knowledge at

24  the time of the filing or invention date of the Goldfarb Application, some four years

25  earlier than Dr. Baker's deposition testimony.

26  273.  Further, both the PTO and the Federal Circuit expressly determined that wall

27  thickness was not a patentable distinction with respect to the claimed subject matter

28

1    and that wall thicknesses in the 0.2 to 0.8 mm range were either known or obvious

2    from the prior art.

3    274.    Accordingly, because Dr. Baker's 1978 deposition testimony does not contradict or

4            vary the statements made in the 1976 Baker Affidavit; Dr. Baker's 1978 deposition

5            refers only to later developed scientific knowledge which is not relevant to the

6            determination of patentability; and the PTO and Federal Circuit determined that wall

7            thickness is not a patentable distinction, Dr. Baker's 1978 deposition testimony is not

8            material to the prosecution of the '135 patent.

9                              **b)     INTENT**

10   275.    There is no evidence that Dr. Goldfarb or his attorneys intended to withhold the 1978

11           deposition testimony of Dr. Baker from the PTO. To the contrary, the evidence shows

12           that: (i) Mr. Cates first disclosed the existence of the Goldfarb v. Impra lawsuit to the

13           PTO and sought to make "the record of those proceedings … available to the

14           Commissioner for consideration"; (ii) Mr. Bookstein again disclosed the Goldfarb v.

15           Impra litigation to the PTO and, knowing that the examiner already had read

16           numerous transcripts from the Cooper Application, disclosed the 1978 Baker

17           deposition and sought to make it available to the examiner should he wish to review

18           it; and (iii) Mr. Lawrence Green expressly disclosed Cooper's Motion to Dissolve to

19           the PTO, which contained Dr. Baker's testimony, and informed the PTO that it

20           needed to consider this motion.

21   276.    The evidence further shows that Dr. Goldfarb and his attorneys did not believe that

22           the 1978 deposition testimony of Dr. Baker was material to the patentability of the

23           Goldfarb Application. Specifically: (i) Mr. Cates wrote a letter to his Australian

24           counterpart noting the "lack of candor" and "evasive and nonspecific" answers

25           provided by Dr. Baker; (ii) Mr. Bookstein informed the PTO that he did not

26           understand the Baker deposition testimony to repudiate or contradict the 1976 Baker

27           Affidavit in any material respect; and (iii) the PTO and Federal Circuit had

28

1    determined that wall thickness was not a patentable distinction, and thus Mr.
2    Lawrence Green believed that "anything that related to wall thickness, in my view,
3    was no longer material."

4    277.   There can be no intent to mislead or deceive when information is disclosed or the
5    PTO or where a good faith belief as to lack of materiality is established.  Speciality
6    Composites, 845 F.2d at 982.  Accordingly, because Dr. Goldfarb and his attorneys
7    expressly disclosed the Goldfarb v. Impra litigation and the 1978 Baker deposition
8    testimony to the PTO; and Plaintiffs have presented substantial evidence
9    demonstrating that Dr. Goldfarb and his attorneys had a good faith belief that the 1978
10   Baker deposition was not material to the prosecution of Goldfarb Application, Gore
11   has failed to demonstrate an intent to mislead or deceive the PTO by clear and
12   convincing evidence.

13                              **c)      BALANCE**

14   278.   Gore has failed to establish the existence of inequitable conduct by clear and
15   convincing evidence.  This is true for the following reasons: (1) the 1978 deposition
16   testimony of Dr. Baker was disclosed to the PTO at various times; (2) the PTO found
17   wall thickness not material to the prosecution of the '135 patent; and (3) no intent to
18   mislead the PTO has been demonstrated.

19   279.   Without clear and convincing evidence of inequitable conduct, there was no
20   compelling need for Mr. Lawrence Green to cure any inequitable conduct by
21   expressly disclosing the 1978 Baker deposition testimony and any related alleged
22   inequitable conduct to the PTO during the resumed ex parte prosecution following the
23   conclusion of the Interference.

