**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Bard Peripheral Vascular, Inc., and David Goldfarb, M.D., | ) ) | No. CV-03-0597-PHX-MHM |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | |
| W.L. Gore & Associates, Inc., | ) ) | |
| Defendant. | ) ) | |
| | ) | |

Currently pending before the Court are Defendant's Motion Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(h)(3) to Dismiss Plaintiffs' Complaint for Lack of Standing or in the Alternative Renewed Motion for Judgment as a Matter of Law (Dkt.#849.), Motion for New Trial or Remittitur for Excessive Damages (Dkt.#840.),  Motion for Judgment as a Matter of Law Regarding Invalidity Because Cooper and Goldfarb are Joint Inventors (Dkt.#841.), Renewed Motion for Judgment as a Matter of Law Regarding Willful Infringement (Dkt.#842.), Renewed Motion for Judgment as a Matter of Law Regarding Invalidity of the '135 Patent' for Failure to Disclose Best Mode (Dkt.#843.),  Renewed Motion for Judgment as a Matter of Law that Claims 20-27 are Invalid for Failure to Satisfy the Written Description Requirement of 35 U.S.C. § 112, ¶1 (Dkt.#844.),  Renewed Motion for Judgment as a Matter of Law that Claims 20-27 are Invalid Under 35 U.S.C. § 102(B) for Lack of Novelty in View of the 1973 Matsumoto *Surgery* Article (Dkt.#845.), Renewed Motion for Judgment as a

Matter of Law Regarding Plaintiffs' Failure to Prove that Gore's Accused Products Meet the Typicality Element of Claims 20-27 (Dkt.#846.), Renewed Motion for Judgment as a Matter of Law Regarding Plaintiffs' Claim that Propaten Infringes the '135 Patent.' (Dkt.#847.) After reviewing the pleadings and holding oral argument on Defendant's remittitur motion, the Court issues the following Order.

## I.   STANDING

In the instant Motion, Gore reiterates arguments it set forth in its previous standing briefing. See Doc. 652. Although standing may be challenged at any time, the Federal Rules do not grant the right to assert the same standing arguments repeatedly.

> It makes sense that, at some point, even jurisdictional rulings achieve a reasonable level of finality. Surely a court that has decided that it has jurisdiction is not duty-bound to entertain thereafter a series of repetitive motions to dismiss for lack of jurisdiction. Jurisdictional reconsiderations can be as wasteful as any other kind.

Ferreira v. Borja, 93 F.3d 671, 674 (9th Cir. 1996). Gore's latest standing motion ignores the factual findings the Court has previously made based on the record evidence. For example:

- Gore again argues that Dr. Goldfarb lacked standing because the 1980 License transferred "all substantial rights" in the Goldfarb application to C.R. Bard. (Gore's Motion at 8-11) Yet the Court expressly found that Dr. Goldfarb did not transfer all substantial rights to C.R. Bard under the 1980 License. See Order, July 29, 2008, at 16 ("Dr. Goldfarb retains substantial rights in the 1980 agreement. . . ."); and 17 ("Dr. Goldfarb retained substantial rights to his patent application.").

- Gore again argues that there was no implied-in-fact license of the 1980 License in conjunction with Bard's acquisition of Impra/BPV. Id. at 11-13. Yet the Court expressly found, consistent with the Federal Circuit's holding in Waymark Corp. v. Porta Sys. Corp., 334 F.3d 1358, 1364 (Fed. Cir. 2003), that the record evidence established that the "1996 transfer to Impra/BPV of the 1980 license, created at least an implied-in-fact license … ." Order, July 29, 2008, at 16.

1 •    Gore again argues that the 1997 Amendment did not transfer the exclusive license to

2        Impra/BPV because Mr. McDermott's signature was allegedly insufficient to bind

3        C.R. Bard. Doc. No. 849 at 14-16.   Yet the Court expressly found that Mr.

4        McDermott entered into the agreement on behalf of C.R. Bard and thus no additional

5        signature was required. Order, July 29, 2008, at 18.

6        In addition, the Court also found that "by at least 1997, there is a writing transferring

7    the exclusive license from C.R. Bard to BPV." Id. at 17, 19.  Thus, BPV had constitutional

8    standing to sue with Dr. Goldfarb, the then patent holder.  Waymark Corp. v. Porta Sys.

9    Corp., 334 F.3d 1358, 1364 (Fed. Cir. 2003) ("Under such circumstances, the partnership had

10   standing to bring the action, and it was permissible to join Waymark as a plaintiff under the

11   alleged oral exclusive license.").  Gore's argument that all assignments of exclusive licenses

12   are required to be in writing is both wrong as a matter of law and irrelevant in light of the

13   Court's express factual findings.   Nevertheless, the Court will again entertain Gore's

14   arguments regarding Plaintiffs' standing.

15       Interestingly, Gore bases its current Motion on documents and deposition testimony

16   that, although being listed in the Pre-Trial Order, are not in evidence and were not presented

17   during trial.   Gore offers no explanation for not introducing such information into the

18   evidentiary record.   However, the record is now closed and Gore points to no authority

19   permitting a party to base a Rule 12(h)(3) motion on evidence a party failed to submit

20   following a full evidentiary hearing.[1]  Indeed, consideration of evidence outside the record

21

22       [1] Essentially, it appears that Gore is asking the Court to reopen the record.  But Gore
23   has failed to make any proffer in support of such reopening and the case law does not support
     Gore's belated attempt to do so.  See, e.g., Locklin v. Switzer Bros., Inc., 299 F.2d 160, 169
24   (9th Cir. 1961) ("The time for testing of proof is the time of trial.  Our judicial system does
     not contemplate that the rights of litigants shall be held in abeyance for months or years in
25   order that hindsight may provide a more accurate appraisal of evidence."); Romeo v. Sherry,
26   308 F. Supp. 2d 128, 140 (E.D.N.Y. 2004) (refusing to consider new evidence contained in
     post-trial briefing where "[t]he lack of diligence by [movant's] counsel in pursuing this
27   evidence and bringing it to the court's attention in a timely fashion was the result of his own
     actions (or inaction).");  see also Fed. R. Evid. 403 (relevant evidence may be excluded on

28

1    is improper under Fed.R.Civ.P. 50(b) because such motions challenge the sufficiency of the

2    evidence based on the record "as it existed when the trial was closed." Elbert v. Howmedica

3    Inc., 143 F.3d 1208, 1209 (9th Cir. 1998).  Further, where there has been a full evidentiary

4    hearing on the merits, as there has been here, the Court must "evaluate standing from all

5    materials of record." Pandrol USA,LP v. Airboss Ry. Prods., 320 F.3d 1354, 1367 (Fed. Cir.

