1   **WO**

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8

9   Bard Peripheral Vascular, Inc. And David )   No. CV-03-0597-PHX-MHM
    Goldfarb, M.D.,                          )
10                                           )   **ORDER**
                   Plaintiff,                )
11                                           )
    vs.                                      )
12                                           )
                                             )
13  W.L. Gore & Associates, Inc.,            )
                                             )
14                 Defendant.                )
                                             )
15  _____ )

16

17

18          Currently pending before the Court are Plaintiffs' Motion for Prejudgment Interest

19  Under 35 U.S.C. § 284 (Dkt.#852.), Motion to Amend the Judgment to Provide for

20  Supplemental Damages Under 35 U.S.C. § 284 (Dkt.#855.), Motion for Supplemental

21  Discovery (Dkt.854.), Motion for Permanent Injunction Under 35 U.S.C. § 283 to Enjoin

22  Gore From Further Infringement of the Goldfarb Patent or, in the Alternative, Imposition of

23  an Ongoing Royalty (Dkt.#856.), and Defendant's Motion for Leave to File Motion to File

24  Surreply. (Dkt.#918.)

25  **I.     Motion Prejudgment Interest Under 35 U.S.C. § 284**

26          There are three issues that the Court must address with respect to Plaintiffs' request

27  for prejudgment interest under 35 U.S.C. § 284: (1) whether this case is appropriate for

28  prejudgment interest; (2) if granted, what the interest rate should be set at; and (3) whether

1  that rate should be simple or compounded.  See Bio-Rad Labs., Inc. v. Nicolet Instrument

2  Corp., 807 F.2d 964, 969 (Fed. Cir. 1986).

3        Upon a finding of patent infringement, 35 U.S.C. § 284 states that the district court,

4  shall adequately compensate the plaintiff by adding "interest and costs as fixed by the court"

5  to the jury verdict. "[P]rejudgment interest should ordinarily be awarded absent some

6  justification for withholding such an award." General Motors Corp. v. Devex Corp., 461

7  U.S. 648, 657, 76 L. Ed. 2d 211, 103 S. Ct. 2058 (1983).  Interest is awarded from the time

8  infringement began until the entry of judgment. See, e.g., Bio-Rad Laboratories, Inc. v.

9  Nicolet Instrument Corp., 807 F.2d 964, 967 (Fed. Cir. 1986).  For purposes of determining

10 prejudgment interest, infringement began immediately after the Goldfarb patent was issued.

11       The appropriate interest rate to apply for prejudgment interest is committed to the

12 district court's discretion. Laitram Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997).

13 In the instant case, Plaintiffs argue that the prejudgment interest rate should be awarded at

14 the Arizona statutory rate of 10%.  Plaintiffs cite case law which suggests that because the

15 calculation of the rate of prejudgment interest is not unique to patent law, the law of the

16 regional circuit should apply, Go Med. Indus., Ltd. v. Inmed Corp., 472 F.3d 1264, 1272

17 (Fed. Cir. 2006), and in the Ninth Circuit, there is a preference for using the forum state's

18 statutory interest rate. See, e.g. In re Hayes Microcomputer Prods., Inc. Patent Litig., 766

19 F. Supp 818, 824 (N.D. Cal. 1991); Brooktree Corp. v. Adv. micro Devices, Inc., 757 F.

20 Supp. 1101, 1103 (S.D. Cal. 1990).

21       Defendant responds by arguing that in the Ninth Circuit there is not a strong

22 preference for using state rates for setting prejudgment interest on federal claims. See

23 Brooktree, 757 F. Supp. at 1103 ("the state statutory rate is not controlling in the context of

24 a suit based on a federal claim"). Defendant also notes that Plaintiffs failed to cite a patent

25 infringement case that applied the Arizona's statutory rate of 10%. Defendant notes that the

26 cases relied upon by Plaintiff, In re Hayes and Brooktree, were California cases where that

27 state's statutory prejudgment interest rate was chosen at the request of the defendant, to avoid

28 the imposition of a higher interest rate.  Gore instead urges the Court to use the *post-*

*judgment* interest rate of 28 U.S.C. § 1961, using either the 3-Month or a 1-Year Treasury Bill Rate. Defendant cites Ninth Circuit case law holding, "the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different result." Grosz-Solomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1164 (9th Cir. 2001).

