**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bard Peripheral Vascular, Inc., and David Goldfarb, M.D., | No. CV 03-0597–PHX–MHM |
| Plaintiffs, | **SEALED ORDER** |
| vs. | |
| W.L. Gore & Associates, Inc., | |
| Defendant. | |
| W.L. Gore & Associates, Inc., | |
| Counterclaimant, | |
| vs. | |
| Bard Peripheral Vascular, Inc., David Goldfarb, M.D., and C.R. Bard, Inc., | |
| Counterdefendants. | |

Currently before the Court are Plaintiffs' Motion for Attorney Fees and Non-Taxable Costs (Dkt. #850), Plaintiffs' Motion for Enhanced Damages (Dkt. #868), Plaintiffs' Motion to Strike the Declaration of Mr. John Sininger Submitted in Opposition to Plaintiffs' Request for Enhanced Damages (Dkt. #910). After reviewing the pleadings and holding oral argument on March 30, 2009, the Court issues the following order.

1   **I.   PLAINTIFFS' MOTION FOR ENHANCED DAMAGES[1]**

2       Plaintiffs seek enhanced treble damages for Defendant's willful infringement of

3   the '135 Patent. (Dkt. #868).

4       A court may "increase the damages up to three times the amount found or

5   assessed." 35 U.S.C. § 284. In order to obtain enhanced damages, "the fact-finder must

6   determine whether an infringer is guilty of conduct upon which increased damages may

7   be based. If so, the court then determines, exercising its sound discretion, whether, and to

8   what extent, to increase the damages award given the totality of the circumstances."

9   Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996); see also Read Corp. v. Portec,

10  Inc., 970 F.2d 816, 826 (Fed. Cir. 1992) ("An award of enhanced damages for

11  infringement, as well as the extent of the enhancement, is committed to the discretion of

12  the trial court.") (superseded on other grounds as recognized in Hoechst Celanese Corp. v.

13  BP Chems. Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996)).

14      "An act of willful infringement . . . is, without doubt, sufficient to meet the first

15  requirement to increase a compensatory damages award." Jurgens, 80 F.3d at 1570.

16  Here, the jury was instructed, without objection, on the elements of willful infringement

17  set forth in In re Seagate Technology, LLC, 497 F.3d 1360 (Fed. Cir. 2007) (en banc):

18        To prove willful infringement, Plaintiffs must first persuade you that Gore
    infringed a valid and enforceable claim of the '135 patent. . . . In addition . .

19  . Plaintiffs must persuade you that it is highly probable that prior to the
    filing date of the complaint, Gore acted with reckless disregard of the

20  claims of the '135 patent. To demonstrate such "reckless disregard," . . . .
    Plaintiffs must persuade you that Gore acted despite an objectively high

21

22  ———————————————

23      [1]Plaintiffs also filed a Motion to Strike the Declaration of Mr. John Sininger, which
    was submitted by Defendant in opposition to Plaintiffs' Motion for Enhanced Damages.

24  (Dkt. #910). That Motion violates LRCiv 7.2(m)(2): "An objection to the admission of
    evidence offered in support of or opposition to a motion must be presented in the objecting

25  party's responsive or reply memorandum . . . *and not in a separate motion to strike or other
    separate filing.* Any response to the objection must be included in the responding party's

26  reply memorandum for the underlying motion and may not be presented in a separate
    responsive memorandum." (emphasis added). Therefore, the Court will deny Plaintiffs'

27  Motion to Strike and will consider the Sininger Declaration to the extent that it is relevant

28  and admissible.

likelihood that its actions constituted infringement of a valid and enforceable patent . . . . [and] that Gore actually knew, or that is was so obvious that Gore should have known, that its actions constituted infringement of a valid and enforceable patent.

(Dkt. #769, pp. 60-61). Moreover, the Court instructed the jury, without objection, that

[i]n deciding whether Gore acted with reckless disregard for Plaintiffs' patent, you should consider all the facts surrounding the alleged infringement including . . . [w]hether Gore intentionally copied at least one of Plaintiffs' products covered by the patent[,] and . . . [w]hether Gore relied on a legal opinion that was well-supported and believable and that advised Gore (1) that the products did not infringe Plaintiffs' patent or (2) that the patent was invalid."

(Id., p.61).  The jury returned a verdict for Plaintiffs on all counts and claims, rejecting Gore's myriad infringement defenses and finding, among other things, "that it is highly probable that Gore's infringement . . . was willful." (Dkt. #772, p.20).  The jury thus determined as a factual matter that Defendant acted with the requisite culpability to justify an award of increased damages, and, as discussed above, there was substantial evidence to support the jury's determination.  Accordingly, the jury's finding is sufficient to meet the first requirement for the imposition of enhanced damages pursuant to 35 U.S.C. § 284.

However, "a finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages." Read, 970 F.2d at 826.  But if the jury does find that the defendant willfully infringed the patent-in-suit, "the Court must provide reasons for not increasing a damages award." Informatica Corp. v. Business Objects Data Integration, Inc., 489 F.Supp.2d 1075, 1084 (N.D. Cal. 2007) (citing Jurgens, 80 F.3d at 1572).

"The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." Read, 970 F.2d at 826; accord Informatica, 489 F.Supp.2d at 1084 ("If the Court decides to enhance damages, the Court looks to the totality of circumstances and considers the egregiousness of the defendant's conduct as well as factors that are mitigating or ameliorating to set the amount of enhancement.").  To assist courts "when

- 3 -

1  determining whether an infringer has acted in bad faith and whether damages should be

2  increased," the Federal Circuit has identified a list of several, non-exhaustive factors ("the

3  Read factors") to consider:

> (1) whether the infringer deliberately copied the ideas or design of another;
> (2) whether the infringer, when he knew of the other's patent protection,
> investigated the scope of the patent and formed a good-faith belief that it
> was invalid or that it was not infringed; (3) the infringer's behavior as a
> party to the litigation; (4) defendant's size and financial condition; (5)
> closeness of the case; (6) duration of defendant's misconduct; (7) remedial
> action by the defendant; (8) defendant's motivation for harm; (9) whether
> defendant attempted to conceal its misconduct.

Liquid Dynamics Corporation v. Vaughan Company, Inc., 449 F.3d 1209, 1225 (Fed. Cir.

2006) (internal quotations and alterations omitted) (citing Read, 970 F.2d 826-27).  In

support of their Motion, Plaintiffs argue that "each and every factor demonstrates that, on

balance, Plaintiffs are overwhelmingly entitled to [enhanced] damages." (Dkt. #868, p.5).

