**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bard Peripheral Vascular, Inc., and David Goldfarb, M.D., <br><br> Plaintiffs, <br><br> vs. <br><br> W.L. Gore & Associates, Inc., <br><br> Defendant. <br> _____ <br> W.L. Gore & Associates, Inc., <br><br> Counterclaimant, <br><br> vs. <br><br> Bard Peripheral Vascular, Inc., David Goldfarb, M.D., and C.R. Bard, Inc., <br><br> Counterdefendants <br> _____ | No. CV 03-597-PHX-MHM <br><br> **SEALED ORDER** |

Currently pending is the issue of supplemental damages pursuant to this Court's March 31, 2009 Order. (Dkt.#954.) After reviewing the Parties' joint submission and conducting oral argument, the Court issues the following Order.

**I.      Supplemental Damages**

The Court previously ruled that Bard Peripheral Vascular, Inc. and David Goldfarb, M.D. (collectively referred to as "Bard") are entitled to supplemental damages from W.L.

Gore & Associates, Inc. ("Gore") for the period of July 1, 2007 through March 31, 2009. As the Court noted, supplemental damages shall be "calculated consistent with damages awarded in the jury verdict." (Dkt.# 942 at 5). That verdict included two components: (1) lost profits damages and (2) reasonable royalty damages. The exact measure of those damages remains undecided.

The purpose of supplemental damages is to adequately compensate the patentee while preventing the inefficiencies of forcing a patentee to file new lawsuits to collect from an adjudicated infringer for different periods of infringement. Hynix Semiconductor, Inc. v. Rambus, Inc., 2009 WL 440473, at *6 (N.D. Cal. Feb. 23, 2009) ("the patentee could file another complaint alleging infringement occurring after the time period tried in the first case, but requiring such additional litigation would be inefficient and unhelpful, serving only to delay the patentee's right to recover"). An award of supplemental damages must include those products the jury found to infringe as well as any insubstantial variants of those products launched during the litigation, but after discovery. TruePosition Inc. v. Andrew Corp., 2009 WL 1173292, at *6, *13 (D. Del. Apr. 30, 2009) (awarding supplemental damages on products released after discovery). "Any doubts regarding the calculatory precision of the damage amount must be resolved against the infringer." Kaufman Co., Inc. v. Lantech, Inc., 926 F.2d 1136, 1141 (Fed. Cir. 1991). This is because "fundamental principles of justice require us to throw the risk of any uncertainty upon the wrongdoer instead of upon the injured party." Paper Converting Mach. Co. v. Magna-Graphics Corp., 745 F.2d 11, 22 (Fed. Cir. 1984).

**A.     Lost Profits**

With respect to lost profits, Bard requests that the Court award it supplemental damages totaling $44,556,381.24. To support this figure, Bard points out that the jury adopted down to the final penny its expert's—Dr. Leonard—calculations of lost profits. (See 11/16/07 Trial Tr. at 1325 and Dkt.# 771 at 22). Because the Court has held that Bard's supplemental lost profits damages must "reflect the lost [profits] damages calculations utilized by the jury," (Dkt.#955 at 2), Bard claims that its final figure represents Dr.

Leonard's trial methodology, which was adopted by the jury.

Gore disputes Bard's calculations on lost profits and argues that the total amount of supplemental damages on lost profits should not exceed $40,353,270. Gore argues that Dr. Leonard made two errors. First, Gore contends that Dr. Leonard failed to subtract royalties that Bard would have paid to Dr. Goldfarb on additional sales in the hypothetical ("but-for") lost profits world (i.e., a market without Gore). Second, Gore claims that Dr. Leonard extrapolated prices and costs using a different base than what he used in calculating the lost profits the jury awarded. According to Gore's expert, Dr. Teece, when corrected, these two supposed errors should reduce Bard's supplemental damages on lost profits from $44.6 million to $40.4 million. (Teece Supplemental Damages Report, Ex. A, p. 3, Tables 1 and 9).

