1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Bard Peripheral Vascular, Inc., and David)    No. CV-03-597-PHX-MHM
    Goldfarb, M.D.,                          )
10                                           )    **REDACTED ORDER**
                    Plaintiffs,              )
11                                           )
    vs.                                      )
12                                           )
    W.L. Gore & Associates, Inc.,            )
13                                           )
                    Defendant.               )
14  _____ )
                                             )
15  W.L. Gore & Associates, Inc.,            )
                                             )
16                  Counterclaimant,         )
                                             )
17  vs.                                      )
                                             )
18  Bard Peripheral Vascular, Inc.,          )
    David Goldfarb, M.D., and C.R. Bard,     )
19  Inc.,                                    )
                                             )
20                  Counterdefendants.       )
                                             )
21  _____ )

22

23          This is the final substantive Order in what has been the most complicated case this

24   Court has presided over.  Currently pending is the issue of Bard Peripheral Vascular, Inc.,

25   and David Goldfarb, M.D.'s (collectively referred to as "Bard") compulsory license from

26   W.L. Gore & Associates, Inc. ("Gore") pursuant to this Court's March 31, 2009 Order.

27   (Dkt.#954.)  After reviewing the Parties' joint submission and conducting oral argument, the

28   Court issues the following Order.

1    The essential right granted to patentees is the "right to exclude others from making,

2  using, or selling the invention throughout the United States." Eli Lilly & Co. v. Medtronic,

3  Inc., 496 U.S. 661, 669 (1990) (quoting 35 U.S.C. § 154). That exclusive right is set out in

4  the U.S. Constitution:

5         Congress shall have the power to … promote the progress of science and
          useful arts, by securing for limited times to authors and inventors the exclusive
6         right to their respective writings and discoveries.

7  U.S. Const. Art. I, § 81, and codified in statute by Congress:

8         Every patent shall contain … a grant to the patentee, his heirs or assigns, of the
          right to exclude others from making, using, offering for sale, or selling the
9         invention throughout the United States … .

10  35 U.S.C. § 154 (a)(1). For that reason, "courts have granted injunctive relief upon a finding

11  of infringement in the vast majority of patent cases." (Doc. No. 942 at 8) (quoting Fresenius

12  Med. Care Holdings, Inc. v. Baxter Int'l, Inc., 2008 WL 928496, at *3 (N.D. Cal. 2008)

13  (quoting eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 338, 395 (2006) (Roberts, C.J.,

14  concurring)).)

15    Since 1974, Dr. Goldfarb has pursued the exclusive right to his discovery and Gore

16  has exhausted every mechanism to frustrate Dr. Goldfarb's ability to use and enjoy that right.

17  Gore ignored the PTO's and Federal Circuit's repeated decisions that "found Dr. Goldfarb

18  to be the rightful inventor and patent holder." (Dkt.# 941 at 6). Gore took Dr. Goldfarb's

19  invention as its own and for 35 years manufactured and sold billions of dollars of infringing

20  goods, thereby establishing itself as a leader in the very markets in which Dr. Goldfarb and

21  Bard were entitled to exclusivity. Gore has done Dr. Goldfarb and Bard great harm by

22  co-opting market share,  boxing Bard out of new markets, and following Bard into other

23  markets—all based on wilful patent infringement.

24    Prior to eBay v. MercExchange, L.L.C., 547 U.S. 388 (2006), a finding of

25  infringement would have mandated entry of an injunction against Gore. (Dkt.#942 at 8). An

26  injunction, of course, perfectly effectuates the patentee's "right to exclude others from

27  making, using, offering for sale, or selling the invention throughout the United States . . . ."

28  35 U.S.C. § 154(a)(1). While the Court previously recognized "that '[i]ntellectual property

1  enjoys its highest value when asserted against a direct competitor in the plaintiff's market,'"

2  (Dkt.# 942 at 13), the Court determined that the public interest "precludes it from imposing

3  a permanent injunction" against Gore. (Id. at 14).  Having decided that Bard's constitutional

4  and statutory right to exclude its fiercest competitor from the marketplace for 17 years must

5  give way to the public interest, the Court must now "adequately compensate" Bard for that

6  loss.  Paice LLC v. Toyota Motor Corp., 609 F. Supp. 2d 620, 628 (E.D. Tex. 2009) ("[T]he

7  law must ensure that an adjudged infringer who voluntarily chooses to continue his infringing

8  behavior must adequately compensate the patent holder for using the patent holder's

9  property. Anything less would be manifestly unjust and violate the spirit, if not the letter, of

10 the U.S. Constitution and the Patent Act.").

11      It has been repeatedly stated that there is a strong public interest in protecting

12 inventors' rights and the patent system as a whole.  See, e.g., Sanofi-Synthelabo v. Apotex,

13 Inc., 470 F.3d 1368, 1383 (Fed. Cir. 2006).  While the public has an interest in allowing

14 Gore's continuing infringement, there is nonetheless an equally strong countervailing interest

15 in ensuring that Bard is justly compensated for loss of the right of exclusivity. At the same

16 time, the public interest is not served by allowing a wilful infringer to continue to secure

17 windfall profits based on its infringement.

