Juanita Brooks (*pro hac vice*)
Roger A. Denning, No. 18315
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099
brooks@fr.com
denning@fr.com

Michael E. Florey (*pro hac vice*)
FISH & RICHARDSON P.C.
60 South Sixth Street, Suite 3200
Minneapolis, Minnesota 55402
Telephone; (612) 335-5070
Facsimile: (612) 288-9696
florey@fr.com

Helen Perry Grimwood, No. 006355
N. Douglas Grimwood, No. 003414
The Grimwood Law Firm plc
714 East Rose Lane, Suite 100
Phoenix, Arizona 85014-1960
(602) 265-4995
(602) 230-2878 (facsimile)
ndg@grimwoodlaw.com
hpg@grimwoodlaw.com

Attorneys for Defendant W. L. Gore & Associates, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bard Peripheral Vascular, Inc. and David Goldfarb, M.D.,<br><br>    Plaintiffs,<br><br>v.<br><br>W. L. Gore & Associates, Inc.,<br><br>    Defendant. | Cause No.  CIV 03-0597 PHX MHM<br><br>**DEFENDANT'S MOTION FOR A NEW TRIAL OR IN THE ALTERNATIVE TO AMEND THE JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>**(ORAL ARGUMENT REQUESTED)** |

1    Defendant W.L. Gore & Associates, Inc. respectfully moves for a new trial, or in

2  the alternative to amend the judgment, and submits the following supporting

3  Memorandum.  This Motion and Memorandum are submitted on the assumption that the

4  Court has granted (or will grant) JMOL in favor of Gore and against Bard on the issue of

5  willful infringement under the new standard announced by the Federal Circuit in *Bard*

6  *Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003 (Fed. Cir.

7  2012)("*Bard II*").

8                    **MEMORANDUM OF POINTS AND AUTHORITIES**

9    The Court has now ruled that, as a matter of law, Gore did not willfully infringe

10 Bard's '135 patent.  Under the correct legal standard, the jury should not have heard any

11 evidence or argument relating to willfulness.  Because the Court did not have the benefit

12 of the ruling in *Bard II*, the entire trial was permeated by Bard's relentless efforts to cast

13 Gore as a reckless, willful infringer.  And Bard's efforts succeeded.  The jury rejected all

14 of Gore's defenses, and found that Gore had willfully infringed the '135 patent.  This

15 error was in no way harmless – Bard's improper willfulness evidence and argument

16 tainted the entire trial, and no doubt influenced the jury's verdict as to the liability and

17 damages issues.  Gore is entitled to a new trial free of any suggestion that Gore was a

18 reckless, bad or willful actor.  Gore is cognizant of the substantial resources already

19 expended by the Court and the parties in this case.  Accordingly, for the sake of judicial

20 economy, Gore is willing to agree to retry only the joint inventorship and damages issues

21 should the Court grant this motion.

22

23 **I.     The Ninth Circuit Recognizes A Presumption That Evidentiary Errors Cause
          Prejudice To The Negatively Impacted Party**

24

25    Whether to grant a new trial is a matter of the trial court's discretion.  *City*

26 *Solutions, Inc. v. Clear Channel Communications*, 365 F.3d 835, 843 (9th Cir. 2004).

27 Rule 59(a) provides that a "court may, on motion, grant a new trial on some or all issues .

28

1  . . after a jury trial, for any reason for which a new trial has hereto for been granted in an

2  action at law in federal court." Fed. R. Civ. P. 59(a).  "Historically recognized grounds

3  include, but are not limited to, 'claims that the verdict is against the weight of the

4  evidence, that the damages are excessive, or that, for other reasons, the trial was not fair

5  to the moving party.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir.2007),

6  quoting *Montgomery Ward & Co. v.* Duncan, 311 U.S. 243, 251 (1940).  Even if

7  substantial evidence supports the jury's verdict, a trial court may grant a new trial if "the

8  verdict is contrary to the clear weight of the evidence, or is based upon evidence which is

9  false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice."

10  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th

11  Cir.2001), quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th

12  Cir.1999) (internal quotation marks and citation omitted).

13         District courts in patent cases, as well as the Federal Circuit, apply regional circuit

14  law in evaluating issues relating to admission or exclusion of evidence.  *Siemens Medical*

15  *Solutions USA, Inc. v. Saint Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1284

16  (Fed. Cir. 2011).  In the Ninth Circuit, judicial error alone does not mandate a new trial.

17  *Obrey v. Johnson*, 400 F.3d 691, 699 (9th Cir. 2005).  Instead, the Ninth Circuit requires a

18  showing "that the error affected the substantial rights" of a party.  *Id*.  "In other words,

19  we require a finding of prejudice."  *Id*.  Importantly for this case, though, the Ninth

20  Circuit begins the prejudice analysis with a ***presumption*** that an evidentiary error is not

21  harmless: "when reviewing the effect of erroneous evidentiary rulings, we will begin with

22  a ***presumption of prejudice***."  *Id*. at 701.  To rebut the presumption, the party benefitting

23  from the error must show "that it is more probable than not that the jury would have

24  reached the same verdict even if the evidence had [not] been admitted."  *Id*., (citing

25  *Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1459 (9th Cir.1983).

26  **II.     Gore Suffered Actual, Severe Prejudice As A Result Of The Willfulness Issue
         Being Presented To The Jury For Decision**

27

28         In addition to the presumption of prejudice established by the Ninth Circuit in

2

1    *Obrey* and *Haddad*, in this case the prejudice to Gore was not simply presumptive, but

2    also actual and severe.  As outlined below, the totality of this improper evidence,

3    argument and instruction tainted the trial such that it could not possibly have been fair to

4    Gore.  As Judge Sue L. Robinson – who has one of the busiest patent dockets in the

5    country – recently observed, "[w]illfulness is an intrusive and inflammatory issue to

6    discover and try."  *Robert Bosch LLC v. Pylon Mf'g Corp.*, 2009 WL 2742750 at *1

7    (D.Del. Aug. 26, 2009).  That observation held true in this case.

8         **A.    Bard Used The Willfulness Issue To Improperly Argue That The**
9              **USPTO Had Already Decided That Dr. Goldfarb Was The Sole**
10             **Inventor**

11        The lengthy Interference proceeding between Dr. Goldfarb and Mr. Copper

12   decided one thing and one thing only: as between the two, which was the first to both

13   conceive the invention and reduce it to practice.  The Federal Circuit decisions relating to

14   the Interference make clear that priority of invention was the only issue considered or

15   decided in those proceedings.  *Cooper v. Goldfarb*, 154 F.3d 1321, 1326-27 (Fed. Cir.