24   /////

25

26

27

28
                                       - 77 -

1
2
3

**2.    DR. VOLDER'S CLAIMS OF INVENTORSHIP, MR. DETTON'S REPUDIATION OF HIS 1976 AFFIDAVITS, THE BAKER AND HAROLD GREEN DEPOSITION TRANSCRIPTS, AND THE 1978 VERMEIRE LETTER**

4

**a)    MATERIALITY**

5
6
7
8
9
10
11
12
13
14
15
16

280.   As noted previously, the unsubstantiated allegations of Dr. Volder's claim of inventorship was not material to the prosecution of the '135 patent.   There is no evidence that Dr. Goldfarb was ever "elected" as the inventor of the '135 patent.   The sole evidence regarding the so-called election was the hearsay testimony of Dr. Baker (a 20 percent shareholder in Impra) at a time when Impra was seeking to "torpedo" the Goldfarb Application, and the hearsay testimony of Mr. Detton, who has admitted to committing perjury.   This testimony, which is both hearsay and lacks foundation, is contradicted by the testimony of those persons who actually attended the September 9, 1974 meeting, who testified that it was unanimously agreed that Dr. Goldfarb was the inventor based on the scientific merits of his research.   The hearsay allegations made during the <u>Goldfarb v. Impra</u> litigation are thus immaterial to the prosecution of the '135 patent.

17
18
19
20
21
22

281.   Mr. Detton's alleged repudiation of his 1976 Affidavits were not withheld and were not material to the prosecution of the '135 patent. Further, Mr. Detton's repudiation of his 1976 Affidavits was disclosed to the PTO in the 1980 Detton Affidavit.   In contrast to the allegations by Impra in the <u>Goldfarb v. Impra</u> litigation, the 1980 Detton Affidavit provided Mr. Detton's own sworn description of the scope of his alleged repudiation.

23
24
25
26

282.   As stated above, the 1978 deposition testimony of Dr. Baker and Mr. Harold Green from the <u>Goldfarb v. Impra</u> litigation was disclosed to the PTO on at least three separate occasions.   This deposition testimony set forth all of the allegations made by Impra in the <u>Goldfarb v. Impra</u> litigation regarding Dr. Volder's inventorship, the

27
28

so-called "election" of Dr. Goldfarb as inventor, and the alleged repudiation of the 1976 Detton affidavits.

283. Information that is disclosed to the PTO cannot be considered to be withheld. <u>Scripps Clinic</u>, 927 F.2d at 1582. Accordingly, Gore has failed to demonstrate that Dr. Goldfarb and his attorneys withheld any information from Dr. Baker's and Mr. Harold Green's 1978 deposition testimony from the PTO.

284. The Vermiere letter did not provide details or evidence to support the allegations it contained. Mr. Harold Green testified that this letter, and other disclosures provided by Impra in connection with the <u>Goldfarb v. Impra</u> litigation, were part of an effort by Impra to "torpedo" the Goldfarb Application in order to avoid potential litigation in the future. Following receipt of Mr. Vermiere's February 21, 1978 letter, Mr. Swenson wrote to Mr. Vermiere on March 10, 1978, requesting facts to support the allegations contained in the letter and asked for a copy of the Volder Notebook. No facts were provided, nor was the Volder Notebook disclosed.

285. The Baker and Green deposition testimony and the allegations in Mr. Vermiere's 1978 letter can be considered cumulative, and therefore less material than the information already before the PTO.

286. There is no obligation to disclose immaterial or cumulative information to the PTO. <u>Elk Corp.</u>, 168 F.3d at 31.

287. Gore has failed to demonstrate that Dr. Goldfarb or his attorneys withheld material information from the PTO by clear and convincing evidence because the allegations from the <u>Goldfarb v. Impra</u> litigation regarding Dr. Volder's claims of inventorship, Mr. Detton's alleged repudiation of his 1976 Affidavits, the Baker and Harold Green deposition transcripts, and the 1978 Vermeire Letter, were either immaterial or cumulative of evidence already before the PTO.