6    2003) (citation omitted).

7         Moreover, even if supplementation of the record were permissible under Rule

8    12(h)(3), Gore's reliance on inadmissible testimony[2] is not because "any evidence submitted

9    outside the pleadings [must] be 'competent.'"  Kamen v. Am. Tel. & Tel. Co., 791 F.2d

10   1006, 1011 (2d Cir. 1986) (rejecting "conclusory and hearsay statements contained in the

11   affidavits submitted by defendants"); accord Sapp v. FDIC, 876 F. Supp. 249, 251 (D. Kan.

12   1995) ("[A]ffidavits in support of or opposing motions to dismiss for lack of jurisdiction

13   must comply with the requirements of Fed. R. Civ. P. 56(e) … [and must] set forth such facts

14   as would be admissible into evidence[.]").  Gore's improper and inadmissible evidentiary

15   supplementation, therefore, cannot support its Motion.

16        Nor can Gore's effort to manufacture alleged legal error salvage its Motion. Gore

17   disingenuously argues that the Court applied the wrong standard of proof when it denied

18   Gore's last standing motion by mischaracterizing the import of a single line at the end of the

19   Court's Order – a line that does not purport to set forth the applicable legal standard. Gore's

20   Motion at 1.  Gore has cherry-picked one line at the end of the Court's Order and

21   misrepresents that it reflects a misallocation of the burden of proof.  However, a review of

22   the entirety of the Court's judgment (instead of a single line out of context) establishes that

23   the Court correctly reviewed and credited the standing evidence adduced by Plaintiffs, and

24

25

26   grounds of "unfair prejudice" and "undue delay").

27        [2] For example, Gore cites the deposition testimony of Mr. Krueger, a witness within
28   the Court's subpoena power, who did not testify during trial.

1   concluded that Gore failed to adduce sufficient credible evidence to rebut Plaintiffs'
2   showing.[3]

3       **A.   Background**

4       The Court reiterates the relevant background, which was similarly provided in its pre-
5   judgment JMOL Order addressing standing.  On or about October 24, 1974, Dr. Goldfarb
6   filed a patent application involving the subject matter of the '135 patent.  The '135 patent
7   issued in Dr. Goldfarb's name on August 20, 2002.  At the time this suit was filed, Dr.
8   Goldfarb was the owner of the '135 patent.

9       On or about September 23, 1980, Dr. Goldfarb and USCI entered into a written license
10  agreement pursuant to which Dr. Goldfarb granted USCI a "worldwide, exclusive license[],
11  with the right to sublicense, to make, use, and sell products covered by [the Goldfarb
12  Application]."  PX4; Trial. Tr., 11/7/07, at 462:10-463:4 (Goldfarb).  The 1980 license did
13  not transfer all of Dr. Goldfarb's rights to USCI.  For example, Dr. Goldfarb retained the
14  right to share in any damages recovered from enforcement or licensing of the '135 patent.
15  PX4 § 5.3.  Dr. Goldfarb also retained significant reversionary rights if C.R. Bard did not
16  prosecute its rights.  Id. at §§ 3.1-3.2.  In addition, the exclusive license excluded a category
17  of products ("heart valves") from its "subject matter."  Id. at 1.1.

18      In September 1996, C.R. Bard acquired Impra.  Trial Tr., 11/16/07, at 1635:20-22
19  (McDermott).  At that time, USCI was no longer involved in the vascular graft business and
20  it subsequently was sold.  Id. at 1644:9-19 (McDermott).  Responsibility for C.R. Bard's
21  vascular graft business had passed to Bard Vascular Systems Division, which manufactured
22  non-ePTFE grafts, and that business was merged into Impra.  Id. at 1635:23-1636:9, 1639:24-
23  1640:17 (McDermott).

24  / / /

25

26

---

27      [3]   Courts "review judgments, not the rhetoric in opinions."  Lindemann
28  Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., 730 F.2d 1452, 1458 (Fed. Cir. 1984).

1       Though a wholly-owned subsidiary, Impra was a separate corporate entity from C.R.

2   Bard. Id. at 1680:17-1681:6 (McDermott). Thus, as Mr. McDermott testified, because Impra

3   was the sole C.R. Bard entity manufacturing ePTFE grafts, all rights and obligations under

4   the 1980 License were transferred to it.  Id. at 1644:2-1645:10 (McDermott); see also

5   11/07/07 Tr. at 489:6-490:18 (Goldfarb).  This testimony was confirmed by the extensive

6   evidence of the parties' subsequent conduct, including the following:  (i) the payment to, and

7   acceptance by Dr. Goldfarb, of all royalty payments from Impra, (Trial Tr., 11/16/07, at

8   1644:20-1645:10, 1647:14-23 (McDermott); PX564 (showing Impra royalty payments).); (ii)

9   the entry into the written amendment of the 1980 License by Dr. Goldfarb, C.R. Bard and

10   Impra in 1997 making Impra the exclusive licensee, (PX191); (iii) Impra's granting of a

11   sublicense to Endomed as the holder of "certain license rights under United States Patent No.

12   6,436,135, including the right to grant sublicenses," (PX785 at 785.1), and (iv) Dr.

13   Goldfarb's 2007 assignment of the '135 patent to BPV (Impra's successor) confirming that

14   Dr. Goldfarb had "granted [BPV] an exclusive, worldwide license under the Patent." PX1475

15   at 1475.2.  The 1997 Amendment (PX191) is particularly significant.  Not only did this

16   agreement confirm the understanding of all three contracting parties – Dr. Goldfarb, C.R.

17   Bard and Impra – that C.R. Bard had "assigned and transferred the License Agreement to

18   Impra along with responsibility for management of Bard's vascular graft business," (id. at

19   191.1), but it also amended and substantially altered the terms of the 1980 License by

20   replacing USCI with Impra as the exclusive licensee, (id. at § 3), removing the subject matter

21   exclusion of heart valves under the license, (id. at §§ 5 and 6), and granting Impra the ability

22   to freely assign the license to any affiliate or division of C.R. Bard (id. at § 14).  Thus, as the

23   Court found, the 1997 Amendment enlarged and enhanced the rights granted to Impra by

24   transferring several of Dr. Goldfarb's previously retained rights.  Doc. No. 833 at 19-20; see

25   also DX3181 (referring to "a new agreement").  The preamble to the 1997 Amendment

26   expressly states that it is made "by and among" Dr. Goldfarb, C.R. Bard, and Impra. PX191

27   at 191.1.  As the Court has already found, Mr. McDermott's unrebutted testimony established

28   that he signed the agreement both as President of Impra and on behalf of C.R. Bard with its

1  full knowledge and consent. Trial Tr., 11/16/07, at 1647:2-5 (McDermott).  The authority of

2  Mr. McDermott to enter into this agreement on behalf of C.R. Bard was confirmed by the

3  decade-long course of conduct during which C.R. Bard has never repudiated the agreement.