Given the exclusivity of the jurisdictional grant that Congress has provided to the Federal Circuit, the Ninth Circuit has never had the opportunity to address the use of Arizona's prejudgment interest statute in the context of the Patent Act. However, the Federal Circuit has previously recognized that district courts are free to apply their forum state's prejudgment interest statute in the context of patent claims. See e.g., Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549, 551, 557 (Fed. Cir. 1984). With respect to whether the Court should apply the postjudgment interest rate under 28 U.S.C. § 1961, the Court notes that there are significant policy differences between a claimant's prejudgment and postjudgment compensation. As Plaintiff notes in their briefing, the policies that underlie an award of prejudgment interest focuses on adequately compensating a plaintiff who has lost the 'time value' benefit of its capital. Once the jury makes a finding of infringement, the infringing defendant has been reduced to no more than a borrower who has received the undeserved benefit of using the monies of the rightful patent holder free and clear of interest. An award of prejudgment interest therefore seeks to rectify that error in order to make the claimant whole. See General Motors Corp. v. Devex Corp., 461 U.S. 648, 655 n.10 (1983) (noting that a prejudgment interest award should not "undercompensate" the rightful holder of the patent, thereby creating a "windfall to the infringer and creat[ing] an incentive to prolong litigation"). The T-Bill rate, particularly in this recent nationwide economic downturn, provides a substantially lower rate of return to a prudent investor. The T-Bill rate does have its advantages though. In exchange for receiving a lower rate of return, an investor receives the benefit of having the stability of the federal government standing behind its investment.

In the context of patent infringement, the T-Bill rate is often inappropriate, as its lower rate of return has the potential to result in a windfall profit for the wrongful interloper, who would have the benefit of using the patent holder's money without fully compensating him for its use.  As the Northern District of Indiana has noted, "no one would make a long-term, voluntary loan [to an infringer] at the T-Bill rate."  Grain Processing Corp. v. Am. Maize-Prods. Co., 893 F. Supp. 1386, 1396 (N.D. Ind. 1995), rev. on other grounds, 108 F.3d 1392 (Fed. Cir. 1997).

Thus, given the historically low rate of return on the T-Bill, the Court finds that the equities do not justify using the T-Bill rate in the instant case. The Court will therefore impose a 10% prejudgment interest rate on the jury's damages award, pursuant to Arizona law.  See A.R.S. § 44-1201.  However, recognizing that the Court is using a rate calculation that is higher than the T-Bill rate proffered by Defendant, in the interest of equity, prejudgment interest shall not be compounded. The prejudgment interest rate shall instead be set at 'simple interest rate.'  This decision is also consistent with Arizona state case law, which has been hesitant to compound its statutory prejudgment interest rate.  See Westberry v. Reynolds, 653 P.2d 379, 384 (Ariz. App. 1982); Fairway Builders, Inc. v. Malouf Towers Rental Co., 603 P.2d 513, 538 (Ariz. App. 1979)

Lastly, Plaintiffs are to also receive pre-judgment interest on their attorneys fees at the same 10% simple interest rate under the Arizona statute. Such an award comports with the policies of  prejudgment interest awards under the Patent Act, since Plaintiffs' have lost of the use value of their money over the course of this litigation by retaining legal counsel.  On the other hand, the Court will not exercise its discretion to provide Plaintiffs with prejudgment interest on their supplemental damages, since supplemental damages only relate to damages that have accrued after the much more recent verdict date.