Defendant concedes no factor: "[N]one of these factors weigh in favor of enhancement of

damages." (Dkt. #884, p.1).[2]

### A.    Deliberate Copying

The first Read factor is whether Defendant deliberately copied the ideas or design

embodied in the '135 patent.  Defendant argues that "Plaintiffs presented no evidence at

trial that Gore committed acts of copying during the seven month period after the grant of

the Goldfarb patent." (Dkt. #884, p.3).

First, however, in its instructions the Court expressly asked the jury to consider

whether Defendant intentionally copied any of the products embodied in the '135 patent.

After weighing the evidence, the jury rejected all of Defendant's invalidity defenses and

returned a verdict for Plaintiffs on all counts and claims, including willful infringement.

Considering the detailed jury instructions, the only way that the jury could have reached

---

[2]Defendant continues that "[t]o the contrary, [the Read factors] call into question the
jury's willfulness verdict itself, which Gore asked the Court to carefully review and overturn
in its JMOL/New Trial Motion." (Dkt. #884, p.1).  As discussed in its July 29, 2008 Order,
the Court denied Defendant's JMOL to overturn the jury's verdict on willful infringement.
(Dkt. #833, pp. 3-4).

1   its verdict was to find that Defendant intentionally copied the products covered by the

2   '135 patent. See Voda v. Cordis Corp., 506 F.Supp.2d 868, 877 (W.D. Okla. 2007) ("[A]

3   finding of conscious copying is inherent in the jury's finding of willfulness."); see also

4   Perkin-Elmer Corp. v. Computer Vision Corp., 732 F.3d 888, 893 (Fed Cir. 1984) ("[T]he

5   law presumes the existence of findings necessary to support the verdict the jury

6   reached."). Thus, the first factor is met, and the Court "does not have the discretion to

7   reweigh th[e] evidence once the matter has been decided by the jury." Jurgens, 80 F.3d at

8   1572.

9       Second, as discussed in its July 29, 2008 Order, the Court has already found that

10  "the trial record in this case provides sufficient evidence for the jury to have found willful

11  infringement by clear and convincing evidence." (Dkt. #833, p.4). As such, there was

12  sufficient evidence of post-issuance copying to support the jury's verdict.[3] The jury

13  found that Defendant's original ePTFE microstructure was an intentional copy of Dr.

14  Goldfarb's structure, as embodied in the '135 patent. And the evidence presented at trial

15  established that Defendant's post-issuance infringing products contain the same or similar

16  ePTFE microstucture as Defendant's original ePTFE vascular grafts. See PX-414.24,

17

18  _____

19  [3]While "[a] jury verdict of willfulness . . . does not bar a district court from
    determining the egregiousness of a willful infringer's conduct," Electro Scientific Industries,

20  Inc. v. General Scanning Inc., 247 F.3d 1341, 1354 (Fed. Cir. 2001), "the district court must
    take care to avoid second guessing the jury or contradicting its findings," Applied Medical

21  Resources Corp. v. United States Surgical Corp., 967 F.Supp. 861, 863 (E.D. Va. 1997).
    Thus, despite Defendant's contention to the contrary, once a jury has weighed evidence and

22  made a determination therefrom, the Court may not reweigh that evidence; it may only

23  examine the evidence to determine whether, and to what extent, the jury's determination was
    or was not supported by the evidence presented. See, e.g., Acumed LLC v. Stryker Corp.,

24  483 F.3d 800, 811 (Fed. Cir. 2007) ("Willfulness is 'not an all-or-nothing trait, but one of
    degree.'") (quoting Comark Commc'ns v. Harris Corp., 156 F.3d 1182, 1190 (Fed. Cir.

25  1998)); Jurgens, 80 F.3d at 1572 ("[A district court] does not have discretion to reweigh th[e]

26  evidence once the matter has been decided by the jury and the court finds the evidence
    sufficient to support the jury determination."); Forro Precision, Inc. V. Int'l Bus. Machs.

27  Corp., 673 F.2d 1045, 1058 (9th Cir. 1982) ("[A district court] must accept as true facts that

28  necessarily were established by the jury's verdicts.").

1   PX-1547.2154; 11/29/07 Tr. at 2348:14-24, 2349:12-19.  Accordingly, Defendant's post-

2   issuance infringing products, which admittedly contain the same or similar ePTFE

3   microstructure as Defendant's original ePTFE vascular grafts, establish that Defendant

4   committed, and continues to commit, acts of copying after the grant of the '135 patent.

5       There is also pre-issuance evidence that Defendant deliberately copied Dr.

6   Goldfarb's invention.  See, e.g., Minn. Mining & Manufacturing Co. v. Johnson &

7   Johnson Orthopaedics, Inc., 976 F.2d 1559, 1581 (Fed. Cir. 1992) ("[P]re-patent conduct

8   may also be used to support a finding of willfulness."); Jepson, Inc. v. Makita USA, Inc.,

9   1994 U.S. Dist. LEXIS 21622, at *17 (C.D. Cal. 1994) ("Pre-patent copying shows that

10  the infringer's sales after it receives notice of the patent were intentional and deliberate,

11  in willful disregard of the patentee's rights and belies any contention that the post-notice

12  sales were made with a good-faith belief that there was no infringement.").  The evidence

13  includes, among other things, that Dr. Goldfarb disclosed the structure described in the

14  '135 patent to Defendant in June or July of 1973.  (11/07/07 Tr. at 377-83, 398-400; PX

15  115.1062-67, PX 115o; Dkt. #833, p.69).  Defendant subsequently filed a patent

16  application for that structure, which copied verbatim a memo summarizing Dr. Goldfarb's

17  research results and named Peter Cooper, the Plant Manager of Defendant's facility in

18  Flagstaff, Arizona, as the sole inventor.  (11/07/07 Tr. at 408-09, 430; PX 115.925-30; PX

19  115n, PX 117.6-18).  However, despite being named as the sole inventor, Mr. Cooper

20  subsequently removed some of Dr. Goldfarb's lab slides to see if "there was something to

21  be learned through the microscope that could help [Defendant] decide if production of

22  variables in the grafts were important."  (11/07/07 Tr. at 434-25; 11/08/07 Tr. at 642-43,

23  691-92; PX 116.115123-25, PX 116.15124).  That evidence is merely some of the

24  evidence, along with the extensive litigation history before the PTO – "all of which has

25  found Dr. Goldfarb to be the rightful inventor and patent holder" – that supports the jury's

26

27

28

1    finding that Defendant objectively and deliberately copied the products embodied in the

2    '135 patent.[4]   Accordingly, the first <u>Read</u> factor supports a finding of enhanced damages.