The Court is not persuaded by Gore's argument. "The measure of lost profits is the difference between the patent owner's cost of production and the price at which the patent owner would have sold the product." Beckson Marine, Inc. v. NFM, Inc., 2007 WL 951706, at *2 (W.D. Wash. Mar. 27, 2007). During the damages period covered by trial, Bard paid Dr. Goldfarb a 5% royalty on sales of his invention. Shortly before trial, Bard bought the Goldfarb patent for $7 million and ended its obligation to pay a continuing royalty to Dr. Goldfarb. Bard's payment turned what had been a variable cost into a fixed (and sunk) cost. Gore fails to account for the lump sum payment and charges Bard an additional 5% ongoing royalty cost that Bard undisputedly did not incur. Gore's accounting is problematic (Bard can only be charged once for the cost)— and the last company entitled to amounts allegedly payable by Bard to Dr. Goldfarb is Gore.

In addition, there is no reason to reduce Bard's lost profits by $4.2 million on the grounds that Bard's cost and market share data for the lost profits calculation is arbitrary and unjustified. By stipulation the parties agreed to use the existing cost and market share data to calculate supplemental lost profits damages. (Dkt.# 954 at 2; 7/14/09 Teece Tr. at 129). The only question on this sub-topic is whether the supplemental damages calculation should be extrapolated from 2 quarters of the most recent data (as Bard suggests), or from either 20

1 quarters of data or 7 quarters of data (as Gore suggests). To the extent there is disagreement
2 as to the reliability of Dr. Leonard's use of 2 quarters worth of information, it is well settled
3 that all "doubts . . . must be resolved against the infringer," which is Gore. Kaufman Co.,
4 Inc. v. Lantech, Inc., 926 F.2d 1136, 1141 (Fed. Cir. 1991).

As such, the Court will award supplemental lost profits damages in the amount of $44,556,381.24, which was the figure submitted by Bard.

### B.     Reasonable Royalty

With respect to supplemental reasonable royalty damages, Bard requests supplemental damages totaling $98,228,460.90. Bard notes that supplemental damages are awarded "in the amount of the verified sales figures multiplied by [the reasonable royalty rate]." In re Hayes Microcomputer Prods., Inc. Patent Litig., 766 F. Supp. 818, 828 (N.D. Cal. 1991); Nat'l Instruments Corp. v. Mathworks, Inc., 2003 WL 24049230, at *4 (E.D. Tex. June 23, 2003) (the district court should "adopt[] a formula that uses the defendant's actual sales figures in the United States multiplied by a reasonable royalty rate."). In a special interrogatory, the jury awarded Bard a reasonable royalty and set that rate at 10%. (Dkt.# 771 at 23.) Bard contends that straightforwardly applying the jury's 10% royalty rate to the royalty base, which are Gore's verified sales figures on its infringing products subject to a reasonable royalty for the supplemental time period, results in $98,228,460.90 of reasonable royalty damages for the supplemental period.

Gore disagrees with Bard's total and proffers supplemental damages on a reasonable royalty totaling $64,440,740. Gore's reasonable royalty damages calculations are based on its theory that the jury rejected Dr. Leonard's royalty calculations and instead credited Gore's evidence as to the same. Specifically, Gore argues that at trial, Dr. Leonard testified that the "royalty base" was $1,276,000,000, which was 100% of Gore's infringing sales revenues on products subject to the reasonable royalty theory. (Trial Tr. 1348; accord, Ex. B, Tr. 29-30). The jury determined the royalty rate to be 10%. (Trial Tr. 4043-44). Gore claims that if the jury had applied a 10% royalty rate to the entirety of the royalty base (i.e., the entirety of Gore's sales revenues subject to the royalty theory), Bard's royalty damages verdict would

have been $127.6 million. Instead, the jury's verdict on reasonable royalty damages was substantially lower than what Dr. Leonard calculated—the jury awarded reasonable royalty damages at $83,508,292.20. According to Gore, the verdict of approximately $83.5 million shows that what the jury did was apply a 10% royalty rate to a royalty base of 65.4% of Gore's verified sales of $1.276 billion.