18      The Court has determined "that a compulsory license is the appropriate manner in

19 which the Plaintiffs may be compensated for Gore's future infringement," (Dkt.# 942 at 15),

20 and that the compulsory license will run "from April 1, 2009 through August 20, 2019."

21 (Dkt.# 955 at 2.)  The principal issue to be decided is the royalty rate that will adequately

22 compensate Bard for involuntarily surrendering its right to stop Gore from willfully

23 infringing the Goldfarb patent for the next decade plus. As the Court acknowledged with

24 regard to Plaintiffs' request for an injunction, "this is a difficult and relatively novel issue,

25 in light of the eBay decision." (Dkt.# 941 at 12.)  Few courts have addressed how to

26 compensate a patentee for continued willful infringement since the eBay decision.

27      The Parties agree that the terms of the compulsory license should be set based on the

28 Parties' legal positions and the economic conditions as they are found on April 1, 2009, the

day after the Court's order denying Bard's request for a permanent injunction and the first day of the agreed on term of the compulsory license. (Dkt.# 955 at 2.) Bard contends that the royalty rate applicable on April 1, 2009 is at a minimum 35% for Gore's surgical graft products and at a minimum 20% for Gore's stent-graft products. Gore contends that the appropriate royalty rate on all of its infringing products should be set at 5.25%.

**A.     The Monetary Terms Compulsory License Request**

> **1.     Bard's Argument in Favor of 35% Rate for Gore's Surgical Graft Products and a 20% for Gore's Stent-Graft Products**

Bard contends that the post-judgment royalty calculus should be "markedly different" from the 10% royalty rate fixed by the jury because the Parties' legal status has changed after the jury verdict, as the patent was found valid and the potential licensee adjudicated a willful infringer. Amado v. Microsoft Corp., 517 F.3d 1353, 1362 (Fed. Cir. 2008). "There is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." Id. at 1361. "Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty." Id. at 1362. "Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic factors are involved." Id. (citing Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1315 (Fed. Cir. 2007)). In considering past damages, the jury was instructed on and relied upon the Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970) factors to fix a reasonable royalty rate of 10% as to Gore's non-counterpart products, for which Bard was awarded reasonable royalty damages. (Dkt.#769 at 33-36; Dkt.#771 at 23). Bard believes that in light of the Parties' changed legal status and the different economic factors, a strict application of the Georgia-Pacific factors does not necessarily apply to the post-verdict calculation of an ongoing royalty imposed in lieu of a permanent injunction. See Amado, 517 F.3d at 1362 ("If the Court applies the Georgia-Pacific factors, it runs the risk of skewing the analysis towards a pre-judgment framework.")

1    For this reason, Bard states that courts determining an on-going post-verdict

2 compulsory licensing rate have frequently departed from a traditional <u>Georgia-Pacific</u>

3 analysis. Although these courts have continued to use the "hypothetical negotiation"

4 framework, their approach has been mostly focused on the parties' post-judgment legal

5 positions and the economic factors relevant to the post-verdict conditions. <u>See, e.g.</u>, <u>Paice</u>

6 <u>LLC</u>, 609 F. Supp. 2d at 624 ("A post-judgment, ongoing royalty negotiation, however, is

7 logically different from the pre-trial hypothetical negotiation discussed in <u>Georgia-Pacific</u>.

8 . . . It is under this modified <u>Georgia-Pacific</u> framework that the Court proceeds."). As such,

9 Bard asks that the Court apply what has been referred to as a "modified <u>Georgia-Pacific</u>"

10 analysis, which would take into account (1) the parties' "changed legal status" and (2) the

11 "different economic factors [that] are involved." <u>Amado</u>,517 F.3d at 1362.

12    Assuming that this Court applies a modified <u>Georgia-Pacific</u> framework, Bard argues

13 that the legal relationship between the Parties has been unquestionably altered: Gore was

14 adjudicated a willful infringer on each asserted claim of the Goldfarb patent, and the

15 Goldfarb patent was found valid and enforceable. Bard argues that the "jury finding of

16 liability in this case would have strengthened [Bard's] bargaining position had the parties

17 negotiated a license after the jury verdict." <u>Boston Scientific Corp. v. Johnson & Johnson</u>,

18 2009 WL 975424, at *5 (N.D. Cal. Apr. 9, 2009).  In addition, Bard points out that the Court

19 found the case exceptional and awarded attorneys' fees. (Dkt.# 941 at 21-22).  Gore was

20 found liable, both in the period preceding issuance of the Goldfarb patent as well as during

21 the litigation and trial.  (<u>Id.</u> at 4-6; 11-14; and 17). The Court determined Gore's conduct was

22 sufficiently culpable to enhance damages. (<u>Id.</u> at 23).  Bard also notes that in any future

23 negotiation, specifically, one that would take place on or after April 1, 2009, the Parties

24 would also evaluate the alternatives to a compulsory license, namely that Bard could sue

25 again and Gore would once again be liable for willful infringement, treble damages and

26 attorneys' fees.  <u>Paice LLC</u>, 609 F. Supp. 2d at 626.