16   1998); *Cooper v. Goldfarb*, 240 F.3d 1378, 1326-27 (Fed. Cir. 2001).  As Bard

17   eventually conceded during oral argument at the Federal Circuit in this case, the

18   Interference did ***not*** decide – or even consider -- the issue of whether Dr. Goldfarb and

19   Mr. Cooper were co-inventors of any claim of the '135 patent.

20   [http://www.cafc.uscourts.gov/oral-argument-recordings/2010-1510/all at timestamp

21   20:30].

22        Despite this undeniable fact, Bard repeatedly told the jury that the USPTO had

23   already decided that Dr. Goldfarb was "the" inventor – by which Bard clearly meant "the

24   sole" inventor.  Bard then made this improper argument one of the centerpieces of its

25   willfulness case, telling the jury that Gore's joint inventorship defense was evidence of

26   Gore's bad-faith and recklessness, since the USPTO had already ruled against Gore.

27   Right from opening statements, Bard packaged its erroneous inventorship argument with

28   its willfulness claim:

                                          3

How do we know it's [Goldfarb's] invention? Because after 28 years, **the patent office decided it was his invention, not the W.L. Gore Company's invention**. Dr. Goldfarb had a choice at that point. He could give in to a bigger company or fight. He chose to fight. And that fight took 28 years and he won. **Every time the patent office said, Dr. Goldfarb, not Gore, was <u>the inventor</u>, Gore would appeal**, until finally, in 2002, 29 years after he came up with this invention, the Court of Appeals for the Federal Circuit . . . said enough and ended the fight and gave the patent to Dr. Goldfarb.
* * *

The evidence will show how Dr. Goldfarb's artificial graft solved numerous serious medical problems, how he came up with his invention, how the Gore company tried to take Dr. Goldfarb's invention, and **how the PTO and the courts stopped Gore**, how Gore has sold hundreds of millions of dollars worth of Goldfarb grafts, and how Gore has been **willfully infringing** on Dr. Goldfarb's patent since it issued in 2002.

[Tr. 190-191 (emphasis added)(all cited transcript pages are attached to the Grimwood Declaration.)]

Bard told the jury in opening that the USPTO had decided that only one person could be an inventor, and that person was Dr. Goldfarb:

We are now going to have a litigation inside the patent office **to determine who invented the vascular graft between the two of you**, and a number of other issues can be dealt with at the same time.
* * *
But at this point, all they know is that Dr. Goldfarb's claiming the invention, Gore is claiming the invention, **we've got to figure out who <u>the inventor</u> is**.
* * *
After 13 years, in 1996, and 23 years after he came up with the invention, **the PTO declares David Goldfarb <u>the inventor</u>**.

[Tr. 237-238 (emphasis added)]

Bard's counsel repeated this falsehood over and over in opening, telling the jury that only Dr. Goldfarb **or** Mr. Cooper could be the "owner" of the invention:

And both were fighting over who owned that house. And then Bard moved in a little bit later, in 1980, when it became Dr. Goldfarb's renter. And for 28 years, Goldfarb and Gore are fighting over this house. And then in 2002, **the court says: House is Dr. Goldfarb's**.

4

1    [Tr. 240 (emphasis added)]  Of course this is not true.  Patents often have co-inventors,

2    and under such circumstances each co-inventor is a co-owner of the patent.  35 U.S.C. §§

3    116, 262.

4            Immediately after its opening statement, Bard called Dr. Goldfarb to the stand.

5    Dr. Goldfarb is a physician – not a patent lawyer – who presumably has little personal

6    knowledge concerning the precise patent law issues decided by the USPTO during an

7    Interference proceeding.  But that did not stop Bard from continuing to misrepresent the

8    import of the Interference proceeding through Dr. Goldfarb's testimony:

9            Q.    Okay. What was your understanding what the patent office's decision was
                   the first time back in '95?
10

11           A.    That the issue -- I'm sorry, **the patent belonged to me** as **_the inventor_**.
                * * *
12                 Well, I think **the ultimate authority is the patent office**.  And they had
                   many, many, many years to consider the conflict of the two applications.
13                 And just felt it was a satisfying result.

14   [Tr. 481-482 emphasis added)]

15           As part of Dr. Goldfarb's testimony, Bard also continued its pattern of wrapping

16   together the Interference proceeding with its willfulness claim:

17           Q.    After a request for that decision in the patent office awarding you the patent
                   was asked to be looked at again by Gore, what happened?
18

19           A.    The **_patent office again decided that I was the inventor_**.
                * * *
20           Q.    Okay. When you heard that Gore had appealed the patent decision, how did
                   that strike you, Dr. Goldfarb?
21

22           A.    I wasn't surprised. I think all along things have been difficult. **_And this was
                   a continuation of their attempt to make things difficult_**.
23

24   [Tr. 492 (emphasis added)]

25           Dr. Goldfarb continued to wrap himself in the flag of the USPTO right to the end

26   of his testimony: "[o]n the first appeal, **_the inventorship was again given to me_**."  [Tr.

27   494]  Bard counsel then invited Dr. Goldfarb to incorrectly testify as what was decided in

28

                                              5

1  the USPTO:

2      Q.    Dr. Goldfarb, I would ask that you please tell the Court and the jury why
3            you're here then.

4      A.    Well, I felt that over the lifetime of the patent application it's just been a
             long, hard fight over **who the inventor is**. Considering and reconsidering
5            and reconsidering, there's no question in my mind that I am the inventor.
             There have been many attempts to dislodge that and I feel an obligation to
6            myself and **frankly the system that this is an opportunity to try to commit
             further the decision of the patent office to me**. It's just the right thing to do.
7            I don't know how else to express that.