**b)     INTENT**

288. As noted previously, there is insufficient evidence to support a finding that Dr.

1    Goldfarb and his attorneys intended to mislead or deceive the PTO with respect to Dr.

2    Volder's alleged inventorship, or Mr. Detton's alleged repudiation of his 1976

3    affidavits.  In fact, Dr. Goldfarb and his attorneys also had a good faith belief that the

4    allegations regarding the so-called "election" of Dr. Goldfarb as inventor were false.

5    In addition, there is insufficient evidence to support finding that Dr. Goldfarb and his

6    attorneys intended to withhold the Baker and Harold Green deposition transcripts

7    from the Goldfarb v. Impra litigation or the 1978 Vermeire letter.

8    289.   Gore has failed to demonstrate by clear and convincing evidence that Dr. Goldfarb

9           and his attorneys intended to mislead or deceive the PTO with respect to this same

10          information from the Goldfarb v. Impra litigation.

11                          **c)     BALANCE**

12   290.   Because the 1978 deposition testimony of Dr. Baker and Mr. Harold Green was

13          disclosed to the PTO, the allegations made by Impra concerning Dr. Volder's

14          inventorship and Mr. Detton's repudiation of his 1976 Affidavits is not material to the

15          prosecution of the '135 patent, and no intent to mislead the PTO has been

16          demonstrated, Gore has failed to establish the existence of inequitable as to the

17          Goldfarb v. Impra litigation evidence by conduct by clear and convincing evidence.

18   **G.     ALLEGED FAILURE TO ADVISE THE PATENT OFFICE OF THE
            EXISTENCE OF THE GORE SHIPPING LOG**
19

20   291.   The Gore shipping logs were disclosed to the PTO during the Interference as part of

21          the Interference record.

22   292.   Although these shipping logs indicate that Gore may have shipped "thin wall" grafts

23          to Dr. Volder prior to Dr. Goldfarb's invention date, there is no evidence that Dr.

24          Volder actually used any such "thin wall" grafts in his medical research prior to such

25          use by Dr. Goldfarb.

26                          **1.     MATERIALITY**

27   293.   The PTO expressly determined that wall thickness was not a patentable distinction

28                                      - 80 -

1   with respect to the claimed subject matter and that wall thicknesses in the 0.2 to 0.8

2   mm range were either known or obvious from the prior art.  The Gore shipping logs

3   indicating that ePTFE grafts with a wall thicknesses of less than 1.0 mm were shipped

4   to Dr. Volder are thus not material to the prosecution of the '135 patent.

5   294.  There is no evidence that Dr. Volder actually used any ePTFE grafts received from

6   Gore with a wall thickness of less than 1.0 mm in any medical research prior to Dr.

7   Goldfarb's work.  To the contrary, the Volder A-V Shunts Article (PX115JJ) only

8   reports on the use of grafts with a wall thickness of 1.2 mm and Dr. Volder, who was

9   represented by his own attorney, has never asserted otherwise or sought to repudiate

10   his 1976 Affidavit on this basis.  The Gore shipping logs indicating that ePTFE grafts

11   with a wall thicknesses of less than 1.0 mm were shipped to Dr. Volder are thus not

12   material to the patentability of the '135 patent for this additional reason.

13   295.  Furthermore, Gore was in possession of the shipping logs during the prosecution of

14   the Cooper Application, yet never disclosed them to the PTO in the Cooper

15   Application.  Indeed, despite having possession of the Gore shipping logs, Gore told

16   the PTO that it had investigated whether Dr. Volder had a claim of inventorship and

17   had determined that he did not.  Thus, Gore must not have believed that the shipping

18   logs were material to the patentability of the claimed invention.

19   **2.   INTENT**

20   296.  There is no evidence that Dr. Goldfarb or his attorneys had any possession or

21   knowledge of Gore's shipping logs at the time the 1976 Volder Affidavit was

22   submitted.  Indeed, there is no evidence that they had the shipping logs until the

23   Interference.

24   297.  Further, once they had the shipping logs, there is no evidence that Dr. Goldfarb or his

25   attorneys considered Gore's shipping logs to contradict the 1976 Volder Affidavit or

26   otherwise be material to the prosecution of the '135 patent.  To the contrary, Mr.