4  The Court explicitly found that these facts established standing.  Doc. No. 833 at 13-20.

5      In support of its Motion, Gore presents document and deposition testimony from the

6  previous New Jersey litigation between C.R. Bard and Gore.  Not a single one of the

7  documents attached to Gore's Motion were presented or admitted at trial or are "materials

8  of record."  Pandrol USA, L.P. v. Airboss Ry. Products, Inc., 320 F.3d 1354, 1367 (Fed. Cir.

9  2003).  Gore presents no justification for its failure to timely present this alleged evidence,

10  and cites no authority establishing that it is legally permissible for the Court to consider such

11  non-evidence at this late stage.  Indeed, Gore does not even explain why it waited until its

12  most recent standing motion to cite to this non-record evidence.

13  **B.    Legal Standard**

14      Standing is a judicially created doctrine that is an essential part of the

15  case-or-controversy requirement of Article III.  Pritikin v. Dept. of Energy, 254 F.3d 791,

16  796 (9th Cir. 2001).  "To satisfy the Article III case or controversy requirement, a litigant

17  must have suffered some actual injury that can be redressed by a favorable judicial decision."

18  Iron Arrow Honor Soc. v. Heckler, 464 U.S. 67, 70 (1984).  "In essence the question of

19  standing is whether the litigant is entitled to have the court decide the merits of the dispute

20  or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).

21      The doctrine of standing "requires careful judicial examination of a complaint's

22  allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the

23  particular claims asserted."  Allen v. Wright, 468 U.S. 737, 752 (1984).  The court is

24  powerless to create its own jurisdiction by embellishing otherwise deficient allegations of

25  standing.  Whitmore v. Arkansas, 495 U.S. 149, 155-56 (1990).

26  / / /

27

28

1

**C.     Discussion**

2      The Plaintiffs have met their burden of establishing standing.  Standing in a patent

3   infringement case is derived from the Patent Act: "A patentee shall have remedy by civil

4   action for infringement of his patent."  35 U.S.C. § 281.  The term "patentee" includes "not

5   only the patentee to whom the patent was issued but also the successors in title to the

6   patentee." 35 U.S.C. § 100(d).  The Federal Circuit recognizes three categories of potential

7   plaintiffs in patent cases: "[1] those that can sue in their own name alone; [2] those that can

8   sue as long as the patent owner is joined in the suit; and [3] those that cannot even participate

9   as a party to an infringement suit."  Morrow v. Microsoft Corp., 499 F.3d 1332, 1339 (Fed.

10  Cir. 2007).  The first two categories of plaintiffs have constitutional standing to sue for patent

11  infringement.  Id.  After considering the evidentiary record here, the Court previously

12  determined that Dr. Goldfarb was "the owner of the patent title" and that Bard Peripheral

13  Vascular ("BPV") was the exclusive licensee when the suit was filed.  Order, July 29, 2008,

14  at 19-20.  Based on these two findings, the Court determined that Plaintiffs had standing.  Id.

15  at 20.

16

**1.     Transfer of Rights**

17      Gore argues that Dr. Goldfarb's complaint must be dismissed because Goldfarb

18  granted all substantial rights to C.R. Bard and C.R. Bard is not a plaintiff."  Gore's Motion

19  at 8.  In an attempt to support this claim, Gore ascribes legal error to the Court's July 29

20  Order asserting that the Court "used the wrong legal test" in finding that Dr. Goldfarb did not

21  transfer "all rights," as opposed to "all substantial rights," to C.R. Bard.  Gore's Motion at

22  8 (citing Order at 15), see also id. at 1, 9.  Gore mischaracterizes the Court's holding and

23  ignores the Court's express finding, which stated that: "[c]ontrary to Gore's argument, Dr.

24  Goldfarb retained substantial rights in the 1980 agreement including, *inter alia*, the right to

25  share in any patent damages or license fees.  Thus, the 1980 agreement granted an exclusive

26  license, not title, to USCI/C.R. Bard."  Order, July 29, 2008, at 16; see also id. at 17 ("In

27  addition, Dr. Goldfarb retained substantial rights to his patent application.").  However,

28  Gore's mischaracterization of, and refusal to acknowledge, the Court's factual findings is not

1   well taken.  The Court's July 29 Order makes plain that the Court applied the correct legal

2   test: "To determine whether an agreement conveys all substantial rights in the patent, '[the

3   court] must ascertain the intention of the parties and examine the substance of what was

4   granted by the agreement.'"  Fieldturf, Inc. v. Sw. Rec. Indus., 357 F.3d 1266, 1269 (Fed.

5   Cir. 2004). "In making such a determination, it is helpful to consider rights retained by the

6   grantor in addition to rights transferred to the grantee."  Intellectual Prop. Dev., Inc. v. TCI

7   Cablevision of Cal., Inc., 248 F.3d 1333, 1342 (Fed. Cir. 2001).  This is precisely the

8   analysis conducted by the Court in finding that Dr. Goldfarb retained "substantial rights"

9   under the 1980 License. July 29,2008 Order at 15-16.

10      Gore nonetheless challenges the Court' factual findings claiming that "[a]s a matter

11  of law, none of these retained rights are substantial rights and do not affect the conclusion

12  that C.R. Bard received substantially all the rights."  Gore's Motion at 9.  However, Gore

13  appears to be rearguing its point based on the same legal authority it previously relied on,

14  which the Court previously considered and disregarded.  See Gore's Response to Plaintiffs'

15  Objection to Gore's Notice [re:] Standing, Doc. 829, at 5 (citing Vaupel Texilmaschinen KG

16  v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 874-75 (Fed. Cir. 1991).

17      The instant case is distinguishable from Vaupel for a number of reasons.  First, unlike

18  the agreement in Vaupel (which had no subject matter limitation), the 1980 License expressly

19  excluded a category of products ("heart valves") from its "subject matter."  See Order, July

20  29, 2008, at 15 (citing PX4 at § 1.1). Licenses with "subject matter" exclusions are "field of

21  use" licenses and cannot confer "all substantial rights."  See, e.g., Int'l Gamco, Inc. v.