## II.   Motion for Supplemental Damages Under 35 U.S.C. § 284 & Motion for Supplemental Discovery

Under the Patent Act, a finding of infringement requires the Court to award damages that are "adequate to compensate" the plaintiff.  35 U.S.C. § 284.  Accordingly, Plaintiffs

are entitled to a full and fair accounting, which would include Gore's sales of the Goldfarb patent from June 30, 2007 until the imposition of a permanent royalty by the Court. Because "[s]upplemental damages are calculated consistent with the damages awarded in the jury verdict, <u>TiVo, Inc. v. Echostar Comm'ns Corp.</u>, 2006 US Dist. LEXIS 64291, at *7 (E.D. Tex. Aug. 17, 2006), Plaintiffs request that the Court award supplemental damages in the form of both lost profits and a 10% reasonable royalty. Defendant concedes that Plaintiffs are entitled to a reasonable royalty rate and lost profits for the period after the verdict and up until the clerk's entry of judgment of July 30, 2008; however, Defendant opposes supplemental damages based on lost profits beyond the date of judgment. Defendant argues that in the Pretrial Order, Plaintiffs only sought compensation in the form of a compulsory license for the period after judgment, (Dkt.#525 at 75), and therefore, any claim to compensation in the form lost profits for the period after judgment has been waived. Plaintiff disputes this allegation.

The language at issue in the Pretrial Order reads as follows: "17. If Plaintiffs are not entitled to a permanent injunction, the royalty to be applied to infringing products post-judgment." <u>Id.</u> Plaintiffs argue that this sentence does not amount to a waiver of lost profits, but only indicates that if the Court should rule against them on the injunction issue, Plaintiff would be entitled to a hearing to establish the rate of a compulsory license. The Court agrees with Plaintiffs interpretation of the Pretrial Order, and cannot find that post-judgment lost profits have been waived. Thus, the accounting of supplemental damages shall include supplemental post-judgment, lost profits damages.

Gore also requests that the Court hold Plaintiffs' Motion in abeyance pending the outcome of its eventual appeal before the Federal Circuit. Gore has cited several patent cases where this has been done. <u>See, e.g.</u>, <u>Itron, Inc. v. Benghiat</u>, 2003 WL 22037710, at *16 (D. Minn. Aug. 29, 2003); <u>Maxwell v. J. Baker, Inc.</u>, 879 F. Supp. 1007, 1011-12 (D. Minn. 1995); <u>Eolas Techs., Inc. v. Microsoft Corp.</u>, 2004 U.S. Dist. LEXIS 534, at *30 (N.D. Ill. Jan. 14, 2004). Gore also cites a non-patent Ninth Circuit case, where the panel did not take issue with the district court's decision to preserve the accounting determination pending

appeal—but the Ninth Circuit did so without directly addressing the issue.  <u>Barrows v.</u>
<u>Hickel</u>, 447 F.2d 80, 83-84 (9th Cir. 1971).  Plaintiffs reply to Gore by arguing that to delay the ultimate calculation of damages would needlessly drag out the proceeding, among other things.  The Court finds that in the interests of judicial economy and fairness to the Parties, the supplemental damages determination must be completed prior to Gore's eventual appeal, if one is to be taken. Although the damages issues might be somewhat "complicated," as Gore suggests, complexity alone does not justify such a delayed course of action.  The Court will therefore grant Plaintiffs' request for supplemental damages, pending its ability to accurately calculate the appropriate amount of supplemental damages.

There is some dispute as to how the Court should calculate supplemental damages and what procedural steps must to be taken before it may do so. With respect to supplemental damages calculations, Defendant argues that the jury did not apply a 10% royalty to all of Gore's sales not subject to lost profits. This is because Dr. Leonard proffered a royalty base of $1.27 Billion, which would have provided Plaintiffs with $127.6 Million in royalties. Gore notes that the jury returned a verdict of $83.5 Million in royalties, which corresponds to a $835 Million royalty base. Gore requests that the Court use a royalty base that would roughly correspond with what the jury actually awarded, rather than what the Parties argued for at trial. The Court notes that this argument, while present in Defendant's brief, was underdeveloped.  The Court will therefore take up the issue of a proper supplemental damages calculation once the Parties have provided supplemental briefing on this issue–as described below. With respect to discovery, Plaintiffs have requested that Gore should provide discovery on unit sales for lost profits products during the relevant time period, plus revenues for reasonable royalty products.  Plaintiffs have further requested that its expert, Dr. Leonard, should be able to provide an affidavit with supplemental damages calculations. Plaintiffs state that if Gore disputes the calculations, it may depose him and file a response brief, to which Plaintiffs would reply.  Gore has responded by arguing that Plaintiffs' discovery request is over broad and should be denied to the extent it seeks anything more than Gore's unit and dollar sales and IMS data.