3    **B.    Good-Faith Belief**

4           The second <u>Read</u> factor is whether Defendant, when it knew of the patent

5    protection, investigated the scope of '135 patent and formed a good-faith belief that it was

6    invalid or that it was not infringed.  Defendant argues that it acted in good-faith because it

7    obtained and relied on a legal opinion of counsel that the patent claims were invalid.

8    (Dkt. #884, p.4).

9           "[A] potential infringer with actual notice of another's patent has an affirmative

10   duty of care that usually requires the potential infringer to obtain competent legal advice

11   before engaging in any activity that could infringe another's patent rights." <u>Comark</u>, 156

12

13   _____

14           [4]Defendant contends that the jury's willfulness verdict is belied by the fact that "it was
     Mr. Cooper who first introduced the ePTFE vascular grafts to Dr. Goldfarb and even
15   supplied Dr. Goldfarb with the very grafts that were the basis for Dr. Goldfarb's conception
     and reduction to practice." (Dkt. #884, p.3).  However, there is no dispute that Mr. Cooper
16   "had conceived the invention by the time Goldfarb evaluated the 2-73 RF graft." <u>Cooper v.</u>
     <u>Goldfarb</u>, 240 F.3d 1378, 1385 (Fed. Cir. 2001) ("<u>Cooper II</u>") (citing <u>Cooper v. Goldfarb</u>,
17   154 F.3d 1321, 1326-27 (Fed. Cir. 1998) ("<u>Cooper I</u>")); see <u>Hybritech Inc. v. Monoclonal</u>
     <u>Antibodies, Inc.</u>, 802 F.2d 1367, 1376 (Fed. Cir. 1986) (conception is the "formation in the
18   mind of the inventor, of a definite and permanent idea of the complete and operative
19   invention").  Nonetheless, Dr. Goldfarb was awarded priority of invention in the interference
     proceeding before the PTO because he was the first to "reduce[ ] the invention to practice."
20   <u>Cooper II</u>, 240 F.3d at 1385-1386 (citing <u>Cooper I</u>, 154 F.3d at 1326-27); see <u>Brunswick</u>
     <u>Corp. v. U.S.</u>, 34 Fed. Cl. 532, 584 (1995) (reduction to practice "requires that the claimed
21   invention work for its intended purpose").  The fact that Mr. Cooper first conceived of the
22   invention does not call into question the jury's finding that Defendant intentionally copied
     the specific structure embodied in the '135 patent, i.e., Dr. Goldfarb's reduction to practice.
23   The Court agrees with Plaintiffs that there is sufficient evidence to establish that "[i]t was
24   only *after* Cooper learned of the Goldfarb structure via a report of Goldfarb's work that
     [Defendant] filed the [patent] application, and only *after* Cooper [took] Dr. Goldfarb's slides
25   that Gore and Cooper sufficiently understood Goldfarb's work to make a working graft and
26   begin to commercialize its infringing grafts." (Dkt. #913, p.4 n.3) (emphasis in original).
     That evidence is sufficient to support the jury's willfulness verdict and finding that
27   Defendant "deliberately copied the ideas or design" of the structure embodied in the '135
28   patent.

1    F.3d at 1190.  "To reasonably rely on an opinion, it must be authoritative, not just

2    conclusory, and objective."  Jurgens, 80 F.3d at 1572 (citing Minn. Mining, 976 F.2d at

3    1580 (Fed. Cir. 1992)); see Read, 970 F.2d at 829 ("Those cases where willful

4    infringement is found despite the presence of an opinion of counsel generally involve

5    situations where opinion of counsel was either ignored or found to be incompetent.").

6         That an opinion is "incompetent" must be shown by objective evidence.
          For example an attorney may not have looked into the necessary facts, and,
7         thus, there would be no foundation for his opinion.  A written opinion may
          be incompetent on its face by reason of its containing merely conclusory
8         statements without discussion of facts or obviously presenting only a
          superficial or off-the-cuff analysis.
9
     Read, 970 F.2d at 828-29 (citations omitted); see also Comark, 156 F.3d at 1191 ("In
10
     order to provide such a prophylactic defense [against willful infringement], . . . counsel's
11
     opinion must be premised upon the best information known to the defendant.  Otherwise,
12
     the opinion is likely to be inaccurate and will be ineffective to indicate the defendant's
13
     good faith intent.").
14
          Here, Defendant obtained an approximately 100-page opinion of counsel from the
15
     law firm of Morgan & Finnegan in 2002 that "cited the pertinent legal authorities and
16
     contained detailed analyses of the patent specification, prosecution history and claims,
17
     including a claim construction, as well as the Graham obviousness factors."  (Dkt. #884,
18
     p.6 (citing DX 3841)).
19
          First, the jury was specifically instructed to consider in making its willfulness
20
     determination whether Defendant relied on a legal opinion that was well-supported and
21
     believable and that advised Defendant (1) that the products did not infringe Plaintiffs'
22
     patent or (2) that the patent was invalid.  Despite that instruction, the jury returned a
23
     verdict in favor of Plaintiffs on the issue of willful infringement.  Accordingly, "the only
24
     way the jury could have reached the decision that [Defendant's] conduct was willful was
25
     to reject [Defendant's] contention that it relied in good faith on the opinion of counsel."
26
     Jurgens, 80 F.3d at 1572; see also Acumed, 483 F.3d at 811 ("The jury here was free to
27

28

1   disbelieve or weigh lightly evidence tending to show [Defendant's] reliance on the

2   opinion letter and to place that evidence within the overall factual context of the case.").[5]

3        Second, there is sufficient evidence to support the jury's implicit finding that

4   Defendant did not rely on an objective opinion of counsel as to the validity and

5   infringement of the '135 patent.[6]  The Court has already found that "Gore relied on the

6   same references (the Soyer, Volder, and Matsumoto articles) to support its invalidity

7   defense that the PTO previously found not to invalidate Dr. Goldfarb's invention."

8   (7/29/08 Order (Dkt. #833, p.4)).  In addition, while the Court notes that "the PTO's

9   rejection in light of [ ] identical prior art is by no means dispositive of the issues that need

10  to be resolved to determine the validity of the asserted claims," Agrizap, Inc. v.

11  Woodstream Corp., 520 F.3d 1337, 1344 (Fed. Cir. 2008), the bases of alleged invalidity

12  as set forth in Defendant's 2002 opinion of counsel were directly contrary to the validity

13  arguments that Defendant presented to the PTO when attempting to patent Dr. Goldfarb's

14  invention.  Therefore, despite the fact that Defendants contend that the 2002 opinion of

15  counsel "include[d] a thorough review of the cited prior art and prosecution history,"

16  _____

17      [5]The Court notes that despite the instructions submitted to the jury, without objection,
    that in making their willfulness determination they should consider whether Defendant relied
18  on a legal opinion that was well-supported and believable, Defendant failed to present any
    evidence or argument to the jury with respect to the alleged objectivity of Defendant's 2002
19  opinion of counsel.