Gore claims that by reducing the royalty damages from $127.6 million to $83.5 million, the jury must have found that non-infringing components contributed a portion of the value and sales price of Gore's products subject to a reasonable royalty. By way of example, Gore points to the fact that in its stent-grafts, the non-infringing components include the metal stents, catheters, introducers and special impermeable wraps, all of which the jury likely considered when arriving at a reduced royalty base. Gore suggests that in order to remain consistent with the jury verdict, reasonable royalty supplemental damages must be calculated by applying the jury's royalty rate of 10% to a royalty base of 65.4% of approximately $982 million—which is Gore's verified sales figures on its infringing products subject to a reasonable royalty for the supplemental time period. Under Gore's theory, reasonable royalty supplemental damages should total no more than $64,440,740.

In its reply brief, Bard counters by claiming that there is no basis for the Court to hold that Bard is only entitled to what essentially amounts to a royalty rate of 6.54% for the supplemental damages period, instead of the 10% reasonable royalty rate set by the jury, and that "[a]ny doubts regarding the calculatory precision of the damage amount must be resolved against the infringer," which is Gore. Kaufman Co., Inc., 926 F.2d at 1141. Bard also notes that the Federal Circuit's en banc decision in Rite-Hite v. Kelley Co., 56 F.3d 1538 (Fed. Cir. 1995) unquestionably controls this case. In Rite-Hite, the Federal Circuit held that "[a] patentee may be entitled to recover damages based on the revenue of the entire product, including unpatented components, [provided] the patent-related component or feature is "the basis for customer demand or substantially creates value of the component parts." Id. at 1549. Bard contends that there is no dispute that Dr. Goldfarb's invention is the basis for customer demand of Gore's infringing products and that Gore would not sell a single one of

those products or their "related components" without infringing Goldfarb's patent. Gore's own expert conceded that Gore would not sell a single stent graft without Dr. Goldfarb's invention:

> Q. In fact, if you remove any ePTFE that has Dr. Goldfarb's patented structure, you don't have a stent graft that's usable in the body at all, do you?
>
> A. I think that's correct.

(7/14/09 Teece Tr. at 128, attached hereto as Exhibit A).

Bard further claims that despite Gore's current position that the jury applied the 10% royalty to a base discounted by 65.4%, there is no evidence in the record to support such a claim. Bard argues that Gore's expert, Dr. Teece, freely admitted that how the jury arrived at the damages awarded is, at best, ambiguous, and that Gore presented no cognizable theory on which to base its argument other than speculating that the jury's reasonable royalty damage totals accounted for the value Gore added to the infringing products subject to a reasonably royalty.

With respect to the Parties' various contentions, the Court must preliminarily note that it cannot be determined how the jury arrived at reasonable royalty damages totaling $83,508,292.20. It is clear from the record that neither Party argued at trial for a royalty base of approximately $835 million. Bard argued that the royalty base should be set at approximately $1.276 billion. (See Leonard 11/15/07 Trial Tr. 1341:1-5; 1348: 12-22). Gore, on the other hand, argued for a royalty base of approximately $516 million, which it contended was the total of Gore's verified sales figures on its infringing products subject to a reasonable royalty, minus Gore's non-infringing technologies. (See Teece 11/29/07 Trial Tr. 2464:25-2466:18; 2471:12-2475:14). Because the uncontested jury verdict form did not include a special interrogatory for the royalty base,[1] (see Dkt.#771), to the extent there is any

---

[1] With respect to the uncontested verdict form, Gore argues in its briefing as follows:

> At trial, Gore unsuccessfully requested a special interrogatory

ambiguity regarding the jury's calculation of reasonable royalty damages, the Parties have only themselves to blame, since there were no objections to the stipulated verdict form. While both Parties offered several theories as to what the jury may or may not have done when it awarded $83,508,292.20 in reasonable royalty damages, their positions must be rejected as objectively unverifiable.

As to Gore, it contends that in determining the royalty base, the jury credited Gore's trial evidence that its non-infringing components contributed to the value and sales price of the products. Gore's theory, however, is based entirely on conjecture. Gore seemed to acknowledge as much in its earlier briefing, stating that "how the jury allocated the base among the accused products, particularly the stent-graft products, cannot be determined," since "the jury verdict form does not have the detail necessary to determine how the jury arrived at its reasonable royalty award." (Dkt.#883 at 3-4). Consistent with such statements, Gore's expert testified he "didn't know" how the jury's calculations were made:

> Q. Okay. And what did the jury do in terms of discounting the vascular grafts

---

> for the jury to decide the royalty base, stating "the proper base . . . is a hotly contested issue in this case and an important factor in calculating the amount of reasonable royalty damages." (Doc. 715 at p. 4). Plaintiffs objected and the Court declined to submit the interrogatory to the jury.