27    Turning to the additional relevant economic factors, Bard argues that they too support

28 a royalty rate substantially higher than 10% for Gore's surgical graft products and stent-graft

1    products. Bard first notes that the fact that Gore competes directly with Bard "supports a

2    higher rate because a patent owner is more likely to extract a greater royalty from a direct

3    competitor in order to account for lost sales and profits." Boston Scientific Corp., 2009 WL

4    975424, at *7.  As the Court previously noted, "it is undisputed that the Parties are direct

5    competitors in the same market at least for some of the infringing products (such as those

6    products for which Plaintiffs were awarded lost profits)." (Dkt.# 941 at 19).  Bard claims that

7    the competitive posture of the companies has only increased over time, and that Gore

8    continues to launch new surgical graft products to compete with Bard's surgical grafts.  For

9    example, in late-2006 Gore launched its infringing PROPATEN® grafts.  Bard also states

10   that failing to compensate it on the surgical graft products at the level of Bard's true lost

11   profits would lead to adverse public policy consequences and perverse incentives that would

12   encourage patent infringement and resulting litigation. For example, if a patentee is awarded

13   lost profits by a jury but is compensated at a lower level for any future infringement,

14   plaintiffs may stop seeking compulsory licenses as the alternative to a denied injunction,

15   preferring to bring new infringement suits every six years to recover their lost profits. See

16   Hynix Semiconductor, Inc. v. Rambus, Inc, 2009 WL 440473, at *6 (N.D. Cal. Feb. 23,

17   2009) ("the patentee could file another complaint alleging infringement occurring after the

18   time period tried in the first case, but requiring such additional litigation would be inefficient

19   and unhelpful, serving only to delay the patentee's right to recover").

20          Bard next argues that Gore's high profitability on its infringing products also justifies

21   a royalty rate significantly higher than 10%.  As the Court previously noted, "Defendant has

22   sold billions of dollars of ePTFE grafts embodying Dr. Goldfarb's invention, and have reaped

23   substantial profits as a result." (Dkt.# 941 at 14-15; Dkt.# 940 at 16.)  Bard alleges that "but

24   for" Dr. Goldfarb's patented invention, Gore never would have had the success the Court

25   acknowledged, and that the vast majority of the product line made and sold by Gore's

26   medical division for the past 30 years is derived directly from Dr. Goldfarb's invention. Bard

27   claims that despite a 35% license rate for Gore's surgical graft products and a 20% rate for

28   Gore's stent-graft products, Gore would still be capable of making a reasonable profit on its

1   products (Dr. Leonard declared that the profit margin on Gore's surgical graft products is

2   somewhere between ███ and ███ and the profit margin on Gore's stent-graft products is

3   somewhere between ███ and ███.)  In any event, Bard notes that the sole public purpose

4   of the compulsory license is to reward innovation by fully compensating Bard—and the

5   public interest in not served by Gore continuing to profit from its infringement. <u>Monsanto</u>

6   <u>Co. v. Ralph</u>, 382 F.3d 1374, 1384 (Fed. Cir. 2004) ("the law does not require that an

7   infringer be permitted to make a profit") (citation omitted); (<u>see</u> Dkt.# 940 at 19) ("What an

8   infringer would prefer to pay is not the test for damages.") (citation omitted).).

9        The final economic factor, which Bard argues supports a royalty rate substantially

10  higher than 10%, is that Gore has not taken any remedial actions since the jury verdict while

11  it has continued to release different iterations of products relying on the Goldfarb patent.

12  <u>Paice LLC</u>, 609 F. Supp. 2d at 629 ("the fact that Toyota has introduced new hybrid models

13  employing the same, or very similar technology, is evidence of the extent to which Toyota

14  has made use of Paice's invention").  Indeed, Bard notes that all of Gore's infringing stent-

15  graft products were introduced to the vascular market after the Goldfarb patent issued.

16  (Leonard Decl. at ¶ 8.)  Bard notes that Gore sales of its existing stent-grafts are increasing:

17  EXCLUDER® and TAG® worldwide sales grew at an average of ███ from the third quarter

18  of 2007 to the first quarter of 2009 and VIABAHN® sales increased by ███ during the same

19  period. (Leonard Decl. at ¶ 18.)  Furthermore, Bard points to the fact that Gore has continued

20  releasing additional infringing stent-graft indications. Since the period of time covered by

21  the trial record, Gore has launched or has been approved to launch at least two new stent-

22  grafts. (9/5/07 Gore Press Release on VIABAHN® with heparin (Ex. C); 3/24/09 Gore Press

23  Release on new EXCLUDER (Ex. D).)  Bard points to this as additional evidence of the

24  extent to which Gore is making use of the Goldfarb patent. <u>Paice LLC</u>, 609 F. Supp. 2d at

25  629.

26        Because the vast scope of Gore's infringement with its stent-grafts and usurpation of

27  the stent-graft market from Bard did not become apparent until after the 2002 hypothetical

28  negotiation considered by the jury, Bard claims that as of April 2009, the Parties would have

been much more certain about the vast success of Gore's stent-graft products and Gore's stent-graft market dominance. Bard alleges that it has had to forgo, and will continue to forgo for years to come, entering entire markets for certain stent-grafts because of Gore's willful infringement: "Bard will never be able to 'catch up' on future product development, much less recapture past lost product development opportunities." (Deford Decl. at ¶¶ 7, 9.) Without Gore unlawfully invading this market, Bard claims that it would have entered, made the sales and achieved the associated profits. Therefore, with respect to stent-grafts, in order to be adequately compensated for the market position Gore is usurping from Bard with its willful infringement, Bard must receive a royalty rate 20% or higher. (Leonard Decl. at ¶ 19.)