8

9  [Tr. 507 (emphasis added)]

10         Predictably, Bard hammered the "co-inventorship defense as willfulness" theme in

11 its closing argument as well.  Bard's counsel told the jury that Gore was relitigating the

12 same issue already decided by the USPTO, and that doing so was reckless:

13         But I don't know how, if Peter Cooper and all the spokes couldn't win in 28 years,
           I don't know how breaking them apart is making -- is any more of a winning
14         argument. And the answer is it's not a winning argument. **It's the same argument**.
           So let's take a look at them because I think this is **very indicative of Gore's
15         argument and whether Gore's argument is a real argument or a reckless
           argument**.
16

17 [Tr. 3505 (emphasis added)]

18

19         Bard's counsel added fuel to the fire by (1) misstating the law of co-inventorship;

20 and (2) telling the jury that the USPTO had decided that Peter Cooper was not an

21 inventor:

22         In the interference they said: "Cooper is the inventor. Goldfarb is not." And the
           PTO and the Federal Circuit said: "No, Goldfarb was the first to reduce the
23         invention to practice." You've heard stuff about Peter Cooper conceiving.
           Conception is not enough to make an invention. Conception just means you have
24         an idea. **In order to be <u>the inventor</u>, you have to reduce it to practice**.

25

26 [Tr. 3559 (emphasis added)]

27         Bard used the false claim that Gore was challenging a decision already made by

28

6

the USPTO as the "grand finale" of **both** its initial closing argument, and its rebuttal

closing argument:

> You know, that's what Dr. Goldfarb did. He made the invention. Peter Cooper
> didn't make the invention. ***The patent office repeatedly said he wasn't <u>the</u>***
> <u>***inventor***</u>. And he's not a co-inventor.
> * * *
> Everything about Peter Cooper was before the patent office in the interference. All
> the stuff that was argued here was in front of the patent office when they were
> arguing that Peter Cooper was the real inventor. Do you think they didn't make the
> same argument that Peter Cooper sent this tube April 19th, to Dr. Goldfarb. This
> tube was special. Every last argument was made and considered.

[Tr. 3546; 3641 (emphasis added)]

The presence of the willfulness issue in the case provided Bard with a platform to

make extremely misleading and prejudicial arguments about the USPTO's Interference

decision, and to suggest that Gore was reckless and willful because it refused to accept

that any issue of joint inventorship had been considered and adjudicated as part of the

Interference.  Indeed, Bard even succeeded in convincing the Court that there was some

link between the willfulness issue and the Interference proceeding.  586 F.Supp.2d at

1089 (sufficient evidence of willfulness included "the extensive litigation history before

the PTO-all of which has found Dr. Goldfarb to be the rightful inventor and patent holder

. . ..").  Judge Newman specifically noted in her dissenting opinion that Goldfarb's

counsel misstated the import of the Interference determinations to the jury.  *Bard I*, 670

F.3d at 1198-99.    Bard's improper characterization of the Interference proceedings

combined with its repeated statements that Gore's co-inventorship defense was reckless

and willful severely prejudiced Gore's ability to fairly try the joint inventorship issue.

### B.    <u>Gore Suffered Extreme Prejudice Because It Was Forced To Waive Its Attorney-Client Privilege And Rely On Advice Of Counsel As A Defense To Willfulness</u>

As a result of the improper submission of the willfulness issue to the jury, Gore

was forced to waive its attorney-client privilege in order to rely on an exculpatory

7

opinion of counsel.  This waiver alone cast a pall over Gore's defense.  Jurors often view an accused infringer who relies on advice of counsel as a party who knows it is "guilty" and is trying to hide behind its (highly paid) lawyers.  In this case, Bard did everything in its power to reinforce that stereotype by raising bogus criticisms of Gore's opinion in order to mislead the jury.

### 1.  Bard Used The Opinion Of Counsel As A Launching Pad To Improperly Impugn Unrelated Aspects Of Gore's Case

First and foremost, Bard used cross-examination ostensibly relating to the willfulness issue to launch an attack on Gore's entire case.  Counsel for Bard hammered on the fact that Gore's opinion of counsel was directed only to validity, repeatedly asking Gore's corporate witness to confirm that the opinion did not address the infringement issue.  [Tr. 3035]  Of course, this line of questioning had no relevance to the issue at hand – whether Gore reasonably relied on counsel's invalidity opinion.  Instead, Bard was clearly using these questions to improperly suggest that Gore's non-infringement defense was meritless, since it was not addressed in the opinion of counsel.

Bard also used the opinion of counsel to attack Gore's trial strategy and Gore's presentation of evidence at trial.  Bard's counsel argued on cross-examination of Mr. Sininger that since the opinion raised co-inventorship by Peter Cooper, but did not discuss co-inventorship by Dr. Volder, Gore's decision to present evidence of co-inventorship by Dr. Volder at trial was somehow improper and suspect.  [Tr. 3032-3033] Of course, Mr. Sininger had no personal knowledge of these inventorship issues, and therefore could not provide any informed response to Bard's improper questions.  Bard's counsel then reversed that logic, berating Mr. Sininger on cross-examination because Gore's opinion of counsel raised an invalidity theory (a public presentation by Dr. Goldfarb) that Gore ultimately elected not to present at trial.  [Tr. 3032]  Bard's counsel effectively argued that the jury should view *any* difference between the opinion of counsel and Gore's trial presentation as evidence that *both* the opinion and the trial

presentation were made in bad faith.

Gore obtained its opinion of counsel in 2002 – *five years* prior to the trial, and before Gore had taken any discovery in the case.  There is simply no way that even the most diligent attorney preparing an opinion of counsel can accurately predict the defenses an accused infringer may ultimately present at trial years later.  The only relevant issue should be whether the analysis actually performed by opinion counsel was reliable, or not.  But because Gore was forced to place its opinion into evidence to establish its subjective good faith, Bard was able to use the opinion as a basis for attacking aspects of Gore's case in no way related to the analysis actually contained in the opinion.

### 2.     Bard Used The Opinion Of Counsel To Improperly Question The Credibility Of Gore's Corporate Representative

In addition to raising red-herring arguments about topics not covered in Gore's opinion of counsel, Bard used the willfulness issue as a means to broadly question Mr. Sininger on a number of purely legal issues that he, as a non-lawyer, could not reasonably be expected to field.  Bard repeatedly suggested through questioning that Mr. Sininger had some duty to personally "investigate" whether Gore's positions at trial were potentially "inconsistent" with positions Gore took during prosecution of the Cooper application, and the Interference, years earlier:

> Q.     So are you telling the ladies and gentlemen of the jury *you've undertaken no investigation whatsoever into the positions that Gore took in the Cooper patent prosecution that might be inconsistent with the positions they are taking in this courtroom today*?
>
> * * *
>
> Q.     *So you are telling the members of the jury that you did not investigate, you <u>personally</u> did not investigate whether Gore took factual positions in the patent prosecution of the Cooper and Goldfarb patents, the interference, that are inconsistent with the positions taken in this courtroom in this trial*?
>
> * **
>
> Q.     *And you think it's reasonable* not to have asked that question, I take it?