27   Lawrence Green testified that he did not disclose the shipping logs to the *ex parte*

28

1
2
patent examiner because they only concerned wall thickness, which was not a patentable distinction, and thus were not material.

3   298.   There can be no intent to mislead or deceive when there is a failure to disclose
4          unknown information or where a good faith belief as to lack of materiality is
5          established. Speciality Composites, 845 F.2d at 982. Gore has not established that
6          Dr. Goldfarb and his attorneys intentionally withheld any information from the 1976
7          Volder Affidavits or material information concerning the Gore shipping logs.

8                    **3.    BALANCE**

9   299.   Because the 1976 Volder Affidavit does not contain any misrepresentation, the Gore
10         shipping logs are not material to the prosecution of the '135 patent, and no intent to
11         mislead the PTO has been demonstrated, Gore has not establish the existence of
12         inequitable conduct by clear and convincing evidence.

13  **IV.   CONCLUSION**

14         Gore has not demonstrated the requisite intent or bad faith to establish the affirmative
15  defense of inequitable conduct.[9]  Gore has failed to present sufficient evidence to establish
16  that Plaintiffs have not fulfilled their duty of candor, good faith, and honesty to the PTO.
17  Nor has Gore established by clear and convincing evidence that Plaintiffs participated in
18  affirmative misrepresentations of a material fact, failed to disclose material information, or
19  submitted false material information, and an intent to deceive.

20         Specifically, Gore has failed to present sufficient evidence to establish inequitable
21  conduct by clear and convincing evidence as to Plaintiffs' failure to advise the PTO of Dr.

22

23              [9] As an aside, it should be noted that the Jury heard a substantial amount of evidence
24  that related to inequitable conduct. The Court recognizes that the Jury was asked to consider
    the validity of claims 20 through 27 of the '135 patent and the inequitable conduct evidence
25  pertains to claims one through ten. Nevertheless, much of the inequitable conduct evidence
    was allowed to be presented to the Jury as it relates to the substantive claims. Despite
26  hearing much of Gore's inequitable conduct evidence, the Jury returned a verdict for
27  Plaintiffs on every count and every claim.

28

1  Volder's connections with Impra in his 1976 affidavit. Gore has failed to present sufficient

2  evidence to establish inequitable conduct by clear and convincing evidence as to Plaintiffs'

3  alleged failure to advise the PTO that Dr. Baker withdrew and repudiated Paragraph 6 of his

4  1976 Affidavit.  Gore has failed to present sufficient evidence to establish inequitable

5  conduct by clear and convincing evidence as to Plaintiffs' alleged inappropriate filing and

6  reliance on Mr. Detton's two 1976 Affidavits. Gore has failed to present sufficient evidence

7  to establish inequitable conduct by clear and convincing evidence as to Plaintiffs' alleged

8  inappropriate reliance on the PTO's error in connection with wall thickness of the prior art

9  Matsumoto Publication.   Gore has failed to present sufficient evidence to establish

10 inequitable conduct by clear and convincing evidence as to Plaintiffs' alleged failure to

11 provide to the PTO Dr. Volder's work, notebook, and possible role as an inventor or co-

12 inventor. Gore has failed to present sufficient evidence to establish inequitable conduct by

13 clear and convincing evidence as to Plaintiffs' alleged failure to produce material information

14 from <u>Goldfarb v. Impra</u> as ordered by the PTO.  Gore has failed to present sufficient

15 evidence to establish inequitable conduct by clear and convincing evidence as to Plaintiffs'

16 alleged failure to advise the PTO of the existence of the Gore Shipping Log.

17      Accordingly, the Court finds that Gore has not proven by clear and convincing

18 evidence that Dr. Goldfarb and/or his attorneys committed inequitable conduct during the

19 prosecution of U.S. Patent No. 6,436,135.

20      **JUDGMENT ENTERED ACCORDINGLY** as to this Order and the Jury's Verdict,

21 which was entered December 11, 2007 (Doc. 771).

22      DATED this 29th day of July, 2008.

23

24

25 _____

26 Mary H. Murguia
   United States District Judge

27

28                              - 83 -