22  Multimedia Games, Inc., 504 F.3d 1273, 1278 (Fed. Cir. 2007) ("exclusive field of use

23  licensee does not have standing to sue in its own name" because license "divide[s] the scope

24  of a patent right by its subject matter").  At a minimum, this exclusion is strong evidence that

25  / / /

26

27

28

1   Dr. Goldfarb and C.R. Bard intended the 1980 agreement to be a license not an assignment.[4]

2   Abbott Labs. v. Diamedix Corp., 47 F.3d 1128, 1132 (Fed. Cir. 1995) (license was exclusive

3   where patentee reserved "a limited right to make, use and sell products embodying the

4   patented inventions").

5          Second, Dr. Goldfarb retained an ownership interest in any patent that C.R. Bard

6   elected to abandon, with "any patent so obtained [] not [] subject this LICENSE," (PX4 at

7   § 3.2), and received royalties irrespective of the prosecution or maintenance of any patents

8   (Id. § 2.2).  Dr. Goldfarb's reversionary interest was, thus, materially different from the

9   termination provision in Vaupel, which applied only in instances of bankruptcy or cessation

10  of manufacture. See Order, July 29, 2008, at 15 (citing PX4 at §§ 3.1-3.2).

11         Third, the right to sue granted under the 1980 License is different from the right to sue

12  in Vaupel and is limited to the right to "file, control, defend and settle, by granting a

13  sublicense or otherwise, all actions and claims against third parties for infringement of any

14  PATENTS brought against Dr. GOLDFARB or USCI seeking to declare a PATENT

15  invalid." PX4 at § 5.3.  By its terms, therefore, this right is limited to third party challenges

16  to validity and does not grant C.R. Bard the exclusive right to sue for all infringement as

17  Gore contends.  Sicom Sys. Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 979 (Fed. Cir. 2005)

18  (no virtual assignment where licensee was granted exclusive right to sue for "commercial"

19  infringement only.)  In addition, Dr. Goldfarb's right to share in any litigation damages was

20  contingent on him bearing a portion of the litigation costs. PX4 at § 5.3.  The 1980 License

21

22         [4] Gore's argument declaring that the exclusion of heart valves was "not a substantial
23  right under the patent" is baseless.  The 1980 License defines "VASCULAR PROSTHESES"
    as "prostheses for replacing, repairing or bypassing blood vessels of the human body except
24  HEART VALVES."  PX4 AT § 1.1.  Thus, as of the time of the 1980 License, the parties
    clearly understood heart valves to be within the scope of the licensed patents (otherwise they
25  would not have needed to expressly exclude them), and clearly thought that this right was
26  substantial enough to expressly carve it out of their license.  In addition, Gore's claim that
    heart valves fall outside of the Court's claim construction is unsubstantiated and lacks
27  evidentiary foundation.  The issue of whether ePTFE heart valves constitute a vascular
28  prosthesis has yet to be decided and was not put before the Court.

1   thus contemplated Dr. Goldfarb's participation in any lawsuit, which is contrary to an

2   assignment.  See e.g., Abbott Labs., 47 F.3d at 1132 (no virtual assignment where "the

3   parties appear to have contemplated that [patentee] could participate in a suit" filed by

4   licensee).

5          Fourth, the 1980 License was not assignable by C.R. Bard except in limited

6   circumstances to "any successor to or purchaser of all or substantially all of its VASCULAR

7   PROSTHESIS business."  PX4 at § 6.4.  This precludes any assignment because "limits on

8   the assignment of rights are a factor weighing in favor of finding a transfer of fewer than all

9   substantial rights."  Intellectual Prop. Dev., 248 F.3d at 1345; see also Abbott Labs., 47 F.3d

10  at 1132 (finding "the right to prevent Abbott from assigning its rights under the license to any

11  party other than a successor in business" a substantial retained right).

12         In sum, Plaintiffs presented substantial evidence – confirmed by the issuance of the

13  patent to Dr. Goldfarb and the January 2007 Assignment of Patent Rights (PX1475) –

14  demonstrating that the parties intended that the 1980 License to be a transfer of less than "all

15  substantial rights."

16                    **2.      Implied-In-Fact License**

17         Because the Court determined, based on the evidence, that the 1980 License is not a

18  virtual assignment, it found that, as in Waymark, the "1996 transfer to Impra/BPV of the

19  1980 license, created at least an implied-in-fact transfer of the license to Impra/BPV thereby

20  conferring standing to sue in conjunction with Dr. Goldfarb."  Order, July 29, 2008, at 16.

21  Gore raises a new argument asserting that the terms of the 1980 License require an express

22  written assignment.  Gore's Motion at 12.  However, Gore's argument is wrong. First, New

23  Jersey law (which governs the 1980 License) expressly permits the oral assignment of

24  contracts.  See, e.g., Paxson v. Comm'r, 144 F.2d 772, 775 (3d Cir. 1944) ("New Jersey

25  follows the Restatement view that contracts may be assigned orally.").  Second, there is no

26  requirement in the 1980 License for a written assignment, because the only restriction on

27  assignment is that the transferee be a "successor or purchaser of all or substantially all of

28  [C.R. Bard's] VASCULAR PROSTHESIS business."  PX4 at § 6.4.  Mr. McDermott's

1   unrebutted trial testimony established that Impra/BPV was the successor to that vascular

2   prosthesis business, (Trial Tr., 11/16/07, at 1636:2-9 (McDermott) and 1639:24-1640:17

3   (McDermott), as confirmed by the 1997 Amendment, (PX191 at 191.1.), and Impra/BPV's

4   assumption of all rights and obligations under the 1980 License for over a decade.  Trial Tr.,

5   11/16/07, at 1644:20-1645:10 (McDermott), 1647:14-23 (McDermott); PX564.    The

6   evidence adduced at trial, thus, strongly supports the Court's finding that there was "at least"

7   an implied-in-fact assignment of the 1980 License.  See, e.g., Weiner v. Rollform, Inc., 744

8   F.2d 797 (Fed. Cir. 1984) (finding standing based on oral exclusive distribution agreement

9   as fact-finder "was at liberty to believe the testimony that an oral contract existed").