1   The Court hereby directs the Parties to meet and confer in an attempt to work out or
2   at least narrow their differences concerning the scope of discovery. Within 15 days of this
3   Order, after having met and conferred, the Parties shall file a joint proposed schedule for the
4   Court's approval. If the Parties cannot resolve the differences before submission, they should
5   so indicate and concisely describe their respective positions. Any proposed schedule must
6   be consistent with the dictates of the instant Order. The Court further notes that the issue of
7   supplemental damages will be decided based on the Parties briefs, along with any exhibits.

8   **III.   Motion for a Permanent Injunction or, in the Alternative, Imposition of an Ongoing Royalty**

9   Plaintiff argues that Gore sells two types of infringing products. The first are products
10  for which Bard sells an alternative, nearly identical counterpart—these are what Plaintiff
11  refers to as "Counterpart Products." The Counterpart Products include PROPATEN grafts,
12  INTERING grafts, cardiovascular patches, and other variations of those grafts and patches.
13  The second group of products are made up of items for which Bard does not currently offer
14  an alternative in the marketplace—these are "Non-Counterpart Products." The Non-
15  Counterpart Products include Gore's VIABAHN stent-grafts, EXCLUDER stent-grafts, TAG
16  stent-grafts, VIATORR stent-grafts, ACUSEAL patches, as well as other products. Plaintiffs
17  ask the Court to enjoin Gore from producing and selling the Counterpart Products, Non-
18  Counterpart Products, and from any further development of infringing products—including
19  products for which it lacks or is presently seeking FDA approval. In the alternative, Plaintiffs
20  ask the Court to levy a compulsory license on any of Gore's infringing products for which
21  an injunction would be inappropriate.

22  The Parties have filed a voluminous amount of briefing on the Court's docket related
23  to the instant motion.  This is not entirely surprising, given the practical consequences that
24  a permanent injunction would have on Gore and Bard's future business operations.  Even
25  though the Parties efforts have resulted in somewhat complicating the issue, the legal
26  analysis that must guide the Court's decision is straightforward and when applied correctly
27  to the instant facts, can compel only one result.

28

35 U.S.C. § 283, confers on courts hearing disputes over patents the right to "prevent the violation of any right secured by patent, on such terms as the court deems reasonable." Because the "essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent," Acumed LLC v. Baxter Int'l, Inc., 2008 WL 928496, *2 (N.D. Cal. 2008), "courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases." Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc., 2008 WL 928496, at *3 (N.D. Cal. Apr. 4, 2008) (quoting eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 338, 395 (2006) (Roberts, C.J., concurring)). However, the ease and frequency with which trial courts have historically granted injunctions in patent cases was often at odds with traditional principles of equity, which has long held that injunctive relief is an "extraordinary" remedy. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) ("courts of equity should pay particular regard fo the public consequences in employing the extraordinary remedy of injunction"). These apparent inconsistencies came to a head in the case of eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 338, 395 (2006). In eBay, the Supreme Court struck down the Federal Circuit's long standing rule that a patentee is presumptively entitled to a permanent injunction against infringement. Id. at 392. The Supreme Court explained that district courts must exercise discretion when weighing an injunction in a patent case, and the exercise of such discretion must be guided by the same traditional four factor test that courts sitting in equity have used for centuries to determine the appropriateness of injunctive relief. See eBay, 547 U.S. at 395 (Roberts, C.J., concurring). This test is familiar to the Court, and involves the following factors: (1) whether plaintiff has suffered irreparable harm; (2) there is no adequate remedy at law; (3) the balance of hardships favors injunction; and (4) the public interest favors imposing an injunction. In the instant case, factors two and four dominate the Court's inquiry; both weigh heavily against imposing an injunction.