20
        [6]Defendant cites Electro Scientific for the proposition that the Court may reweigh the
21  competency of Defendant's opinion of counsel.  247 F.3d at 1354 ("Although substantial
    evidence supports the jury verdict of willfulness, the district court retained authority to
22  reweigh the competency of [Defendant's] opinion of counsel and [Defendant's] reliance on
    that opinion.").  However, unlike this case, it is unclear whether the jury in Electro Scientific
23  was instructed to consider in making its willfulness determination whether Defendant relied
    in good-faith on an objective opinion of counsel.  As such, the Court will not reweigh the
24  evidence presented, but merely consider whether there was sufficient evidence presented at
    trial to support the jury's verdict on willful infringement.  See  Church & Dwight Co. v.
25  Abbott Labs., 2008 U.S. Dist. LEXIS 49588, at *8 ("The Court concludes that the jury's
    willfulness finding precludes a finding that [Defendant] had a good faith belief either that it
26  was not infringing the [patents-in-suit] or that they were invalid."); see also Jurgens, 80 F.3d
    at 1572.

27

28

1    Jurgens, 80 F.3d at 1572, the contradictory nature of Defendant's pre-issuance and post-

2    issuance arguments – in addition to the fact that the 2002 opinion that the '135 patent was

3    invalid was written by the same law firm that represented Defendant in its pre-issuance

4    litigation, arguing that the patent was valid but should not be issued in Dr. Goldfarb's

5    name – calls into question the objective nature of the 2002 opinion of counsel.  See Minn.

6    Mining, 976 F.2d at 1582 ("In such circumstances due care may require the opinion of

7    outside counsel.").

8         Furthermore, it does not appear that Defendant's 2002 opinion of counsel was

9    necessarily premised on the best evidence available as the opinion excluded certain

10   available evidence, such as the fact that "[e]ven with the expanded disclosure contained in

11   Matsumoto[,] Goldfarb and others could not figure out the details of the structural grafts

12   used by Matsumoto."  (Dkt. #868, p.8 (quoting PX 116aaa.3822)).  Despite Defendant's

13   contention to the contrary, that evidence is relevant to the issue of anticipation and

14   whether the Matsumoto article "enable[d] a person of skill in the art to practice the

15   claimed invention."  (Dkt. #884, pp. 6-7).  As such, although the Court is hesitant to label

16   Defendant's 2002 opinion of counsel as "incompetent," in light of the jury's verdict and

17   the evidence presented, the Court agrees with Plaintiffs that "Gore's decades-long attempt

18   to patent Dr. Goldfarb's invention, its arguments to the PTO that the invention was valid,

19   and its abrupt about-face when the Goldfarb patent issued is . . . sufficient for the jury to

20   reject the opinion."  (Dkt. #913, p.6).  Moreover, even if the Court held otherwise, the

21   validity arguments asserted by Defendant prior to the issuance of the '135 patent, as

22   discussed above, leads the Court to conclude that despite the 2002 opinion of counsel,

23   Defendant did not possess a good-faith belief in the invalidity or noninfringement of the

24   '135 patent.  See American Original Corp. v. Jenkins Food Corp., 774 F.2d 459, 465

25   (Fed. Cir. 1985) ("Although the presence or absence of an opinion of counsel is pertinent

26   evidence in determining good faith, that determination is based on the totality of the

27   circumstances presented in this case.") (internal quotation marks and citation omitted).

28   The totality of the circumstances supports an inference that Defendant's 2002 opinion of

1   counsel was "more of a protective device than a genuine attempt to determine before

2   infringing whether the patent was invalid." In re Hayes Microcomputer Prods., Inc.

3   Patent Litig., 982 F.2d 1527, 1544 (Fed. Cir. 1992). Thus, the second Read factor weighs

4   somewhat in favor of enhanced damages.

5         **C.    Behavior as a Party of the Litigation**

6         The third Read factor is whether Defendant's behavior as a party to the litigation

7   was reprehensible. Defendant argues that [w]hile Gore did not prevail before the jury, it

8   continues to believe that [its] defenses [to Plaintiffs' claims of infringement] have merit

9   and that it will eventually be vindicated." (Dkt. #884, p.7). Defendant also "cautions"

10   the Court "not to draw any adverse inference from Gore's zealous advocacy and the fact

11   that it did not prevail at the trial level." (Id.).

12         The Court is well aware that "an infringer may generally avoid enhanced damages

13   with a meritorious good faith defense." Delta-X Corp. v. Baker Hughes Production

14   Tools, Inc., 984 F.2d 410, 413 (Fed. Cir. 1993). However, there comes a point when a

15   defendant's zealous advocacy runs so contrary to reality that such continuing reliance on

16   its positions, without change or reevaluation of those positions, becomes reprehensible.

17   Here, as discussed above, the good-faith nature of Defendant's "zealous advocacy" is

18   called into question by the fact that Defendant spent decades fighting before the PTO and

19   the Federal Circuit to patent the Goldfarb invention as its own and block the issuance of

20   the '135 patent in Dr. Goldfarb's name, only to then attack the validity of that patent with

21   every tool in the toolbox once it was issued in Dr. Goldfarb's name, while all along

22   manufacturing products that contain the same or similar ePTFE microstructure claimed in

23   the '135 patent.[7]

24   _____

25       [7]The Court notes that it stated in its September 29, 2005 order on Plaintiffs' Motion
to Narrow the Issues (Dkt. #223) that "[t]he positions Gore took before the PTO and
26   subsequent tribunals do not appear to be irreconcilably inconsistent with the invalidity
defenses Gore now asserts, that is, anticipation based on prior art and inequitable conduct
27   before the PTO based on alleged failure to name the proper inventor." (Dkt. #311, p.12).
28   The Court thus "conclude[d] that principles of judicial estoppel do not necessarily preclude

1    "The Court's analysis of this factor focuses on the objective reasonableness of the

2    contentions put forth during this litigation." <u>Church & Dwight</u>, 2008 U.S. Dist. LEXIS

3    49588, at *9 (citing <u>Hoechst Celanese Corp. v. BP Chemicals Ltd.</u>, 846 F. Supp. 542,

4    548-549 (S.D. Tex. 1994) (focusing on the objective reasonableness of counsel's

5    arguments, not their professionalism and talent), aff'd, 78 F.3d 1575 (Fed. Cir. 1996)).