(Dkt.#979 at 6 n.2).

This assertion by Gore is at best disingenuous. While Gore did submit a draft verdict form early in the process that included such an interrogatory, its attorneys stipulated to all aspects of the final verdict form submitted to the jury, save handling of the option.

THE COURT: [W]ere you able to confer on this verdict form issue?
MR. MALEDON: Yes, we were, Your Honor, and I think we've reached agreement on everything except the issue of what to do with the option.

(12/5/07 Trial Tr. at 3426; see id. at 3441 (same)). As the trial record clearly demonstrates, Gore did not preserve an objection to the verdict form as submitted to the jury on the issue of the royalty base. It is disconcerting that Gore would now claim otherwise.

| | | |
|---|---|---|
| 1 | | that were sold here in the U.S. for which there was no exact and direct Bard |
| 2 | | counterpart? |
| 3 | A. | I don't know. |
| 4 | Q. | Okay. And the truth is the jury might have treated [the royalty base of] those |
| 5 | | products differently, correct? |
| 6 | | Objection; calling for speculation. |
| 7 | A: | I don't know. |

(7/14/09 Teece Tr. at 83). When asked how the jury calculated the $83.5 million royalty number, Gore's economist conceded the obvious: "I obviously wasn't in the jury room . . . I just simply don't know." (Id.) Like Gore's expert, the Court was not in the room with the jury when it came to a decision on the issue of reasonable royalty damages. Accordingly, the Court must unequivocally reject Gore's theory as to why the jury set reasonable royalty damages at approximately $83.5 million.

As to Bard, when pressed at oral argument on the issue of the royalty base, Bard's counsel stated that "the most likely scenario is the jury wrote a wrong number down," and that this miscalculation—whereby the jury utterly failed to properly move a decimal point one place—saved Gore $40 million in damages. (Dkt.#1026 at 28). As the Court must note, Bard's theory of mathematical error is farfetched. There is no credible evidence to support Bard's claim that the jury intended to award a 10% royalty on $1.276 billion, miscalculated, and somehow arrived at approximately $83.5 million.[2]

While the jury's precise methodology will never be known, the end result of its calculation is clear. As the Parties are aware and as this Court has previously stated, supplemental damages must be "calculated consistent with the damages awarded in the jury

---

[2]At oral argument, the Court proffered its own theory as to how the jury arrived at approximately $83.5 million in reasonable royalty damages. The Court suggested that the jury took Bard's proffered royalty base of $1.276 billion and Gore's proffered royalty base of $516 million and selected the approximate half-way point between the Parties' two figures. (See Dkt.#1026 at 30-33). In this Court's experience, civil juries tend to compromise on damages issues by splitting suggested dollar amounts down the middle.

- 8 -

verdict." (Dkt.#942 at 5, citing Tivo, Inc. v. Echostar Comm'ns Corp., 2006 U.S. Dist. LEXIS 64291, at *7 (E.D. Tex. Aug. 17, 2006).). Although Bard argues for the Court to award reasonable royalty supplemental damages at 10% of Gore's verified sales figures on its infringing products subject to a reasonable royalty for the supplemental period, such an award would not comport with the jury verdict. It is a mathematical fact that the jury did not award reasonable royalty damages at 10% of a $1.276 billion. (See Leonard 11/15/07 Trial Tr. 1341:1-5; 1348: 12-22). Had the jury simply multiplied a 10% royalty rate against the net sales for Gore's infringing products that are subject to the reasonable royalty theory, the jury would have presumably returned a verdict in the amount of $127.6 million on reasonable royalty damages—or 10% of $1.276 billion. Instead, the jury provided Bard with reasonable royalty damages totaling $83,508,292.20. (See Dkt.#771 at 23). As the Court previously indicated, the Parties stipulated to the verdict form, which did not include a special interrogatory as to the royalty base. This left the Parties and the Court with nothing more than pure speculation as to how the jury arrived at $83.5 million in reasonable royalty damages, in light of a royalty rate of 10%. It would therefore be improper for the Court to calculate Bard's reasonable royalty damages for the supplemental period by taking $982,284,609—what amounts to Gore's verified sales figures for the supplemental period on its products subject to a reasonable royalty—and multiplying that number by 10% to arrive at approximately $98.2 million, when relevant case law instructs the Court to calculate supplemental damages "consistent with the damages awarded in the jury verdict." (Dkt.#942 at 5, citing Tivo, Inc., 2006 U.S. Dist. LEXIS 64291, at *7.).