### 2. Gore's Argument in Favor of 5.25% Rate on all of its Infringing Products

Gore contends that the factors to be considered by the Court in determining what change, if any, should be made to the jury verdict in setting an ongoing royalty include: (1) changed market conditions, Amado, 517 F.3d at 1362; (2) changed bargaining positions, id.; (3) changed economic circumstances, id., and additional economic factors, Paice, 504 F.3d at 1316; (4) the value of the infringing functionality, Cummins-Allison Corp. v. SBM Co., Ltd., 584 F. Supp. 2d 916 (E.D. Tex. 2008); (5) evidence and arguments found material in denial of the injunction, Amado, 517 F.3d at 1362; and (6) the infringer's likelihood of success on appeal. Id. Gore argues that the willfulness of infringement is not an appropriate factor to be used by the Court.

As such, Gore similarly maintains that the Court should apply a modified Georgia-Pacific analysis to depart from the jury's 10% royalty determination on Gore's stent-graft products. Unlike Bard, Gore asks the Court to depart in a downward direction and decrease the post-verdict compulsory license to under 10% on all of its infringing products. To support its contention that a royalty rate substantially lower than the 10% rate set by the jury, Gore again argues that the effective royalty base (i.e., what portion of the infringer's revenue is attributable to the patent) should be set at 65.44% of Gore's sales price. According to Gore, because Bard's infringement proof was directed to one component (the ePTFE base

1  tube), and because in none of the products found to infringe was this tube the only
2  component—all were combinations of ePTFE base tube with Gore's other non-infringing
3  components, to arrive at the final damages totals, the jury must have rejected Bard's theory
4  of the case and adopted the testimony and findings of Gore's expert, Dr. Teece. Gore states
5  that the issue now before the Court is whether this 65.44% base should be left intact or
6  adjusted because of evidence of changes and new developments. Because of the many
7  changes that have taken place since the time period considered by the jury, Gore contends
8  that the base should be lowered from 65.44% to somewhere between 50% and 55%.

9        In support of its claim that changed circumstances justify a downward departure from
10  Gore's proffered royalty base of 65.44%, Gore makes several claims: (1) the market shift to
11  stent-grafts has diluted the relative value of the Goldfarb patent; (2) changed market
12  conditions and economic circumstances may decrease Gore's future ability to pay royalties;
13  (3) changed bargaining positions related to the denial of a permanent injunction justify a
14  lower rate; (4) Bard's lost profits claim has diminished since trial; and (5) Gore has a strong
15  likelihood of success on appeal.

16        With respect to Gore's argument regarding a market shift to stent-grafts, Gore claims
17  that in the first quarter of 2009, about ▮▮ of its infringing sales were stent-grafts, which
18  marked an increase from less than about ▮▮ when the Goldfarb patent issued in August of
19  2002. Gore claims that its stent-grafts have numerous value added features necessary for the
20  product to work that are not the subject of the Goldfarb patent, such as the metallurgy and
21  design of the stent, the attachment of the stent to the graft, the constraint to keep the
22  stent-graft compressed, the catheter to place the stent-graft in the desired location, the
23  introducer to allow insertion of the catheter and stent-graft without bleeding, the release
24  mechanism to allow the stent to expand when placed in the proper location, and the
25  anchoring mechanism to hold it in place after insertion and release. (Decl. Sininger ¶3, Ex.
26  I; Ex. F, pp. 8-9).  Gore further claims that the addition of heparin to PROPATEN® and
27  VIABAHN® is the primary basis for the increased sales of those products. Gore argues that
28  PROPATEN® is now about ▮▮ of the total peripheral graft market, and that sales of

1  PROPATEN® grafts have increased dramatically in what is otherwise a declining market for

2  surgical vascular grafts, even though they sell at substantially higher prices than Gore's

3  surgical grafts without heparin. Gore claims that the high value attributed by the market to

4  heparin is not due to the claimed features of the Goldfarb patent. As such, Gore claims that

5  the shift in the market and in Gore's product mix to stent-grafts has caused an inflation of the

6  overall amount of the royalty base that is unrelated to the Goldfarb patent, since the much

7  higher price for stent-grafts over surgical vascular grafts is caused by the many non-patented

8  components. Thus, Gore claims that applying a 65.44% royalty base to these increasing sales

9  unrelated to the contribution of the Goldfarb patent would overcompensate Bard.