[Tr. 3029-3030 (emphasis added)]

9

Without the willfulness issue in the case, Bard would have had no basis for this line of cross-examination.  Mr. Sininger's personal knowledge of legal arguments made at trial was only relevant because Gore was forced to litigate the subjective prong of the willfulness issue.  Without the willfulness issue in the case, whether or not Mr. Sininger "personally investigated" the "consistency" of any legal defense would be irrelevant.  Because the "reasonableness" of Gore's legal positions was an issue for the jury to decide, Bard ran wild to create the false impression that a business person like Mr. Sininger had the duty (or ability) to understand and explain the "consistency" of Gore's defenses.

Although the Federal Circuit has made clear that willfulness is based on *pre-suit* conduct, Bard's counsel also attacked Mr. Sininger because he had not asked for an "update" of the opinion following the Court's claim construction, which took place several years *after* Bard had filed suit: "you're telling me that you did not ask your lawyers, through the opinion on validity, to update that opinion to see whether that claim construction changed their opinion?"  [Tr. 3035-3036]  Bard's counsel then argued with Mr. Sininger about whether Gore's expert Dr. Aretz had properly applied the Court's claim construction (Tr. 3036-3037), and concluded with another personal attack on Mr. Sininger:

> And yet you bring to this jury a witness [Dr. Aretz] who says that tissue ingrowth has never ever been observed. ***You don't think that's bad faith?***

[Tr. 3038 (emphasis added)]

With Peter Cooper deceased, Mr. Sininger was the "face" of Gore at trial.  Having the jury decide the "reasonableness" of Gore's defenses as part of the willfulness issue allowed Bard to launch devastating attacks on Mr. Sininger based on legal points that he really knew nothing about.

### 3. Bard Used Gore's Opinion Of Counsel To Improperly Attack Gore's Trial Counsel

In addition to improperly questioning Mr. Sininger's personal credibility, and

1    Gore's entire case, Bard also used the privilege waiver to imply that Gore's trial counsel

2    was not trustworthy.  Bard's counsel asked numerous questions designed to create the

3    false impression that it is somehow inappropriate to hire a law firm that has previously

4    represented the company to provide an opinion of counsel.  [Tr. 3022-3024]  Of course,

5    the opposite is true.  Companies typically hire firms that have an understanding of how

6    their business and their products work to provide opinions.  The ***only*** reason Bard could

7    make these baseless charges of impropriety against Gore and its trial counsel was because

8    the willfulness issue was sent to the jury.

9         **C.    Submitting The Objective Reasonableness Issue To The Jury Was**

10        **Highly Prejudicial In And Of Itself**

11        By instructing the jury that it needed to decide if Gore's defenses were reasonable

12   or not, the Court necessarily conveyed to the jury that the reasonableness of Gore's case

13   was in question.  Here, the jury was instructed that:

14        You should focus on whether a reasonable person in the position of Gore, after
          learning of the patent, could have reasonably believed that it did not infringe the
15        patent or reasonably believed the patent was invalid or unenforceable.  ***If a***
          ***reasonable person in the position of Gore*** <u>***could not have held such belief***</u>***, then***
16        ***you need to consider the second part of the test.***

17

18   [D769 (J.I. 34)(emphasis added)].  In other words, the jury was told there was a question

19   as to whether Gore could even have reasonably believed it was not liable for

20   infringement.  This type of instruction clearly has the potential to bias the jury in favor of

21   plaintiff, and is no doubt part of the reason that the Federal Circuit decided that the

22   objective reasonableness of a defendant's case should be assessed by the Court – not the

23   jury.

24        The effect of the jury being asked to decide reasonableness was exacerbated by the

25   fact that Bard insisted on a limiting instruction in conjunction with admission of Gore's

26   opinion of counsel into evidence.  The Court told the jury that Gore's opinion "is not

27   admissible for the truth of what is contained in the entirety of the exhibit."  [Tr. 3006-

28

                                                    11

3007]  While this may have been legally correct as hearsay limiting instructions go, the jury still heard that the content of Gore's opinion was not necessarily true.

Bard predictably grabbed ahold of the willfulness issue and made it the centerpiece of its closing argument in the case.  Counsel for Bard used the word "reckless" ten times in his closing argument.  The fact that the jury was asked to decide the willful infringement issue provided Bard with a large soapbox from which to bias the jury during closing arguments:

* "this is relevant to the idea of how reckless they were in terms of going forward with this case. Remember, you are also not just being asked to decide an infringement, but whether that infringement was willful, ***and as the Court discussed***, whether it was objectively reckless." [Tr. 3474 (emphasis added)]

* "I have to tell you, as I piled this on, and I apologize because it is a little bit of a pile on, I want you to think not just about infringement. I want you to think about how reckless it was for the Gore company to make us come to this court to get a judgment, to make us litigate this, what they told the FDA for 30 years that there is tissue ingrowth. And they are going to come and tell you, well, we had a good faith belief. They didn't have a good faith belief." [Tr. 3479]

* "I don't want to belabor it. But it's important because it's not just important that you see this for infringement. It's that you see this for the willfulness that occurred, the objective recklessness that occurred in – in continuing on after David Goldfarb got the house." [Tr. 3483]

* "And I think we are at the point of talking about whether the infringement was willful, not whether it occurred." [Tr. 3501]

* "So let's take a look at them because I think this is very indicative of Gore's argument and whether Gore's argument is a real argument or a reckless argument." [Tr. 3505]

* "Again, I ask you to think about whether this was reckless or not." [Tr. 3518]

* "And so my view of that number is it's a big number.  We're asking a lot. But you know something? Look into the evidence I've just shown you and decide whether you believe these -- these were people who were in good faith going forward, or whether this was an objectively reckless attempt to

take Dr. Goldfarb's work and keep it for themselves."  [3551]

At the end of the day, Bard used the willfulness issue as its central case theme, focusing its presentation of every claim through the lens of this inflammatory charge. Bard clearly appreciated and seized on the severe disadvantage that having a willfulness charge in a jury trial presents for the defendant.  It is no surprise that among the last things Bard's counsel said to the jury in his closing argument was:

> I think it's clear that they [w]ere willful. And I think after everything we've heard today, I don't think there's any doubt that this was done objectively, reckless thing that Gore did and made us bring this lawsuit.