10  Moreover, even if the 1980 License required a written assignment, it is well-settled under

11  New Jersey law that the terms of a contract (including a requirement for written consent to

12  any transfer) may be waived by the parties.  Goldstein v. Barclay Amusement Corp., 123

13  N.J.L. 166, 169 (N.J. 1939).  Such waiver may be "by a written instrument, a course of

14  dealing, or even passive conduct, i.e., taking no action to invalidate the assignment vis-à-vis

15  the assignee."  Garden State, L.P. v. First Fidelity Bank, N.A., 305 N.J. Super. 510, 523, 702

16  A.2d 1315 (1997).  Plaintiffs presented substantial evidence demonstrating that Dr. Goldfarb

17  – the only party who could have objected – consented to the assignment of the 1980 License,

18  including: Dr. Goldfarb's agreement to amend the 1980 License to make Impra the exclusive

19  licensee; Impra/BPV's assumption of all rights and obligations under the 1980 License,

20  including the payment of royalties to Dr. Goldfarb; and Dr. Goldfarb's 2007 assignment of

21  the '135 patent to BPV expressly acknowledging that "Dr. Goldfarb granted [BPV] an

22  exclusive, worldwide license under the Patent."   See Trial Tr., 11/07/08, at 489-90

23  (Goldfarb); Trial Tr., 11/16/08, at 1646-47 (McDermott); Trial Tr., 11/16/08, at 1644-45

24  (McDermott); PX191; PX564; PX1475 at 1475.2.

25      Thus, the only evidence presented is that all relevant parties – Dr. Goldfarb,

26  Impra/BPV, and C.R. Bard – treated BPV as the exclusive licensee, which is sufficient to

27  establish standing.  See, e.g., Kalman v. Berlyn Corp., 914 F.2d 1473, 1482 (Fed. Cir. 1990)

28  (granting standing to de facto licensee as the "real party in interest").  Moreover, to the extent

1   that Gore is correct that a written transfer of the license is required, the Court found that "by

2   at least 1997, there is a writing transferring the exclusive license from C.R. Bard to BPV."

3   Order, July 29, 2008, at 17, 19.

4                    **3.        Transferring a License by Way of a Writing**

5         Gore asserts that all transfers of exclusive licenses are required to be in writing.

6   Gore's Motion, Doc. 849, at 12 ("[U]nder 35 U.S.C. § 261, a transfer of an existing exclusive

7   written license is required to be in writing").  As the Court has previously ruled, Gore's

8   argument is wrong as a matter of law.  However, if a written transfer of C.R. Bard's

9   exclusive license were somehow required, the evidence underlying the Court's findings

10  shows that there is such a writing, the 1997 Agreement Amending License Agreement.

11  Order, July 29, 2008 at 17 (finding that the record supports finding that "by at least 1997,

12  there is a writing transferring the exclusive license from C.R. Bard to BPV").

13        Gore now argues that the Court's finding cannot stand because "[a]ny assignment of

14  C.R. Bard's license to BPV, under 35 U.S.C. § 261 and the case law, had to be in writing

15  signed by C.R. Bard as the assignor."  Gore's Motion at 2.  Again, Gore misstates the law

16  and the facts.

17        Section 261, to the extent it applies, only states that patents "shall be assignable in law

18  by an instrument in writing," and imposes no limitations as to the form or content of such

19  writing.  See generally Morrow, 499 F.3d at 1337 n.3 ("The type of written instrument [under

20  35 U.S.C. § 261] (e.g., license or assignment agreement, dissolution agreement, or merger

21  agreement) and the factual context in which the instrument is created is irrelevant.")  The

22  lack of C.R. Bard's signature on the 1997 Amendment is thus irrelevant under 35 U.S.C. §

23  261.

24  / / /

25

26

27

28

1

### 4.       Prudential Standing

2       The record evidence that Plaintiffs introduced at trial further confirms that a C.R.

3   Bard's signature was not required.  For example, the preamble to PX191 expressly states that

4   the 1997 Agreement is "made … by and among David Goldfarb, M.D., … C.R. Bard, Inc.,

5   and IMPRA, Inc."  Another example is that the evidence showed that although the 1997

6   Amendment was drafted by C.R. Bard, and identified C.R. Bard as a party, the only signature

7   block C.R. Bard included for itself was through Mr. McDermott in his capacity as president

8   of C.R. Bard's wholly-owned subsidiary Impra.  PX191 at 191.1 and .3; Trial Tr., 11/16/07,

9   at 1646:4-7 (McDermott).  A third example is that Mr. McDermott confirmed C.R. Bard's

10   intent to be bound by the Agreement, testifying that he signed it on C.R. Bard's behalf and

11   with Bard's express authorization.[5]  Trial Tr., 11/16/07, at 1647:2-5 (McDermott).  This

12   evidence overwhelmingly establishes Mr. McDermott's authority to enter into the 1997

13   Amendment for C.R. Bard.  Alfano v. BDO Seidman, LLP, 393 N.J. Super. 560, 569 (N.J.

14   Super. Ct. App. Div. 2007) ("When one corporation acts as the agent of a disclosed principal

15   corporation, the latter corporation may be liable on contracts made by the agent.")  In

16   addition, C.R. Bard's failure to repudiate Mr. McDermott's actions during the decade-long

17   assumption of all rights and obligations under the 1980 License by Impra/BPV confirms Mr.

18   McDermott's authority, and constitutes a ratification of the 1997 Amendment.  Thermo

19   Contractor Corp. v. Bank of N.J., 69 N.J. 352 (1976) ("Ratification may be express or

20   implied, and intent may be inferred from the failure to repudiate an unauthorized act, … or

21   from conduct on the part of the principal which is inconsistent with any other position than

22   intent to adopt the act.").  The admitted evidence thus proves that the 1997 Amendment was

23   a written assignment.

24       The record evidence indisputably established that BPV was an exclusive licensee,

25   therefore, BPV unquestionably has constitutional standing.  Intellectual Prop. Dev., 248 F.3d

26

27       [5] The Court has already found that this testimony is not negated by Mr. McDermott's
testimony on cross-examination that he signed the 1997 Amendment as President of Impra.
28   Order, July 29, 2008, at 18 n.1.

1   at 1346 (exclusive licensees are "constitutionally injured by another entity that makes, uses

2   or sells the invention.")  All that is required for prudential standing, therefore, is for the

3   "patentee" to be joined. Id. at 1348.  Because both Dr. Goldfarb and C.R. Bard are parties,

4   and have participated throughout its duration, there are no prudential standing concerns.[6]

5   Evident Corp. v. Church & Dwight Co., 399 F.3d 1310, 1314 (Fed. Cir. 2005) ("[R]egardless

6   of whether [the patent owner] was brought into the suit by the accused or the licensee, there

7   is no standing problem.").