First, with respect to the adequacy of money damages, Plaintiffs argue that Gore's usurpation of Bard's exclusive right to use Dr. Goldfarb's invention cannot be fixed by merely allocating additional monies through a compulsory license. To support this claim,

Plaintiffs argues that Gore has flooded the market with infringing products thereby obtaining more customers and sales than Bard, that the Court cannot quantify the value related to Bard's ability to control its patented technology, that absent an injunction Bard will be prevented from exploiting its own property, and if Gore is allowed to continue infringing, no company will likely take a future license from Bard.  The Court is unpersuaded by Plaintiffs contentions.  Without minimizing the harm caused by Gore's wilful infringement, the Court notes that Plaintiffs can be brought adequately whole through legal remedies.  For instance, to compensate Plaintiffs for past harm, the jury has already awarded Plaintiffs lost profits and a 10% reasonable royalty rate. That amount currently totals more than $185 Million. At the same time, to compensate Plaintiffs for future harm, the Court can impose a compulsory license on the continued sales of Gore's infringing products for the remainder of the life of the Goldfarb patent.  See High Tech Med. Instrumentation v. New Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995).  Certainly, money damages are not the perfect remedy for Plaintiffs; there is no remedy available at either law or equity that can rewrite the history of Gore's objectively reckless and wilful conduct towards Dr. Goldfarb over these past thirty years.  Perfection, however, is not the Court's goal with respect to damages, adequacy is. The Court is satisfied that a fair and full amount of compensatory money damages, when combined with a progressive compulsory license, will *adequately* compensate Plaintiffs' injuries, such that the harsh and extraordinary remedy of injunction–with its potentially devastating public health consequences—can be avoided.

To this end, and with the public health consequences of enjoining Gore from producing or selling its infringing products in mind, the Court will turn to address the fourth equitable factor that is required for an injunction—that the public interest must favor an injunction.

The Court will first address the issue of Gore's Counterpart Products. Again, these products are mostly comprised of Gore's vascular grafts and patch grafts. These are also products for which Plaintiffs have been awarded damages based on lost profits. As Defendant notes in its brief, Gore's vascular grafts, which infringe on the Goldfarb patent, have a 62%

market share, while Bard Peripheral, which rightfully produces grafts using the same patent, has captured only 28% of the market.  Plaintiff argues that, as demonstrated by the jury's verdict, Gore's Counterpart Products were found to be clinically interchangeable with competing Bard products, such that Bard could competently step into and capture Gore's market share without affecting product availability.  See Fresenius, 2008 WL 928496, at *5 ("Numerous courts have granted permanent injunctions in cases involving medical devises where, as here, there were alternative products already on the market or available to the infringer . . .").  Evidence of such interchangeability, according to Plaintiffs, is found throughout the record and in the jury instructions entitled "Lost Profits Due to Lost Sales." and "Lost Profits: Market Share." (Dkt#769 at 65, 66.)  The lost profits instruction asked the jury to award damages on lost profits due to "sales the patent owner lost because of the infringement."    Id. at 66.   At the same time, the market share instruction stated that "[p]roducts are in the same market if they are sufficiently similar to compete against each other. Two products are sufficiently similar if one does not have a significantly higher price than or possess characteristics significantly different than the other." Id. at 65. Plaintiffs contend that because the Court is bound by the factual determinations made by the jury, the Court should impose an injunction on the production and distribution of the Counterpart Products, since, as the jury determined, Bard produces clinical alternatives to Gore's Counterpart Products.  See (Dkt.#770 at 22) ("Have Plaintiffs proved that it is more likely than not that Bard Peripheral Vascular is entitled to damages for lost profits due to Gore's sales of surgical vascular grafts and patches inside the United States? [Jury box marked] Yes."); Beacon Theaters v. Westover, 359 U.S. 500 (1959) ("When issues common to both legal and equitable claims are to be tried together, the legal issues are to be tried first, and the findings of the jury are binding on the trier of equitable claims.").  At oral argument, Gore responded to Plaintiffs by arguing that the jury determination on lost profits was based on a hypothetical market, one that is far removed from reality.  According to Gore, the jury only determined that 'but for' Defendant's infringement, Plaintiff would have captured over $102 Million worth of lost sales. But that does not mean that in a real technical or scientific sense

that all of Gore's products could be removed from the market and replaced by Bard's products without public health ramifications.