6    For the reasons discussed in the Court's July 2008 JMOL opinions, Defendant's

7    numerous infringement and invalidity defenses, and inequitable conduct claims, were, on

8    the whole, not very strong.  (Dkt. #s 833-835).

9        As the Court noted, Defendant's JMOL on invalidity "b[ore] a striking

10   resemblance to the arguments Gore set forth in its February 2004 Motion for Partial

11   Summary Judgment (Doc. 68 at 5-13).  The Court denied that Motion.  Now, three years

12   later, following trial of this matter, Gore asserts the argument again." (Dkt. #833, p.5).

13   The Court went on to conclude that Defendant's written description, best mode,

14   typicality, lack of novelty, infringement, obviousness, anticipation, and joint ownership

15   defenses and counterclaims were somewhat weak. See, e.g., Dkt. #833, p.6 ("Gore's

16   argument appears to ignore the fact that these same issues were rejected by the Patent

17   Office"), p.7 ("[T]he only evidence Gore offered to rebut infringement of the 'average

18   distance between nodes" limitation . . . is the testimony and measurements of Gore's

19   expert Dr. McMillin.  However, Dr. McMillin offered no testimony to contradict that the

20   ePTFE base graft included in each of the accused products has a 'typical' distance

21   between nodes that fits within the claims."), p.8 ("In fact, at trial, Gore's fact witness, Mr.

22

23

24   Gore's affirmative defenses concerning inequitable conduct." (Id.).  However, in light of the
     Court's continued involvement in this case over the past four years, the complexity of patent

25   law and the issues presented, and the current posture of the case, the Court is now more
     inclined to conclude that at least some of the positions taken by Defendant before this Court,

26   in light of the contradictory nature of some of the positions taken by Defendant over the past

27   thirty years of litigation over the invention claimed in the '135 patent, amount to "playing
     fast and loose with the court." (Id., p.11 (quoting <u>Yanez v. United States</u>, 989 F.2d 323, 326

28   (9th Cir. 1993)).

1    Detton, stated that 'you couldn't figure anything' from the Matsumoto article 'because

2    the article itself did not define anything.'"), p.11 ("Gore has not established, nor even

3    discussed, the 'ready for patenting' requirement to prove anticipation").  Defendant also

4    (1) relied heavily on fact witness, D. Dan Detton, whom the Court noted "ha[d] perjured

5    himself previously," and whose testimony was "highly suspect and lacking in credibility"

6    (Dkt. #835, p.66), (2) failed to present evidence from Dr. Volder, despite the fact that it

7    claimed that Dr. Volder was the actual or joint inventor (see Dkt. #835, pp. 70, 72), and

8    (3) failed to present evidence with respect to its invalidity theory concerning the Cohn

9    graft despite conducting discovery and motion practice on the issue and identifying

10   witnesses to testify to the graft's chain of custody (Dkt. # 526, pp. 6-7, 9, 13, 16).

11   Furthermore, Defendant failed to present any evidence in support of its unfair competition

12   counterclaims.[8]

13        The record establishes that Defendant "adopted a 'shotgun' approach of litigating

14   virtually every conceivable issue, thereby burdening the Court with a number of meritless

15   arguments." Church & Dwight, 2008 U.S. Dist. LEXIS 49588, at *9.  Defendant

16   presented nine different invalidity defenses and seven separate bases for alleged

17   inequitable conduct at trial.  (Dkt. #835).  And in addition to those issues discussed

18   above, Defendant proffered the expert report and testimony of Dr. Wheatley, who

19   adopted claim constructions inconsistent with those recommended by the Special Master

20   and adopted by the Court "without reviewing the Special Master's R&R or the Court's

21

22   _____

          [8]Although the Court recognizes that elimination of issues and withdrawal of defenses
23   prior to trial do not alone establish bad faith or constitute vexatious or dilatory tactics, Stickle
     v. Heublein, Inc., 716 F.2d 1550, 1564-65 (Fed. Cir. 1983), unlike Stickle, here the record
24   discloses that Defendants raised an entire litany of affirmative defenses and counterclaims
     that are commonly asserted in patent cases without regard to the merits of, or evidentiary
25   support for, some of those defenses and claims. See Medtronic Navigation, Inc. v. BrainLAB
     Medizinische Computersystems GmbH, 2008 U.S. Dist. LEXIS 13483, at *6 (D. Colo. 2008)
26   ("Vexatious conduct includes conduct that obfuscates the legal issues and complicates . . .
     the court's task of sorting them out.") (internal quotation marks and citation omitted).
27

28

1    Order adopting the R&R." (Dkt. #559, p.18). The Court found that "Gore's silence in its

2    Response regarding the issue of Dr. Wheatley's report contradicting the Court's claim

3    construction [wa]s significant." (Id., p.20); see Medtronic, 2008 U.S. Dist. LEXIS 13483,

4    at *18 ("After receiving the Court's claims construction ruling, however, [Defendant] had

5    a duty to reexamine this litigation and make an objective assessment of the validity [of

6    their defenses].").  In addition, some of Defendant's pre-trial and post-trial positions

7    appear contradictory.  For example, in the instructions to the jury, Plaintiffs contended

8    that "a person of ordinary skill was a surgeon who performed vascular surgery," while

9    Defendant contended more broadly "that a person of ordinary skill was a person involved

10   in and familiar with the design, development, and use of vascular grafts." (Dkt. #769,

11   p.59). Defendant now, in its RJMOL, states that both Plaintiffs *and* Defendant's expert

12   believe that the level of ordinary skill is restricted to "a surgeon with vascular surgery

13   experience." (Dkt. #848, p.2). Accordingly, for those reasons, among others, the Court

14   concludes the third <u>Read</u> factor weighs at least somewhat in favor of enhanced damages.

15       **D.    Size and Financial Condition**

16       The fourth <u>Read</u> factor is whether Defendant's size and financial condition would

17   allow it to weather an enhancement of damages.  Here, it is undisputed that Defendant is a

18   large and financially sound company.  Defendant employs approximately 7,000

19   individuals in 45 different plants and ███████████████████annual sales.  (PX

20   1478.4).  In addition, during the period for which damages were calculated – from August

21   20, 2002 until June 30, 2007 – Defendant sold███████████████████of the

22   infringing graft products. (11/15/07 Tr. at 1399-1400; PX 114). Furthermore, the

23   profitability margin for those products███████████████(11/15/07 Tr. at

24   1358-61; PX 998.4, PX 1403.47). However, Defendant points to statements in the

25   Sininger Declaration that Plaintiffs' "figures are misleading because they ignore fixed and

26   previously sunk costs," and that "Gore has not recouped its investment expended in the

27   development of the [infringing] products." (Dkt. #884, p.10). Defendant also points to

28   Mr. Sininger's statement that "[t]he jury's award represents███████████████

1   Gore's Medical Division's after tax profit for the damages period and this does not take

2   into account Gore's cumulative cash investment in the development costs for these

3   products," and that "any enhancement of damages will not only delay but could prevent

4   Gore's expansion of its Medical Products business on land purchased in North Phoenix."

5   (Id.).