The Court must similarly reject Gore's theory that the jury credited its trial argument on the royalty base, as the jury verdict does not support such an inference. Again, Gore argued at trial for the jury to set the royalty base at approximately $516 million. See Teece 11/29/07 Trial Tr. 2464:25-2466:18; 2471:12-2475:14). Yet, the jury verdict in no sense corresponds to Gore's $516 million royalty base, and the jury verdict does not otherwise contain any factual findings that would permit the Court to conclude that the jury adopted Gore's arguments concerning the royalty base calculation and its non-infringing components.

At the same time, the Court must acknowledge that Gore's mathematical formula for calculating reasonable royalty damages accrued during the supplemental period provides a framework for the Court to calculate reasonable royalty supplemental damages in a manner that is most consistent with the jury's verdict. Gore's calculation requires the Court to apply a 10% royalty rate to a royalty base that is 65.4% of Gore's verified sales figures on its infringing products subject to a reasonable royalty for the supplemental time period. As Gore has noted, such a calculation most closely parallels the jury's verdict of approximately $83.5 million in reasonable royalty damages, in light of a 10% royalty rate and $1.276 billion in net sales for the relevant infringing products. In order to remain consistent with the jury verdict, the Court has therefore determined that reasonable royalty damages for the supplemental period should be calculated by applying the jury's royalty rate of 10% applied to a royalty base of 65.4% of Gore's $982,284,609 in supplemental sales to arrive at damages totaling $64,440,740.

As such, the Court will award supplemental reasonable royalty damages in the amount of $64,440,740, which was the figure submitted by Gore. (See Dkt.#985 Exhibit A).

**Accordingly,**

**IT IS HEREBY ORDERED** awarding Plaintiffs Bard Peripheral Vascular, Inc. and David Goldfarb, M.D. supplemental damages on lost profits in the amount of $44,556,381.24.

**IT IS FURTHER ORDERED** awarding Plaintiffs Bard Peripheral Vascular, Inc. and David Goldfarb, M.D. supplemental damages on reasonable royalty damages in the amount of $64,440,740.

**IT IS FURTHER ORDERED** denying Bard's request that the Court enhance supplemental damages pursuant to 35 U.S.C. § 284. In light of the previous enhancement, which doubled Bard's damages from $185,589,871.02 to $371,179,742.04, the totality of the circumstances do not warrant an additional enhancement. Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996) (noting that the issue of a statutory enhancement is left to the sound discretion of the district court). The Court finds that its previous enhancement

sufficiently punished Gore for its egregious conduct and likely deterred Gore from engaging in similar conduct. See Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992) ("The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances."). The Court finds that another enhancement at this stage of the litigation would be overly punitive and would serve no discernable purpose other than to drive up Bard's already substantial damages award.

**IT IS FURTHER ORDERED** denying Bard's request that the Court reconsider its prejudgment interest Order, which the Court set at a 10% simple interest rate pursuant to A.R.S. § 44-1201. (Dkt.#942 at 4). While Bard correctly notes that A.R.S. § 44-1201 provides for a prejudgment interest rate of "ten per cent per annum" and that the Court's prejudgment interest Order did not account for a "per annum" calculation, the Court notes that it only intended to provide Bard with a one time simple 10% interest rate on its verdict damages and attorneys' fees.

**IT IS FURTHER ORDERED** denying Bard's request that the Court reconsider its discretionary Order denying prejudgment interest on an award of supplemental damages. See Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006) ("The granting of a motion for reconsideration is an extraordinary remedy which should be used sparingly.") (internal quotations omitted).

DATED this 9th day of July, 2010.

_____
Mary H. Murguia
United States District Judge

cc: all counsel