10        With respect to Gore's argument regarding changed market conditions and economic

11  circumstances, Gore contends that pricing pressures and cost increases may decrease Gore's

12  ability to pay royalties and the rate of a license should leave Gore with a profit sufficient

13  enough so that it may continue to develop new products. First, Gore argues that government

14  and private reimbursement programs have been trending toward "evidence based medicine"

15  and more specific coding (e.g., for patient profile) for reimbursement requiring additional

16  costly clinical trials just to receive reimbursement for products on the market. Gore claims

17  that too high a royalty would impair its ability to keep its existing life-saving products

18  available to a wide range of patients. The specter of increased FDA and other form of

19  government regulation is another factor that Gore claims will increase its future costs. Gore

20  cites to Bard's 2008 Annual Report, which it says also echoes these trends by referring to the

21  "lengthy and costly regulatory approval processes which may result in lost market

22  opportunities." (Ex. J, p. II-16). Next, Gore points to the fact that its products and features

23  that provide "clinically effective and life saving treatments" resulted from a very large

24  investment, about ▮▮▮▮▮▮ for stent-grafts alone. (Ex. I, ¶2; Ex. H, ¶11). To continue

25  developing new technology during the life of the Goldfarb patent, Gore will be required to

26  invest even larger sums of money into research and development. Gore notes that its 38

27  pending patent applications relating to new vascular graft and stent-grafts and endovascular

28  delivery systems underscore this point. Accordingly, Gore claims that for it to stay in

business and continue to innovate, it must be allowed to earn a reasonable profit, and that even a royalty of 10% applied to all of its stent-graft sales would make Gore's return on investment so negative it would not make economic sense to continue to invest in the research and development to create new products.

With respect to the denial of a permanent injunction, Gore contends that this factor also justifies a downward departure from its proffered royalty base of 65.44%, since the Court's denial of an injunction weakens Bard's bargaining position from the original hypothetical negotiation in 2002 by removing the threat of taking Gore's products off the market. In addition, Gore claims that a reduction to the royalty rate is justified because Gore faces a threat of "royalty-stacking" from paying multiple royalties on the same products. In other words, in any one of Gore's grafts or stent-grafts, besides the Goldfarb patent, there may be third-parties who are due a portion of the sales price because these third-parties may hold patents on other aspects of Gore's grafts or stent-grafts. Gore cites to <u>Integra Lifesciences, Ltd. v. Merck</u>, 331 F.3d 860, 872 (Fed. Cir. 2003) along with other cases to support its royalty-stacking theory. <u>See</u> <u>Integra Lifesciences, Ltd.</u>, 331 F.3d at 872 ("stacking royalties may also play a role in crafting the hypothetical license").

With respect to Gore's claim that Bard's lost profits claim has diminished since trial, Gore position is that because Bard does not produce counterpart products to Gore's stent-grafts such as EXCLUDER®, TAG® and VIABAHN®, royalty proceeds are the only way Bard can obtain revenue from stent-graft sales.  In addition, Gore claims that the turn towards small diameter grafts such as PROPATEN®, should also reduce Bard's lost profits claim since, according to Gore, the contribution of the Goldfarb patent to the usefulness of these type of grafts is less central.

### 3. The Court's Analysis of the Monetary Value of Bard's Compulsory License

The Court finds that a "modified <u>Georgia-Pacific</u> framework" is the most appropriate framework for determining the rate of a compulsory license, since the methodology would take into account (1) the parties' "changed legal status" and (2) the "different economic

1    factors [that] are involved." Amado, 517 F.3d at 1362.  As the District of New Jersey noted,

2    "because the parties' bargaining positions change upon a judgment for the patentee, an

3    on-going royalty rate ordered as a remedy . . . should not automatically be the same

4    reasonable royalty rate applied by the jury in determining the damages for past

5    infringement."  Joyal Prods. v. Johnson Elec. North Am., Inc., 2009 U.S. Dist. LEXIS 15531,

6    *38 (D.N.J.  Feb. 27, 2009).

7          As has been previously noted by the Court, there are two categories of products that

8    are at issue in this case: (1) Gore's "surgical graft products," and (2) Gore's "stent-graft

9    products."  Surgical graft products include those products on which Gore and Bard directly

10   compete, including the surgical graft and patch products for which the jury awarded Bard lost

11   profit damages. The Court has sometimes referred to Gore's surgical graft products as its

12   "Counterpart Products." Gore's surgical graft products include the PROPATEN® grafts,

13   INTERING® grafts, cardiovascular patches, and other variations of those grafts and patches.

14   On the other hand, Gore's "stent-graft products" include those products on which Gore and

15   Bard do not presently directly compete, including the four stent-graft products for which the

16   jury awarded Bard reasonable royalty damages: VIABAHN®, EXCLUDER®, TAG®,

17   VIATORR®.  Gore's stent-grafts have been referred to by the Court as Gore's

18   "Non-Counterpart Products."  The market considerations for the surgical graft products and

19   the stent-graft products are different from each other—e.g., the surgical graft market is an

20   older established market, while the stent-graft market has developed more recently.  Also,

21   as found by the jury, the Parties directly compete in the surgical graft market but do not

22   directly compete in the stent-graft market. Accordingly, a free-market license between Bard

23   and Gore would separate the royalty rates on the two sets of products to account for those

24   differences.

25         After weighing the equities and considering the relevant factors under a modified

26   Georgia-Pacific framework, the Court finds that an ongoing royalty rate on both Gore's

27   surgical graft and stent-graft products should be higher than the 10% reasonable royalty rate

28   that was set by the jury for Gore's non-counterpart products.  As Bard has noted, there has

1   been a post-verdict change in the Parties' legal relationship in that Gore is now an adjudged

2   willful infringer, this Court determined this was an exceptional case and then enhanced

3   damages and awarded Bard its reasonable attorneys' fees, and Gore has voluntarily chosen

4   to continue its post-verdict infringement unabated.[1]   At the same time, economic factors,

5   such as Bard and Gore's direct competition, the high profitability of Gore's infringing

6   products,  the fact that Gore faces stiffer losses—which might include a permanent

7   injunction—in the event of a second lawsuit, and that Bard seeks adequate compensation and

8   lacks incentive to accept a below market deal, all point towards an upward departure from

9   the 10% reasonable royalty rate set by the jury.