[Tr. 3647]

Without willfulness being at issue, the jurors would have simply decided the case on the merits, free from bias.  As one court reasoned in ordering a phased trial on willfulness, "a jury that has been exposed to evidence and arguments that Defendants behaved badly may be less objective in deciding the issue of infringement."  *Mike's Train House, Inc. v. Broadway Limited Imports, LLC*, 2011 WL 1045630 at *3 (D. Md. March 17, 2011).

**III.   The Court Should Grant Gore A New Trial In Light Of The Severe Prejudice Caused By Allowing The Jury To Decide The Willfulness Issue**

Gore has set forth above the overwhelming evidence demonstrating how Bard used the willfulness case to taint the entire trial against Gore.  Under the applicable law – and by any measure of fundamental fairness – the Court should award Gore a new trial now that willfulness has been removed as an issue from this case.

**A.   Bard And The Court Both Recognized The Extreme Prejudicial Impact Associated With The Jury Hearing Evidence Relating To A Charge Of Wrongdoing**

To conclude that Gore suffered meaningful prejudice as a result of the willfulness issue going to the jury, one need only look at how Bard and the Court treated the parallel issue of inequitable conduct prior to and during the trial.  Bard moved to bifurcate the

1  inequitable conduct issue.  The Court agreed, and heard the evidence and argument

2  relating to inequitable conduct at a separate bench trial.  573 F.Supp.2d 1170.  The

3  arguments made by Bard, and the reasons stated by the Court, in favor of bifurcation

4  demonstrate a clear recognition that exposing the jury to these inflammatory allegations

5  would lead to prejudice and potentially reversible error.  At the Final Pretrial Conference,

6  Bard framed the issue thusly:

> So I think now we are left with trying to figure out what's the best way to ensure
> that the jury trial isn't ***infected with any prejudicial testimony on an issue that it's***
> ***not entitled to make judgment on which may affect those areas that it is entitled***
> ***to make judgment on***.

10  [Final Pretrial Conference (October 10, 2007) Tr. 99 (emphasis added)]

11  Bard's counsel was right.  Allowing the jury to hear highly prejudicial testimony

12  on an issue not for their decision could improperly affect the jury's decision on the issues

13  that are for its decision.  As Bard's counsel argued: "we are going to have procedurally

14  very complicated set of testimony and we are additionally ***putting highly prejudicial***

15  ***testimony before the jury***.  [*Id*. at 104 (emphasis added).]  Importantly for this motion,

16  Bard advocated that once the jury was improperly exposed to prejudicial evidence and

17  argument, the damage could not be undone:

> And if something inappropriate's presented to the Court and its argued after the
> fact ***that bell can be unrung because the Court is differently situated to consider***
> ***evidence than jury*** would be. And if something that should not be before the jury
> or that's prejudicial gets to the jury ***that bell can never be unrung***.

21  [*Id*. at 105 (emphasis added)]

22  The Court agreed with Bard: "[t]he reasons to bifurcate include Rule 403 and the

23  need to not prejudice the jury with evidence not intended for their consideration."  [*Id*. at

24  152]  The Court was also quite candid in recognizing that allowing such prejudicial

25  evidence and argument in front of the jury could ultimately cause the parties to have to

26  retry the case.  [*Id*. at 158-159]  The Court's Order bifurcating inequitable conduct [D604

27  at p. 3] states:

28

[t]here would be ***extreme prejudice to Bard because of the serious allegations*** of inter alia withholding evidence from the PTO and destruction of evidence.  If this evidence is presented to the jury it may be ***so prejudicial*** that jury would have difficult time finding in Bard's favor on infringement ***despite the fact that such evidence is not for the jury's consideration***.

It is through no fault of this Court that the Federal Circuit on appeal decided to fundamentally change the law regarding decision of the willful infringement issue.  By the same token, it is now clear that Gore is not a willful infringer, and that the jury in this case should never have been exposed to that inflammatory charge, or asked to decide the issue at all.  Under any standard of prejudice and fundamental fairness, Gore is entitled to a new trial free from the taint of Bard's willful infringement charge.

### B.   Submission Of The Willfulness Issue To The Jury Was Not Harmless Error

In light of the Court's ruling that Gore is not a willful infringer, there is no longer any doubt that the jury should not have been asked to decide the issue, and that Bard should not have been able to argue to the jury that Gore intentionally and recklessly infringed Dr. Goldfarb's patent.  Bard's willfulness evidence and argument was central to its case.  Exposing the jury to the willfulness issue was in no way harmless.

### 1.   Bard Cannot Overcome The Presumption Of Harm In This Case

As set forth above, to rebut the presumption of harmful prejudice, Bard must show "that it is more probable than not that the jury would have reached the same verdict even if the evidence had [not] been admitted."  *Obrey*, 400 F.3d at 701 (citing *Haddad*, 720 F.2d at 1459 ("Just as the verdict in a civil case need only be more probably than not true, so an error in a civil trial need only be more probably than not harmless."))  The party benefitting from the error – Bard -- has the burden of persuasion, and in cases of "equipoise" the court should grant a new trial.  *United States v. Seschillie,* 310 F.3d 1208, 1214-15 (9th Cir.2002).

The Ninth Circuit in *Obrey*, looking at the "more probable than not" test from an

1   appellate vantage, emphasized that it is not proper to simply evaluate the sufficiency of

2   the evidence supporting the verdict: "The danger of the harmless error doctrine is that an

3   appellate court may usurp the jury's function, by merely deleting improper evidence from

4   the record and assessing the sufficiency of the evidence to support the verdict below."

5   400 F.3d at 701 (quoting *Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1459 (9th

6   Cir.1983)).  The Court stated that it therefore "must determine whether the evidentiary

7   error of which appellant complains has deprived him of the degree of certainty to which

8   he is entitled."  *Id.*  The *Obrey* court ordered a new trial because "[t]he evidence at issue

9   was not merely tangential or cumulative; rather, it was directly probative of the central

10  issues in dispute."  *Id.* at 701-702.

11       The willfulness evidence, argument, and instructions to the jury in this case went

12  straight to "the central issues in dispute."  Bard used Gore's opinion of counsel, and

13  related cross-examination of Mr. Sininger, to directly attack Gore's core defenses.  Bard

14  improperly argued that Gore's key co-inventorship defense was reckless because the

15  USPTO had already decided the issue.  Bard weaved its willfulness arguments into its

16  entire closing argument.  And then the Court instructed the jury to decide whether or not

17  Gore's defenses could even be deemed reasonable.  Bard's willfulness evidence was not

18  "merely tangential or cumulative;" it went to the heart of the issues before the jury.