8   **II.   MOTION FOR NEW TRIAL OR REMITTITUR**

9          Pursuant to Fed. R. Civ. P. 59 Defendant requests that the Court grant a new trial, or

10  in the alternative, a remittitur, based on claim that the jury awarded Plaintiffs excessive

11  "reasonable  royalty" damages.

12         **A.   Legal Standard**

13         The decision of whether to grant a new trial rests with the sound discretion of the trial

14  court.  See Allied Chem. Corp. v. Daifon, Inc., 449 U.S. 33, 36 (1980).  Traditionally, trial

15  courts grant new trial motions "only if the verdict is contrary to the clear weight of the

16  evidence, is based upon false or pernicious evidence or to prevent a miscarriage of justice."

17  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007).  In the context of damages, a

18  new trial is generally granted when the trial court finds that the damages awarded by the jury

19  are "grossly excessive or monstrous, clearly not supported by the evidence or based only on

20  speculation or guesswork." See Monsanto Co. V. Ralph, 382 F.3d 1374, 1383 (Fed. Cir.

21  2004).  When an award of damages justifies a new trial, the trial court may, within its

22  discretion, "grant defendant's motion for a new trial or deny the motion conditional upon the

23

24         [6] If it appeared to the Court that standing was an issue here and that to have standing
25  C.R. Bard is a necessary plaintiff, the Court would grant Plaintiffs leave to amend the
    Complaint under Fed.R.Civ.P. 15 and 21.  Intellectual Prop. Dev., 248 F.3d at 1348 n.5
26  ("[E]ven appellate-level amendments to correct jurisdictional defects may be appropriate to
    allow an exclusive license to join the patent owner." (citing Mentor H/S, Inc. v. Med. Device
27  Alliance, Inc., 240 F.3d 1016, 1019 (Fed. Cir. 2001)).  However, the Court finds standing
28  exists with the current Plaintiffs and does not find amendment necessary.

1    prevailing party accepting a remittitur." <u>Fenner v. Dependable Trucking Co.</u>, 716 F.2d 598,

2    603 (9th Cir. 1983).  If the prevailing party accepts remittitur, judgment must be entered in

3    the lesser amount.  <u>Fenner v. Dependable Trucking Co.</u>, 716 F.2d 598, 603 (9th Cir. 1983).

4    This allows the party to avoid the delay and expense of a new trial when the jury's verdict

5    is excessive in relation to the evidence found in the record.  <u>Unisplay S.A. v. Am. Elect. Sign</u>

6    <u>Co.</u>, 69 F.3d 512, 519 (Fed. Cir. 1995).

7         **B.    Analysis**

8         Defendant makes two central arguments in its motion for a new trial/remittitur.

9    Defendant first claims that the verdict returned by the jury was "grossly excessive" and

10   cannot stand. Next, Defendant argues that the jury's verdict of a 10% reasonable royalty was

11   not supported by the evidence and was contradictory.  Because of the alleged excessiveness

12   and inconsistent nature of the verdict, Defendant asks the Court to either grant a new trial or

13   reduce Plaintiffs' reasonable royalty damages award  to $41.8 Million.

14        With respect to whether the jury's verdict was grossly excessive, the Court notes that

15   this argument was not substantively or adequately addressed by Defendants in their briefing.

16   In any event, the Court is unmoved by Defendants's bare bones assertion that the jury's

17   determination of damages could in any sense be considered grossly excessive or monstrous.

18   Although neither party specifically argued for a 10% reasonable royalty, that does not render

19   the jury's verdict erroneous for "the factual determination of a reasonable royalty . . . need

20   not be supported, and indeed, frequently is not supported by the specific figures advanced

21   by either party." <u>Smithkline Diagnostics, Inc. v. Helena Labs. Corp.</u>, 926 F.2d 1161, 1167

22   (Fed. Cir. 1991).  "Rather, a jury's choice simply must be within the range encompassed by

23   the record as a whole."  <u>Unisplay</u>, 69 F.3d at 519.  Here, consistent with the Court's

24   instructions, Plaintiffs presented evidence establishing not only that a reasonable royalty was

25   greater than 5%, but Plaintiffs attempted to argue at trial that a royalty of 15% or higher was

26   supportable. As Plaintiffs note, the evidence presented at trial established that Defendant has

27   sold billions of dollars of ePTFE grafts embodying Dr. Goldfarb's invention, and have reaped

28   substantial profits as a result.   Indeed, the Goldfarb patent was an important industry

achievement, which, some 30 years later, still remains the gold standard for vascular grafts, and both Bard and Gore have enjoyed substantial commercial success from Dr. Goldfarb's invention, each selling millions of ePTFE grafts. Under circumstances such as these, the jury's award cannot be fairly characterized as grossly excessive or monstrous.

The Court will now turn to the merits of whether damages amount was inconsistent or otherwise not supported by the clear weight of the evidence adduced at trial. The point of departure for an analysis of damages in the instant case is found in the language of the Patent Act, which states that damages for infringement shall be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. To achieve adequate compensation, an award of damages must provide "full compensation." General Motors Corp. V. Devex Corp., 461 U.S. 648, 654-55 (1983). The award must also not be less than a reasonable royalty, the purpose of which "is not to direct the form of the compensation, but to set a floor below which damage awards may not fall." Rite-Hite Corp. V. Kelley Co., 56 F.3d 1538, 1544 (Fed. Cir. 1995). The Patent Act's position on damages is "expansive rather than limiting. It affirmatively states that damages must be adequate, while providing only a lower limit and other limitation." Id.

In the instant case, Defendant argues that the jury determined that Gore's 5% option to sublicense the '135 patent lapsed on February 9, 2004 was available to it during the August 2002 hypothetical negotiation. As such, Defendant contends that the option constituted a binding contract. Thus, when the jury calculated a reasonable royalty award of 10%, without accounting for the 5% royalty rate of the option, it rendered the verdict internally inconsistent, meriting either a new trial or remittitur. Plaintiffs counter by arguing that there are several ways to reconcile the 10% royalty with the jury's finding that the option lapsed on February 9, 2004. First, Plaintiffs suggest that based on the evidence, the jury could determine that the 5% rate negotiated in 1984 was not a reasonable royalty and was incapable of adequately compensating Plaintiff for the infringement. Second, Plaintiff writes that the jury could have determined that the 1984 agreement was merely an "agreement to

agree," and thus not available to Defendant in the hypothetical negotiation. Third, Plaintiffs claim that the jury was entitled to treat the option as lapsed in both the real world and in the hypothetical negotiation.