To this end, Gore has highlighted features of its various Counterpart Products and what a disruption in product availability might portend to thousands of cardiovascular patients. Gore attached supporting declarations by various medical doctors in aid of its argument. Gore notes that the film wrap on its surgical grafts substantially increases suture removal with a reduced risk of tearing the graft. (Booth Ex. ¶7; Yamauchi Ex. ¶ 5.)   With respect to dialysis patients, Dr. Neville, one of Gore's supporting doctors has stated that Gore's wrapped grafts are the best "synthetic prosthetic graft" used as access points for dialysis patients. (Neville Ex. ¶ 7.)  Gore submits that some doctors will use Gore's ePTFE grafts exclusively for such treatments. (Ascher Ex. ¶ 7.)  Gore also argues that its wrapped grafts are stronger and more resistant to aneurysms than competitors, and that in above the knee applications, Gore's wrapping helps to prevent aneurysmal dilation, especially for patients with high blood pressure. (Veith Ex. ¶ 6; Hollis Ex. ¶ 9; Yamauchi Ex. ¶ 5.)  Dr. Ascher stated that without access to Gore's grafts, doctors would not have access to a product that could salvage the legs of some patients.  (Ascher Ex. ¶¶ 3-5.)  Furthermore, Gore claims that its wrapped grafts have been clinically proven to significantly reduce risks when compared to non-wrapped grafts, such as those produced by Bard. Additionally, Gore and its supporting doctors have noted that the stretch and thin wall characteristics of its standard grafts produce clinical benefits that would  not be otherwise available to the general public, if the Court issued an injunction. (See Wheatley Ex. ¶ 4; Morasch ¶ 11; Yamauchi Ex. ¶ 10.) Gore has also highlighted numerous other features, which it argues are unique and currently unavailable, but which the Court will not highlight in detail. With respect to Gore's brand name products, in its briefing, Gore discussed the uniquely therapeutic uses of its PROPATEN graft, which it argues is the only FDA approved product on the market with heparin bioactivty.  As one of Gore's medical experts states, PROPATEN "is an exceedingly successful breakthrough" that has no "substitute" and "will save many limbs." (Hollis Ex. ¶ 9.)  Other defense supporters note that removing PROPATEN from the market would lead

to increased amputations and death, resulting from increased graft failure from clotting. (Neville Ex. ¶ 13; Kanjickal Ex. ¶ 12.)

Gore argues that its ring products also provide benefits that cannot be duplicated by substitute products on the market. Gore notes that application of INTERING internal ring grafts results in easier insertion by the surgeon and reduced trauma for the patient. (Yamauchi Ex. ¶ 9; Wheatley Ex. ¶ 7.) Lastly, at oral argument, Gore's lead counsel was also emphatic in highlighting the potentially dangerous consequences for pediatric patients if Gore's pediatric shunts were no longer available. As one of Gore's supporting medical professionals, Dr. Teodori, noted, taking Gore's pediatric shunts and related products off the market "would expose my patients to more risk of complications such as infection and injury to the heart." (Teodori Ex. ¶ 5.)