6          First, however, Plaintiffs' evidence on Defendant's profitability was

7   uncontroverted at trial. (11/15/07 Tr. at 1443:20-1448:2; 12/04/07 Tr. at 3014:1-

8   3015.16). Second, Mr. Sininger's statements that Plaintiffs' figures ignore fixed and

9   previously sunk costs, and the alleged amount of those costs, lacks evidentiary support

10  and amounts to self-serving and conclusory statements  See Taylor v. List, 880 F.2d 1040,

11  1045 (9th Cir. 1989) (conclusory allegations, unsupported by factual material, are

12  insufficient). In addition, Mr. Sininger fails to inform the Court how much of Gore's

13  Medical Division's profits for the damages period are derived from sales of the infringing

14  products, let alone why the Court is required to consider only after tax profits.

15  Regardless, the fourth Read factor is not limited to the profits of only one of Defendant's

16  divisions; it is an inquiry into Defendant's entire size and financial condition and whether

17  enhanced damages would irreparably harm Defendant or, in the alternative, is necessary

18  to provide a sufficient deterrent effect.

19         Moreover, to the extent that Defendant alleges that an enhanced damages award

20  might prevent it from expanding its Medical Division's operations in one instance,

21  Defendant does not indicate what sort of enhanced damages award would have that effect

22  (double, treble?). In any event, one who elects to build or grow a business on a product

23  found to infringe can not be heard to complain if an enhanced damages award adversely

24  impacts the business so elected. See Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995,

25  1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to

26  infringe cannot be heard to complain if an injunction against continuing infringement

27  destroys the business so elected."). The Court agrees with Plaintiffs: "It takes nerve for a

28  willful infringer to complain that enhancing damages will adversely impact its ability to

- 15 -

1    continue to infringe." (Dkt. #913, p.8 n.9).  For these reasons, in addition to the fact that

2    an enhanced damages award appears necessary to provide a sufficient deterrent effect

3    given the extensive history of litigation with respect to the invention claimed in the '135

4    patent, the Court concludes that the fourth <u>Read</u> factor weighs in favor of enhancement.

5        **E.    Closeness of the Case**

6        The fifth <u>Read</u> factor is whether the case was relatively close or not based on the

7    evidence presented.  Here, the jury returned a unanimous verdict in favor of Plaintiffs,

8    finding that all eight asserted claims were willfully infringed by Defendant's vascular

9    grafts and/or stent grafts, and rejecting Defendant's nine invalidity defenses and seven

10   bases for alleged inequitable conduct. (Dkt. #s 771, 835).  However, Defendant argues

11   that "Plaintiffs are not entitled to enhanced damages simply because they are the

12   prevailing party." (Dkt. #884, p.11).  To the contrary, Defendant's argue, "Defendant's

13   invalidity, unenforceability, and noninfringement defenses have had merit, and the issues

14   raised by th[o]se defenses were so close that they could not be decided prior to trial." (Id,

15   p.10).

16       It is well-settled that "a finding of willful infringement merely *authorizes*, but does

17   not *mandate*, an award of increased damages."  <u>Modine Mfg. Co. v. Allen Group, Inc.</u>,

18   917 F.2d 538, 543 (Fed. Cir. 1990) (emphasis in original); <u>see</u> <u>Cybor Corp.</u>, 138 F.3d at

19   1461 ("[A]lthough Cybor was found to infringe all twenty of the claims, this result does

20   not mean that the case was not close, particularly in light of its justifiable albeit

21   unsuccessful arguments regarding the prosecution history of the '837 patent.").  However,

22   unlike <u>Modine</u> or <u>Cybor</u>, here, for the reasons discussed above and in the Court's JMOL

23   opinions, the evidence on willfulness and copying was not weak (whereas the evidence

24   supporting a number of Defendant's defenses was somewhat weak).  Nonetheless, the

25   Court cannot conclude that all of Defendant's defenses were entirely without merit.

26   Accordingly, the fifth <u>Read</u> factor is either neutral or weighs only somewhat in favor of

27   enhanced damages.

28

1          **F.     Duration of Misconduct**

2          The sixth <u>Read</u> factor is the duration of Defendant's misconduct.  Defendant

3    argues that the "duration of any alleged misconduct . . . was only *seven months* between

4    the issue date of the patent and the commencement of this lawsuit."  (Dkt. #884, p.15)

5    (emphasis added).

6          In light of the extensive history of litigation over the invention claimed in the '135

7    patent, and the fact that Defendant continues to infringe the '135 patent, that contention is

8    somewhat astonishing.  Clearly "willful infringement is misconduct." <u>Church & Dwight</u>

9    <u>Co.</u>, 2008 U.S. Dist. LEXIS 49588, at *12.  In addition, although Defendant is correct

10   that "[t]o willfully infringe a patent, the patent must exist and one must have knowledge

11   of it," <u>State Indus. Inc. v. A.O. Smith Corp.</u>, 751 F.2d 1226, 1236 (Fed. Cir. 1985), as

12   discussed above, the misconduct relevant to an enhancement analysis can begin well

13   before the issuance of the patent-in-suit.  <u>See</u> <u>Minn. Mining</u>, 976 F.2d at 1581.  Here,

14   although the '135 patent did not issue in Dr. Goldfarb's name until 2002, Defendant filed

15   a patent application to patent the invention claimed therein in 1974.  Defendant was

16   intimately familiar with Dr. Goldfarb's patent application and knew the scope of the

17   count of the interference in 1983.  That count ultimately issued with minor changes (that

18   did not impact the scope of coverage in any material way) as Claim 20.  Moreover, the

19   PTO concluded in 1995 that Dr. Goldfarb established priority and the earlier reduction to

20   practice (a decision that was upheld numerous times by both the PTO and Federal

21   Circuit).  <u>Cooper I</u>, 154 F.3d at 1326-27.  As such, in light of Defendant's intimate

22   involvement in the extensive litigation history over the invention claimed in the '135

23   patent, Defendant cannot in good faith now contend that it was not knowingly using Dr.