10          However, a modified Georgia-Pacific framework does not support the Court in

11  providing Bard with a compulsory license rate at 35% for Gore's surgical graft products and

12  20% for Gore's stent-graft products.  Instead, the Court finds that setting the compulsory

13  license rate for Gore's surgical graft products at 20%, and 15% for Gore's stent-graft

14  products will both adequately compensate Bard and permit Gore to receive a reasonable

15  return on the continued production of its infringing products.  The Court additionally finds

16  that equity favors the Court setting a compulsory license rate on Gore's heparin bound stent-

17  graft VIABAHN® at 12.5% and on Gore's heparin bound surgical graft PROPATEN® at

18  15%. The lower royalty rate on these two products enables Gore to remain slightly more

19  profitable on its two most popular products, which, by way of bonding with heparin, Gore

20  has added significant value.  In light of the undisputed evidence presented at trial on the issue

21  of Gore's overall profitability, the Court finds that a compulsory license rate set at 20% on

22

23  _____

24          [1]Although the Court denied Bard's motion for a permanent injunction, no part of that
    Order should be understood as sanctioning Gore's continued wilful infringement. Instead,
25  the Court's denial of a permanent injunction was focused on the potential health
    consequences that a dramatic decrease in the availability of Gore's lifesaving products might
26  portend for the general population and the doctors who rely on them. It bears mentioning that
    the denial of Bard's request for a permanent injunction was not akin to the Court providing
27  Gore's wilful infringement with a safe harbor, and Gore should have remained on notice that
28  it was using Dr. Goldfarb's invention at its own peril.

1    surgical grafts, 15% on stent-grafts, 12.5% on the VIABAHN® stent-graft, and 15% on the

2    PROPATEN® surgical graft, should likely allow Gore to continue to make a reasonable,

3    albeit reduced, profit on the products it sells utilizing Dr. Goldfarb's invention, and that such

4    an outcome would be a fair result of a renewed hypothetical negotiation.  See Paice, 609 F.

5    Supp. 2d at 63.

6    **B.      The Non-Monetary Terms of Bard's Compulsory License Request**

7            The Parties have conferred in good faith to compose a form of order that addresses

8    most of the non-monetary terms of the Court's Compulsory License Order. There are,

9    however, several areas of disagreement with respect to the non-monetary components of the

10   Court's Order.

11           The first issue deals with the range of Gore's products that the compulsory license will

12   cover. Gore requests that the compulsory license cover "new vascular indications for the very

13   Gore vascular products that have been held to infringe." According to Gore, a new indication

14   occurs when the same product that the jury held to infringe is approved by the FDA for use

15   for a different medical condition. Bard disagrees and asks that the Court not permit Gore to

16   seek new indications for its infringing products. The next non-monetary issue deals with the

17   issue of escrow.  While both sides agree that Bard is only entitled to the compulsory license

18   fees after there is a final and non-appealable judgment, Gore requests language stating that

19   if another court (not limited to the United States Court of Appeals for the Federal Circuit)

20   finds the Goldfarb patent invalid or unenforceable, Gore's royalty payments should be held

21   in escrow until the appeal is decided, with the payments returned to Gore should invalidity

22   or unenforceability be affirmed on appeal. Bard disagrees with the language insofar as it

23   relates to collateral actions in other courts. Another non-monetary issue deals with interest

24   payments to Bard, should Gore underpay its obligations by a significant amount.  Both

25   Parties agree that some form of interest is appropriate. Bard requests that the Court apply a

26   10% per annum simple interest rate, which the Court previously used in another context,

27   while Gore believes that the prime rate of interest is the most appropriate interest on delayed

28   payments. The final non-monetary issue concerns the definition of the phrase "net sales

1   price." Bard has asked the Court to take great care in crafting its definition, so as to avoid a

2   situation where Gore might be able to shift revenue from royalty bearing products into

3   non-royalty bearing products or services in a manner that would evade this Court's intent

4   (e.g., by selling a $1,000 stent-graft for $10 and charging $990 for associated "services").

5          With respect to the range of products that the compulsory license will cover, the Court

6   agrees with Gore, and finds the compulsory license should also cover new vascular

7   indications for the products that have been found by the jury to infringe upon the Goldfarb

8   patent. The Court does not accept the logic in restricting patients' access to Gore's products

9   for additional medical conditions approved by the FDA, as such a decision would be

10  antithetical to the strong public interest in permitting access to lifesaving medical devices,

11  irrespective of whether a device is currently approved for a specific indication.  As to the

12  escrow issue, should another court determine the Goldfarb patent invalid or unenforceable

13  in a collateral action, the Court finds that there is no reason for Gore's payments to be held

14  in an escrow account pending the appellate resolution of the collateral litigation. As the

15  Parties are aware, lawsuits concerning the infringement, and by extension, the validity, of a

16  patent, take many years before a court of last resort is well-positioned to issue a final and

17  non-appealable judgment.  As such, the Court considers it unfair for Bard's royalty payments

18  to be withheld during the pendency of  prolonged collateral litigation.  As to the interest rate,

19  the Court finds that it is more appropriate for Gore to pay the prime rate of interest on its

20  delayed payments that have been revealed by audit, than the 10% rate requested by Bard.