19   **2.      The Jury Would Not Have Heard The Same Willfulness**
20   **Evidence And Argument Had The Court Applied The Federal**
    **Circuit's New Standard**
21

22       In its Status Report [D1097], Bard preemptively argued that even under the new

23  *Bard II* standard, the jury would have heard the same evidence and argument relating to

24  willfulness.  Bard's argument is fatuous.   If the parties and the Court had known that the

25  Court would be required to decide the objective reasonableness of Gore's defenses as a

26  matter of law, the trial would have been markedly different.  Gore would have moved for

27  a phased trial, whereby the jury would initially have heard evidence relating only to

28

liability and damages issues.  If the jury had ruled in Gore's favor, the case would be over.  If the jury ruled in Bard's favor on liability, the Court would have to decide whether the liability defenses the jury had rejected were objectively reasonable or not.  If the Court decided those defenses were reasonable, Bard's willfulness claim would have been dismissed.  ***Only*** if the Court had decided they were not reasonable would the jury have been asked to weigh in on the willfulness issue.  In that case, immediately following its verdict on liability and damages, the jury would have heard evidence on the "subjective intent" prong, would have been instructed by the Court on that issue, and then would have rendered a willfulness verdict.  *See, e.g. Mike's Train House*, 2011 WL 1045630 at *3.

Bard argues that the *Bard II* court's reference to willfulness being a "mixed question of law and fact" means that the jury would have heard the same willfulness evidence.  This is wrong.  The *Bard II* court clearly stated that the jury's role in assessing the objective reasonableness prong would be to rule on the merits of the asserted defenses:

> In considering the objective prong of Seagate, the judge may when the defense is a question of fact or a mixed question of law and fact allow the jury to ***determine the underlying facts relevant to the defense in the first instance, for example, the questions of anticipation or obviousness***. But, consistent with this court's holding today, the ultimate legal question of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent ***should always be decided as a matter of law by the judge***.

682 F.3d 1008 (emphasis added).

Under the *Bard II* holding, the type of inflammatory and prejudicial willfulness evidence and argument that Bard presented directly to the jury would simply not be allowed.  In particular, Gore would not have had to place its opinion of counsel into evidence and endure Bard's theatrical cross-examination of its lead business witness. The jury would have no reason to learn about the willfulness issue until ***after*** the Court had ruled that the defendant lacked an objectively reasonable basis for its defenses.

District courts considering trial of willfulness post-*Bard II* are in accord:

> Accordingly, to the extent Cal–Royal's motion in limine requests that ***the Court allow the jury to resolve the subjective prong <u>before</u> the Court decides the objective prong***, this request is DENIED. The Court will present any questions of fact related to objective recklessness to the jury in the form of interrogatories. After the jury has answered the interrogatories, the Court will then resolve the legal question of objective recklessness. If, on the basis of any determinations of fact made by the jury if such fact questions exist, the Court finds that the objective recklessness prong has been satisfied, ***the Court will then present the question of subjective recklessness to the jury along with the remainder of the case***.

*Sargent Mfg. Co. v. Cal-Royal Products, Inc.*, 2012 WL 3101691 at *2 (D.Conn. July 27, 2012) (emphasis added); *Carnegie Mellon University v. Marvell Technology Group, LTD*, 2012 U.S. Dist. LEXIS 157337 (W.D. Penn. November 2, 2012); *BASF Corp. v. Aristo, Inc.*, 2012 WL 2529229 (N.D.Ind. June 29, 2012) ("in order to send the issue of willfulness to the jury, I would have to find that Aristo's defenses to its conduct . . . . are all "objectively baseless.").

In light of the JMOL, the Court would ***not*** have instructed the jury on willful infringement or asked the jury to make any decisions about whether or not Gore was reasonable or reckless.  Bard's claim of harmless error is preposterous in light of the fact that Bard succeeded in convincing the jury that Gore was a willful infringer.  Indeed, one of the Federal Circuit judges who heard Gore's first appeal has already concluded that Gore should receive a new trial.  In her dissenting opinion, Judge Newman noted that "[a]t a minimum a new trial is required, lest we 'make a scarecrow of the law.'"  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 670 F.3d 1171, 1202 (Fed. Cir. 2012) ("*Bard I*").

### C.    Gore Is Willing To Limit The Retrial To The Issues Of Co-Inventorship And Damages

Gore recognizes that the original trial encompassed 18 trial days and consumed substantial party and judicial resources.  Gore believes it is entitled to a new trial on all issues, and in particular, as set forth in Gore's brief in support of JMOL, its meritorious anticipation defense.  But in light of the legitimate judicial economy concerns, Gore is

willing to limit the retrial to two discrete issues: co-inventorship and damages.  Since

Gore bears the burden of proof on the liability issue, Gore would be willing to proceed

first at trial as the nominal plaintiff.  Gore will agree to limit the retrial to no more than 4

trial days.

The prejudicial taint from Bard's willfulness allegations had a more severe impact

on the co-inventorship issue due to the fact that Bard's witness is alive and Gore's

witness is not.  For example, as part of its willfulness case Bard was able to allege that

the deceased Mr. Cooper – who could not defend himself – broke into Dr. Goldfarb's

office and "stole" his slides, and "copied" one of Dr. Goldfarb's reports into his own

patent application.  [Tr. 424-25; 430]  The damages issue is also ripe for retrial.  The jury

no doubt factored in willfulness in setting its damages award, since Bard actively

suggested in its closing that the jury accept Bard's admittedly huge damages claim on the

grounds that Gore was a bad actor:

> And so my view of that number is it's a big number.  We're asking a lot.  But you
> know something?  Look into the evidence I've just shown you and decide whether
> you believe these – these were people who were in good faith going forward, or
> whether this was ***an objectively reckless attempt to take Dr. Goldfarb's work and
> keep it for themselves***.

[Tr. 3551 (emphasis added)]  As one court of appeals has observed:

> A jury which is prejudiced with respect to its finding of liability is not likely to be
> free from prejudice in awarding damages. Because there is a substantial
> probability that the error which affected the liability verdict also affected the
> determination of damages, the new trial must deal with both liability and damages.

*Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3rd Cir. 1978).