Without addressing all of the arguments raised by the parties in their moving papers, the Court notes that Defendant has not convincingly argued that the 5% option constitutes a ceiling on the amount of damages that Plaintiffs could recover as a reasonable royalty rate under 35 U.S.C. § 284. For that reason, the jury's verdict cannot be classified as inconsistent or irreconcilable. For similar reasons the imposition of a 10% reasonable royalty rate was not against the clear weight of the evidentiary record.

As Plaintiffs contend, the record is replete with evidence suggesting that a 5% royalty rate—negotiated in 1984, 18 years before the hypothetical negotiation—could not reflect what a reasonable royalty would be in 2002 in view of the vastly changed circumstances of the parties. In addition, the 5% royalty was negotiated as part of the settlement of litigation with Gore, and as such, is only of limited relevance to the hypothetical negotiation. See Rite-Hite Corp. v. Kelley Co., 774 F. Supp. 1514, 1535 (E.D. Wis. 1991) ("settlement-induced royalty agreements are determined largely by factors not considered in the 'hypothetical royalty negotiation' . . . ."). Importantly, the 5% royalty rate of the lapsed option was negotiated at a time when the Goldfarb application was still being processed and was in the midst of a contentious challenge by Defendant. There were numerous uncertainties at that time, including: (1) whether Dr. Goldfarb would prevail in the interference; (2) if Dr. Goldfarb did prevail, whether a patent would issue; (3) if a patent issued, whether its claims would cover Gore's products; and (4) if a patent issued, whether its claims would be upheld as valid. Because none of the uncertainties that existed in 1984 are present during the hypothetical negotiation, the evidence presented tended to show that the 5% rate negotiated in 1984 did not set the ceiling on the amount of damages that would be adequate to compensate Plaintiffs for the infringement. Furthermore, as Plaintiffs note, the fact that the 5% royalty was confirmed by the real world evidence establishing that the lapsed option might have been a below market deal because of the uncertainties that existed

1   at the time. As fact witness, Mr. McDermott, testified, based on his extensive industry

2   experience, that the 5% royalty was "phenomenally low" and "below market rate."

3       Q:     And based on that experience, and being president of the company, what was

4                       your view on a royalty rate of five percent in your industry?

5       A:     Well, it was phenomenally low. To license a competitor at that level just— I

6                       was surprised. I wasn't involved when that got done originally. But when I

7                       learned about it, I was certainly surprised.

8       Q:     What was your view when the option was not exercised?

9       A:     Well, because I felt it was such below market rate and they didn't take it, I was

10                      just surprised. It didn't make sense to me.

11  (11/16/07 tr. at 1667:6-16.)  The jury was entitled to rely on such evidence and conclude that

12  the 5% rate negotiated in 1984 was significantly less than a reasonable royalty resulting from

13  a hypothetical negotiation in 2002 based on materially different circumstances.

14          The Court is further unmoved by Defendant's argument that the 10% royalty cannot

15  stand because Gore "would never have agreed to pay more than five percent rate of the

16  option during the hypothetical negotiation." (Dkt.#840, p. 1.)  Notwithstanding Defendant's

17  contention, it should be noted that Gore did not try to exercise the option and did not take a

18  license to the Goldfarb patent.  Instead, Defendant elected to take their chances with

19  litigation; now that the jury has found Defendant's conduct to be objectively reckless, the

20  fact that Gore would prefer to now pay the 5% royalty that it earlier rejected rather than the

21  10% royalty assessed by the jury is irrelevant.  "[W]hat an infringer would prefer to pay is

22  not the test the damages."  Rite-Hite, 56 F.3d at 1555 (citing TWM Mfg. Co. v. Dura Corp.,

23  789 F.2d 895, 900 (Fed. Cir. 1986)).  In fact, as Plaintiffs point out, the Federal Circuit has

24  specifically rejected the claim that Defendant has made, holding that the law does not

25  preclude reasonable royalty from "be[ing] set so high that no rational self-interested wealth

26  maximizing infringer acting ex ante would ever have agreed to it."  Monsanto Co. v. Ralph,

27  382 F.3d 1374, 1383 (Fed. Cir. 2004).

28

1    Lastly, Defendants incorrectly assert that the jury determined that the lapsed option
2    was in effect on August 20, 2002, and therefore was an available non-infringing alternative
3    in the hypothetical negotiation.  To the contrary, the jury was only asked to determine the
4    reasonable period of time for exercise of the lapsed option, and was not asked to determine
5    whether it was "in effect."    Moreover, this Court previously determined that "the
6    unexercised Option is nothing more than an agreement to agree at some point in the future,
7    rather an enforceable contract" and held that "whether Gore is entitled to limit Bard's royalty
8    damages claim . . . to five percent" was a question for the jury. (Dkt.# 559, p. 29.)

9    Defendant's claim that it can simply exercise the lapsed option in the hypothetical
10   negotiation ignores the fact that the hypothetical negotiation does not mirror real business
11   conditions.  Rather, the "willing licensee/licensor approach must be flexibly applied as a
12   'devise in the aid of justice.'"  TWM, 789 F.2d at 900 (internal citations omitted).
13   Accordingly, the hypothetical negotiation differs from the real world at the time of the
14   hypothetical negotiation in two significant respects.  First, the court must "assume, for
15   purposes of the hypothetical negotiation, that all parties would have known all relevant
16   information." Mobil Oil Corp. v. Amoco Chems. Corp., 915 F. Supp. 1333, 1353 (D. Del.
17   1994).  Second, and most importantly, the hypothetical negotiation requires the trial court to
18   take into account facts that occur after the date of the first infringement.  See Fromson v.
19   Western Lito Plate and Supply Co., 853 F.2d 1568, 1575 (Fed. Cir. 1988). Here, among the
20   subsequent information that the jury was permitted to take into account in the hypothetical
21   negotiation was the fact that the parties could not agree on any of the material terms of a
22   sublicense. It was undisputed that the lapsed option did not contain the negotiated terms of
23   any sublicense agreement. It was also undisputed that following the issuance of the Goldfarb
24   patent, Bard sent Gore a partial list of suggested license terms "to be discussed" including
25   provisions on the royalty base on which royalties would be due; details as to the exclusivity
26   of the sublicense; assignability or transfer provisions; provisions relating to payment and
27   audit; provisions describing termination; covenants by Gore not to attack the validity or
28   enforceability of the Goldfarb patent.  As Plaintiffs note, not one of these terms was ever

1   agreed on by the Parties. (11/16/07 Tr. At 1657:4-1668:21, 1727:7-12; 11/29/07 Tr. At
2   2493:8-2498:18; 12/04/07 Tr. At 3043:1-3047:20.)  Instead the only evidence at trial was
3   that in the event that Gore did decide to exercise the lapsed option, all of the material license
4   terms needed to be negotiated.