The Court is mindful of the jury's findings regarding lost profits and how such findings relate to the interchangeability of Gore's Counterpart Products. At the same time, the Court understands that the jury's determination took place in the vacuum of the courtroom; they were asked only to determine whether Bard, absent Gore's infringement, would have been capable of making the same sales. As a hypothetical matter, the jury answered yes. That is the not same inquiry that the Court, sitting in equity, is presently engaged in. Here, the Court weighs the utility of Gore's products against potential harm to public health, and in doing so, it must focus on the practical consequences—for real patients and surgeons—of granting Plaintiffs' requested remedy. This inquiry is not tantamount to reweighing the evidence or drawing inferences that contradict the facts as embodied by the jury's verdict. The court acknowledges that this is a difficult and relatively novel issue, in light of the eBay decision. The Court is aware of the sentiments expressed by Plaintiffs' counsel at oral argument, that a willful infringer, such as Gore, should not be able to continue its future infringement unabated simply because it wrongfully acquired and then successfully

1   reproduced a product of great public importance.[1]  Nor does the Court dispute the accuracy

2   of Plaintiffs argument that "[i]ntellectual property enjoys its highest value when asserted

3   against a direct competitor in the plaintiff's market." Acumed LLC v. Stryker Corp., 2007

4   WL 4180682, *4 (D. Or. 2007), aff'd, 551 F.3d 1323 (Fed. Cir. 2008). However, the values

5   of the Patent Act and the protections that it offers to the patentee are sometimes outweighed

6   by the Court's equitable concern for the greater public good, particularly in the realm of

7   vascular surgery and other potentially life saving technologies. The Court therefore declines

8   to enjoin Gore from the continued production and sales of its Counterpart Products, finding

9   that Plaintiffs' remedy at law provides adequate compensation under the meaning of the

10  Patent Act, particularly when viewed in light of the public interest served by Gore's

11  continued infringement—for which Plaintiffs are to receive a compulsory license.

12       Turning to Gore's Non-Counterpart Products, as Gore notes in its brief, the TAG and

13  EXCLUDER stent-grafts are preferred by experts because of ease of use and low patient risk.

14  TAG was the first sten-graft approved fo thoracic aortic aneurysms, has the most clinical use,

15  and is considered to be the industry standard.  As one practitioner noted, "[f]or . . . patients

16  with small or tortous arteries, and who cannot tolerate the shock of open heart surgery, there

17  is no appropriate alternative." (Morasch Ex. ¶ 4.) Gore has submitted statements by other

18  doctors which mirror those of Dr. Morasch. In addition, Gore claims that the EXCLUDER

19  stent-graft is the product of choice for treating abdominal aortic aneurysms.  Dr. Morasch

20  stated that he uses the EXCLUDER "almost exclusively" because it is "more deliverable

21  through small or diseased iliac arteries than stiffer alternatives" due to its low profile and

22  greater flexibility  and because its "low permeability film promotes reduction in aneurysm

23  _____

24       [1]Plaintiff has cited to cases where trial courts have imposed injunctions in the medical
     field. Mallinckrodt, Inc. v. Masimo Corp., 147 Fed. Appx. 158, 177-78 (Fed. Cir. 2005)
25   (blood oximeter); Smith & Nephew, Inc.v. Synthes (U.S.A.), 466 F. Supp. 2d 978, 985 (W.D.
     Tenn. 2006) (orthopedic bone nails); Diomed, Inc.v. AngioDynamics, Inc., 2007 WL
26   2045227, at *1 (D. Mass. 2007) (laser vein ablation); Sanofi-Synthelabo v. Apotex, Inc., 492
     F. Supp. 2d 353 (S.D.N.Y.) (anti-platlet aggregation drug); Amgen, Inc. v. F. Hoffman-La
27   Rouche, Ltd., 581 F. Supp. 2d 160 (D. Mass. 2008) (anemia drug); Fresenius, 2008 WL
     928496 (N.D. Cal. 2008) (dialysis machines).
28

'sack size'."  Id. at ¶ 6.  Furthermore, Dr. Morasch described the EXCLUDER as a "life saving paradigm shift" to treat young patients injured in car accidents. Id. at ¶ 6.  Despite Gore's infringement, removing these products from the market would increase patient risk and may lead to preventable deaths from burst arteries.  The Court is unwilling to take such a gamble.