24   Goldfarb's invention prior to issuance of the '135 patent.  <u>But see</u> <u>State Indus.</u>, 751 F.2d

25   at 1236 ("What the scope of claims in patents that do issue will be is something totally

26   unforeseeable.").  Accordingly, the sixth <u>Read</u> factor favors an enhancement of damages.

27   / / /

28

1          **G.      Remedial Action**

2          The seventh <u>Read</u> factor is whether Defendant's have taken any remedial action to

3   mitigate or minimize infringement.

4          "[T]he relevant time for remedial action [is when the infringing party] learned of

5   the lawsuit." <u>nCUBE Corp. v. SeaChange Int'l, Inc.</u>, 313 F. Supp. 2d 361, 390 (D. Del.

6   2004).  Here, it is undisputed that Defendants have taken no remedial action since

7   learning of the instant lawsuit.  But Defendants argue that "there was no possible way for

8   Gore to sell Dacron stent grafts [i.e., a non-infringing alternative product] because it

9   would have taken many years to develop, clinically test and obtain FDA approval for

10  non-ePTFE stent graft products and with no assurance that such products would be

11  acceptable for Gore's present life saving products." (Dkt. #884, pp. 15-16).  However, as

12  Plaintiffs point out, "Gore presented no evidence at trial that it ever attempted to

13  manufacture or obtain FDA approval to sell a non-ePTFE graft." (Dkt. #913, p.11).  And

14  Defendant's contention that it had no assurances that Dacron products would be

15  acceptable is belied by the testimony of Defendant's own expert, Dr. Wheatley, that

16  "[t]here is no difference between those two graft materials [ePTFE and Dacron] and graft

17  products when dealing with either open surgical repair on the aorta or endovascular

18  repair." (11/27/07 Tr. at 1821:13-23).  Moreover, it is undisputed that after learning of

19  the instant lawsuit, Defendant made no attempt to avail itself of the below-market royalty

20  rate in the 1984 sublicense option.  Accordingly, the seventh <u>Read</u> favor supports a

21  finding of enhanced damages.

22         **H.      Motivation for Harm**

23         The eighth <u>Read</u> factor is whether Defendant's infringement was driven by a

24  motivation to harm.  Plaintiffs merely reiterate their arguments above that "Gore's

25  conscious decision to continue with its objectively reckless infringement, rather than

26  abate its infringement through license or otherwise, is strong evidence of an intent to

27  harm warranting enhancement." (Dkt. 913, p.11).  Defendant, on the other hand, argues

28

- 18 -

1    that "Gore's decision to develop and market its products cannot be the basis for Plaintiffs'

2    assertion since they had their origin long before the patent issued." (Dkt. #884, p.16).

3           However, "willful infringement by a direct competitor in a competitive market

4    when the infringer did not have a strong basis to believe that the patents were invalid"

5    constitutes motivation for harm." Church & Dwight, 2008 U.S. Dist. LEXIS 49588, at

6    *13.  It is undisputed that the parties are direct competitors in the same market for at least

7    some of the infringing products (such as those products for which Plaintiffs were awarded

8    lost profits).  In addition, as discussed above, the totality of the circumstances support that

9    for at least part of the extensive history of litigation surrounding the invention claimed in

10   the '135 patent, and certainly during the post-issuance litigation, Defendant did not

11   appear to have a strong basis for asserting that the patent was invalid or unenforceable.

12   That is compounded by the fact that Defendant has taken no remedial action at any time

13   since either the issuance of the '135 patent or the jury's finding that Defendant wilfully

14   infringed the patent.  Accordingly, the eighth Read factor supports a finding of enhanced

15   damages.

16          **I.      Attempt to Conceal**

17          The ninth Read factor is whether Defendant attempted to conceal its allegedly

18   infringing conduct.  Defendant states that "Gore has openly promoted and marketed its

19   products." (Dkt. #884, p.16).  Plaintiff does not dispute this statement, and presents no

20   arguments with respect to this factor.  Accordingly, the ninth Read factor does not support

21   a finding of enhanced damages.

22          **J.      Amount of Enhancement**

23          In light of the totality of the circumstances, the Court finds that Plaintiffs are

24   entitled to an award of enhanced damages under 35 U.S.C. § 284 and the Read factors.

25   The jury found that there was willful infringement; the evidence presented supports that

26   finding.  In addition, as discussed above, eight of the nine Read factors favor enhanced

27   damages.

28

1    However, the Court notes that three of the <u>Read</u> factors – good faith belief,

2    behavior as a party to the litigation, and closeness of the case – only somewhat favor an

3    enhancement of damages.  Thus, the Court, in its discretion, concludes that the maximum

4    enhancement is not appropriate.  <u>But see</u> <u>Amsted Indus. Inc. v. Buckeye Steel Castings</u>

5    <u>Co.</u>, 24 F.3d 178, 183-84 (upholding the district court's decision to treble damages where

6    there was deliberate copying, bad faith, inappropriate litigation behavior, and closeness of

7    the willfulness issue).  The maximum enhancement under 35 U.S.C. § 284 is appropriate

8    only when the <u>Read</u> factors conclusively demonstrate the infringer's bad faith and the

9    egregiousness of the infringer's conduct.  Here, as some of the <u>Read</u> factors concerning

10   Defendant's bad faith and behavior only somewhat favor a finding of enhanced damages,

11   the Court declines to award the maximum enhancement.  Instead, the Court, in its

12   discretion and in consideration of the <u>Read</u> factors, concludes that the damages should be

13   enhanced by a factor of two.

14   **II.     PLAINTIFFS' MOTION FOR ATTORNEY FEES**

15   Under 35 U.S.C. § 285, the Court, using its inherent authority, may "in exceptional

16   cases . . . award reasonable attorney fees to the prevailing party."  Attorney fees are

17   generally compensatory in nature, and are not designed to punish the non-prevailing

18   party.  <u>Central Soya Co., Inc. v. Geo A. Hormel & Co.</u>, 723 F.2d 1573, 1578 (Fed. Cir.

19   1983) ("The purposes of § 285 is, in a proper cases and in the discretion of the trial judge,

20   to compensate the prevailing party for its monetary outlays in the prosecution or defense

21   of the suit.").

22   To award attorney fees, the Court must employ a two-step process: (1) "The

23   district court must first determine whether the case is exceptional, . . . [and (2)] if the case

24   is found to be exceptional, the district court must then determine whether attorney fees

25   should be awarded."  <u>Enzo Biochem, Inc. v. Calgene, Inc.</u>, 188 F.3d 1362, 1370 (Fed. Cir.