21  The Court finds that Bard's requested rate of 10% does not reflect current market conditions

22  for short term borrowing.  Finally, with respect to the definition of the phrase "net sales

23  price," the Court finds that using Bard's proffered definition will decrease the potential for

24  Gore to create sham transactions that seek to avoid paying accurate royalties for the total

25  sales of Gore's infringing products.

26          **Accordingly,**

27          **IT IS HEREBY ORDERED** granting a compulsory license to Bard Peripheral

28  Vascular, Inc., and David Goldfarb, M.D. in the form of 20% on surgical grafts, 15% on

stent-grafts, 12.5% on the VIABAHN® stent-graft, and 15% on the PROPATEN® surgical graft against W.L. Gore & Associates, Inc.

**WHEREAS**, this Court has denied Plaintiff Bard Peripheral Vascular, Inc.'s motion for a permanent injunction prohibiting prospective infringement by W. L. Gore & Associates, Inc. ("Gore") of U.S. Patent No. 6,436,135 (the "'135 patent");

**IT IS FURTHER ORDERED** that Gore be permitted to practice, and Bard Peripheral Vascular, Inc. ("Bard"), a subsidiary of C. R. Bard, Inc., be compelled to permit Gore to practice, the '135 patent subject to the following terms:

1. **TERM**: Gore's obligation to pay a royalty associated with this ORDER is effective as of April 1, 2009, and expires upon the expiration of the '135 patent, on August 20, 2019, unless earlier terminated as provided herein.

2. **TERMINATION**:

   **(a)** The provisions of this ORDER permitting Gore to practice the '135 patent shall terminate if Gore violates this ORDER, including without limitation if Gore violates its obligation to timely pay royalties, and fails to cure any such breach within thirty (30) days after receipt of written notice thereof from Bard or the Court. Upon any such termination, Gore shall no longer be permitted to practice the '135 patent.

   **(b)** Should all the asserted claims (20-27) of the '135 patent be held invalid, not infringed, and/or unenforceable in a final and non-appealable judgment in this case, then this ORDER shall be void and all payments made by Gore hereunder and escrowed, plus interest accrued thereon, shall be returned to Gore.

   **(c)** If there is a final and non-appealable judgment in another case that all the asserted claims (20-27) of the '135 patent are held invalid or unenforceable, then the Parties' obligations under this ORDER will immediately terminate.

**3.**     **SCOPE OF ORDER**: This ORDER permitting Gore to practice the '135 patent under the terms specified herein is: (i) non-transferable and does not inure to the benefit of any Gore joint venturers, affiliates, successors, or any other legal person beyond Gore; (ii) non-exclusive to Gore in so much as the ORDER does not limit in any way whatsoever Bard's ability to license, sublicense or assign any or all of its rights in the '135 patent, including rights granted under this ORDER; and (iii) limited to permitting Gore to make, use, sell and/or import the following products in the United States:

**(a)**     Standard Grafts (Standard Walled Ringed; Standard Walled Removable Ringed; Thin Walled Ringed; Thin Walled Removable Ringed; Standard Walled; Thin Walled);

**(b)**     Stretch Grafts (Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch);

**(c)**     PROPATEN® Grafts;

**(d)**     INTERING® Grafts;

**(e)**     INTERING® Stretch Grafts;

**(f)**     ACUSEAL® Patch;

**(g)**     Cardiovascular Patchs;

**(h)**     VIABAHN® Stent-Grafts;

**(i)**     EXCLUDER® Stent-Grafts;

**(j)**     TAG® Stent-Grafts;

**(k)**     VIATORR® Stent-Grafts;

**(l)**     Gore products not more than colorably different from those on the market as of December 11, 2007, and falling within any of 3(a) through

3(k) hereof.

**(m)** Gore products falling within any of 3(a) through 3(l) that are approved by the FDA for new vascular indications.

This ORDER shall not confer any right to Gore to enforce the '135 patent nor any right to seek to have Bard enforce the '135 patent. All rights to prosecute, maintain, enforce, license, sublicense or assign the '135 patent are reserved solely and exclusively to Bard.

**4.    ROYALTY PAYMENT**

**(a)** SURGICAL GRAFT PRODUCTS: "Surgical Graft Products" are those products identified in 3(a), (b), (d), (e), (f), (g) and (l), to the extent applicable. The royalty rate on such products is 20% of Gore's net selling price from Gore's sale of Surgical Graft Products.

**(b)** STENT GRAFT PRODUCTS: "Stent Graft Products" are those products identified in 3(i),(j),(k) and (l), to the extent applicable. The royalty rate on such products is 15% of Gore's net selling price from Gore's sale of Stent Graft Products.

**(c)** PROPATEN® Grafts: "PROPATEN® Grafts" are those products identified in 3(c), and (l), to the extent applicable.  The royalty rate on such products is 15% of Gore's net selling price from Gore's sale of PROPATEN® Grafts.