## IV.   The Mandate Rule Does Not Preclude The Court From Granting Gore A New Trial Under The Circumstances Of This Case

Based on Bard's Status Report [D1079], it appears that Bard will argue that Gore

is precluded by the "Mandate Rule" from seeking a new trial on remand.  "The mandate

rule provides that 'issues *actually decided* [on appeal] – those within the scope of the

judgment appealed from, minus those explicitly reserved or remanded by the court – are foreclosed from further consideration.'" *Amado v. Microsoft Corp.*, 517 1353, 1360 (Fed. Cir. 2008), *quoting Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999)(emphasis added).  To determine if the mandate rule applies, "[t]he scope of the issues presented to this court [the Federal Circuit] on appeal must be measured by the scope of the *judgment appealed from*." *Engel*, 166 F.3d at 1382 (emphasis added).

It is beyond dispute that the Federal Circuit did not *actually decide* whether Gore is entitled to a new trial in the event that, on remand, the Court grants JMOL on the willfulness issue.  The question, then, is whether the impact of the new willfulness standard was somehow within the scope of the Court's original judgment such that Gore should have raised it when it appealed from that judgment.  *Id.*  This is the Mandate Rule at its essence – if a party could have made an argument on appeal, but did not do so, it cannot raise that argument later in the case.  *Amado*, 517 F.3d at 1360.

The Court entered judgment on the ***jury's*** willfulness verdict, and Gore appealed that judgment.  The Federal Circuit initially affirmed the jury's willfulness determination.  670 F.3d at 1189-91.  Gore had no opportunity to argue for a new trial because at the time of Gore's appeal, the law allowed the jury to decide willfulness *in toto*.  The most Gore could do was to ask the *en banc* Federal Circuit to change the law.  Moreover, the Federal Circuit did not conduct an *en banc* hearing.  Instead, it issued a brief *en banc* order returning the appeal to the merits panel to modify its willfulness opinion.  476 Fed.Appx. 747, 2012 WL 2149764, (Fed. Cir. June 14, 2012).  The modified panel opinion was attached to the *en banc* order, issuing simultaneously therewith.  682 F.3d 1003.  Gore had no opportunity to argue that it should get a new trial under the new legal standard announced in the modified panel opinion.  The new trial issue will not even be ripe for decision until this Court grants JMOL of no willfulness.  Plainly the remand proceeding is the result of an unanticipated change in the law, and will result in an entirely new legal decision on the willfulness issue by this Court.  If that decision results in a holding that

1   Gore was wrongly adjudicated as a willful infringer, nothing in the Mandate Rule

2   prevents Gore from seeking further relief as a result of that new decision.

3         Fundamentally, Bard's argument is that because the court of appeals explicitly

4   instructed this Court to look at certain issues, the Court is necessarily foreclosed from

5   considering any other issue.  This is contrary to established law.  The Federal Circuit has

6   repeatedly cautioned against the type of wooden application of remand instructions that

7   Bard urges here.   For example, in *Laitram Corp.  v. NEC Corp.*, 115 F.3d 947, 951 (Fed.

8   Cir. 1997) the court stated that "while this court *could* have remanded with explicit

9   instructions to decide the JMOL motions, the failure to do so is not dispositive."

10   (Emphasis in original).  Of particular relevance here is the *Laitram* court's subsequent

11   holding that it was "incorrect to conclude that we decided issues not only undecided on

12   the merits by the trial court because they were moot, and thus on appeal unripe, but also

13   neither presented to us nor discussed in our opinion, nor necessary to our disposition of

14   the appeal."  *Id*. at 952.

15      *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1479 (Fed. Cir.

16   1998) makes clear that "a judgment that does not specifically provide for a remand is ***not***

17   ***necessarily incompatible*** with further proceedings to be undertaken by the district court."

18   137 F.3d at 1483 (emphasis added) (citing *Sprague v. Ticonic National Bank*, 307 U.S.

19   161 (1939).  In *Exxon*, the Federal Circuit reversed a judgment of literal infringement

20   after changing the district court's claim construction, but did not remand for a new trial

21   on the doctrine of equivalents.  *Exxon*, 137 F.3d at 1477.  On remand, plaintiff sought a

22   new trial on the doctrine of equivalents.  The district court denied the motion, finding that

23   the Federal Circuit's Mandate "left him with 'no authority to grant a new trial'" because

24   it did not specifically order a new trial on remand—the same argument Bard makes here.

25   *Id*.  On plaintiff's second appeal, defendant argued that plaintiff should have anticipated

26   that the Federal Circuit might change the claim construction, just as Bard apparently

27   argues that Gore should have anticipated that the Federal Circuit might change the law

28

and remand Bard's willfulness claim.  *Id.* 1478-79.  Like Bard, defendant also argued that the Federal Circuit's lack of a specific remand instruction to consider a new trial precluded the district court from conducting one on remand.  *Id.* at 1479.

The Federal Circuit rejected these arguments, ruled that plaintiff had waived nothing by not conditionally appealing, and held that the district court was fully empowered to consider the new trial issue on remand.  *Id.*  The Federal Circuit held that:

> The question whether there could be doctrine-of-equivalents infringement under the claim construction adopted by this court became a critical issue in the case **only after this court's decision on appeal**.  For that reason, this court did not address the merits of Exxon's claim that it is entitled to a new trial on infringement under the doctrine of equivalents, and the district court therefore erred in concluding it was barred by this court's mandate from considering Exxon's new trial motion.

*Id.* (emphasis added).

The Federal Circuit then went out of its way to explain why appellants are not required to conditionally raise issues that arise only as a result of the Federal Circuit's ultimate ruling on appeal:

> As a practical matter, **the first opportunity that a party in Exxon's position would have to make its arguments for a new trial would be in a petition for rehearing**, and rehearing petitions are normally not a suitable vehicle for making new arguments to the appellate court.  *See Pentax Corp. v. Robison,* 135 F.3d 760 (Fed. Cir. 1998).

*Id.* at 1482 (emphasis added).

Added to this is the fact that the Federal Circuit recognizes an exception to the Mandate Rule when there is a change in the law.  The Federal Circuit recently ruled that "it may be appropriate in some circumstances for a court to revisit an issue that would otherwise be deemed waived or beyond the scope of an appellate mandate."  *Yankee Atomic Electric Co. v. United States*, 679 F.3d 1354, 1360 (Fed. Cir. 2012), *quoting Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1349 (Fed. Cir. 2001).  The *Yankee Electric* court

1    held that such circumstances "may occur . . . *where an intervening decision has changed*

2    *the law . . . .*" *Id*. at 1361 (emphasis added).