5           In fact, Defendant's expert on the damages issue, Professor Teece, stated that he did
6   not know what terms the Parties would agree to because he had not "done an analysis of what
7   would be needed to finish off the actual world this—or to convert the option, to exercise the
8   option and convert it into a license agreement." (11/29/07 Tr. At 2496:16-19.)  This lack of
9   any agreement as to the material terms was also confirmed by Plaintiffs' licensing expert, Dr.
10  Berneman, who testified that "many significant aspects" still required negotiation, and that
11  reasonable parties frequently never reach agreement over such terms. (12/05/07 Tr. At
12  3237:1-22.)

13          The jury was therefore free to credit Plaintiffs' evidence and find that the lapsed
14  option was merely an agreement to agree, though not an enforceable contract, and that Gore
15  could not simply exercise it without first working out the terms.  Just as in the real world, the
16  jury was free to conclude that the Parties could not work out the material terms of any
17  agreement before the option lapsed and thus the lapsed option was not available to Gore to
18  exercise in the hypothetical negotiations.  Thus, the jury's 10% reasonable royalty award is
19  supported by record evidence and fully consistent with the jury's finding that Gore's 5%
20  option lapsed on February 9, 2004.

21          In sum, Defendant has not met the requirements for a new trial or remittitur on the
22  issue of damages.

23  **III.    REMAINING RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF**
24          **LAW**

25          The Court will now address Defendant's remaining Motions. These Motions are all
26  Renewed Motions for Judgment as a Matter of Law:  Motion for Judgment as a Matter of
27  Law Regarding Invalidity Because Cooper and Goldfarb are Joint Inventors (Dkt.#841.),
28  Renewed Motion for Judgment as a Matter of Law Regarding Willful Infringement

(Dkt.#842.), Renewed Motion for Judgment as a Matter of Law Regarding Invalidity of the '135 Patent' for Failure to Disclose Best Mode (Dkt.#843.),  Renewed Motion for Judgment as a Matter of Law that Claims 20-27 are Invalid for Failure to Satisfy the Written Description Requirement of 35 U.S.C. § 112, ¶1 (Dkt.#844.),  Renewed Motion for Judgment as a Matter of Law that Claims 20-27 are Invalid Under 35 U.S.C. § 102(B) for Lack of Novelty in View of the 1973 Matsumoto *Surgery* Article (Dkt.#845.), Renewed Motion for Judgment as a Matter of Law Regarding Plaintiffs' Failure to Prove that Gore's Accused Products Meet the Typicality Element of Claims 20-27 (Dkt.#846.),  Renewed Motion for Judgment as a Matter of Law Regarding Plaintiffs' Claim that Propaten Infringes the '135 Patent.' (Dkt.#847.)

A renewed motion for judgment as a matter of law is properly granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002).  The "jury's verdict must be upheld if its is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." Id.  Accordingly, a court "can overturn the jury's verdict and grant such a motion only if there is no legally sufficient basis for a reasonable jury to find for that party on that issue." Costa v. Desert Palace, Inc., 299 F.3d 858, 859 (9th Cir. 2002) (internal citations omitted).  If there is "sufficient evidence before the jury on a particular issue, and if the jury instructions on the issue were correct, then the jury's verdict must stand." Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir. 1985).

In ruling on a motion for judgment as a matter of law, the trial court must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the nonmover, and disregard all evidence favorable to the moving party that the jury is not required to believe. Costa, 299 F.3d at 859.  The court "may not substitute [its] view of the evidence for that of the jury," nor can the court "make credibility determinations nor weigh the evidence." Id.  The "high hurdle" of the 50(b) standard thus

1  "recognizes that credibility, inferences, and factfinding are the province of the jury, not [the]
2  court." Id.

3          The Court is intimately familiar with the all of the invalidity defenses and other issues
4  that Defendant has raised in its renewed motions and finds little need to revisit each one
5  individually.  Suffice it to say that the Court is firmly convinced that the jury's decisions
6  were supported by substantial evidence. The Court therefore denies Gore's remaining
7  Renewed Motions for Judgment as a Matter of Law.

8  **Accordingly,**

9          **IT IS HEREBY ORDERED** denying Defendant's Motion Pursuant to Fed.R.Civ.P.
10  12(b)(1) and 12(h)(3) to Dismiss Plaintiffs' Complaint for Lack of Standing or in the
11  Alternative Renewed Motion for Judgment as a Matter of Law. (Dkt.#849.)

12          **IT IS FURTHER ORDERED** denying Defendant's Motion for New Trial or
13  Remittitur for Excessive Damages. (Dkt.#840.)

14          **IT IS FURTHER ORDERED** denying Defendant's Motion for Judgment as a Matter
15  of Law Regarding Invalidity Because Cooper and Goldfarb are Joint Inventors. (Dkt.#841.)

16          **IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment
17  as a Matter of Law Regarding Willful Infringement. (Dkt.#842.)

18          **IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment
19  as a Matter of Law Regarding Invalidity of the '135 Patent' for Failure to Disclose Best
20  Mode. (Dkt.#843.)

21          **IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment
22  as a Matter of Law that Claims 20-27are Invalid for Failure to Satisfy the Written Description
23  Requirement of 35 U.S.C. § 112, ¶1. (Dkt.#844.)

24          **IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment
25  as a Matter of Law that Claims 20-27 are Invalid Under 35 U.S.C. § 102(B) for Lack of
26  Novelty in View of the 1973 Matsumoto *Surgery* Article. (Dkt.#845.)
27  / / /
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment as a Matter of Law Regarding Plaintiffs' Failure to Prove that Gore's Accused Products Meet the Typicality Element of Claims 20-27. (Dkt.#846.)

**IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment as a Matter of Law Regarding Plaintiffs' Claim that Propaten Infringes the '135 Patent.' (Dkt.#847.)

DATED this 31st day of March, 2009.

Mary H. Murguia
United States District Judge