With respect to VIABAHN, that devise is used to treat femoral and visceral artery aneurysms and artery ruptures. (Hollis Ex. ¶ 5; Morasch Ex. ¶ 9.)  It is an FDA approved minimally invasive alternative to open surgery for narrowing of the superficial femoral artery, and according to Gore, is the only practical FDA approved endograft for treating long segment superficial femoral artery occlusive legions. (Morasch Ex. ¶ 9.) Untreated, this condition can lead to loss of limb and increased risk of death. (Beckstead Ex. ¶ 3.)  Patients for whom open heart surgery is not an option are at increased risk for amputation without VIABAHN.  Gore has proffered statements by doctors who view VIABAHN as unique and without any real substitute. (Morasch Ex. ¶ 9.)  In addition, VIABAHN is considered to be ideal fo behind the knee implantation: Dr. Ascher stated that he would not cross a joint with any other stent-graft, while Dr. Wheatley stated that he would not use small diameter Dacron stent-grafts in a patient's leg. (Ascher Ex. ¶ 12; Wheatley Tr. 1819, 1837-38.)  Gore argues that Bard's competing products cannot work in such applications.

Given the utility of Gore's infringing products, both Counterpart and Non-Counterpart, the important role that these products play in aiding vascular surgeons who perform life saving medical treatments, sound public policy does not favor removing Gore's items from the market. The risk is too great. Placing Gore's infringing products out of reach of the surgeons who rely on them would only work to deny many sick patients a full range of clinically effective and potentially life saving treatments. The Court finds that the strength of this factor alone precludes it from imposing a permanent injunction.

The Court will therefore deny Plaintiffs' request to permanently enjoin Gore from future development, manufacture and sale of products that infringe upon the Goldfarb patent. Finding that a permanent injunction cannot be justified in the instant case, the Court holds

1  that a compulsory license is the appropriate manner in which Plaintiffs may be compensated

2  for Gore's future infringement.  Therefore, Plaintiffs' motion for a permanent injunction is

3  denied and Plaintiffs' motion for a compulsory licence is granted.

4      Within 15 days of this Order the Parties, after satisfying a meet and confer

5  requirement, are to file a proposed schedule for the Court's approval regarding the imposition

6  of a compulsory license on Defendant Gore.

7      **Accordingly,**

8      **IT IS HEREBY ORDERED** granting Plaintiffs' Motion for Prejudgment Interest

9  Under 35 U.S.C. § 284. (Dkt.#852.)  The Court shall levy a 10% rate of simple interest on

10  Plaintiffs' award of damages from the jury.  The jury awarded Plaintiffs $185,589,871.02.

11  The Court will therefore impose prejudgment interest on the jury verdict at a total of

12  $18,558,987.10.   Additionally, the Court shall levy a 10% rate of simple interest on

13  Plaintiffs' award of attorneys fees, which has been stipulated at $19,000,000. The Court will

14  therefore impose prejudgment interest on the attorneys fees at a total of $1,900,000.

15      **IT IS FURTHER ORDERED** granting Plaintiffs' Motion to Amend the Judgment

16  to Provide for Supplemental Damages Under 35 U.S.C. § 284 (Dkt.#855.) and Motion for

17  Supplemental Discovery. (Dkt.854.) The Court hereby directs the Parties to meet and confer

18  in an attempt to work out their differences concerning the scope of discovery. Within 15 days

19  of this Order, after having met and conferred, the Parties shall file a joint proposed schedule

20  for the Court's approval. Any proposed schedule must be consistent with the dictates of the

21  instant Order. The Court further notes that the issue of supplemental damages will be decided

22  based on the Parties briefs, along with any exhibits.

23      **IT IS FURTHER ORDERED** granting Defendant's Motion for Leave to File Motion

24  to File Surreply. (Dkt.#918.)

25  / / /

26

27

28

**IT IS FURTHER ORDERED** granting in part and denying in part Plaintiffs' Motion for Permanent Injunction Under 35 U.S.C. § 283 to Enjoin Gore From Further Infringement of the Goldfarb Patent or, in the Alternative, Imposition of an Ongoing Royalty (Dkt.#856.)

DATED this 31st day of March, 2009.

Mary H. Murguia
United States District Judge

- 16 -