26   1999).  A case is exceptional where "there has been some material inappropriate conduct

27   related to the matter in litigation, such as wilful infringement ," <u>Brooks Furniture Mfg.,</u>

28   <u>Inc. v. Dutailier Int'l, Inc.</u>, 393 F.3d 1378, 1381 (Fed. Cir. 2005), or "bad faith, litigation

- 20 -

1   misconduct, and unprofessional behavior," SeaChange, 436 F.3d at 1325.  Inappropriate

2   conduct by the parties or its counsel covers a spectrum of misdeeds, such as frivolous

3   claims or other vexatious actions, and the presentation of non-credible testimony, baseless

4   defenses, or duplicative motions.  See Beckman Instruments, Inc. v. LKB Produkter AB,

5   892 F.2d 1547, 1551 (Fed. Cir. 1989).  In addition, with respect to whether the prevailing

6   party should be entitled to recover attorney fees, "[a]s a general rule, attorneys fees under

7   section 285 may be justified by any valid basis for awarding [statutorily enhanced]

8   damages under section 284."  Jurgens, 80 F.3d at 1573 n.4.  As discussed in the preceding

9   section, the Court employs the Read factors to determine whether the prevailing party is

10  entitled to enhanced damages.   In the instant case, the Parties have stipulated that, if

11  applicable, $19 million would be a reasonable award of attorney fees and non-taxable

12  costs.  (Dkt.#919.)  Thus, the only issue before the Court is whether Plaintiffs are entitled

13  to that stipulated amount.

14          Here, the jury was instructed, without objection, on the issue of willful

15  infringement and returned a verdict in favor of Plaintiffs, finding that Defendant had

16  willfully infringed the '135 patent.  In addition, the Court ruled against Defendant in its

17  JMOL and RJMOL, holding that the jury verdict on willfulness was supported by

18  substantial evidence.  As such, the Court will not go through the evidence supporting the

19  jury's verdict at this time; several points are, however, worth noting.  First, the evidence

20  presented at trial permitted the jury to conclude that Defendant acted in an objectively

21  reckless manner.  Among other things, the jury was able to determine that Defendant

22  fought vigorously for control and ownership of Dr. Goldfarb's patent for 18 years in the

23  interference proceedings—and the matter now apparently has the longest patent history in

24  the history of the PTO, along with two appeals before the Federal Circuit, only to claim

25  after it repeatedly lost that it did not practice the very invention it fought so hard to

26  control.  All the while, Defendant produced and sold the infringing patent.  Accordingly,

27  based on the totality of the circumstances, the Court finds that the jury's verdict on willful

28  infringement (and evidence in support thereof) is a sufficient basis for classifying this

1    case as exceptional for the purpose of awarding attorney fees. See, e.g., Mahurkar v. C.R.

2    Bard, Inc., 79 F.3d 1572 (Fed. Cir. 1996).

3         Furthermore, Defendant, as a party to this litigation, has taken contradictory

4    positions that also justify an award of attorney fees. The Court notes, again, that

5    Defendant's reference to the Court's September 29, 2005 order as evidence that

6    Defendant could not have acted in bad faith in taking such contradictory positions is

7    unavailing. The Court's previous order, issued at a fairly early stage in the litigation, did

8    not reflect subsequent findings and the Court's growing awareness of the nature of this

9    case and what appears to be Defendant's decades-long patent, litigation, and business

10    strategy. Defendant argued before this Court that it did not practice the Goldfarb patent

11    because the accused products did not permit tissue ingrowth or meet the average

12    internodal distance limitation of the claims. (PX16, 21 22-23. 112.26, 136,137.22, 345).

13    Yet, Gore's position was belied by earlier admissions made by its representatives that the

14    accused products fell squarely within the asserted claims. Defendant offered scant

15    evidence, in the form of testimony by Drs. Aretz and McMillan, to rebut those earlier

16    positions. There is also the issue of Defendant's proffered theory of the "Volder

17    inventorship," which was refuted by a sworn statement from Dr. Volder himself. Several

18    questions regarding this theory still remain unresolved, not the least of which is

19    Defendant's decision not to memorialize Dr. Volder's testimony in the vast amount of

20    time prior to his infirmity, despite the payments that were made to him. (11/30/07 Tr. at

21    2664-65; Dkt.#835, p.72). In fact, the Court has already commented on Dr. Volder's lack

22    of presence in this case:

23          Gore made no attempt to depose Dr. Volder or obtain his sworn statement
             before the close of fact discovery. The Court reiterates that there is no
24          indication that Dr. Volder. has ever claimed to be the inventor based on his
             own sworn statement or deposition testimony.
25

26    (Dkt. #343). The Court also notes that reliance on testimony found by the Court to be

27    "not credible," "unconvincing," or "unbelievable" is an additional basis to award attorney

     fees. Nilsen v. Osram Sylvania, Inc., 528 F.3d 1352, 1359 (Fed. Cir. 2008). Defendant
28

1  relied on the testimony of Mr. Detton throughout the course of this case; he was also paid

2  by Defendant.  However, in its July 29, 2008 order, the Court found that Mr. Detton's

3  testimony was unconvincing, unbelievable, and not credible, writing "[t]he Court notes

4  that Mr. Detton has perjured himself previously.  The Court finds his testimony highly

5  suspect and lacking in credibility." (Dkt. #835, p.66).  Thus, Defendant's reliance on Mr.

6  Detton's testimony further justifies the imposition of attorney fees.

7       The Court incorporates by reference its discussion of the <u>Read</u> factors in the

8  preceding section of this Order, and finds that those factors also contribute to the overall

9  determination by the Court that attorney fees are justified given the exceptional nature of

10  this case.  <u>See</u> <u>Enzo Biochem</u>, 188 F.3d at 1370.

11    **Accordingly,**

12    **IT IS HEREBY ORDERED** denying Plaintiffs' Motion to Strike the Sininger

13  Declaration.  (Dkt. #910).

14    **IT IS FURTHER ORDERED** granting in part Plaintiffs' Motion for Enhanced

15  Damages.  (Dkt. #868).  Plaintiffs' damages award is doubled from $185,589,871.02 to

16  $371,179,742.04.

17    **IT IS FURTHER ORDERED** granting Plaintiffs' Motion for Attorney Fees and

18  Non-Taxable Costs.  (Dkt. #850).  Plaintiffs are awarded $19 million in attorney fees and

19  non-taxable costs.

20    **IT IS FURTHER ORDERED** directing the Clerk of the Court to unseal this

21  Order on April 15, 2009, unless counsel file a notice of opposition to unsealing the Order

22  prior to that date.

23    DATED this 31st day of March, 2009.

24

25

26                Mary H. Murguia

27               United States District Judge

28  cc: all counsel