**(d)** VIABAHN® Stent-Grafts: "VIABAHN® Stent-Grafts" are those products identified in 3(h), and (l), to the extent applicable. The royalty rate on such products is 12.5% of Gore's net selling price from Gore's sale of VIABAHN® Stent-Grafts.

**(e)** Gore shall have no obligation to pay any royalties for products identified in Section 3 covered by 35 U.S.C § 271(e)(1).

**(f)** As used herein, "net selling price" shall be the invoiced selling price (or imputed price, based on the average net selling price for the applicable products for the preceding two fiscal quarters, if non-monetary

consideration is provided or services are bundled with such sales) of a product identified in Section 3 sold by or on behalf of Gore to a third party in an arms-length transaction less the following deductions to the extent recognized in accordance with applicable generally accepted accounting principles consistently applied to all Gore products and services: excise and sales taxes, quantity and cash discounts granted and taken by customers and not already reflected in the invoiced selling price, freight and handling charges to the extent included in the invoiced selling price, and allowances for returns due to warranty claims.

6. **PAYMENT TIMING**: Payments by Gore to Bard shall be wired in same day funds quarterly no later than the 30th day following the close of the calendar quarter. For clarity, payment for the first quarter shall be made within 30 days after March 31, payment for the second quarter shall be made within 30 days after June 30, payment for the third quarter shall be made within 30 days after September 30, and payment for the fourth quarter shall be made within 30 days after December 31. Payment for any quarters ending before the entry date of this Order shall be made within 30 days of the entry of this Order. Thereafter, payments shall be made within 30 days of the end of the subsequent quarters.

7. **ESCROW:** Payments made under this ORDER shall be escrowed with this Court until there is a final and non-appealable judgment in this case.

8. **AUDIT RIGHTS**

(a) Gore is ORDERED to keep complete, true and accurate books of account and records, including but not limited to, unit sales, dollar sales and average selling price for infringing products, for the purpose of determining the royalty amounts payable. Gore shall certify its compliance with the ORDER annually 60 days after the close of its financial year and ensure that the quarterly payments for the preceding

financial year are in accordance with the ORDER. Such certification shall be accompanied with any underpayments for the preceding four quarters. If Gore's certification process reveals an underpayment in excess of five percent (5%) of the amount owed, Gore is ORDERED to pay interest on the unpaid royalties at the prime interest rate calculated quarterly, at the same time. An underpayment discovered pursuant to this section will not terminate this ORDER pursuant to Section 2 unless Gore fails to pay the underpayment within 60 days of the end of its financial year.

**(b)** Bard shall have the right, upon reasonable notice and at its expense, to direct an independent certified accounting firm to inspect and audit the relevant accounting and sales books and records, including but not limited to, the unit sales, dollar revenue and average selling price for each infringing product. The audit may be made once per year and may cover any period within the previous four completed fiscal years prior to the audit, provided that such period has not been previously audited. The determination of the independent certified accounting firm shall be final. In the event an audit reveals an underpayment, Gore shall remit payment of such amount to Bard within thirty (30) days of receiving written notice of such underpayment from the independent certified accounting firm. In addition, if any such audit reveals an underpayment in excess of five percent (5%) of the amount owed for the period audited, Gore is ORDERED to pay the reasonable fees and expenses actually incurred relating to the audit as well as interest on the unpaid royalties at the prime interest rate calculated quarterly, which Gore is ORDERED to pay to Bard within thirty (30) days of notice from Bard to Gore. An underpayment discovered pursuant to this Section 8(b) will not terminate this ORDER pursuant to Section 2 unless Gore fails to

pay the underpayment within thirty (30) days of notice.

If the audit discloses an overpayment, Bard is ORDERED to credit Gore the overpayment amount for future payments. If the overpayment exceeds the royalty amount owed by Gore at the expiration of this ORDER, Bard is ORDERED to refund Gore the amount of overpayment in excess of Gore's owed royalties within thirty (30) days.

9. **MARKING**: Gore shall mark all products covered by this ORDER in accordance with 35 U.S.C. § 287.

10. **NOTICE OF NEW PRODUCTS**: Gore shall provide Bard notice no less than 180 days before the first anticipated commercial sale of any new vascular product utilizing ePTFE that it contends constitutes to be a Gore product covered by Section 3(l) or Section 3(m) of this ORDER.

11. **DISPUTE RESOLUTION**: Bard and Gore shall meet and confer in good faith in an attempt to resolve all disputes that may arise under the ORDER. The Court specifically retains jurisdiction to enforce, modify, or terminate this ORDER as the equities may require, and to adopt procedures for resolution of any dispute under the ORDER.

12. **FORM OF NOTICES**: All notices of any asserted breach or any other asserted dispute under this compulsory license shall be in writing and shall be deemed given when sent by (a) prepaid, registered or certified mail, addressed to the party at the below address, or (b) by private courier service signature for delivery required, addressed to the party at the address below. Each party may change such address from time to time by notice so given.

To Bard: C.R. Bard, Inc.

730 Central Avenue

Murray Hill, NJ USA

Attn: General Counsel

(800) 367-2273

To Gore: W. L. Gore & Associates, Inc.

1          551 Paper Mill Road

2          Newark, Delaware 19711

3          Attn: General Counsel

4     DATED this 8th day of September, 2010.

5

6

7     _____

8          Mary H. Murguia
          United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28