3         The *Yankee Electric* court cited *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed.

4    Cir 2008), which also recognizes that a change in the law can impact the scope of the

5    court of appeals' mandate.  In considering when a legal change impacts a remand

6    proceeding, the *Amado* court framed the issue thusly: "whether [the new decision]

7    constitutes an intervening decision, and forecloses application of the mandate rule, turns

8    on whether Microsoft *had a reasonable opportunity to claim the <u>decision's benefit prior</u>*

9    *<u>to our issuance of the Amado I mandate</u>*."  *Id*. at 1360 (emphasis added).  There is no

10   dispute that Gore had no reasonable opportunity to "claim the benefit" of the new

11   willfulness standard prior to issuance of the mandate.  That "benefit" existed only after

12   this Court applied the new standard in Gore's favor on remand.

13        The Ninth Circuit also recognizes that issues not decided by the court of appeals

14   remain open for consideration on remand.  *United States v. Kellington*, 217 F.3d at 1084,

15   1092-93 (9th Cir. 2000).  In *Kellington*, the mandate stated that the case was "reversed

16   and remanded for entry of judgment and for sentencing."  *Id*. at 1092.  Like Bard here,

17   the government argued that this language prevented the district court on remand from

18   considering a new trial motion.  The district court disagreed and ordered a new trial, and

19   the Ninth Circuit affirmed.  *Id*. at 1087, 1094.  The *Kellington* court noted that "[o]n

20   remand, courts are often confronted with issues that were never considered by the

21   remanding court."  *Id*. at 1093, *quoting Biggins v. Hazen Paper co.*, 111 F.3d 205, 209

22   (1st Cir. 1997).

23        Here, the district court is the proper forum for Gore to seek a new trial following

24   reversal of the willfulness judgment.  The Federal Circuit remanded the case to this Court

25   "for further proceedings consistent with this opinion."  682 F.3d at 1009.  It is fully

26   consistent with the Federal Circuit's opinion to conclude that sending the willfulness

27   issue to the jury fatally tainted the previous trial.  The Federal Circuit did not consider

28

1    this issue, and this Court is not barred from considering it by the rule of Mandate.

2    **V.    If The Court Does Not Order A New Trial Then It Should Amend The**
3    **Judgment To Provide For A Lower Ongoing Royalty Rate**

4    Even if the Court determines that the Mandate Rule precludes a new trial, this

5    Court retains the power to amend its judgment where "applying it prospectively is no

6    longer equitable."  Fed. R. Civ. P. 60(b)(5)(6).  This is particularly true where the

7    judgment involves ongoing injunctive relief entered pursuant to the Court's equitable

8    discretion.  *Amado*, 517 F.3d at 1361.  Now that the Court has ruled that Gore did not

9    willfully infringe the '135 patent, the Court should reconsider its previous exercise of

10   discretion, and lower the ongoing royalty rate it assessed against Gore.  Gore

11   acknowledges that the *Bard II* court indicated that the current rates are not an abuse of

12   discretion.  682 F. 3d at 1005 fn. 1.  Gore simply requests that the Court consider whether

13   lower rates are now a more *appropriate* exercise of its equitable discretion.  Gore makes

14   this request for three reasons.

15   First, it is evident from the Court's previous exercise of discretion in setting the

16   ongoing royalty [D1036] that the Court was heavily influenced by Bard's argument, and

17   the jury's ruling, that Gore was a willful infringer.  The Court's royalty Order refers to

18   the willfulness issue no less than twelve times.  [D1036 at pp. 2, 3, 4, 5, 8, 13]  In setting

19   the ongoing royalty, the Court also relied on the fact that it had declared the case

20   exceptional, had awarded attorneys' fees, and had "determined that Gore's conduct was

21   sufficiently culpable to enhance damages."  [D1036 at p. 5]  It appears that the Court's

22   view of Gore as a bad actor informed and animated the Court's exercise of discretion in

23   setting the ongoing royalty.  Additionally, Judge Newman's vigorous dissent

24   demonstrates that this case was not as one-sided as the Court may have believed at the

25   time it awarded the ongoing royalty.

26   Second, as demonstrated above, Bard openly used the willfulness charge to

27   encourage the jury to punish Gore by awarding very high royalty rates when determining

28   damages.  [Tr. 3551]  There appears to be little doubt that the jury's huge damage award

1   was motivated at least in part by Bard's willfulness allegations.  Since the Court used the

2   jury's award as the "starting point" in setting the ongoing royalty [D1036 at p. 12], the

3   Court should now reconsider the ongoing royalty in light of the remand ruling.

4          Finally, in looking at the equities of this situation the Court should give some

5   weight to the substantial contributions to this invention made by Gore.  Even if those

6   contributions did not legally rise to the level of co-inventorship, they were admittedly

7   important.  Dr. Goldfarb testified that he would not have been able to make the

8   inventions without the assistance of Gore.  [Tr. 686]  Dr. Goldfarb also testified that Gore

9   paid for half of the costs of caring for the animals Dr. Goldfarb used in his work.  [Tr.

10  369]  The current ongoing royalty rates are equitably inconsistent with Gore's

11  contribution to the discovery of the patented products.  For these reasons, Gore requests

12  that the Court reduce the ongoing royalty to a rate equal to or less than the jury's verdict.

13                              **<u>CONCLUSION</u>**

14          For the reasons set forth above, Gore requests that the Court grant its

15  motion for new trial, or in the alternative amend the judgment.

16          Dated this 17th day of December 2012.

17                                      Fish & Richardson P.C.

18
                                        By  /s/Juanita Brooks
19                                           Juanita Brooks
                                             Roger Denning
20                                           Fish & Richardson P.C.
                                             12390 El Camino Real
21                                           San Diego, California  92130
                                             (858) 678-5070
22

23  Helen Perry Grimwood                     Michael E. Florey
24  N. Douglas Grimwood                      Fish & Richardson P.C.
    The Grimwood Law Firm plc               60 South Sixth Street, Suite 3200
25  714 East Rose Lane, Suite 100           Minneapolis, Minnesota 55402
    Phoenix, Arizona 85014-1960             (612) 335-5070
26  (602) 265-4995

27                                           Attorneys for Defendant
                                             W. L. Gore & Associates, Inc.
28

                                      25

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2012, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants.


/s/Gaynell Carpenter